J. Stephen Peek
(Nevada Bar No. 1758)
Erica C. Medley
(Nevada Bar No. 13959)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Tel: 702.669.4600
Fax: 702.669.4650
speek@hollandhart.com

Tariq Mundiya (*pro hac vice* forthcoming)
Jeffrey B. Korn (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tmundiya@willkie.com
jkorn@willkie.com

Michael J. Gottlieb (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JYSAN HOLDING, LLC, a Nevada Limited Liability Company; JUSAN TECHNOLOGIES LTD, an England and Wales Limited Company;<br><br>Plaintiff,<br><br>v.<br><br>REPUBLIC OF KAZAKHSTAN, a foreign sovereign state; THE AGENCY FOR REGULATION AND DEVELOPMENT OF THE FINANCIAL MARKET OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government agency; THE ANTI-CORRUPTION AGENCY OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government anti-corruption | **Case No.:**<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

1

1  agency ; THE FINANCIAL MONITORING
   AGENCY OF THE REPUBLIC OF
2  KAZAKHSTAN, a Kazakhstan Government
   agency; THE COMMITTEE FOR
3  NATIONAL SECURITY OF
   KAZAKHSTAN, a Kazakhstan Government
4  intelligence agency; MADINA
   ABYLKASSYMOVA, an individual;
5  OLZHAS KIZATOV, an individual;
   ARMAN OMARBEKOV, an individual;
6  and ADILBEK DZHAKSYBEKOV, an
   individual,
7

8                     Defendants.

9                         **INTRODUCTION**

10      1.      Since early 2022, the Government of the Republic of Kazakhstan ("Government"

11  or "Government of Kazakhstan") has perpetrated an illegal campaign against Nevada

12  corporations—Plaintiff Jysan Holding, LLC ("Jysan Holding") and the New Generation

13  Foundation, Inc. ("NGF"), and their direct and indirect subsidiaries (together, the "Jusan

14  Group")—in an effort to steal more than USD $1.5 billion of Plaintiffs' assets.  This corrupt

15  and lawless campaign demonstrates the brazen thuggery of a nation—a satellite of the former

16  Soviet Union—that has weaponized the Government's vast powers and senior-most officials

17  to reach far outside Kazakhstan to steal from, intimidate, and otherwise harm persons and

18  entities in the United States.  Defendants are engaged in precisely the type of racketeering and

19  expropriation that federal laws are designed to prohibit. Plaintiffs bring this action to remedy

20  the Defendants' unlawful confiscatory conduct.

21      2.      Although the Government of Kazakhstan has offered numerous, contradictory,

22  and pretextual justifications for its conduct against the Jusan Group, the Government's true

23  aim is to seize control of the Jusan Group's Kazakhstan-based assets for its own commercial

24  benefit while delivering massive commercial benefits to the Government's favored private

25  individuals.   The Government has evinced its intent to pursue this goal by any means

26  necessary, including threats, intimidation, criminal and civil investigations and litigations, and

27  blocking USD $387 million in dividends slated for distribution by the Jusan Group's privately

28  owned bank, First Heartland Jusan Bank ("First Heartland Bank" or the "Bank") and the

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Bank's direct parent, First Heartland Securities JSC ("FHS")—funds destined for Plaintiff Jusan Technologies Ltd. ("JTL"), Plaintiff Jysan Holding, and ultimately, NGF. The Defendants' scheme to use the organs of Kazakhstan's Government to harm Nevada entities has been made abundantly clear. After Plaintiffs informed Defendants of their intention to enforce their rights in the instant action, Defendants took two plainly retaliatory acts—first, in November 2022, Defendants introduced legislation specifically targeting Plaintiffs and, second, on December 2, 2022, Kazakhstan's Prosecutor General filed a trumped-up lawsuit against Plaintiffs and other members and employees of the Jusan Group in the courts of Kazakhstan. The legislation targeted at the Jusan Group—detailed below—directed the unlawful seizure of the assets under the control of a Nevada entity. Most recently, on February 10, 2023, the Kazakhstani Prosecutor General filed a frivolous lawsuit, predicated on spurious allegations, for the sole purpose of confiscating assets under JTL's control. Even worse, Kazakhstan has leveled threats of violence and imprisonment against United States residents who have material economic interests in the Jusan Group if Kazakhstan's commercial demands are not met. These acts are in line with the Government of Kazakhstan's history of rampant corruption, which according to public reporting has worsened since 2022. In sum, the Government of Kazakhstan has resorted to the same unlawful tools—confiscation, expropriation, threats, and intimidation—favored by the world's most repressive dictators and authoritarian regimes.

3.     The conduct by the Government and several individuals is obstructing Plaintiffs—including a Nevada LLC which was formed precisely to avoid the type of illegal asset seizure being perpetrated now—from fulfilling their commitment to ensuring educational freedom and excellence to the NGF grantees by providing U.S.-style higher education and free-market reforms in the Republic of Kazakhstan. Indeed, prior to the illegal conduct described herein, through Plaintiffs' efforts, NGF and the Jusan Group as a whole have provided millions of dollars in grants to Nazarbayev University—a modern, English-language research university located in Astana (formerly Nur-Sultan), the Republic of Kazakhstan's capital—as well as Nazarbayev Intellectual Schools and their organizations.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4.     Absent judicial relief, Defendants' unlawful scheme will continue to deprive Plaintiffs of a primary source of funding from their subsidiaries connected to the Bank and will accordingly leave them unable to fulfill their obligation to provide dividend funding to their parent organizations, including NGF.  In turn, NGF is unable to transfer its own funds or receive lawfully issued dividends, to serve its sole mission of funding Nazarbayev University and Nazarbayev Intellectual Schools.  Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming their students, researchers, and educators by obstructing an education that emphasizes the values of excellence, academic rigor, evidence-based research, scientific temper, intellectual liberty, innovation, and academic freedom.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically 18 U.S.C. § 1964(c).

6.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, are foreign states as defined in 28 U.S.C. § 1603(a) and are not entitled to immunity under 28 U.S.C. §§ 1605–07 or any applicable international agreement. Defendant Republic of Kazakhstan, as well as the Defendant agencies and instrumentalities listed below, are not immune from the jurisdiction of this Court under 28 U.S.C. § 1605(a)(2) because this action is based upon acts outside the territory of the United States in connection with a commercial activity of Defendants elsewhere and those acts have caused a direct effect in the United States.

7.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the other claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

8. This Court has personal jurisdiction over Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, under 28 U.S.C. § 1330(b).

9. This Court has personal jurisdiction over all Defendants under Nev. Rev. Stat. § 14.065. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965, and Rules 4(k)(1)(C) and 4(k)(2) of the Federal Rules of Civil Procedure.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because a substantial part of the events giving rise to the claim occurred in this District. In the alternative, venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## PARTIES

11. Plaintiff Jysan Holding is a limited liability company incorporated under the laws of the State of Nevada. Jysan Holding's sole member is NGF, a registered 501(c)(4) organization based and incorporated in Nevada. Jysan Holding has a 96.96% direct ownership interest in JTL, which serves as the holding company for Jysan Holding's indirect subsidiaries and is an indirect majority owner of other companies located in Kazakhstan. Jysan Holding manages businesses and other investments of NGF, for the ultimate benefit of students of the grantee educational institutions in the Republic of Kazakhstan.

12. Plaintiff JTL is a limited company organized under the laws of England and Wales. JTL's direct parent is Jysan Holding (the Nevada entity identified above). JTL is a direct and indirect majority owner of other companies in Kazakhstan, including FHS, in which JTL holds a direct 99.48% ownership interest.

13. Defendant Republic of Kazakhstan is a foreign sovereign state within the meaning of 28 U.S.C. § 1603(a). Defendant Republic of Kazakhstan maintains an Embassy within the United States at 1401 16th St. NW, Washington, DC 20036.

14. Defendant Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan ("ARDFM") is a Government agency tasked with supervising the financial market and financial organizations within Kazakhstan.

15.     Defendant Anti-Corruption Agency of the Republic of Kazakhstan ("AARK") is a Government anti-corruption agency.   AARK is responsible for formulating and implementing the anti-corruption policy of the Government of Kazakhstan, coordinating the anti-corruption enforcement actions, and detecting, restraining, revealing, and investigating corruption offenses.  AARK reports directly to the President of Kazakhstan.

16.     Defendant Financial Monitoring Agency of the Republic of Kazakhstan ("FMA") is a Government agency responsible for providing guidance in countering money laundering and the financing of terrorism, as well as for the prevention, detection, suppression, disclosure, and investigation of economic and financial offenses referred to it by the legislature of the Republic of Kazakhstan.  FMA reports directly to the President of Kazakhstan.

17.     Defendant Committee for National Security of Kazakhstan ("KNB") is a Government intelligence agency (together with ARDFM, AARK, and FMA, the "Governmental Agency Defendants").

18.     Defendant Madina Abylkassymova is the Chairperson of ARDFM.  She is a resident and citizen of Kazakhstan.

19.     Defendant Olzhas Kizatov is the Deputy Chairperson of ARDFM.  He is a resident and citizen of Kazakhstan.

20.     Defendant Arman Omarbekov is a representative of ARDFM.  He is a resident and citizen of Kazakhstan.

21.     Defendant Adilbek Dzhaksybekov (together with Defendants Abylkassymova, Kizatov, and Omarbekov, the "Individual Defendants") is the former owner of Tsesnabank, a bank the Jusan Group purchased in February 2019.  He is a resident and citizen of Kazakhstan.

**FACTS**

**A.   Members of the Jusan Group Assist the Government of Kazakhstan by Purchasing Failing Kazakhstani Banks.**

22.     In 2018, Kazakhstan's banking sector, which had not fully recovered from the 2007-2009 financial crisis and subsequent devaluations of the Kazakhstani tenge in 2008 and 2015, became acutely vulnerable following a sharp drop in global energy prices that had

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

6

significantly devalued the tenge once again.  In response, the Government of Kazakhstan sought various commercial solutions in an attempt to avoid a collapse of the country's entire banking system.

23. At the time, Tsesnabank was Central Asia's second-largest bank in terms of assets and was owned by Defendant Dzhaksybekov.  Defendant Dzhaksybekov misused his authority at Tsesnabank to financially advantage himself, his family, and his friends, essentially treating Tsesnabank as a private equity and investment firm for his personal benefit and engaging in other questionable or malicious business conduct.

24. By 2018, Tsesnabank was on the brink of failure, with nearly 90% of its assets non-performing.

25. Despite having received capital injections as part of the Government of Kazakhstan's banking sector bailout in 2017, Tsesnabank continued to face severe liquidity issues.  In early September 2018, it received a short-term loan of several hundred million dollars from the National Bank of the Republic of Kazakhstan.  In a last-ditch attempt to preserve its business, Tsesnabank sold a significant portion of its agricultural loan portfolio to the state.  Nonetheless, by mid-September, S&P had downgraded Tsesnabank's liquidity rating from "adequate" to "less than adequate."

26. The Government of Kazakhstan determined that if Tsesnabank were to fail, it would likely take with it the entire banking sector in Kazakhstan.  The Government of Kazakhstan was therefore adamant about brokering a commercial solution to keep Tsesnabank afloat.  In an attempt to do so, the Government of Kazakhstan initiated a series of attempted bailouts for Tsesnabank between 2018 and 2019.

27. The Government described those measures as "enhanc[ing] the robustness of Tsesnabank by cardinally improving its credit portfolio."  Contemporaneous reporting recognized that this was another bailout targeted at correcting Tsesnabank's weak and deteriorating financial situation.

28. Even with this financial support, by January 2019, significant losses in Tsesnabank's credit portfolio continued to threaten Tsesnabank's viability.  Tsesnabank

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

needed an additional injection of capital to survive.  The Government of Kazakhstan searched urgently for another bank to purchase Tsesnabank, so that the purchasing bank could provide Tsesnabank with new capital to prevent collapse, in addition to providing a change of management to strengthen Tsesnabank's operations.

29.     The Government of Kazakhstan identified First Heartland Bank in Kazakhstan, owned by the Jusan Group, as a potential solution.  Under the Jusan Group's stewardship, First Heartland Bank had significantly grown its cash reserves and maintained a sterling reputation for proper stewardship.

30.     The Government of Kazakhstan approached the Jusan Group about a potential acquisition of Tsesnabank.  The Jusan Group sought to answer the Government's plea and step in to assist the banking sector.  But the Jusan Group was clear that it could not acquire Tsesnabank if it had a negative balance sheet, and due to Tsesnabank's mismanaged loan portfolio under Defendant Dzhaksybekov, Tsesnabank's balance sheet was deeply in the red.

31.     Eager to find a commercial solution, the Government of Kazakhstan led the negotiations of a number of contracts (culminating together in the "Tsesnabank Framework Agreements"), pursuant to which the Government would provide Tsesnabank with additional bailout funds, including through the purchase of distressed assets, and the Jusan Group would then purchase Tsesnabank.

32.     In January and February 2019, the Tsesnabank Framework Agreements were executed.  The parties to the Tsesnabank Framework Agreements included the Bank's parent company, First Heartland Securities JSC ("FHS"), Defendant Dzhaksybekov, Tsesnabank, and the Government of the Republic of Kazakhstan represented by the Ministry of Finance of the Republic of Kazakhstan and the National Bank of the Republic of Kazakhstan.  The Tsesnabank Framework Agreements were also expressly supported and negotiated by the current Prime Minister of Kazakhstan, Alikhan Smailov, and the President of Kazakhstan's First Deputy Chief of Staff, Timur Suleimenov.

33.     The framework agreement executed on January 17, 2019 ("January 17 Tsesnabank Framework Agreement") provided for the injection of Government funds into

Tsesnabank Bank, which ultimately took the form of bonds with long-term maturities.  Then, pursuant to Article 8 of the January 17 Tsesnabank Framework Agreement, FHS purchased Tsesnabank.

34.     The Government of Kazakhstan not only fully consented to the deal, but was leading the charge in its execution.

35.     Importantly, at no time did the Government of Kazakhstan make paying back the bailout funds before 2023 a condition of its support for the acquisition of Tsesnabank, nor did the Government of Kazakhstan otherwise restrict the Bank's payment of dividends.  In fact, until recently, the Bank has issued dividends without objection from the Government of Kazakhstan, including issuing dividends in December 2021.

36.     Not long after brokering the acquisition of Tsesnabank, the Government again approached the Jusan Group about acquiring another failing bank, ATF Bank.

37.     As with Tsesnabank, the Government was the primary negotiator of the deal in which the Jusan Group acquired ATF Bank (effectuated through the ATF Bank Framework Agreements).  And as with Tsesnabank, ATF Bank had significant losses in its credit portfolio, which the Government agreed to bail out in connection with the acquisition.

38.     Importantly, and as discussed above, the Government did not condition its bailout of ATF Bank on any obligation to repay the bailout funds before 2023 and it did not otherwise restrict the Bank's payment of dividends.

39.     Thus, with the acquisition of ATF Bank, the Jusan Group answered the Government of Kazakhstan's plea for a commercial solution to the banking crisis, invested significant capital into the country's banking sector, and saved it from total failure for the second time in two years.  As recently as January 2023, Prime Minister Smailov affirmed that the Jusan Group's acquisitions of Tsesnabank and ATF Bank were necessary to stabilize the institutions' financial situations and to ensure the safety of Kazakhstani citizens' and businesses' deposits.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**B.   Jusan Group Established Nevada Entities to Protect and Grow Its Holdings Amidst the Kazakhstani Banking Crisis.**

40.     At the same time the Jusan Group was assisting the Government in bailing out failing Kazakhstani banks, the Jusan Group leadership was considering how best to continue to protect and grow its own assets.  Up until 2019, the Jusan Group was owned by the Nazarbayev Fund ("NF")—a Kazakhstani corporation established to fund Nazarbayev University and Nazarbayev Intellectual Schools—as well as supporting organizations of Nazarbayev University and Nazarbayev Intellectual Schools.

41.     Established in 2010, Nazarbayev University is Kazakhstan's flagship academic institution with aspirations to become a global-level research university.  Its vision is to "give Kazakhstan and the world the scientists, academics, managers, and entrepreneurs needed to prosper and develop," and it was founded on principles of autonomy and academic freedom. Nazarbayev University has made itself an integral part of the academic research ecosystem, and is associated with more than 5,600 international publications.  Nazarbayev University provides Western-style, English-language based education.

42.     Founded in 2008, the Nazarbayev Intellectual Schools were envisioned as a modern and innovative educational platform for the development and implementation of modern models of educational programs from preschool through high school.  Nazarbayev Intellectual Schools graduates have proven to be successful in gaining admission to top universities, including Nazarbayev University and other top undergraduate programs in Europe and East Asia.

43.     After nearly a decade of having Nazarbayev University and Nazarbayev Intellectual Schools successfully supported by the Kazakhstan-based endowment fund, the Jusan Group leadership became concerned that the endowment's growth was inherently limited and at risk within Kazakhstan.

44.     The Jusan Group leadership decided to establish an endowment fund in Nevada, a state known for strong legal protections and corporate governance standards, strong

philanthropic traditions, and ample examples of successful university endowments and non-profit organizations.

45.     More specifically, the Jusan Group chose to incorporate in Nevada because it is one of the leading jurisdictions in the United States for corporate governance standards.  The Jusan Group also considered the fact that many major for-profit and non-profit organizations operate as Nevada corporations.

46.     In 2019, NGF was established as a non-stock Nevada non-profit corporation for the sole benefit of Nazarbayev University and Nazarbayev Intellectual Schools.  NF then transferred all of its ownership interest in the Jusan Group to NGF.  NGF's sole mission is to secure funding for the activities of Nazarbayev University and Nazarbayev Intellectual Schools and their organizations, and it serves as their endowment.  Jysan Holding was established to manage NGF's assets.

47.     In 2020, JTL, a limited company incorporated under the laws of England and Wales, was established and later placed under Jysan Holding through a capital contribution. JTL was incorporated for the purpose of creating a common corporate holding structure for the Jusan Group's financial and technology arms.  JTL is a holding company invested in various sectors, including banking, brokerage, insurance, asset management, e-commerce, telecommunications, logistics, and retail.  Although JTL is expanding its portfolio through strategic mergers and acquisitions, its indirect ownership in the Bank makes up 90% of its total assets.

48.     JTL has a 99.48% ownership interest in FHS, which in turn has an approximately 80% ownership interest in First Heartland Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

49.     Thus, by its indirect ownership of JTL, NGF receives passive income in the form of dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.



50.     Under intercompany policies and agreements, dividend payments will be distributed from the Bank to FHS, and, in turn, to JTL, Jysan Holding, and NGF, less the funds necessary to support the reasonable operational expenses.  Each entity has a legal right to declare and to receive dividends from its direct subsidiary.

51.     NGF first began to provide funding to Nazarbayev University and Nazarbayev Intellectual Schools in 2021.  As noted, in two years alone, NGF and the Jusan Group have provided millions of dollars to Nazarbayev University, Nazarbayev Intellectual Schools, and supporting organizations.  These grants have supported efforts to provide education that emphasizes the values of intellectual liberty, innovation, and academic freedom.  NGF expects funding to increase substantially in the coming years, particularly to address a significant

decrease in financial support from the Government of Kazakhstan in light of severe fiscal challenges to Kazakhstan's national budget.

52.     NGF is funded entirely by profit distributions from Jysan Holding, which receives its revenue solely in the form of dividend payments from the Jusan Group entities through JTL.

**C. The Jusan Group's Financial Success Provokes the Government and Dzhaksybekov to Force a Takeover of First Heartland Bank.**

53.     After its acquisitions of Tsesnabank and ATF Bank—which are now part of First Heartland Bank—First Heartland Bank achieved rapid revenue growth.

54.     This success and increased profitability was attributable to a disciplined and strategic approach to handling the impaired loans that still made up a substantial share of the Tsesnabank's and ATF Bank's portfolio after their acquisition by First Heartland Bank.  As part of this effort, First Heartland Bank implemented a new business strategy geared toward increasing repayment of poorly performing loans.  This marked a sharp departure from the corrupt banking practices engaged in by Tsesnabank's former owner.

55.     In addition, the Bank implemented transparent corporate governance and decision-making, clear mechanisms for judicial and out-of-court debt collection, systematic elimination of corruption in the process of debt collections, and categorical suppression of loan restructurings between collectors and debtors.  By removing borrowers' incentives to negotiate for informal payment arrangements, the Bank incentivized borrowers to pay off their debt rather than risk losing collateral.  These and other measures had a significant positive effect on the Bank's revenue and bottom line.

56.     The Bank has also taken a forward-looking approach to its business model.  As one example, in the past few years, the Bank has focused on digital technologies, establishing an e-commerce platform and moving toward an integrated model for financial services.  As a result of these efforts and improvements in profitability, asset quality, solvency, and risk management, Moody's Investors Service upgraded its outlook on the Bank's ratings from stable to positive on December 14, 2022.

57.     Thanks in part to the success of these strategies, the Bank has been able to pay dividends.

58.     Today, First Heartland Bank is the third-largest banking conglomerate in Kazakhstan and maintains strong relationships with foreign financial institutions.

59.     The Bank's ability to pay dividends to its shareholders has, in turn, enabled NGF to provide significant funding to Nazarbayev University and Nazarbayev Intellectual Schools. NGF and the Jusan Group funded these entities, and supporting organizations, with millions of dollars in support to provide education emphasizing excellence, academic rigor, evidence-based research, scientific temper, innovation, and academic freedom.

**D.   Defendants Harass and Extort the Jusan Group in an Effort to Steal the Group's Assets.**

60.     Beginning in 2022, Defendants, including the government and government-agency Defendants, began to operate as an enterprise associated-in-fact and to participate in and operate other enterprises through a pattern of racketeering activity.  Defendants' goal was to wrongfully obtain the assets of the Jusan Group for the benefit of the Individual Defendants. Each of the Individual Defendants are associated by virtue of operating under the color of authority of the Government of Kazakhstan, either directly through employment by the Government, or in the case of Defendant Dzhaksybekov, through close ties to the Government. Defendants' association-in-fact enterprise was in existence at least since January 2022 and is ongoing in a manner that permits its associates to engage in a pattern of racketeering.

61.     This pattern of racketeering includes attempts to extort the Jusan Group constituting a violation of the Hobbs Act, 18 U.S.C. § 1951, which provides in relevant part: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both," 18 U.S.C. § 1951(a).  As used in that section, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).  "Commerce"

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

includes "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

    1. *The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan Begins Harassing First Heartland Bank.*

    62.    Beginning in January 2022 and continuing through the date of this filing, the Government of Kazakhstan, including various governmental and quasi-governmental agencies, has ordered at least 11 unjustified and unlawful investigations, requests, or inspections of Jysan Holding's indirect subsidiary, First Heartland Bank.  These unlawful acts began as a purported effort to assist the Bank with compliance, but they quickly revealed themselves to be transparent—and at times breathtakingly illegal—attempts to force unlawful payments to the Government of Kazakhstan and private individuals.

    63.    More specifically, starting on or about January 11, 2022, representatives for the ARDFM assigned five agents to surveil the Bank full-time.  This surveillance represents an unwarranted intrusion far beyond ARDFM's historical monitoring of the Bank and ARDFM's standard monitoring of other banks.

    64.    In connection with this surveillance, ARDFM representatives flooded the Bank with broad and harassing requests for information regarding all aspects of the Bank's activities.  These requests were made with unreasonably short deadlines, forcing Bank staff to prioritize ARDFM's request over regular business operations.

    65.    In addition to around-the-clock surveillance, ARDFM imposed arbitrary restricted-transaction thresholds on all transactions of parties related to the Bank.  These restrictions, which continue to the date of this filing, are so extreme that all transactions involving the Jusan Group must be approved by ARDFM and the FMA before being executed.

    66.    ARDFM has, in turn, unjustifiably denied approval for small and large transactions.  For example, under the auspices of these transaction thresholds, ARDFM has blocked certain Bank staff from using their bank card to pay for daily expenses and has blocked

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

the transfer of USD $4 million from NGF's account at the Bank to NGF's U.S.-based bank account. This payment remains blocked and is ultimately needed to fund Nazarbayev University's and Nazarbayev Intellectual Schools' operating expenses. NGF has since been unable to transfer any funds from its account at the Bank. This includes small transfers to its own accounts for operations, as well as payments to vendors who have provided services to NGF in furtherance of its core mission. For example, NGF's payments for legal services, web design, translation services, and accounting and tax services have all been blocked. Remarkably, NGF was not provided any formal explanation as to why its transfers have been blocked.

67.   ARDFM went even further and instructed the Bank to freeze the accounts of certain Bank personnel and their relatives indefinitely and without justification.

68.   ARDFM has been unwilling to leave a record of their actions. When ARDFM approves a transaction, it insists on doing so orally. When ARDFM denies a transaction, it does not provide, either in writing or orally, any explanation for why the transaction was denied.

69.   These efforts have hindered the economic activities of the Bank and have caused the loss of many established clients. The Bank's loss of clients and business has had a significant impact on Plaintiffs, which depend on dividend payments from the Bank to fund their operations and their obligations to NGF.

70.   ARDFM has stated that the purpose of this surveillance was to ensure the Bank's compliance with the newly updated anti-money laundering regulations. But it is clear that this was pretextual. In reality, no other bank received such "assistance." ARDFM was instead initiating a broad campaign of intimidation, coordinated with several Government agencies and individuals and designed to prevent the Bank from engaging in regular business and, in turn, to pressure the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates.

16

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

2.  *Financial Monitoring Agency of the Republic of Kazakhstan Launches Pretextual Investigation into First Heartland Bank and Seizes Documents.*

71.     In February 2022, the FMA launched a criminal investigation against former ATF Bank officials purportedly regarding the issuance of non-performing loans between 2013 and 2016.

72.     But the focus of the investigation has also proven to be pretextual.  During the pendency of the criminal case, FMA seized documents from the Bank well beyond the scope of an investigation into historical loans.  As examples, the FMA seized documents related to the purchase of ATF Bank in 2020, the Bank's dividend information after 2020 and account transactions of Bank officials entirely unrelated to ATF Bank's historical loans.

3.  *Government-Owned Organizations Take Adverse Actions Against First Heartland Bank.*

73.     Between January and March 2022, a number of Government-owned organizations withdrew all funds from the Bank on the instruction of the Government of Kazakhstan.  This resulted in an outflow of significant capital from the Bank.  These Government-owned organizations include, but are not limited to: Damu, Kazakhstan's Entrepreneurship Development Fund; Kazakhtelecom and Kcell, the largest telecommunications company and main cellular communication operator in Kazakhstan; and Samruk-Kazyna, a Kazakhstani sovereign wealth fund with ownership interests in national rail and postal service as well as state-run gas and oil.

74.     Moreover, during this time, all Government agencies, in particular the Ministry of Digital Development and the Tax Committee, ceased all cooperation relating to the Bank's collaborative effort with the Government to develop "govtech" products.

4.  *Anti-Corruption Agency of the Republic of Kazakhstan Launches a Sham Criminal Action and Makes Extortion Attempts.*

75.      Beginning in June 2022, AARK launched a purported criminal investigation into the Bank regarding its 2019 commercial purchase of Tsesnabank and subsequent earnings.

76.     On information and belief, the impetus of this investigation was a letter from the former owner of Tsesnabank, Defendant Adilbek Dzhaksybekov, in which he improperly leveraged his personal connections to AARK leadership to force the investigation and with the ultimate goal of extorting millions of dollars from the Bank.

77.     Defendant Dzhaksybekov's push for criminal investigations centers around accusations that the Bank's commercial purchase of Tsesnabank was somehow illegal, notwithstanding the fact that both he and the Government of Kazakhstan participated in and/or led the purchase, and that the purchase was necessitated by the near collapse of Tsesnabank under his prior ownership.

78.     In connection with its investigation, AARK has undertaken extreme illegal and arbitrary enforcement measures, including excessive interrogations of Bank employees, unwarranted searches of key personnel and premises of the Bank, as well as travel restrictions for Jusan Group officers and employees.   On information and belief, these extreme enforcement measures were undertaken by AARK at the request of Mr. Dzhaksybekov.

79.     In addition, AARK directed ARDFM to block all transactions, including the payment of dividends of the Jusan Group.   On October 7, 2022, ARDFM received correspondence from AARK to "take effective and comprehensive measures to suspend all expense (debit) transactions on payment of dividends by the Bank, FHS JSC, Jysan Technologies, Jysan Holding and [NGF] to their shareholders and owners, as well as any other payment transactions under the specified group of companies" and to "suspend expropriation actions of the shares of the Bank and FHS" during the pendency of the criminal investigation. On October 8, 2022, First Heartland Bank received correspondence from ARDFM signed by Defendant Kizatov, in which he detailed AARK's October 7, 2022 instruction to ARDFM.

80.     On behalf of the Bank, Mr. Shigeo Katsu attended a meeting in July 2022 with the President of Kazakhstan, Kassym-Jomart Tokayev, seeking to end the unfounded investigation.  Mr. Katsu is the Chairman of the Board of Directors for both the Bank and FHS. During the meeting, President Tokayev stated he was aware that Defendant Dzhaksybekov had

1   raised complaints about the purchase of Tsesnabank, and suggested that Mr. Katsu should

2   settle with Defendant Dzhaksybekov.

3         81.    Following this meeting, Defendant Dzhaksybekov attempted to extort Mr. Katsu

4   and the Bank, suggesting that AARK would close its investigation if the Bank paid him.

5   Defendant Dzhaksybekov touted his personal connection to AARK officials, and demanded a

6   payment of 60 million tenge (approximately USD $130 million) for unspecified "damages."

7         82.    Mr. Katsu refused all attempts to extort him and the Bank, noting that such

8   payment without any evidence or justification would violate various anti-corruption laws and

9   that the Jusan Group has to obey all laws, including those of Kazakhstan, the United Kingdom,

10  and the United States.

11       *5.  Government of Kazakhstan Attempts to Force Repayment of Government Assistance*

12          *and to Take Control of FHS.*

13        83.    The mounting regulatory harassment from the Government of Kazakhstan in the

14  first quarter of 2022 forced Mr. Katsu to attend a series of additional meetings with

15  Government of Kazakhstan officials to seek an end to the Government's illegal campaign.

16        84.    During those meetings, Government of Kazakhstan officials, including

17  representatives of ARDFM and the Prime Minister of Kazakhstan, Alikhan Smailov, claimed

18  that the Bank was forbidden from paying dividends until the Bank repaid the Government

19  assistance provided to Tsesnabank and ATF Bank.

20        85.    No such limitation existed under any applicable law or contract, which of course,

21  the Government knows.  Nor had this restriction ever been raised before, including when the

22  Bank issued dividends in December 2021.

23        86.    Further, the Government of Kazakhstan has allowed other financial institutions

24  to declare dividends without any issues, notwithstanding prior government assistance.  As

25  examples, Halyk Bank, Kaspi Bank and Sberbank Kazakhstan were allowed to pay dividends

26  despite receiving significant state support over multiple years without first fully repaying the

27  loans.

28

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

87.     Nonetheless, ARDFM continues to state that it will block any dividend payments and has threatened to imprison any Jusan Group employee who facilitates any dividend payment.

88.     In addition, Mr. Suleimenov met with Jusan Group officials in September 2022, to demand that ownership of the Jusan Group be taken from U.S. and U.K. entities and be given to Kazakhstan.   During one such meeting, Mr. Suleimenov stated that he was participating as a representative of, and at the direction of,  President Tokayev, and threatened the Jusan Group with additional Government actions over the lack of Kazakhstani citizens on the Boards of NGF and Jysan Holding.  In that meeting, Mr. Suleimenov also demanded that control of FHS (and by extension, of the Bank) be given to unspecified Kazakhstani citizens. He did not provide any legal justification for the demand, nor could he.

   *6.*   *Government of Kazakhstan Takes Action against Jusan Group Employees.*

89.     Upon information and belief, in the context of the Government of Kazakhstan's negotiations with the Jusan Group in the first quarter 2022, the Government put pressure on the Jusan Group's auditors to withhold audit reports until the return of all shares and option agreements from Jusan Group employees.  The Government also threatened to initiate a criminal case relating to options that were not returned.

90.     The ongoing negotiations and the threat of criminal action caused the involuntary surrender of these assets held by the Jusan Group employees.

91.     The involuntary return of options caused Jusan Group personnel significant personal losses in the amount of tens of millions of dollars—compounding the personal losses implicated by ARDFM's instruction to the Bank to freeze accounts of certain Bank personnel and their relatives.

92.     For example, one member of the Jusan Group management—now a permanent resident of the United States—was forced to return his option of 4.62% shares of JTL, a book value of over USD $73 million as of May 2022.  The Government has also threatened that same member with trial in absentia and imprisonment should that employee take any actions

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

to counter the Government of Kazakhstan in its efforts to seize the property of the Jusan Group and its employees.

93.     Mr. Suleimenov in particular inquired as to the return of shares and options during subsequent negotiations in September 2022, corroborating the Government-backed nature of the extortion.

*7.   ARDFM Illegally Interferes with FHS's Dividend Payments.*

94.     On October 6, 2022, FHS declared dividends and requested that the Bank add the declaration of dividends to its extraordinary general meeting.  That declaration and request legally obligated the Bank, under its written policies and governing documents, to make a dividend distribution to FHS.  Significant portions of the dividends owed to FHS are the ultimate property of Jysan Holding, and will, in turn, be owed to Jysan Holding under intercompany policies and agreements.

95.     On October 7, 2022, ARDFM blocked FHS and the Bank from making this and other dividend payments in the approximate total amount of USD $387 million, as well as from making other payment transactions of the Bank to its direct and indirect parent companies.

96.     ARDFM representatives Defendants Kizatov and Omarbekov called Bank representatives in October 2022 regarding these blocked payments.  During a call with the Bank's Chief Compliance Officer, Ms. Ardak Mukasheva, Defendant Omarbekov echoed the assertions made in prior meetings between representatives of the Bank and the Government, claiming that the Bank's funds belong to the Government of Kazakhstan and threatening that law enforcement was preparing to arrest and interrogate employees of the Bank and employees of its affiliates.

97.     Defendant Omarbekov called the Bank again on October 8, 2022, claiming that ARDFM had obtained a letter from an unnamed law enforcement agency directing ARDFM to block all dividend payments from the Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

*8. FMA Illegally Interferes with FHS's Dividend Payments.*

98.     On October 13, 2022, the FMA sent a letter to the Bank incorrectly asserting that the Bank had received 1.5 trillion tenge from the Government of Kazakhstan on preferential terms and somehow was in default on this "debt."  In the letter, the FMA asserted that it was suspending the Bank's ability to pay dividends to its shareholders and requiring that the Bank notify FMA before further dividend payments are carried out.

*9. The Government's Proffered "Justifications" are Shifting, Contradictory, and Baseless.*

99.     Throughout the pendency of its campaign, the Government has provided various "justifications" for its actions—none of which justify the Government's illegal actions against the Jusan Group.

100.    When ARDFM increased surveillance of First Heartland Bank, the "justification" was to ensure the Bank's compliance with the newly updated anti-money laundering regulations.

101.    When FMA launched a criminal investigation against former ATF Bank officials, the "justification" was to investigate the issuance of non-performing loans between 2013 and 2016.

102.    In the end, the Government has settled on a single justification: that AARK's criminal investigation, and ARDFM and FMA's blocking of dividend payments, are somehow "justified" by First Heartland Bank's commercial purchase of Tsesnabank and ATF Bank.  Of course, this "justification" is just as baseless as all of its predecessors, as the key members of the campaign to harass the Bank were also the architects of the Framework Agreements.  Indeed, the Bank has previously issued dividends without objection from the Government of Kazakhstan, including as recently as December 2021.

103.    On information and belief, the Defendants' intent has been to stop the dividend funds from traveling outside of Kazakhstan—and thus outside of the Government's control—for the benefit of Plaintiffs, because Defendants know the dividend funds are for the benefit of, and owed to, Plaintiffs JTL and Jysan Holding, and ultimately NGF.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**E.   The Government Retaliates Against the Plaintiffs After Negotiation Fails.**

*10. Plaintiffs Notify Defendants of Their Intention to Enforce Their Rights and the Parties Engage in Unsuccessful Negotiations.*

104.    In a last-ditch effort to resolve the dispute without court intervention, Plaintiffs notified Defendants of their intention to bring suit in Nevada.  Throughout November, the parties, including counsel for the parties, engaged in a series of informal negotiations.  Those negotiations were unsuccessful and part of a delay tactic while Defendants lined up corrupt legislators and agencies to ready an assault on Plaintiffs.

105.    Since then, Defendants' campaign of harassment has only intensified in what is plainly retaliation for Plaintiffs' informing Defendants of their intention to file this lawsuit.

*11. Defendants Retaliate Against Plaintiffs by Introducing Legislation Targeting the Jusan Group.*

106.    On November 22, 2022, one day after President Tokayev's re-election, the lower house of Kazakhstan's Parliament, the Majilis, approved a draft law with amendments to the Law "On Banks and Banking Activities in the Republic of Kazakhstan."  The proposed amendments were directed at Plaintiffs and sought to, *inter alia*, (1) change the definitions of "bank holding" and "major participant in a bank" such that non-profit organizations, like NGF, could not directly or indirectly own banks; (2) place restrictions on banks that have received Government assistance, like First Heartland Bank, to prevent them from distributing dividends, including by allowing ARDFM to block such dividends; and (3) require all major direct and indirect shareholders and controlling entities of banks to apply for and obtain approval from ARDFM within 30 days of the date of publication of the amendments.

107.    The upper house of Kazakhstan's Parliament, the Senate, subsequently approved the amendments allowing ARDFM to block dividends from banks that have received Government assistance and requiring ARDFM approval for major direct and indirect shareholders and controlling entities of banks, while it rejected the proposed amendment barring non-profit organizations from owning banks, for lack of justification.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

108.    These amendments, which entered into force on January 1, 2023, will allow the Government to block the dividends to which Plaintiffs are entitled and even to prohibit Plaintiffs' ownership interests in the Bank.  Under the amendments, JTL, Jysan Holding, and NGF would each need to obtain and submit to ARDFM credit ratings, audited financial statements, and relevant notarizations and apostilles from multiple jurisdictions within 30 days, which is simply not feasible.  Further, if these entities remain major shareholders in the Bank without ARDFM approval, ARDFM may demand that they reduce their indirect ownership share to below 25% and suspend all transactions between them and the Bank; establish trust management of the Bank's shares for up to three months; and ultimately alienate the Bank's shares by selling them on a securities market.  **There could not be a clearer case of unlawful seizure of assets under the control of Nevada citizens**.

109.    At least one member of the Majilis publicly stated that these amendments are explicitly designed to target the shareholders of First Heartland Bank and block the dividends at issue here.

110.    After delaying until one day following President Tokayev's re-election, the Government has now made the objectives and intent of its campaign clear—to stop the dividend funds from traveling outside Kazakhstan, to coerce the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates, and to retaliate against the Jusan Group for seeking to enforce its rights in an American court.

*12. Defendants Retaliate Against Plaintiffs by Filing a Suit Against Them in Kazakhstan.*

111.    On December 2, 2022, Kazakhstan's Prosecutor General filed suit against numerous members of the Jusan Group, including Plaintiffs, and employees of the Jusan Group, including Mr. Katsu and the employee previously threatened with imprisonment.  The Prosecutor General reports directly to the President and represents the interests of the Government of Kazakhstan in court.

112.    The suit sought to do through the court exactly what Defendants have attempted to do through their campaign of harassment—to weaken the Jusan Group and limit its access to its own capital.

113.    Specifically, the lawsuit sought to invalidate an agreement between two members of the Jusan Group—JTL and Pioneer Capital Invest LLP ("Pioneer").    The invalidation of this agreement would have eliminated NGF's ownership interests in JTL and therefore eliminated NGF's access to dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.  The lawsuit also sought the return of millions of dollars (USD) in assets and cash from JTL to Pioneer, including JTL's shares in the Bank.  The assets and funds at issue were properly transferred to JTL via the agreement the Government sought to invalidate.  By seeking the movement of assets and funds from Plaintiff JTL to Kazakhstan-based Pioneer, the Government is interfering with Jusan Group's assets and seeking to move them into Kazakhstan where the Government will be able to exert greater control.   Finally, the lawsuit sought that all the named Jusan Group employees surrender their shares in the Bank.

114.    A Kazakhstani court quickly dismissed the Prosecutor General's suit based on its determination that the claims lacked  evidence.    This emphatic dismissal of the Prosecutor General's baseless suit further demonstrates the Government's blatant misuse of the state apparatus to target the Jusan Group.

*13. Kazakhstani Government Officials Threaten "War" Against Jusan Group Employees.*

115.    On December 20, 2022, Kazakhstani Prime Minister Alikhan Smailov sent a message to the same Jusan Group employee – a United States resident – who was previously threatened with imprisonment, demanding the Jusan Group's return to Kazakhstan and threatening "war" if the Government's demands are not met.

*14. Defendants Repackage Their Previously Dismissed Complaint and Refile Suit in Kazakhstan.*

116.    On February 10, 2023, the Kazakhstani Prosecutor General filed another suit against members of the Jusan group challenging the 2020 transaction between JTL and Pioneer and seeking to seize certain Jusan Group property.  While this suit alleges slightly different facts and claims different causes of action, its aim is the same as the suit filed, and swiftly

dismissed, in December 2022—to threaten the Jusan Group into handing over its control to the Government.

117.    But the Government goes even a step further in the February suit and seeks to seize myriad assets of not just the defendants to the action, but of the Jusan Group at large. The Prosecutor General seeks to seize Jusan Group shares in over a dozen entities.

118.    Once again the Prosecutor General sought to have JTL return to Pioneer millions of dollars (USD) in assets and cash which were properly transferred to JTL.  And once again the result, if the suit were successful, would be the movement of the Jusan Group's lawfully controlled assets into Kazakhstan where the Government will be able to exert greater control.

**F.    The Government's Illegal Campaign Is Consistent with Historical Corruption.**

119.    Defendants' actions are consistent with historical corrupt practices in Kazakhstan, as well as reports of a marked increase in corruption in Kazakhstan in recent years.

120.    As one example, in 2013, an arbitration panel awarded a Moldovan company USD $497,685,101 in damages (plus 50% of the cost of legal representation) for the Government of Kazakhstan's breach of the Energy Charter Treaty, an international agreement establishing cross-border cooperation in the energy industry.  That matter involved strikingly similar tactics to those employed against the Plaintiffs.  There, the tribunal found that Kazakhstan breached the company's right to fair and equitable treatment under the Treaty.  Specifically, the company alleged that Kazakhstan engaged in a campaign of harassment, culminating in the cancellation of its oil and gas exploration contracts and the seizure of its assets located in Kazakhstan.  That campaign reportedly included tactics by Kazakhstan's financial police and seven quasi-state entities and involved the baseless freezing of the company's assets, around-the-clock surveillance and inspection by government agency officials which prevented employees from conducting regular business affairs, the unwarranted seizure of documents, the unlawful arrest and conviction of an in-country manager, and the reversal of prior government approvals and waivers.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

121.    More recently, media reports have noted that corruption cases in Kazakhstan have increased dramatically in 2022, including by as much as 30 percent.    Transparency International's Corruption Perceptions Index, the most widely used global corruption ranking in the world, measures Kazakhstan as a bottom performer in public sector corruption within Eastern Europe and Central Asia, itself the second lowest performing region worldwide.  A recent report published by the Group of States Against Corruption, the Council of Europe's anti-corruption body, has comprehensively identified the ongoing "serious problem" of corruption that exists in Kazakhstan.  Expert assessments reveal that Kazakhstan's progress toward anti-corruption measures is scattered at best.

122.    In October 2022, U.S. Senators on the Senate Foreign Relations Committee called for an "international investigation into state-sanctioned violence and review of U.S. security assistance following nationwide protests earlier this year" in Kazakhstan, including Kazakh security forces' violent response toward civilian protestors.  As part of that investigation, the Senators have called on the U.S. Department of State to review its relationship with Kazakhstan in order to "prioritize protecting fundamental freedoms and strengthening the rule of law."

**G.   The Government's Illegal Campaign, Particularly Blocking Dividend Payments, Is Causing a Concrete Harm to the Jusan Group's Operations.**

123.    Unsurprisingly, and presumably as the Government intended, the Government's campaign, including most notably the blocking of approximately USD $387 million in dividends, is causing significant, immediate, and concrete harm to Plaintiffs' operations.

124.    Plaintiffs are unable to receive dividend funding from their subsidiaries connected to the Bank—a primary source of funding—nor are they able to fulfill their obligation to provide dividend funding to their parent organizations.  In turn, NGF is unable to transfer or use its own funds in its own bank accounts or receive lawfully issued dividends, to serve its sole mission: to fund Nazarbayev University and Nazarbayev Intellectual Schools. Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Nazarbayev University's and Nazarbayev Intellectual Schools' students, researchers, and educators.

125.    In addition, in August 2022, Plaintiff JTL represented its intention to buy back USD $20 million in JTL shares from an investor.  Because of the blocked dividend payments, JTL is unable to proceed with this buyback.

**FIRST CAUSE OF ACTION**
**(EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW)**
**(against Defendant Republic of Kazakhstan and Governmental Agency Defendants)**

126.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

127.    As parent corporations and shareholders of First Heartland Securities and First Heartland Bank, Plaintiffs have direct property interests in their rights to receive declared dividends from those subsidiaries.

128.    Through their conduct alleged above, including obstructing Plaintiffs' subsidiaries from paying lawfully declared dividends to their foreign shareholders and directly aiming their conduct at that result, Defendant Republic of Kazakhstan and its agencies have expropriated and taken Plaintiffs' property in violation of international law.

129.    Defendant Government of Kazakhstan and its agencies have also violated customary international law by expropriating and taking similar property interests belonging to First Heartland Securities and First Heartland Bank with the discriminatory purpose to harm their foreign shareholders.

**SECOND CAUSE OF ACTION**
**(18 U.S.C. § 1964(c)) (against the Individual Defendants)**

130.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

131.    The Individual Defendants are associated-in-fact as an enterprise engaged in and whose activities affect interstate commerce, and have operated and participated in the conduct of additional enterprises, including the Defendant Government and its agencies.

132. The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting Plaintiffs, ultimately for their own personal benefit.

133. The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting the Jusan Group.

134. The Individual Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

135. As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

**THIRD CAUSE OF ACTION**
**(Nev. Rev. Stat. § 207.470) (against all Individual Defendants)**

136. Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

137. Individual Defendants have committed at least two distinct crimes related to racketeering as defined in Nev. Rev. Stat. § 207.360, constituting racketeering activity pursuant to Nev. Rev. Stat. § 207.390.

138. Defendants have participated directly and indirectly in the conduct of the affairs of an enterprise whose activities constitute racketeering activity, in violation of Nev. Rev. Stat. § 207.400.

139. Plaintiffs have been injured in their business and property by reason of Defendants' violations.

**FOURTH CAUSE OF ACTION**
**(INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)**
**(against all Defendants)**

140. Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

29

141.    Valid intercompany agreements exist between First Heartland Bank and First Heartland Securities, First Heartland Securities and JTL, JTL and Jysan Holding, and Jysan Holding and NGF.  Each of those intercompany agreements entitles the parent company in the corporate relationship to dividend payments from its subsidiary.  Jysan Holding and JTL are parties to those agreements or, with respect to the agreements to which Jysan Holding and/or JTL are not a party, third-party beneficiaries.

142.    Defendants each have knowledge of the aforementioned agreements, and have committed intentional acts intended and designed to disrupt each relationship.  Defendants' acts have caused actual disruption of each agreement, and caused Jysan Holding and JTL damages resulting from that disruption.

### FIFTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE
### WITH PROSPECTIVE ECONOMIC ADVANTAGE) (against all Defendants)

143.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

144.    Upon receipt of the blocked dividend from the Bank, FHS planned to dividend all or portions of the blocked dividend to JTL, and JTL then planned to dividend all or portions of the blocked dividend to Jysan Holding, which was to dividend all or portions to its parent, NGF, minus reasonable operational expenses.  Defendants each have knowledge of the ultimate purpose of the blocked dividend, and have committed intentional acts intended and designed to disrupt the dividends to Plaintiffs and the dividend to NGF.  Defendants' acts have caused actual disruption to those prospective dividends, and caused Jysan Holding and JTL damages resulting from that disruption.

145.    Defendants' conduct was unwarranted and without justification.  No agreement or law provides for a right of interference or dividend obstruction relating to the Government's bailout payments to Tsesnabank and ATF Bank. As a direct result of Defendants' conduct, Plaintiffs and their affiliates did not receive funds necessary to perform their basic functions and missions, including their funding of NGF, Nazarbayev Intellectual Schools, and Nazarbayev University.

**SIXTH CAUSE OF ACTION**
**(CIVIL CONSPIRACY) (against all Defendants)**

146.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

147.    Defendants have acted in concert with the intent to accomplish an unlawful objective for the purpose of harming the Jusan Group, including Plaintiffs.

148.    As a result of Defendants' acts in furtherance of that conspiracy, the Jusan Group, including Plaintiffs, has suffered damages.

149.    Defendants are jointly and severally liable for the damages that Plaintiffs have suffered as a result of each act taken by each Defendant in furtherance of Defendants' conspiracy.

**SEVENTH CAUSE OF ACTION**
**(CIVIL AIDING AND ABETTING) (against all Defendants)**

150.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

151.    Each Defendant has substantially assisted and encouraged other Defendants' conduct in breaching duties owed to Plaintiffs, including tort duties and statutory duties as set forth above.

152.    Defendants' breaches have caused harm to the Jusan Group, including Plaintiffs.

153.    Defendants are each liable under a civil aiding and abetting theory for damages caused by the breaches that they have substantially assisted and encouraged.

**PRAYER FOR RELIEF**

154.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein and respectfully request that the Court:

a)   Declare that Defendants' conduct has unlawfully injured Plaintiffs, and is not subject to any lawful privilege or justification;

b)   Award Plaintiffs compensatory and punitive damages in an amount to be determined at trial, including trebled damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

c)   Award Plaintiffs their costs and expenses, including attorneys' fees; and

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

d)  Award Plaintiffs such further relief as may be just under the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED this 16th day of February 2023

HOLLAND & HART LLP

/s/ *J. Stephen Peek*
J. Stephen Peek
Erica C. Medley
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya
(*pro hac vice* forthcoming)
Jeffrey B. Korn
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134