J. Stephen Peek (1758)
Erica C. Medley (13959)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Tel: 702.669.4600
Fax: 702.669.4650
speek@hollandhart.com
ecmedley@hollandhart.com

Tariq Mundiya (*pro hac vice*)
Jeffrey B. Korn (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tmundiya@willkie.com
jkorn@willkie.com

Michael J. Gottlieb (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| JYSAN HOLDING, LLC, a Nevada Limited Liability Company; JUSAN TECHNOLOGIES LTD, an England and Wales Limited Company;<br><br>        Plaintiffs,<br><br>v.<br><br>REPUBLIC OF KAZAKHSTAN, a foreign sovereign state; THE AGENCY FOR REGULATION AND DEVELOPMENT OF THE FINANCIAL MARKET OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government agency; THE ANTI-CORRUPTION AGENCY OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government anti-corruption agency ; THE FINANCIAL MONITORING AGENCY OF THE REPUBLIC OF | Case No.:  2:23-CV-00247-JAD-VCF<br><br>**APPENDIX OF EXHIBITS TO MOTION FOR SERVICE OF THE SUMMONS AND COMPLAINT ON INDIVIDUALS IN A FOREIGN COUNTRY PURSUANT TO FRCP 4(F)(2)(C)(II)** |

KAZAKHSTAN, a Kazakhstan Government
agency; THE COMMITTEE FOR
NATIONAL SECURITY OF
KAZAKHSTAN, a Kazakhstan Government
intelligence agency; MADINA
ABYLKASSYMOVA, an individual;
OLZHAS KIZATOV, an individual; ARMAN
OMARBEKOV, an individual; and
ADILBEK DZHAKSYBEKOV, an
individual,

Defendants.

In accordance with LR IA 10-3, Plaintiffs Jysan Holding, LLC ("Jysan Holding") and

Jusan Technologies Ltd. ("JTL") (collectively, "Plaintiffs") submit this Appendix of Exhibits

to their Motion for Service of the Summons and Complaint on Individuals in a Foreign Country

Pursuant to FRCP 4(f)(2)(C)(II).

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Complaint, Summons, and Russian Translations for Defendant Madina Abylkassymova | 1- 81 |
| B | Complaint, Summons, and Russian Translations for Defendant Olzhas Kizatov | 82-162 |
| C | Complaint, Summons, and Russian Translations for Defendant Arman Omarbekov | 163-243 |

DATED this 8th day of March 2023.

**HOLLAND & HART LLP**

*/s/ J. Stephen Peek*
J. Stephen Peek
Erica C. Medley
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya (*pro hac vice*)
Jeffrey B. Korn (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiffs*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

# EXHIBIT A

Complaint, Summons, and Russian Translations for Defendant Madina Abylkassymova

# EXHIBIT A

J. Stephen Peek
(Nevada Bar No. 1758)
Erica C. Medley
(Nevada Bar No. 13959)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Tel: 702.669.4600
Fax: 702.669.4650
speek@hollandhart.com

Tariq Mundiya (*pro hac vice* forthcoming)
Jeffrey B. Korn (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tmundiya@willkie.com
jkorn@willkie.com

Michael J. Gottlieb (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JYSAN HOLDING, LLC, a Nevada Limited Liability Company; JUSAN TECHNOLOGIES LTD, an England and Wales Limited Company;<br><br>             Plaintiff,<br><br>v.<br><br>REPUBLIC OF KAZAKHSTAN, a foreign sovereign state; THE AGENCY FOR REGULATION AND DEVELOPMENT OF THE FINANCIAL MARKET OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government agency; THE ANTI-CORRUPTION AGENCY OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government anti-corruption | **Case No.:**<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

1

1  agency ; THE FINANCIAL MONITORING
   AGENCY OF THE REPUBLIC OF
2  KAZAKHSTAN, a Kazakhstan Government
   agency; THE COMMITTEE FOR
3  NATIONAL SECURITY OF
   KAZAKHSTAN, a Kazakhstan Government
4  intelligence agency; MADINA
   ABYLKASSYMOVA, an individual;
5  OLZHAS KIZATOV, an individual;
   ARMAN OMARBEKOV, an individual;
6  and ADILBEK DZHAKSYBEKOV, an
   individual,
7
8                       Defendants.

9                    **INTRODUCTION**

10     1.     Since early 2022, the Government of the Republic of Kazakhstan ("Government"

11  or "Government of Kazakhstan") has perpetrated an illegal campaign against Nevada

12  corporations—Plaintiff Jysan Holding, LLC ("Jysan Holding") and the New Generation

13  Foundation, Inc. ("NGF"), and their direct and indirect subsidiaries (together, the "Jusan

14  Group")—in an effort to steal more than USD $1.5 billion of Plaintiffs' assets.  This corrupt

15  and lawless campaign demonstrates the brazen thuggery of a nation—a satellite of the former

16  Soviet Union—that has weaponized the Government's vast powers and senior-most officials

17  to reach far outside Kazakhstan to steal from, intimidate, and otherwise harm persons and

18  entities in the United States.  Defendants are engaged in precisely the type of racketeering and

19  expropriation that federal laws are designed to prohibit. Plaintiffs bring this action to remedy

20  the Defendants' unlawful confiscatory conduct.

21     2.     Although the Government of Kazakhstan has offered numerous, contradictory,

22  and pretextual justifications for its conduct against the Jusan Group, the Government's true

23  aim is to seize control of the Jusan Group's Kazakhstan-based assets for its own commercial

24  benefit while delivering massive commercial benefits to the Government's favored private

25  individuals.  The Government has evinced its intent to pursue this goal by any means

26  necessary, including threats, intimidation, criminal and civil investigations and litigations, and

27  blocking USD $387 million in dividends slated for distribution by the Jusan Group's privately

28  owned bank, First Heartland Jusan Bank ("First Heartland Bank" or the "Bank") and the

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

2

Bank's direct parent, First Heartland Securities JSC ("FHS")—funds destined for Plaintiff Jusan Technologies Ltd. ("JTL"), Plaintiff Jysan Holding, and ultimately, NGF. The Defendants' scheme to use the organs of Kazakhstan's Government to harm Nevada entities has been made abundantly clear. After Plaintiffs informed Defendants of their intention to enforce their rights in the instant action, Defendants took two plainly retaliatory acts—first, in November 2022, Defendants introduced legislation specifically targeting Plaintiffs and, second, on December 2, 2022, Kazakhstan's Prosecutor General filed a trumped-up lawsuit against Plaintiffs and other members and employees of the Jusan Group in the courts of Kazakhstan. The legislation targeted at the Jusan Group—detailed below—directed the unlawful seizure of the assets under the control of a Nevada entity. Most recently, on February 10, 2023, the Kazakhstani Prosecutor General filed a frivolous lawsuit, predicated on spurious allegations, for the sole purpose of confiscating assets under JTL's control. Even worse, Kazakhstan has leveled threats of violence and imprisonment against United States residents who have material economic interests in the Jusan Group if Kazakhstan's commercial demands are not met. These acts are in line with the Government of Kazakhstan's history of rampant corruption, which according to public reporting has worsened since 2022. In sum, the Government of Kazakhstan has resorted to the same unlawful tools—confiscation, expropriation, threats, and intimidation—favored by the world's most repressive dictators and authoritarian regimes.

3. The conduct by the Government and several individuals is obstructing Plaintiffs—including a Nevada LLC which was formed precisely to avoid the type of illegal asset seizure being perpetrated now—from fulfilling their commitment to ensuring educational freedom and excellence to the NGF grantees by providing U.S.-style higher education and free-market reforms in the Republic of Kazakhstan. Indeed, prior to the illegal conduct described herein, through Plaintiffs' efforts, NGF and the Jusan Group as a whole have provided millions of dollars in grants to Nazarbayev University—a modern, English-language research university located in Astana (formerly Nur-Sultan), the Republic of Kazakhstan's capital—as well as Nazarbayev Intellectual Schools and their organizations.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4.     Absent judicial relief, Defendants' unlawful scheme will continue to deprive Plaintiffs of a primary source of funding from their subsidiaries connected to the Bank and will accordingly leave them unable to fulfill their obligation to provide dividend funding to their parent organizations, including NGF.  In turn, NGF is unable to transfer its own funds or receive lawfully issued dividends, to serve its sole mission of funding Nazarbayev University and Nazarbayev Intellectual Schools.  Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming their students, researchers, and educators by obstructing an education that emphasizes the values of excellence, academic rigor, evidence-based research, scientific temper, intellectual liberty, innovation, and academic freedom.

### JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically 18 U.S.C. § 1964(c).

6.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, are foreign states as defined in 28 U.S.C. § 1603(a) and are not entitled to immunity under 28 U.S.C. §§ 1605–07 or any applicable international agreement. Defendant Republic of Kazakhstan, as well as the Defendant agencies and instrumentalities listed below, are not immune from the jurisdiction of this Court under 28 U.S.C. § 1605(a)(2) because this action is based upon acts outside the territory of the United States in connection with a commercial activity of Defendants elsewhere and those acts have caused a direct effect in the United States.

7.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the other claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4

8. This Court has personal jurisdiction over Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, under 28 U.S.C. § 1330(b).

9. This Court has personal jurisdiction over all Defendants under Nev. Rev. Stat. § 14.065. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965, and Rules 4(k)(1)(C) and 4(k)(2) of the Federal Rules of Civil Procedure.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because a substantial part of the events giving rise to the claim occurred in this District. In the alternative, venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## PARTIES

11. Plaintiff Jysan Holding is a limited liability company incorporated under the laws of the State of Nevada. Jysan Holding's sole member is NGF, a registered 501(c)(4) organization based and incorporated in Nevada. Jysan Holding has a 96.96% direct ownership interest in JTL, which serves as the holding company for Jysan Holding's indirect subsidiaries and is an indirect majority owner of other companies located in Kazakhstan. Jysan Holding manages businesses and other investments of NGF, for the ultimate benefit of students of the grantee educational institutions in the Republic of Kazakhstan.

12. Plaintiff JTL is a limited company organized under the laws of England and Wales. JTL's direct parent is Jysan Holding (the Nevada entity identified above). JTL is a direct and indirect majority owner of other companies in Kazakhstan, including FHS, in which JTL holds a direct 99.48% ownership interest.

13. Defendant Republic of Kazakhstan is a foreign sovereign state within the meaning of 28 U.S.C. § 1603(a). Defendant Republic of Kazakhstan maintains an Embassy within the United States at 1401 16th St. NW, Washington, DC 20036.

14. Defendant Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan ("ARDFM") is a Government agency tasked with supervising the financial market and financial organizations within Kazakhstan.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

5

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

15. Defendant Anti-Corruption Agency of the Republic of Kazakhstan ("AARK") is a Government anti-corruption agency. AARK is responsible for formulating and implementing the anti-corruption policy of the Government of Kazakhstan, coordinating the anti-corruption enforcement actions, and detecting, restraining, revealing, and investigating corruption offenses. AARK reports directly to the President of Kazakhstan.

16. Defendant Financial Monitoring Agency of the Republic of Kazakhstan ("FMA") is a Government agency responsible for providing guidance in countering money laundering and the financing of terrorism, as well as for the prevention, detection, suppression, disclosure, and investigation of economic and financial offenses referred to it by the legislature of the Republic of Kazakhstan. FMA reports directly to the President of Kazakhstan.

17. Defendant Committee for National Security of Kazakhstan ("KNB") is a Government intelligence agency (together with ARDFM, AARK, and FMA, the "Governmental Agency Defendants").

18. Defendant Madina Abylkassymova is the Chairperson of ARDFM. She is a resident and citizen of Kazakhstan.

19. Defendant Olzhas Kizatov is the Deputy Chairperson of ARDFM. He is a resident and citizen of Kazakhstan.

20. Defendant Arman Omarbekov is a representative of ARDFM. He is a resident and citizen of Kazakhstan.

21. Defendant Adilbek Dzhaksybekov (together with Defendants Abylkassymova, Kizatov, and Omarbekov, the "Individual Defendants") is the former owner of Tsesnabank, a bank the Jusan Group purchased in February 2019. He is a resident and citizen of Kazakhstan.

## FACTS

**A. Members of the Jusan Group Assist the Government of Kazakhstan by Purchasing Failing Kazakhstani Banks.**

22. In 2018, Kazakhstan's banking sector, which had not fully recovered from the 2007-2009 financial crisis and subsequent devaluations of the Kazakhstani tenge in 2008 and 2015, became acutely vulnerable following a sharp drop in global energy prices that had

6

significantly devalued the tenge once again. In response, the Government of Kazakhstan sought various commercial solutions in an attempt to avoid a collapse of the country's entire banking system.

23.     At the time, Tsesnabank was Central Asia's second-largest bank in terms of assets and was owned by Defendant Dzhaksybekov. Defendant Dzhaksybekov misused his authority at Tsesnabank to financially advantage himself, his family, and his friends, essentially treating Tsesnabank as a private equity and investment firm for his personal benefit and engaging in other questionable or malicious business conduct.

24.     By 2018, Tsesnabank was on the brink of failure, with nearly 90% of its assets non-performing.

25.     Despite having received capital injections as part of the Government of Kazakhstan's banking sector bailout in 2017, Tsesnabank continued to face severe liquidity issues. In early September 2018, it received a short-term loan of several hundred million dollars from the National Bank of the Republic of Kazakhstan. In a last-ditch attempt to preserve its business, Tsesnabank sold a significant portion of its agricultural loan portfolio to the state. Nonetheless, by mid-September, S&P had downgraded Tsesnabank's liquidity rating from "adequate" to "less than adequate."

26.     The Government of Kazakhstan determined that if Tsesnabank were to fail, it would likely take with it the entire banking sector in Kazakhstan. The Government of Kazakhstan was therefore adamant about brokering a commercial solution to keep Tsesnabank afloat. In an attempt to do so, the Government of Kazakhstan initiated a series of attempted bailouts for Tsesnabank between 2018 and 2019.

27.     The Government described those measures as "enhanc[ing] the robustness of Tsesnabank by cardinally improving its credit portfolio." Contemporaneous reporting recognized that this was another bailout targeted at correcting Tsesnabank's weak and deteriorating financial situation.

28.     Even with this financial support, by January 2019, significant losses in Tsesnabank's credit portfolio continued to threaten Tsesnabank's viability. Tsesnabank

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

7

needed an additional injection of capital to survive. The Government of Kazakhstan searched urgently for another bank to purchase Tsesnabank, so that the purchasing bank could provide Tsesnabank with new capital to prevent collapse, in addition to providing a change of management to strengthen Tsesnabank's operations.

29.     The Government of Kazakhstan identified First Heartland Bank in Kazakhstan, owned by the Jusan Group, as a potential solution. Under the Jusan Group's stewardship, First Heartland Bank had significantly grown its cash reserves and maintained a sterling reputation for proper stewardship.

30.     The Government of Kazakhstan approached the Jusan Group about a potential acquisition of Tsesnabank. The Jusan Group sought to answer the Government's plea and step in to assist the banking sector. But the Jusan Group was clear that it could not acquire Tsesnabank if it had a negative balance sheet, and due to Tsesnabank's mismanaged loan portfolio under Defendant Dzhaksybekov, Tsesnabank's balance sheet was deeply in the red.

31.     Eager to find a commercial solution, the Government of Kazakhstan led the negotiations of a number of contracts (culminating together in the "Tsesnabank Framework Agreements"), pursuant to which the Government would provide Tsesnabank with additional bailout funds, including through the purchase of distressed assets, and the Jusan Group would then purchase Tsesnabank.

32.     In January and February 2019, the Tsesnabank Framework Agreements were executed. The parties to the Tsesnabank Framework Agreements included the Bank's parent company, First Heartland Securities JSC ("FHS"), Defendant Dzhaksybekov, Tsesnabank, and the Government of the Republic of Kazakhstan represented by the Ministry of Finance of the Republic of Kazakhstan and the National Bank of the Republic of Kazakhstan. The Tsesnabank Framework Agreements were also expressly supported and negotiated by the current Prime Minister of Kazakhstan, Alikhan Smailov, and the President of Kazakhstan's First Deputy Chief of Staff, Timur Suleimenov.

33.     The framework agreement executed on January 17, 2019 ("January 17 Tsesnabank Framework Agreement") provided for the injection of Government funds into

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

8

Tsesnabank Bank, which ultimately took the form of bonds with long-term maturities. Then, pursuant to Article 8 of the January 17 Tsesnabank Framework Agreement, FHS purchased Tsesnabank.

34. The Government of Kazakhstan not only fully consented to the deal, but was leading the charge in its execution.

35. Importantly, at no time did the Government of Kazakhstan make paying back the bailout funds before 2023 a condition of its support for the acquisition of Tsesnabank, nor did the Government of Kazakhstan otherwise restrict the Bank's payment of dividends. In fact, until recently, the Bank has issued dividends without objection from the Government of Kazakhstan, including issuing dividends in December 2021.

36. Not long after brokering the acquisition of Tsesnabank, the Government again approached the Jusan Group about acquiring another failing bank, ATF Bank.

37. As with Tsesnabank, the Government was the primary negotiator of the deal in which the Jusan Group acquired ATF Bank (effectuated through the ATF Bank Framework Agreements). And as with Tsesnabank, ATF Bank had significant losses in its credit portfolio, which the Government agreed to bail out in connection with the acquisition.

38. Importantly, and as discussed above, the Government did not condition its bailout of ATF Bank on any obligation to repay the bailout funds before 2023 and it did not otherwise restrict the Bank's payment of dividends.

39. Thus, with the acquisition of ATF Bank, the Jusan Group answered the Government of Kazakhstan's plea for a commercial solution to the banking crisis, invested significant capital into the country's banking sector, and saved it from total failure for the second time in two years. As recently as January 2023, Prime Minister Smailov affirmed that the Jusan Group's acquisitions of Tsesnabank and ATF Bank were necessary to stabilize the institutions' financial situations and to ensure the safety of Kazakhstani citizens' and businesses' deposits.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

9

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**B. Jusan Group Established Nevada Entities to Protect and Grow Its Holdings Amidst the Kazakhstani Banking Crisis.**

40. At the same time the Jusan Group was assisting the Government in bailing out failing Kazakhstani banks, the Jusan Group leadership was considering how best to continue to protect and grow its own assets. Up until 2019, the Jusan Group was owned by the Nazarbayev Fund ("NF")—a Kazakhstani corporation established to fund Nazarbayev University and Nazarbayev Intellectual Schools—as well as supporting organizations of Nazarbayev University and Nazarbayev Intellectual Schools.

41. Established in 2010, Nazarbayev University is Kazakhstan's flagship academic institution with aspirations to become a global-level research university. Its vision is to "give Kazakhstan and the world the scientists, academics, managers, and entrepreneurs needed to prosper and develop," and it was founded on principles of autonomy and academic freedom. Nazarbayev University has made itself an integral part of the academic research ecosystem, and is associated with more than 5,600 international publications. Nazarbayev University provides Western-style, English-language based education.

42. Founded in 2008, the Nazarbayev Intellectual Schools were envisioned as a modern and innovative educational platform for the development and implementation of modern models of educational programs from preschool through high school. Nazarbayev Intellectual Schools graduates have proven to be successful in gaining admission to top universities, including Nazarbayev University and other top undergraduate programs in Europe and East Asia.

43. After nearly a decade of having Nazarbayev University and Nazarbayev Intellectual Schools successfully supported by the Kazakhstan-based endowment fund, the Jusan Group leadership became concerned that the endowment's growth was inherently limited and at risk within Kazakhstan.

44. The Jusan Group leadership decided to establish an endowment fund in Nevada, a state known for strong legal protections and corporate governance standards, strong

10

philanthropic traditions, and ample examples of successful university endowments and non-profit organizations.

45. More specifically, the Jusan Group chose to incorporate in Nevada because it is one of the leading jurisdictions in the United States for corporate governance standards. The Jusan Group also considered the fact that many major for-profit and non-profit organizations operate as Nevada corporations.

46. In 2019, NGF was established as a non-stock Nevada non-profit corporation for the sole benefit of Nazarbayev University and Nazarbayev Intellectual Schools. NF then transferred all of its ownership interest in the Jusan Group to NGF. NGF's sole mission is to secure funding for the activities of Nazarbayev University and Nazarbayev Intellectual Schools and their organizations, and it serves as their endowment. Jysan Holding was established to manage NGF's assets.

47. In 2020, JTL, a limited company incorporated under the laws of England and Wales, was established and later placed under Jysan Holding through a capital contribution. JTL was incorporated for the purpose of creating a common corporate holding structure for the Jusan Group's financial and technology arms. JTL is a holding company invested in various sectors, including banking, brokerage, insurance, asset management, e-commerce, telecommunications, logistics, and retail. Although JTL is expanding its portfolio through strategic mergers and acquisitions, its indirect ownership in the Bank makes up 90% of its total assets.

48. JTL has a 99.48% ownership interest in FHS, which in turn has an approximately 80% ownership interest in First Heartland Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

11

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

49.     Thus, by its indirect ownership of JTL, NGF receives passive income in the form of dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.



50.     Under intercompany policies and agreements, dividend payments will be distributed from the Bank to FHS, and, in turn, to JTL, Jysan Holding, and NGF, less the funds necessary to support the reasonable operational expenses.  Each entity has a legal right to declare and to receive dividends from its direct subsidiary.

51.     NGF first began to provide funding to Nazarbayev University and Nazarbayev Intellectual Schools in 2021.  As noted, in two years alone, NGF and the Jusan Group have provided millions of dollars to Nazarbayev University, Nazarbayev Intellectual Schools, and supporting organizations.  These grants have supported efforts to provide education that emphasizes the values of intellectual liberty, innovation, and academic freedom.  NGF expects funding to increase substantially in the coming years, particularly to address a significant

12

decrease in financial support from the Government of Kazakhstan in light of severe fiscal challenges to Kazakhstan's national budget.

52.     NGF is funded entirely by profit distributions from Jysan Holding, which receives its revenue solely in the form of dividend payments from the Jusan Group entities through JTL.

**C. The Jusan Group's Financial Success Provokes the Government and Dzhaksybekov to Force a Takeover of First Heartland Bank.**

53.     After its acquisitions of Tsesnabank and ATF Bank—which are now part of First Heartland Bank—First Heartland Bank achieved rapid revenue growth.

54.     This success and increased profitability was attributable to a disciplined and strategic approach to handling the impaired loans that still made up a substantial share of the Tsesnabank's and ATF Bank's portfolio after their acquisition by First Heartland Bank.  As part of this effort, First Heartland Bank implemented a new business strategy geared toward increasing repayment of poorly performing loans.  This marked a sharp departure from the corrupt banking practices engaged in by Tsesnabank's former owner.

55.     In addition, the Bank implemented transparent corporate governance and decision-making, clear mechanisms for judicial and out-of-court debt collection, systematic elimination of corruption in the process of debt collections, and categorical suppression of loan restructurings between collectors and debtors.  By removing borrowers' incentives to negotiate for informal payment arrangements, the Bank incentivized borrowers to pay off their debt rather than risk losing collateral.  These and other measures had a significant positive effect on the Bank's revenue and bottom line.

56.     The Bank has also taken a forward-looking approach to its business model.  As one example, in the past few years, the Bank has focused on digital technologies, establishing an e-commerce platform and moving toward an integrated model for financial services.  As a result of these efforts and improvements in profitability, asset quality, solvency, and risk management, Moody's Investors Service upgraded its outlook on the Bank's ratings from stable to positive on December 14, 2022.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

13

57. Thanks in part to the success of these strategies, the Bank has been able to pay dividends.

58. Today, First Heartland Bank is the third-largest banking conglomerate in Kazakhstan and maintains strong relationships with foreign financial institutions.

59. The Bank's ability to pay dividends to its shareholders has, in turn, enabled NGF to provide significant funding to Nazarbayev University and Nazarbayev Intellectual Schools. NGF and the Jusan Group funded these entities, and supporting organizations, with millions of dollars in support to provide education emphasizing excellence, academic rigor, evidence-based research, scientific temper, innovation, and academic freedom.

**D. Defendants Harass and Extort the Jusan Group in an Effort to Steal the Group's Assets.**

60. Beginning in 2022, Defendants, including the government and government-agency Defendants, began to operate as an enterprise associated-in-fact and to participate in and operate other enterprises through a pattern of racketeering activity. Defendants' goal was to wrongfully obtain the assets of the Jusan Group for the benefit of the Individual Defendants. Each of the Individual Defendants are associated by virtue of operating under the color of authority of the Government of Kazakhstan, either directly through employment by the Government, or in the case of Defendant Dzhaksybekov, through close ties to the Government. Defendants' association-in-fact enterprise was in existence at least since January 2022 and is ongoing in a manner that permits its associates to engage in a pattern of racketeering.

61. This pattern of racketeering includes attempts to extort the Jusan Group constituting a violation of the Hobbs Act, 18 U.S.C. § 1951, which provides in relevant part: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both," 18 U.S.C. § 1951(a). As used in that section, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "Commerce"

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

14

includes "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

    1.   *The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan Begins Harassing First Heartland Bank.*

62.    Beginning in January 2022 and continuing through the date of this filing, the Government of Kazakhstan, including various governmental and quasi-governmental agencies, has ordered at least 11 unjustified and unlawful investigations, requests, or inspections of Jysan Holding's indirect subsidiary, First Heartland Bank. These unlawful acts began as a purported effort to assist the Bank with compliance, but they quickly revealed themselves to be transparent—and at times breathtakingly illegal—attempts to force unlawful payments to the Government of Kazakhstan and private individuals.

63.    More specifically, starting on or about January 11, 2022, representatives for the ARDFM assigned five agents to surveil the Bank full-time. This surveillance represents an unwarranted intrusion far beyond ARDFM's historical monitoring of the Bank and ARDFM's standard monitoring of other banks.

64.    In connection with this surveillance, ARDFM representatives flooded the Bank with broad and harassing requests for information regarding all aspects of the Bank's activities. These requests were made with unreasonably short deadlines, forcing Bank staff to prioritize ARDFM's request over regular business operations.

65.    In addition to around-the-clock surveillance, ARDFM imposed arbitrary restricted-transaction thresholds on all transactions of parties related to the Bank. These restrictions, which continue to the date of this filing, are so extreme that all transactions involving the Jusan Group must be approved by ARDFM and the FMA before being executed.

66.    ARDFM has, in turn, unjustifiably denied approval for small and large transactions. For example, under the auspices of these transaction thresholds, ARDFM has blocked certain Bank staff from using their bank card to pay for daily expenses and has blocked

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

15

the transfer of USD $4 million from NGF's account at the Bank to NGF's U.S.-based bank account. This payment remains blocked and is ultimately needed to fund Nazarbayev University's and Nazarbayev Intellectual Schools' operating expenses. NGF has since been unable to transfer any funds from its account at the Bank. This includes small transfers to its own accounts for operations, as well as payments to vendors who have provided services to NGF in furtherance of its core mission. For example, NGF's payments for legal services, web design, translation services, and accounting and tax services have all been blocked. Remarkably, NGF was not provided any formal explanation as to why its transfers have been blocked.

67.     ARDFM went even further and instructed the Bank to freeze the accounts of certain Bank personnel and their relatives indefinitely and without justification.

68.     ARDFM has been unwilling to leave a record of their actions. When ARDFM approves a transaction, it insists on doing so orally. When ARDFM denies a transaction, it does not provide, either in writing or orally, any explanation for why the transaction was denied.

69.     These efforts have hindered the economic activities of the Bank and have caused the loss of many established clients. The Bank's loss of clients and business has had a significant impact on Plaintiffs, which depend on dividend payments from the Bank to fund their operations and their obligations to NGF.

70.     ARDFM has stated that the purpose of this surveillance was to ensure the Bank's compliance with the newly updated anti-money laundering regulations. But it is clear that this was pretextual. In reality, no other bank received such "assistance." ARDFM was instead initiating a broad campaign of intimidation, coordinated with several Government agencies and individuals and designed to prevent the Bank from engaging in regular business and, in turn, to pressure the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

16

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

2. *Financial Monitoring Agency of the Republic of Kazakhstan Launches Pretextual Investigation into First Heartland Bank and Seizes Documents.*

71.    In February 2022, the FMA launched a criminal investigation against former ATF Bank officials purportedly regarding the issuance of non-performing loans between 2013 and 2016.

72.    But the focus of the investigation has also proven to be pretextual.  During the pendency of the criminal case, FMA seized documents from the Bank well beyond the scope of an investigation into historical loans.  As examples, the FMA seized documents related to the purchase of ATF Bank in 2020, the Bank's dividend information after 2020 and account transactions of Bank officials entirely unrelated to ATF Bank's historical loans.

3. *Government-Owned Organizations Take Adverse Actions Against First Heartland Bank.*

73.    Between January and March 2022, a number of Government-owned organizations withdrew all funds from the Bank on the instruction of the Government of Kazakhstan.  This resulted in an outflow of significant capital from the Bank.  These Government-owned organizations include, but are not limited to: Damu, Kazakhstan's Entrepreneurship Development Fund; Kazakhtelecom and Kcell, the largest telecommunications company and main cellular communication operator in Kazakhstan; and Samruk-Kazyna, a Kazakhstani sovereign wealth fund with ownership interests in national rail and postal service as well as state-run gas and oil.

74.    Moreover, during this time, all Government agencies, in particular the Ministry of Digital Development and the Tax Committee, ceased all cooperation relating to the Bank's collaborative effort with the Government to develop "govtech" products.

4. *Anti-Corruption Agency of the Republic of Kazakhstan Launches a Sham Criminal Action and Makes Extortion Attempts.*

75.     Beginning in June 2022, AARK launched a purported criminal investigation into the Bank regarding its 2019 commercial purchase of Tsesnabank and subsequent earnings.

17

76.     On information and belief, the impetus of this investigation was a letter from the former owner of Tsesnabank, Defendant Adilbek Dzhaksybekov, in which he improperly leveraged his personal connections to AARK leadership to force the investigation and with the ultimate goal of extorting millions of dollars from the Bank.

77.     Defendant Dzhaksybekov's push for criminal investigations centers around accusations that the Bank's commercial purchase of Tsesnabank was somehow illegal, notwithstanding the fact that both he and the Government of Kazakhstan participated in and/or led the purchase, and that the purchase was necessitated by the near collapse of Tsesnabank under his prior ownership.

78.     In connection with its investigation, AARK has undertaken extreme illegal and arbitrary enforcement measures, including excessive interrogations of Bank employees, unwarranted searches of key personnel and premises of the Bank, as well as travel restrictions for Jusan Group officers and employees.   On information and belief, these extreme enforcement measures were undertaken by AARK at the request of Mr. Dzhaksybekov.

79.     In addition, AARK directed ARDFM to block all transactions, including the payment of dividends of the Jusan Group.   On October 7, 2022, ARDFM received correspondence from AARK to "take effective and comprehensive measures to suspend all expense (debit) transactions on payment of dividends by the Bank, FHS JSC, Jysan Technologies, Jysan Holding and [NGF] to their shareholders and owners, as well as any other payment transactions under the specified group of companies" and to "suspend expropriation actions of the shares of the Bank and FHS" during the pendency of the criminal investigation. On October 8, 2022, First Heartland Bank received correspondence from ARDFM signed by Defendant Kizatov, in which he detailed AARK's October 7, 2022 instruction to ARDFM.

80.     On behalf of the Bank, Mr. Shigeo Katsu attended a meeting in July 2022 with the President of Kazakhstan, Kassym-Jomart Tokayev, seeking to end the unfounded investigation.  Mr. Katsu is the Chairman of the Board of Directors for both the Bank and FHS. During the meeting, President Tokayev stated he was aware that Defendant Dzhaksybekov had

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1   raised complaints about the purchase of Tsesnabank, and suggested that Mr. Katsu should

2   settle with Defendant Dzhaksybekov.

3       81.    Following this meeting, Defendant Dzhaksybekov attempted to extort Mr. Katsu

4   and the Bank, suggesting that AARK would close its investigation if the Bank paid him.

5   Defendant Dzhaksybekov touted his personal connection to AARK officials, and demanded a

6   payment of 60 million tenge (approximately USD $130 million) for unspecified "damages."

7       82.    Mr. Katsu refused all attempts to extort him and the Bank, noting that such

8   payment without any evidence or justification would violate various anti-corruption laws and

9   that the Jusan Group has to obey all laws, including those of Kazakhstan, the United Kingdom,

10  and the United States.

11      *5.*   *Government of Kazakhstan Attempts to Force Repayment of Government Assistance*

12         *and to Take Control of FHS.*

13      83.    The mounting regulatory harassment from the Government of Kazakhstan in the

14  first quarter of 2022 forced Mr. Katsu to attend a series of additional meetings with

15  Government of Kazakhstan officials to seek an end to the Government's illegal campaign.

16      84.    During those meetings, Government of Kazakhstan officials, including

17  representatives of ARDFM and the Prime Minister of Kazakhstan, Alikhan Smailov, claimed

18  that the Bank was forbidden from paying dividends until the Bank repaid the Government

19  assistance provided to Tsesnabank and ATF Bank.

20      85.    No such limitation existed under any applicable law or contract, which of course,

21  the Government knows.  Nor had this restriction ever been raised before, including when the

22  Bank issued dividends in December 2021.

23      86.    Further, the Government of Kazakhstan has allowed other financial institutions

24  to declare dividends without any issues, notwithstanding prior government assistance.  As

25  examples, Halyk Bank, Kaspi Bank and Sberbank Kazakhstan were allowed to pay dividends

26  despite receiving significant state support over multiple years without first fully repaying the

27  loans.

28

19

87.     Nonetheless, ARDFM continues to state that it will block any dividend payments and has threatened to imprison any Jusan Group employee who facilitates any dividend payment.

88.     In addition, Mr. Suleimenov met with Jusan Group officials in September 2022, to demand that ownership of the Jusan Group be taken from U.S. and U.K. entities and be given to Kazakhstan.   During one such meeting, Mr. Suleimenov stated that he was participating as a representative of, and at the direction of,  President Tokayev, and threatened the Jusan Group with additional Government actions over the lack of Kazakhstani citizens on the Boards of NGF and Jysan Holding.  In that meeting, Mr. Suleimenov also demanded that control of FHS (and by extension, of the Bank) be given to unspecified Kazakhstani citizens. He did not provide any legal justification for the demand, nor could he.

> *6.     Government of Kazakhstan Takes Action against Jusan Group Employees.*

89.     Upon information and belief, in the context of the Government of Kazakhstan's negotiations with the Jusan Group in the first quarter 2022, the Government put pressure on the Jusan Group's auditors to withhold audit reports until the return of all shares and option agreements from Jusan Group employees.   The Government also threatened to initiate a criminal case relating to options that were not returned.

90.     The ongoing negotiations and the threat of criminal action caused the involuntary surrender of these assets held by the Jusan Group employees.

91.     The involuntary return of options caused Jusan Group personnel significant personal losses in the amount of tens of millions of dollars—compounding the personal losses implicated by ARDFM's instruction to the Bank to freeze accounts of certain Bank personnel and their relatives.

92.     For example, one member of the Jusan Group management—now a permanent resident of the United States—was forced to return his option of 4.62% shares of JTL, a book value of over USD $73 million as of May 2022.  The Government has also threatened that same member with trial in absentia and imprisonment should that employee take any actions

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

to counter the Government of Kazakhstan in its efforts to seize the property of the Jusan Group and its employees.

93.    Mr. Suleimenov in particular inquired as to the return of shares and options during subsequent negotiations in September 2022, corroborating the Government-backed nature of the extortion.

### 7. ARDFM Illegally Interferes with FHS's Dividend Payments.

94.    On October 6, 2022, FHS declared dividends and requested that the Bank add the declaration of dividends to its extraordinary general meeting.  That declaration and request legally obligated the Bank, under its written policies and governing documents, to make a dividend distribution to FHS.  Significant portions of the dividends owed to FHS are the ultimate property of Jysan Holding, and will, in turn, be owed to Jysan Holding under intercompany policies and agreements.

95.    On October 7, 2022, ARDFM blocked FHS and the Bank from making this and other dividend payments in the approximate total amount of USD $387 million, as well as from making other payment transactions of the Bank to its direct and indirect parent companies.

96.    ARDFM representatives Defendants Kizatov and Omarbekov called Bank representatives in October 2022 regarding these blocked payments.  During a call with the Bank's Chief Compliance Officer, Ms. Ardak Mukasheva, Defendant Omarbekov echoed the assertions made in prior meetings between representatives of the Bank and the Government, claiming that the Bank's funds belong to the Government of Kazakhstan and threatening that law enforcement was preparing to arrest and interrogate employees of the Bank and employees of its affiliates.

97.    Defendant Omarbekov called the Bank again on October 8, 2022, claiming that ARDFM had obtained a letter from an unnamed law enforcement agency directing ARDFM to block all dividend payments from the Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

21

*8.   FMA Illegally Interferes with FHS's Dividend Payments.*

98.   On October 13, 2022, the FMA sent a letter to the Bank incorrectly asserting that the Bank had received 1.5 trillion tenge from the Government of Kazakhstan on preferential terms and somehow was in default on this "debt."  In the letter, the FMA asserted that it was suspending the Bank's ability to pay dividends to its shareholders and requiring that the Bank notify FMA before further dividend payments are carried out.

*9.   The Government's Proffered "Justifications" are Shifting, Contradictory, and Baseless.*

99.   Throughout the pendency of its campaign, the Government has provided various "justifications" for its actions—none of which justify the Government's illegal actions against the Jusan Group.

100.   When ARDFM increased surveillance of First Heartland Bank, the "justification" was to ensure the Bank's compliance with the newly updated anti-money laundering regulations.

101.   When FMA launched a criminal investigation against former ATF Bank officials, the "justification" was to investigate the issuance of non-performing loans between 2013 and 2016.

102.   In the end, the Government has settled on a single justification: that AARK's criminal investigation, and ARDFM and FMA's blocking of dividend payments, are somehow "justified" by First Heartland Bank's commercial purchase of Tsesnabank and ATF Bank.  Of course, this "justification" is just as baseless as all of its predecessors, as the key members of the campaign to harass the Bank were also the architects of the Framework Agreements.  Indeed, the Bank has previously issued dividends without objection from the Government of Kazakhstan, including as recently as December 2021.

103.   On information and belief, the Defendants' intent has been to stop the dividend funds from traveling outside of Kazakhstan—and thus outside of the Government's control—for the benefit of Plaintiffs, because Defendants know the dividend funds are for the benefit of, and owed to, Plaintiffs JTL and Jysan Holding, and ultimately NGF.

22

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**E. The Government Retaliates Against the Plaintiffs After Negotiation Fails.**

*10. Plaintiffs Notify Defendants of Their Intention to Enforce Their Rights and the Parties Engage in Unsuccessful Negotiations.*

104. In a last-ditch effort to resolve the dispute without court intervention, Plaintiffs notified Defendants of their intention to bring suit in Nevada. Throughout November, the parties, including counsel for the parties, engaged in a series of informal negotiations. Those negotiations were unsuccessful and part of a delay tactic while Defendants lined up corrupt legislators and agencies to ready an assault on Plaintiffs.

105. Since then, Defendants' campaign of harassment has only intensified in what is plainly retaliation for Plaintiffs' informing Defendants of their intention to file this lawsuit.

*11. Defendants Retaliate Against Plaintiffs by Introducing Legislation Targeting the Jusan Group.*

106. On November 22, 2022, one day after President Tokayev's re-election, the lower house of Kazakhstan's Parliament, the Majilis, approved a draft law with amendments to the Law "On Banks and Banking Activities in the Republic of Kazakhstan." The proposed amendments were directed at Plaintiffs and sought to, *inter alia*, (1) change the definitions of "bank holding" and "major participant in a bank" such that non-profit organizations, like NGF, could not directly or indirectly own banks; (2) place restrictions on banks that have received Government assistance, like First Heartland Bank, to prevent them from distributing dividends, including by allowing ARDFM to block such dividends; and (3) require all major direct and indirect shareholders and controlling entities of banks to apply for and obtain approval from ARDFM within 30 days of the date of publication of the amendments.

107. The upper house of Kazakhstan's Parliament, the Senate, subsequently approved the amendments allowing ARDFM to block dividends from banks that have received Government assistance and requiring ARDFM approval for major direct and indirect shareholders and controlling entities of banks, while it rejected the proposed amendment barring non-profit organizations from owning banks, for lack of justification.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

23

108.    These amendments, which entered into force on January 1, 2023, will allow the Government to block the dividends to which Plaintiffs are entitled and even to prohibit Plaintiffs' ownership interests in the Bank.  Under the amendments, JTL, Jysan Holding, and NGF would each need to obtain and submit to ARDFM credit ratings, audited financial statements, and relevant notarizations and apostilles from multiple jurisdictions within 30 days, which is simply not feasible.  Further, if these entities remain major shareholders in the Bank without ARDFM approval, ARDFM may demand that they reduce their indirect ownership share to below 25% and suspend all transactions between them and the Bank; establish trust management of the Bank's shares for up to three months; and ultimately alienate the Bank's shares by selling them on a securities market.  **There could not be a clearer case of unlawful seizure of assets under the control of Nevada citizens**.

109.    At least one member of the Majilis publicly stated that these amendments are explicitly designed to target the shareholders of First Heartland Bank and block the dividends at issue here.

110.    After delaying until one day following President Tokayev's re-election, the Government has now made the objectives and intent of its campaign clear—to stop the dividend funds from traveling outside Kazakhstan, to coerce the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates, and to retaliate against the Jusan Group for seeking to enforce its rights in an American court.

*12. Defendants Retaliate Against Plaintiffs by Filing a Suit Against Them in Kazakhstan.*

111.    On December 2, 2022, Kazakhstan's Prosecutor General filed suit against numerous members of the Jusan Group, including Plaintiffs, and employees of the Jusan Group, including Mr. Katsu and the employee previously threatened with imprisonment.  The Prosecutor General reports directly to the President and represents the interests of the Government of Kazakhstan in court.

112.    The suit sought to do through the court exactly what Defendants have attempted to do through their campaign of harassment—to weaken the Jusan Group and limit its access to its own capital.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

24

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

113.    Specifically, the lawsuit sought to invalidate an agreement between two members of the Jusan Group—JTL and Pioneer Capital Invest LLP ("Pioneer").   The invalidation of this agreement would have eliminated NGF's ownership interests in JTL and therefore eliminated NGF's access to dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.  The lawsuit also sought the return of millions of dollars (USD) in assets and cash from JTL to Pioneer, including JTL's shares in the Bank.  The assets and funds at issue were properly transferred to JTL via the agreement the Government sought to invalidate.  By seeking the movement of assets and funds from Plaintiff JTL to Kazakhstan-based Pioneer, the Government is interfering with Jusan Group's assets and seeking to move them into Kazakhstan where the Government will be able to exert greater control.  Finally, the lawsuit sought that all the named Jusan Group employees surrender their shares in the Bank.

114.    A Kazakhstani court quickly dismissed the Prosecutor General's suit based on its determination that the claims lacked  evidence.   This emphatic dismissal of the Prosecutor General's baseless suit further demonstrates the Government's blatant misuse of the state apparatus to target the Jusan Group.

*13. Kazakhstani Government Officials Threaten "War" Against Jusan Group Employees.*

115.    On December 20, 2022, Kazakhstani Prime Minister Alikhan Smailov sent a message to the same Jusan Group employee – a United States resident – who was previously threatened with imprisonment, demanding the Jusan Group's return to Kazakhstan and threatening "war" if the Government's demands are not met.

*14. Defendants Repackage Their Previously Dismissed Complaint and Refile Suit in Kazakhstan.*

116.    On February 10, 2023, the Kazakhstani Prosecutor General filed another suit against members of the Jusan group challenging the 2020 transaction between JTL and Pioneer and seeking to seize certain Jusan Group property.  While this suit alleges slightly different facts and claims different causes of action, its aim is the same as the suit filed, and swiftly

25

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1  dismissed, in December 2022—to threaten the Jusan Group into handing over its control to the

2  Government.

3  117.  But the Government goes even a step further in the February suit and seeks to

4  seize myriad assets of not just the defendants to the action, but of the Jusan Group at large.

5  The Prosecutor General seeks to seize Jusan Group shares in over a dozen entities.

6  118.  Once again the Prosecutor General sought to have JTL return to Pioneer millions

7  of dollars (USD) in assets and cash which were properly transferred to JTL.  And once again

8  the result, if the suit were successful, would be the movement of the Jusan Group's lawfully

9  controlled assets into Kazakhstan where the Government will be able to exert greater control.

10  **F.  The Government's Illegal Campaign Is Consistent with Historical Corruption.**

11  119.  Defendants' actions are consistent with historical corrupt practices in

12  Kazakhstan, as well as reports of a marked increase in corruption in Kazakhstan in recent

13  years.

14  120.  As one example, in 2013, an arbitration panel awarded a Moldovan company

15  USD $497,685,101 in damages (plus 50% of the cost of legal representation) for the

16  Government of Kazakhstan's breach of the Energy Charter Treaty, an international agreement

17  establishing cross-border cooperation in the energy industry.  That matter involved strikingly

18  similar tactics to those employed against the Plaintiffs.  There, the tribunal found that

19  Kazakhstan breached the company's right to fair and equitable treatment under the

20  Treaty.  Specifically, the company alleged that Kazakhstan engaged in a campaign of

21  harassment, culminating in the cancellation of its oil and gas exploration contracts and the

22  seizure of its assets located in Kazakhstan.  That campaign reportedly included tactics by

23  Kazakhstan's financial police and seven quasi-state entities and involved the baseless freezing

24  of the company's assets, around-the-clock surveillance and inspection by government agency

25  officials which prevented employees from conducting regular business affairs, the

26  unwarranted seizure of documents, the unlawful arrest and conviction of an in-country

27  manager, and the reversal of prior government approvals and waivers.

28

121.    More recently, media reports have noted that corruption cases in Kazakhstan have increased dramatically in 2022, including by as much as 30 percent.    Transparency International's Corruption Perceptions Index, the most widely used global corruption ranking in the world, measures Kazakhstan as a bottom performer in public sector corruption within Eastern Europe and Central Asia, itself the second lowest performing region worldwide.    A recent report published by the Group of States Against Corruption, the Council of Europe's anti-corruption body, has comprehensively identified the ongoing "serious problem" of corruption that exists in Kazakhstan.    Expert assessments reveal that Kazakhstan's progress toward anti-corruption measures is scattered at best.

122.    In October 2022, U.S. Senators on the Senate Foreign Relations Committee called for an "international investigation into state-sanctioned violence and review of U.S. security assistance following nationwide protests earlier this year" in Kazakhstan, including Kazakh security forces' violent response toward civilian protestors.    As part of that investigation, the Senators have called on the U.S. Department of State to review its relationship with Kazakhstan in order to "prioritize protecting fundamental freedoms and strengthening the rule of law."

**G.    The Government's Illegal Campaign, Particularly Blocking Dividend Payments, Is Causing a Concrete Harm to the Jusan Group's Operations.**

123.    Unsurprisingly, and presumably as the Government intended, the Government's campaign, including most notably the blocking of approximately USD $387 million in dividends, is causing significant, immediate, and concrete harm to Plaintiffs' operations.

124.    Plaintiffs are unable to receive dividend funding from their subsidiaries connected to the Bank—a primary source of funding—nor are they able to fulfill their obligation to provide dividend funding to their parent organizations.    In turn, NGF is unable to transfer or use its own funds in its own bank accounts or receive lawfully issued dividends, to serve its sole mission: to fund Nazarbayev University and Nazarbayev Intellectual Schools. Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Nazarbayev University's and Nazarbayev Intellectual Schools' students, researchers, and educators.

125.    In addition, in August 2022, Plaintiff JTL represented its intention to buy back USD $20 million in JTL shares from an investor.  Because of the blocked dividend payments, JTL is unable to proceed with this buyback.

## FIRST CAUSE OF ACTION
### (EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW)
**(against Defendant Republic of Kazakhstan and Governmental Agency Defendants)**

126.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

127.    As parent corporations and shareholders of First Heartland Securities and First Heartland Bank, Plaintiffs have direct property interests in their rights to receive declared dividends from those subsidiaries.

128.    Through their conduct alleged above, including obstructing Plaintiffs' subsidiaries from paying lawfully declared dividends to their foreign shareholders and directly aiming their conduct at that result, Defendant Republic of Kazakhstan and its agencies have expropriated and taken Plaintiffs' property in violation of international law.

129.    Defendant Government of Kazakhstan and its agencies have also violated customary international law by expropriating and taking similar property interests belonging to First Heartland Securities and First Heartland Bank with the discriminatory purpose to harm their foreign shareholders.

## SECOND CAUSE OF ACTION
### (18 U.S.C. § 1964(c)) (against the Individual Defendants)

130.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

131.    The Individual Defendants are associated-in-fact as an enterprise engaged in and whose activities affect interstate commerce, and have operated and participated in the conduct of additional enterprises, including the Defendant Government and its agencies.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

28

132. The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting Plaintiffs, ultimately for their own personal benefit.

133. The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting the Jusan Group.

134. The Individual Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

135. As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

<div align="center">

**THIRD CAUSE OF ACTION**
**(Nev. Rev. Stat. § 207.470) (against all Individual Defendants)**

</div>

136. Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

137. Individual Defendants have committed at least two distinct crimes related to racketeering as defined in Nev. Rev. Stat. § 207.360, constituting racketeering activity pursuant to Nev. Rev. Stat. § 207.390.

138. Defendants have participated directly and indirectly in the conduct of the affairs of an enterprise whose activities constitute racketeering activity, in violation of Nev. Rev. Stat. § 207.400.

139. Plaintiffs have been injured in their business and property by reason of Defendants' violations.

<div align="center">

**FOURTH CAUSE OF ACTION**
**(INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)**
**(against all Defendants)**

</div>

140. Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

141.     Valid intercompany agreements exist between First Heartland Bank and First Heartland Securities, First Heartland Securities and JTL, JTL and Jysan Holding, and Jysan Holding and NGF. Each of those intercompany agreements entitles the parent company in the corporate relationship to dividend payments from its subsidiary. Jysan Holding and JTL are parties to those agreements or, with respect to the agreements to which Jysan Holding and/or JTL are not a party, third-party beneficiaries.

142.     Defendants each have knowledge of the aforementioned agreements, and have committed intentional acts intended and designed to disrupt each relationship. Defendants' acts have caused actual disruption of each agreement, and caused Jysan Holding and JTL damages resulting from that disruption.

<div align="center">

**FIFTH CAUSE OF ACTION**
**(INTENTIONAL INTERFERENCE**
**WITH PROSPECTIVE ECONOMIC ADVANTAGE) (against all Defendants)**

</div>

143.     Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

144.     Upon receipt of the blocked dividend from the Bank, FHS planned to dividend all or portions of the blocked dividend to JTL, and JTL then planned to dividend all or portions of the blocked dividend to Jysan Holding, which was to dividend all or portions to its parent, NGF, minus reasonable operational expenses. Defendants each have knowledge of the ultimate purpose of the blocked dividend, and have committed intentional acts intended and designed to disrupt the dividends to Plaintiffs and the dividend to NGF. Defendants' acts have caused actual disruption to those prospective dividends, and caused Jysan Holding and JTL damages resulting from that disruption.

145.     Defendants' conduct was unwarranted and without justification. No agreement or law provides for a right of interference or dividend obstruction relating to the Government's bailout payments to Tsesnabank and ATF Bank. As a direct result of Defendants' conduct, Plaintiffs and their affiliates did not receive funds necessary to perform their basic functions and missions, including their funding of NGF, Nazarbayev Intellectual Schools, and Nazarbayev University.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

<div align="center">30</div>

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

### SIXTH CAUSE OF ACTION
### (CIVIL CONSPIRACY) (against all Defendants)

146.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

147.    Defendants have acted in concert with the intent to accomplish an unlawful objective for the purpose of harming the Jusan Group, including Plaintiffs.

148.    As a result of Defendants' acts in furtherance of that conspiracy, the Jusan Group, including Plaintiffs, has suffered damages.

149.    Defendants are jointly and severally liable for the damages that Plaintiffs have suffered as a result of each act taken by each Defendant in furtherance of Defendants' conspiracy.

### SEVENTH CAUSE OF ACTION
### (CIVIL AIDING AND ABETTING) (against all Defendants)

150.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

151.    Each Defendant has substantially assisted and encouraged other Defendants' conduct in breaching duties owed to Plaintiffs, including tort duties and statutory duties as set forth above.

152.    Defendants' breaches have caused harm to the Jusan Group, including Plaintiffs.

153.    Defendants are each liable under a civil aiding and abetting theory for damages caused by the breaches that they have substantially assisted and encouraged.

### PRAYER FOR RELIEF

154.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein and respectfully request that the Court:

a)    Declare that Defendants' conduct has unlawfully injured Plaintiffs, and is not subject to any lawful privilege or justification;

b)    Award Plaintiffs compensatory and punitive damages in an amount to be determined at trial, including trebled damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

c)    Award Plaintiffs their costs and expenses, including attorneys' fees; and

31

d)  Award Plaintiffs such further relief as may be just under the circumstances.

### JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED this 16th day of February 2023

<div style="margin-left:40%">

HOLLAND & HART LLP

/s/ *J. Stephen Peek*
J. Stephen Peek
Erica C. Medley
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya
(*pro hac vice* forthcoming)
Jeffrey B. Korn
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

</div>

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

32

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jysan Holding, LLC; Jusan Technologies LTD

## DEFENDANTS

Republic of Kazakhstan et al. (see attached)

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Republic of Kazakhstan
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

(see attached)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☒ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1964(c)

Brief description of cause:
Violation of Racketeer Influenced Corrupt Organizations Act and related violations of state and international law based on expropriation of assets.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/16/2023 | /s/ J. Stephen Peek |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Ex. Page No. 34

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Civil Cover Sheet Attachment

Section I(a) Defendants:
Republic of Kazakhstan;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan;
The Anti-Corruption Agency of the Republic of Kazakhstan;
The Financial Monitoring Agency of the Republic of Kazakhstan;
The Committee for National Security of the Republic of Kazakhstan;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Chairperson, Abylkassymova, Madina;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Deputy Chairperson, Kizatov, Olzhas;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Representative, Omarbekov, Arman;
Dzhaksybekov, Adilbek.

Section I(c) Plaintiffs' Attorneys:
J. Stephen Peek
Erica C. Medley
Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
(702) 669-4600

Tariq Mundiya
Jeffrey B. Korn
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Michael J. Gottlieb
Willkie Farr & Gallagher
1875 K Street, NW
Washington, DC 20006
(202) 303-1000

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | ) ) ) ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Republic of Kazakhstan et al. | ) ) ) ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No.   2:23-cv-00247-JAD-VCF

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Madina Abylkassymova, Chairperson
The Agency for Regulation and Development of the Financial Market of the Republic of
Kazakhstan
21, Koktem-3
Almaty, 050040
Republic of Kazakhstan

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| Stephen Peek | Tariq Mundiya | Michael J. Gottlieb |
|---|---|---|
| Erica C. Medley | Jeffrey B. Korn | Willkie Farr & Gallagher LLP |
| Holland & Hart LLP | Willkie Farr & Gallagher LLP | 1875 K Street, NW |
| 9555 Hillwood Dr., 2nd Fl. | 787 Seventh Ave. | Washington, DC 20006 |
| Las Vegas, NV 89134 | New York, NY 10019 | |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DEBRA K. KEMPI

DATE     February 22, 2023

CLERK

(By) DEPUTY CLERK

Ex. Page No. 37

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:23-cv-00247-JAD-VCF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                              *Server's signature*

                                    _____
                                              *Printed name and title*


                                    _____
                                              *Server's address*

Additional information regarding attempted service, etc:

1   Дж. Стивен Пик/ J. Stephen Peek
    (Лицензия № 1758 Невады)
2   Эрика С. Медли/ Erica C. Medley
    (Лицензия № 13959 Невады)
3   Holland & Hart llp
    9555 Hillwood Drive, 2nd Floor
4   Las Vegas, NV 89134
    Тел: 702.669.4600
5   Факс: 702.669.4650
    speek@hollandhart.com
6

7   Тарик Мундия/ Tariq Mundiya (*pro hac vice будет предоставлено позднее*)
    Джеффри Б. Корн/ Jeffrey B. Korn (*pro hac vice будет предоставлено позднее*)
8   Willkie Farr & Gallagher LLP
    787 Seventh Avenue
9   New York, New York 10019
    (212) 728-8000
10  tmundiya@willkie.com
    jkorn@willkie.com
11

12  Майкл Дж. Готлиб/ Michael J. Gottlieb (*pro hac vice будет предоставлено позднее*)
    Willkie Farr & Gallagher LLP
13  1875 K Street, NW
    Washington, DC 20006
14  (202) 303-1000
    mgottlieb@willkie.com

15
    *Адвокаты Истцов*
16  *Jysan Holding, LLC; и*
    *Jusan Technologies Ltd.,*

17

**ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД США**

18

**ОКРУГ НЕВАДА**

19

| | |
|---|---|
| 20  JYSAN HOLDING, LLC, компания с ограниченной ответственностью, зарегистрированная в штате Невада; JUSAN TECHNOLOGIES LTD, компания с ограниченной ответственностью, зарегистрированная в Англии и Уэльсе; | **Дело №.:** **ИСКОВОЕ ЗАЯВЛЕНИЕ О РАССМОТРЕНИИ ДЕЛА СУДОМ ПРИСЯЖНЫХ** |

20

21

22

23
                   Истец,

24  против

25  Иностранное суверенное государство
    РЕСПУБЛИКА КАЗАХСТАН;
26  Правительственное учреждение
    Казахстана АГЕНТСТВО
27  РЕСПУБЛИКИ КАЗАХСТАН ПО
    РЕГУЛИРОВАНИЮ И РАЗВИТИЮ
28  ФИНАНСОВОГО РЫНКА;

Holland & Hart llp
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Правительственная антикоррупционная служба Казахстана АГЕНТСТВО РЕСПУБЛИКИ КАЗАХСТАН ПО ПРОТИВОДЕЙСТВИЮ КОРРУПЦИИ; Правительственное учреждение Казахстана АГЕНТСТВО РЕСПУБЛИКИ КАЗАХСТАН ПО ФИНАНСОВОМУ МОНИТОРИНГУ; Правительственное разведывательное агентство Казахстана КОМИТЕТ НАЦИОНАЛЬНОЙ БЕЗОПАСНОСТИ РЕСПУБЛИКИ КАЗАХСТАН; физическое лицо МАДИНА АБЫЛКАСЫМОВА; физическое лицо ОЛЖАС КИЗАТОВ; физическое лицо АРМАН ОМАРБЕКОВ; и физическое лицо АДИЛЬБЕК ДЖАКСЫБЕКОВ,

Ответчики.

**ВВЕДЕНИЕ**

1.     С начала 2022 года Правительство Республики Казахстан («Правительство» или «Правительство Казахстана») проводит незаконную кампанию в отношении корпораций штата Невада: Истца Jysan Holding, LLC («Jysan Holding, LLC») и New Generation Foundation, Inc. («NGF»), а также их прямых и косвенных дочерних компаний (вместе именуемых «Jusan Group») в целях хищения активов Истца на сумму более 1,5 млрд долларов США.     Указанная коррупционная и незаконная кампания демонстрирует наглый бандитизм нации — бывшего государства-сателлита Советского Союза, — которая использовала широкие полномочия правительства и высокопоставленных чиновников, чтобы, выходя далеко за пределы Казахстана, красть, запугивать и иным образом причинять вред физическим лицам и организациям в Соединенных Штатах.  Ответчики занимаются тем самым рэкетом и экспроприацией, которые запрещены федеральными законами. Истцы подают настоящий иск, чтобы устранить незаконное конфискационное поведение Ответчиков.

2.     Несмотря на то, что Правительство Казахстана представило многочисленные, противоречивые и предлоговые оправдания их действий против

Ex. Page No. 40

группы Jusan Group, истинная цель Правительства состоит в том, чтобы захватить контроль над активами Jusan Group в Казахстане в целях собственной коммерческой выгоды, обеспечивая огромную коммерческую выгоду частным лицам, наделенным Правительством привилегиями. Правительство продемонстрировало свое намерение добиваться данной цели любыми возможными средствами, среди которых: угрозы, запугивание, уголовные и гражданские расследования и судебные процессы, а также блокировка 387 миллионов долларов США дивидендов, предназначенных для распределения частным банком в составе Jusan Group, First Heartland Jusan Bank («First Heartland Bank» или «Банк») и непосредственной материнской компании Банка, АО First Heartland Securities («FHS») — средства, предназначенные для истца Jusan Technologies Ltd. («JTL»), истца Jysan Holding и, в конечном счете, NGF.  Схема Ответчиков по использованию органов Правительства Казахстана для нанесения вреда организациям из Невады стала предельно ясной. После того, как Истцы проинформировали Ответчиков о намерении защищать свои права в немедленно направленном иске, Ответчики предприняли два очевидных акта возмездия: во-первых, в ноябре 2022 г. Ответчики внесли изменения в законодательство, специально направленные против Истцов; а во-вторых, 2 декабря 2022 г. Генеральная Прокуратура Казахстана подала в суды Казахстана сфабрикованный иск против Истцов и иных членов и сотрудников Jusan Group.  Законодательные меры, направленные против Jusan Group, подробно описанные ниже, предусматривали незаконный захват активов, находящихся под контролем юридического лица из Невады. Совсем недавно, 10 февраля 2023 года, Генеральная прокуратура Казахстана подала недобросовестно составленный иск, основанный на ложных обвинениях, с единственной целью конфискации активов, находящихся под контролем JTL. Более того, Казахстан угрожал насилием и тюремным заключением резидентам США, имеющим материальные экономические интересы в Jusan Group, если коммерческие требования Казахстана не будут выполнены. Эти действия соответствуют ситуации с повсеместной коррупцией в Правительстве

Казахстана, которая, согласно публичным отчетам, ухудшилась с 2022 года. Таким образом, Правительство Казахстана прибегает к тем же незаконным инструментам — конфискации, экспроприации, угрозам и запугиванию, — которым отдают предпочтение самые репрессивные диктаторы и авторитарные режимы мира.

3.      Действия Правительства и некоторых отдельных лиц препятствуют Истцам (включая КОО штата Невада, которая была создана именно для того, чтобы избежать такого незаконного изъятия активов, которое совершается в настоящее время) в исполнении обязательств по предоставлению свободного образования и передового опыта получателям грантов NGF, через предоставление высшего образования в американском стиле и проведения рыночных реформ в Республике Казахстан. Действительно, в период, предшествующий противоправной деятельности, указанной в настоящем документе, NGF и Jusan Group усилиями Истцов в целом предоставили Назарбаев Университету (современному англоязычному исследовательскому университету, расположенному в столице Республики Казахстан Астане (ранее Нур-Султан)), а также Назарбаев Интеллектуальные Школы и их организациям, гранты на миллионы долларов.

4.      В отсутствие судебной защиты незаконная схема Ответчиков будет продолжать лишать Истцов основного источника финансирования от их дочерних компаний, связанных с Банком, и, соответственно, они не смогут выполнять свои обязательства по предоставлению дивидендного финансирования для их головных организаций, среди которых NGF.  В свою очередь, NGF не в состоянии переводить собственные средства или получать законно выпущенные дивиденды для выполнения своей единственной миссии — финансирования Назарбаев Университета и Назарбаев Интеллектуальные Школы.  В конечном счете, замораживая средства Jusan Group, Правительство лишает Назарбаев Университет и Назарбаев Интеллектуальные Школы необходимых ресурсов, следовательно, наносит ущерб их студентам, исследователям и преподавателям, препятствуя предоставлению образования, которое ставит акцент на

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4

необходимость высоких стандартов обучения, академической строгости, исследований, основанных на фактах, научного характера, интеллектуальной свободы, инноваций и академической свободы.

## ЮРИСДИКЦИЯ И МЕСТО РАССМОТРЕНИЯ

5.       Данный Суд обладает предметной юрисдикцией относительно данного иска в соответствии с 28 U.S.C. § 1331, поскольку данный иск возникает в соответствии с законодательством Соединенных Штатов, а именно 18 U.S.C. § 1964(c).

6.       Данный Суд также обладает предметной юрисдикцией относительно данного иска в соответствии с § 1330(a) 28 U.S.C., поскольку Ответчик Республика Казахстан и ее нижеперечисленные учреждения и органы являются иностранными государствами по определению в § 1603(a) 28 U.S.C, и не имеют права на иммунитет в соответствии с 28 U.S.C. §§ 1605–07 или любым применимым международным соглашением. Ответчик Республика Казахстан, а также перечисленные ниже агентства и органы Ответчика не защищены иммунитетом от юрисдикции данного Суда в соответствии с 28 U.S.C. § 1605(a)(2), поскольку данный иск основан на действиях за пределами территории Соединенных Штатов, связанных с коммерческой деятельностью Ответчиков за пределами США, и данные действия оказали непосредственное воздействие в Соединенных Штатах.

7.       Данный Суд обладает дополнительной юрисдикцией в отношении требований Истцов относительно законодательств штата в соответствии с 28 U.S.C. § 1367(a), поскольку эти требования настолько связаны с другими требованиями иска, что они являются частью того же дела или разногласия в соответствии со Статьей III Конституции Соединенных Штатов.

8.       Данный Суд обладает персональной юрисдикцией в отношении Ответчика Республики Казахстан и ее учреждений и органов, перечисленных ниже, в соответствии с 28 U.S.C. § 1330(b).

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 43

9.      Данный Суд обладает персональной юрисдикцией в отношении всех Ответчиков согласно Nev. Rev. Stat. § 14.065.  Данный Суд также обладает персональной юрисдикцией в отношении всех Ответчиков в соответствии с 18 U.S.C. § 1965 и правилами 4(k)(1)(C) и 4(k)(2) Федеральных правил гражданского судопроизводства.

10.      Место рассмотрения в данном округе является надлежащим в соответствии с 28 U.S.C. § 1391 (f) (1), поскольку значительная часть событий, послуживших основанием для иска, произошла в данном округе.  В качестве альтернативы, место рассмотрения в данном округе является надлежащим в соответствии с 28 U.S.C. § 1391(b)(3), поскольку Ответчики подлежат персональной юрисдикции в данном округе в отношении данного иска.

## СТОРОНЫ

11.      Истец Jysan Holding — компания с ограниченной ответственностью, зарегистрированная в соответствии с законодательством штата Невада.  Единственным членом Jysan Holding является NGF — организация со статусом 501 (c) (4), базирующаяся и зарегистрированная в Неваде.  Jysan Holding имеет 96,96 % прямого участия в JTL, которая выступает в качестве холдинговой компании для непрямых дочерних компаний Jysan Holding и является косвенным мажоритарным владельцем иных компаний, расположенных в Казахстане.  Jysan Holding управляет бизнесом и иной инвестиционной деятельностью NGF в интересах студентов учебных заведений-грантополучателей в Республике Казахстан.

12.      Истец JTL — компания с ограниченной ответственностью, учрежденная в соответствии с законодательством Англии и Уэльса.  Прямой материнской компанией JTL является Jysan Holding (указанная выше организация из Невады).  JTL является прямым и косвенным мажоритарным владельцем прочих компаний в Казахстане, среди которых FHS, в которой JTL владеет прямой долей участия в размере 99,48 %.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 44

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

13.     Ответчик Республика Казахстан — иностранное суверенное государство в значении 28 U.S.C. § 1603(a).  Ответчик Республика Казахстан имеет посольство в Соединенных Штатах по адресу 1401 16th St NW, Washington, DC 20036.

14.     Ответчик Агентство Республики Казахстан по регулированию и развитию финансового рынка («АРРФР») — правительственное учреждение, которому поручено осуществлять надзор за финансовым рынком и финансовыми организациями в Казахстане.

15.     Ответчик Агентство Республики Казахстан по противодействию коррупции («Антикоррупционная служба») — правительственное антикоррупционное учреждение.  Антикоррупционная служба отвечает за разработку и реализацию антикоррупционной политики Правительства Казахстана, координацию правоприменительных мероприятий по борьбе с коррупцией, а также выявление, пресечение, раскрытие и расследование коррупционных правонарушений. Антикоррупционная служба подчиняется непосредственно Президенту Казахстана.

16.     Ответчик Агентство Республики Казахстан по финансовому мониторингу («АФМ») — государственный орган, ответственный за предоставление рекомендаций по противодействию отмыванию денег и финансированию терроризма, а также за предотвращение, обнаружение, пресечение, раскрытие и расследование экономических и финансовые правонарушений, направленных им законодательными органами Республики Казахстан.  АФМ подчиняется непосредственно Президенту Казахстана.

17.     Ответчик Комитет национальной безопасности Республики Казахстан («КНБ») — правительственное разведывательное учреждение (совместно с АРРФР, Антикоррупционной службой и АФМ «Ответчики правительственных учреждений»).

18.     Ответчик Мадина Абылкасымова — председатель АРРФР.  Она проживает в Казахстане, гражданка Казахстана.

19.     Ответчик Олжас Кизатов — заместитель председателя АРРФР.  Он проживает в Казахстане, гражданин Казахстана.

Ex. Page No. 45

20.     Ответчик Арман Омарбеков — представитель АРРФР.  Он проживает в Казахстане, гражданин Казахстана.

21.     Ответчик Адильбек Джаксыбеков (вместе с ответчиками Абылкасымовой, Кизатовым и Омарбековым, «Индивидуальные ответчики») — бывший владелец Цеснабанка  банка, который Jusan Group приобрела в феврале 2019 года.  Он проживает в Казахстане, гражданин Казахстана.

## ФАКТЫ

**A. Члены Jusan Group Помогают Правительству Казахстана, Покупая Обанкротившиеся Казахстанские Банки.**

22.     В 2018 году банковский сектор Казахстана, не полностью оправившийся от финансового кризиса 2007–2009 годов и последующих девальваций казахстанского тенге в 2008 и 2015 годах, попал в острую уязвимую ситуацию после резкого падения мировых цен на энергоносители, что снова привело к значительной девальвации тенге. В ответ правительство Казахстана искало различные коммерческие решения, в стремлении избежать краха всей банковской системы страны.

23.     Цеснабанк в то время был вторым самым большим банком по размеру активов в Центральной Азии и принадлежал ответчику Джаксыбекову.  Ответчик Джаксыбеков злоупотреблял своими полномочиями в Цеснабанке для получения финансовой выгоды в собственных целях, а также для своей семьи и друзей, фактически используя Цеснабанк как частную инвестиционную компанию для достижения своих личных интересов и участия в прочих сомнительных или злонамеренных деловых операциях.

24.     К 2018 году Цеснабанк был на грани краха: почти 90 % активов банка были необслуживаемыми.

25.     Серьезные проблемы с ликвидностью у Цеснабанка не прекращались, несмотря на получение капитальных вливаний в рамках государственной помощи банковскому сектору Казахстана в 2017 году.  В начале сентября 2018 года банк получил

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 46

краткосрочный займ в размере нескольких сотен миллионов долларов от Национального Банка Республики Казахстан.  В последней отчаянной попытке остаться в бизнесе, Цеснабанк продал государству значительную часть портфеля сельскохозяйственных кредитов.  Однако, к середине сентября S&P понизило рейтинг ликвидности Цеснабанка с «адекватного» на «менее чем адекватный».

26.     Правительство Казахстана определило, что в случае краха Цеснабанка он, скорее всего, потопит с собой весь банковский сектор Казахстана.  Таким образом, правительство Казахстана непреклонно искало какое-нибудь коммерческое решение, которое бы позволило удержать Цеснабанк на плаву.  Пытаясь достичь поставленной цели, правительство Казахстана инициировало серию попыток спасения Цеснабанка в период с 2018 по 2019 год.

27.     Правительство охарактеризовало данные меры как «повышение устойчивости Цеснабанка за счет кардинального улучшения его кредитного портфеля».  В современных отчетах признавалось, что это была очередная помощь для спасения, направленная на исправление шаткого и ухудшающегося финансового положения Цеснабанка.

28.     Однако даже при такой финансовой поддержке, к январю 2019 года значительные потери в кредитном портфеле Цеснабанка продолжали угрожать жизнеспособности Цеснабанка.   Чтобы выжить, Цеснабанку нужны были дополнительные вливания капитала.  Правительство Казахстана срочно искало другой банк, который купил бы Цеснабанк и предоставил новый капитал, чтобы предотвратить крах Цеснабанка, а также обеспечить смену руководства для усиления операционной деятельности Цеснабанка.

29.     Правительство Казахстана обнаружило, что First Heartland Bank в Казахстане, принадлежащий Jusan Group, — потенциальное решение.  First Heartland Bank значительно нарастил наличные резервы и сохранил безупречную репутацию благодаря надлежащему управлению под руководством Jusan Group.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 47

30.     Правительство Казахстана обратилось к Jusan Group насчет потенциального приобретения Цеснабанка.   Jusan Group постарались удовлетворить просьбу правительства и принять участие в оказании помощи банковскому сектору.   Но для Jusan Group было очевидно, что они не смогут приобрести Цеснабанк, если у Цеснабанка отрицательный баланс, а из-за неэффективного управления кредитным портфелем Цеснабанка под руководством ответчика Джаксыбекова у Цеснабанка был очень отрицательный баланс.

31.     В попытке найти коммерческое решение, Правительство Казахстана провело переговоры по ряду контрактов (кульминацией которых стали «Рамочные соглашения по Цеснабанку»), в соответствии с которыми Правительство предоставит Цеснабанку дополнительные средства на выживание, в которые входит покупка проблемных активов, после чего Jusan Group приобретет Цеснабанк.

32.     Рамочные соглашения по Цеснабанку были заключены в январе и феврале 2019 года.   Сторонами Рамочных соглашений по Цеснабанку были АО First Heartland Securities («FHS»), материнская компания Банка, ответчик Джаксыбеков, Цеснабанк и Правительство Республики Казахстан в лице Министерства финансов Республики Казахстан и Национального Банка Республики Казахстан.   Рамочные соглашения по Цеснабанку явно поддерживались и были согласованы с нынешним премьер-министром Казахстана Алиханом Смаиловым и первым заместителем руководителя аппарата Президента Казахстана Тимуром Сулейменовым.

33.     Рамочное соглашение, подписанное 17 января 2019 года («Рамочное соглашение по Цеснабанку от 17 января»), предусматривало вливание государственных средств в Банк Цеснабанк, которые в конечном итоге приняли форму облигаций с длительным сроком погашения.   Затем, FHS приобрела Цеснабанк, в соответствии со статьей 8 «Рамочного соглашения по Цеснабанку от 17 января».

34.     Правительство Казахстана не только дало полное согласие на сделку, но и возглавило ее исполнение.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 48

35. Важно отметить, что возвращение суммы спасательного капитала к 2023 году не являлось условием Правительства Казахстана для поддержки в вопросе приобретения Цеснабанка, также Правительство Казахстана не ограничивало выплату дивидендов Банком каким-либо иным образом. Фактически до недавнего момента, в декабре 2021 года включительно, Банк выплачивал дивиденды без возражений со стороны Правительства Казахстана.

36. Вскоре после сделки по продаже Цеснабанка, Правительство снова обратилось к Jusan Group, с предложением приобрести еще один обанкротившийся банк, АТФ Банк.

37. Как и в случае с Цеснабанком, Правительство было основной стороной переговоров по сделке, в рамках которой Jusan Group приобрела АТФ Банк (осуществлялось посредством Рамочных соглашений по АТФ Банку). Как и в случае с Цеснабанком, у АТФ Банка имелись значительные убытки по кредитному портфелю, который Правительство согласилось спасти, в связи с приобретением.

38. Важно отметить, что, как указано выше, Правительство не обусловило оказание помощи АТФ Банку какими-либо обязательствами по возврату средств до 2023 года и никаким иным образом не ограничивало выплату Банком дивидендов.

39. Таким образом, приобретая АТФ Банк, Jusan Group удовлетворила просьбу Правительства Казахстана о коммерческом решении банковского кризиса, вложила значительный капитал в банковский сектор страны и во второй раз за два года спасла сектор от полного краха. Еще в январе 2023 года премьер-министр Смаилов подтвердил, что приобретение Jusan Group Цеснабанка и АТФ Банка было необходимо, чтобы стабилизировать финансовое положение учреждений и обеспечить безопасность вкладов казахстанских граждан и юридических лиц.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 49

**B. Jusan Group Создала Предприятия в Неваде для Защиты и Увеличения Своих Активов на Фоне Банковского Кризиса в Казахстане.**

40. В то время, когда Jusan Group помогала Правительству в спасении обанкротившихся казахстанских банков, руководство Jusan Group искало наилучшие варианты, как и далее защищать и приумножать собственные активы. До 2019 года Jusan Group принадлежала фонду Nazarbayev Fund («NF») — казахстанской корпорации, созданной для финансирования Назарбаев Университета и Nazarbayev Intellectual Schools, а также организаций, поддерживающих Назарбаев Университет и Nazarbayev Intellectual Schools.

41. Назарбаев Университет, основанный в 2010 году, является флагманским учебным заведением Казахстана, с амбициями стать исследовательским университетом мирового уровня. Цель университета — «предоставить Казахстану и миру ученых, академиков, менеджеров и предпринимателей, необходимых для процветания и развития», университет был основан на принципах автономии и академической свободы. Назарбаев Университет стал неотъемлемой частью академической исследовательской экосистемы с более 5600 международных публикаций. Назарбаев Университет оказывает образовательные услуги западного образца на английском языке.

42. Nazarbayev Intellectual Schools были основаны в 2008 году и созданы как современная и инновационная образовательная платформа для разработки и внедрения современных моделей образовательных программ от дошкольного до старшего школьного возраста. Выпускники Nazarbayev Intellectual Schools успешно поступают в ведущие университеты, среди которых Назарбаев Университет и другие ведущие программы бакалавриата в Европе и Восточной Азии.

43. После почти десяти лет поддержки Назарбаев Университета и Nazarbayev Intellectual Schools от благотворительного фонда в Казахстане, руководство Jusan Group

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

стало все более беспокоиться о том, что рост благотворительного фонда в Казахстане по сути ограничен и находится под угрозой.

44.    Руководство Jusan Group приняло решение создать благотворительный фонд в Неваде — штате, известном строгой правовой защитой и стандартами корпоративного управления, сильными традициями благотворительности и многочисленными успешными университетскими благотворительными фондами и некоммерческими организациями.

45.    В частности, Jusan Group решила зарегистрировать компанию в Неваде, потому что это одна из ведущих юрисдикций в США по стандартам корпоративного управления.  Jusan Group также учла тот факт, что многие крупные коммерческие и некоммерческие организации ведут свою операционную деятельность как корпорации штата Невада.

46.    NGF была создана в 2019 году в Неваде как неакционерная некоммерческая корпорация, с целью ведения деятельности исключительно в интересах Назарбаев Университета и Nazarbayev Intellectual Schools.  NF затем передала NGF всю свою долю в Jusan Group.  Единственной миссией NGF является обеспечение финансирования деятельности Назарбаев Университета и Nazarbayev Intellectual Schools, а также их организаций, это благотворительный фонд для них.  Jysan Holding был создан для управления активами NGF.

47.    Компания с ограниченной ответственностью JTL была зарегистрирована в 2020 году в соответствии с законодательством Англии и Уэльса и позднее передана Jysan Holding за счет взноса капитала.  JTL была зарегистрирована с целью создания общей корпоративной холдинговой структуры для финансового и технологического подразделений Jusan Group.    JTL — холдинговая компания, инвестирующая в различные сферы, среди которых банковское дело, брокерские услуги, страхование, управление активами, электронная коммерция, телекоммуникации, логистика и розничная торговля.  JTL расширяет свой портфель за счет стратегических слияний и

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

поглощений, тем не менее, косвенное участие JTL в Банке составляет 90 % его общих активов.

48.    JTL владеет 99,48 % долей в FHS, которая, в свою очередь, владеет примерно 80 % долей в First Heartland Bank.

49.    Таким образом, NGF получает пассивный доход через косвенное владение JTL, в виде дивидендов и распределений от бизнеса и деятельности JTL и ее холдингов, включая FHS и Банк.



50.    В соответствии с внутригрупповыми положениями и соглашениями, выплаты дивидендов будут распределяться от Банка к FHS и, в свою очередь, к JTL, Jysan Holding и NGF, за вычетом средств, необходимых для покрытия адекватных операционных расходов.  Каждое предприятие имеет законное право объявлять и получать дивиденды от своей прямой дочерней компании.

51.    NGF впервые начал предоставлять финансирование Назарбаев Университету и Nazarbayev Intellectual Schools в 2021 году.  Как отмечается, только за

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 52

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

два года NGF и Jusan Group предоставили Назарбаев Университету, Nazarbayev Intellectual Schools и поддерживающим их организациям миллионы долларов. Вышеуказанные гранты шли на поддержку усилий по предоставлению образования, в котором особое внимание уделяется ценностям интеллектуальной свободы, инноваций и академической свободы.  NGF ожидает, что финансирование значительно увеличится в ближайшие годы, в частности, в рамках решения проблемы существенного сокращения финансовой поддержки со стороны Правительства Казахстана в контексте серьезных финансовых проблем национального бюджета Казахстана.

52.    NGF полностью финансируется за счет распределения прибыли от Jysan Holding, которая получает свой доход исключительно в виде выплат дивидендов от компаний Jusan Group через JTL.

**C. Финансовый Успех Jusan Group Провоцирует Правительство и Джаксыбекова Принудительно Захватить First Heartland Bank.**

53.    После приобретения Цеснабанка и АТФ Банка — которые теперь являются частью First Heartland Bank — First Heartland Bank добился быстрого увеличения выручки.

54.    Такой успех и повышение прибыльности были связаны с дисциплинированным и стратегическим подходом к работе с обесцененными кредитами, которые по-прежнему составляли значительную долю портфеля Цеснабанка и АТФ Банка после того, как их приобрел First Heartland Bank.  В рамках вышеуказанных усилий First Heartland Bank реализовал новую бизнес-стратегию, направленную на увеличение выплат по неэффективным кредитам.   Что резко отличалось от коррупционной банковской практики бывшего владельца Цеснабанка.

55.    Кроме того, Банк внедрил прозрачное корпоративное управление и принятие решений, четкие механизмы судебного и внесудебного взыскания долгов, системное устранение коррупции в процессе взыскания долгов, категорическое пресечение реструктуризации кредитов между коллекторами и должниками.

Ex. Page No. 53

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ликвидировав у заемщиков стимулы к ведению переговоров по неформальным платежным схемам, Банк стимулировал заемщиков погасить свой долг, а не рисковать потерей залога. Эти и другие меры оказали значительное положительное влияние на размер выручки и чистой прибыли Банка.

56. Банк также придерживается бизнес-модели с дальновидным подходом. Например, за последние несколько лет Банк сосредоточился на цифровых технологиях, создав платформу электронной коммерции и двигаясь в сторону интегрированной модели финансовых услуг. В результате этих усилий и улучшения показателей прибыльности, качества активов, платежеспособности и управления рисками 14 декабря 2022 года агентство Moody's Investors Service повысило прогноз по рейтингам Банка со стабильного на позитивный.

57. Отчасти благодаря успеху вышеуказанных стратегий Банк смог выплачивать дивиденды.

58. Сегодня First Heartland Bank является третьим по величине банковским конгломератом в Казахстане и поддерживает прочные отношения с иностранными финансовыми институтами.

59. Способность Банка выплачивать дивиденды акционерам, в свою очередь, позволила NGF предоставлять значительное финансирование Назарбаев Университету и Nazarbayev Intellectual Schools. NGF и Jusan Group финансировали данные учреждения и поддерживающие их организации, выделяя миллионы долларов на поддержку образования, которое ставит акцент на превосходство, академическую строгость, научно-обоснованные исследования, научный характер, инновации и академическую свободу.

**D. Ответчики Преследовали и Вымогали Деньги у Jusan Group в Попытке Украсть Активы Группы.**

60. Начиная с 2022 года Ответчики, среди которых Ответчики правительственных учреждений и Правительства, стали действовать как фактически

16

совместное предприятие, а также участвовать в деятельности и управлении иными предприятиями путем рэкета.  Цель Ответчиков состояла в том, чтобы неправомерно заполучить активы Jusan Group в интересах Индивидуальных Ответчиков.  Каждый из Индивидуальных Ответчиков связан в силу того, что действует в контексте полномочий Правительства Казахстана, либо напрямую через работу на Правительство, либо, в случае Ответчика Джаксыбекова, через тесные связи с Правительством.  Сообщная деятельность Ответчиков фактически имела место как минимум с января 2022 года и продолжается таким образом, что сообщникам позволено периодически заниматься рэкетом.

61.    Рэкет включает в себя попытки вымогательства у Jusan Group, представляющие собой нарушение Закона Хоббса, 18 U.S.C. § 1951, которым предусматривается в соответствующей части: «Тот, кто любым образом, или в любой степени, препятствует, задерживает, или влияет на коммерческую деятельность или передвижение в рамках коммерческой деятельности любого товара или сырья, путем грабежа или вымогательства, или предпринимает подобные попытки, или вступает в сговор для совершения таких действий. . . подлежит наложению штрафа в соответствии с данным разделом или лишению свободы на срок до двадцати лет, или и тому и другому», 18 U.S.C. § 1951(a).  В соответствии с данным разделом, термин «вымогательство» означает получение собственности от другого лица с его согласия, полученного путем неправомерного применения фактической или угрожаемой силы, насилия    или    запугивания    или    под    прикрытием    официального    права». 18 U.S.C. § 1951(b)(2).  «Коммерческая деятельность» включает в себя «всякую коммерческую деятельность между любой точкой Штата, Территории, Владения или Округа Колумбии и любой точкой за их пределами; всякую коммерческую деятельность между точками внутри одного Штата через любую точку за пределами данного Штата; и всякую прочую коммерческую деятельность, в отношении которой Соединенные Штаты имеют юрисдикцию». 18 U.S.C. § 1951(b)(3).

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

17

1. *Агентство Республики Казахстан по Регулированию и Развитию Финансового Рынка Начинает Преследование First Heartland Bank.*

62.    Начиная с января 2022 года и на момент подачи настоящего иска, Правительство Казахстана, различные правительственные и квазиправительственные учреждения включительно, распорядилось провести не менее 11 необоснованных и незаконных расследований, запросов или проверок по отношению к First Heartland Bank, косвенной дочерней компании Jysan Holding.  Данные незаконные действия начались как завуалированные попытки помочь Банку в соблюдении нормативных требований, но вскоре стало понятно, что это очевидные — а иногда и явно незаконные — попытки принудить к незаконным платежам в пользу Правительства Казахстана и частных лиц.

63.    В частности, начиная примерно с 11 января 2022 года представители АРРФР назначили пять агентов для постоянного наблюдения за Банком. Вышеуказанное наблюдение представляет собой необоснованное вторжение, выходящее далеко за рамки ранее проводимого мониторинга Банка и стандартного мониторинга других банков, которые АРРФР обычно проводит.

64.    В контексте данного наблюдения представители АРРФР завалили Банк обширными и назойливыми запросами информации по всем аспектам деятельности Банка.  Запросы были с неоправданно сжатыми сроками исполнения, что вынудило сотрудников Банка заниматься запросом АРРФР, вместо обычных деловых операций.

65.    В дополнение к круглосуточному наблюдению, АРРФР установило ограничительные пороговые показатели для всех транзакций, проводимых сторонами, имеющими отношение к Банку.  Ограничения, которые действуют на дату подачи данного иска, настолько драконовские, что для проведения любой транзакции с участием Jusan Group требуются предварительные одобрения от АРРФР и АФМ.

66.    АРРФР, в свою очередь, необоснованно отказывает в одобрении мелких и крупных сделок.    Например, в соответствии с установленными пороговыми показателями для транзакций, АРРФР заблокировало банковские карты некоторых

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

18

сотрудников Банка, которые использовались для оплаты ежедневных расходов, а также заблокировало перевод в размере 4 миллионов долларов США со счета NGF в Банке на счет NGF в банке, находящемся в США.   Вышеуказанный платеж остается заблокированным, он в конечном итоге необходим для финансирования операционных расходов Назарбаев Университета и Назарбаев Интеллектуальные Школы.  NGF с тех пор не может перевести никакие средства со своего счета в Банке.   Сюда входят небольшие переводы на оплату собственной операционной деятельности, а также платежи поставщикам, которые предоставляли услуги NGF для достижения целей основной миссии организации.   Например, платежи NGF за юридические услуги, веб-дизайн, переводческие услуги, бухгалтерские и налоговые услуги были заблокированы. Примечательно, что NGF не было предоставлено никаких официальных объяснений, почему его переводы были заблокированы.

67.    АРРФР пошло еще дальше и поручило Банку заморозить счета некоторых сотрудников Банка и их родственников на неопределенный срок и без каких-либо обоснований.

68.    АРРФР не желает документировать свои действия в письменном виде. Когда Агентство Республики Казахстан по регулированию и развитию финансового рынка одобряет транзакцию, оно настаивает на том, чтобы одобрение было сделано в устной форме.   Когда АРРФР отказывает в транзакции, оно не предоставляет ни письменно, ни устно никаких объяснений того, почему транзакция была отклонена.

69.    Данные действия привели к снижению экономической деятельности Банка и к потере многих постоянных клиентов.   Потеря Банком клиентов и бизнеса значительно повлияла на Истцов, чье финансирование деятельности и выполнение обязательств перед NGF зависят от выплат им дивидендов Банком.

70.    АРРФР заявило, что целью наблюдения было обеспечение соблюдения Банком недавно обновленных правил по борьбе с отмыванием денег.  Но ясно, что это было предлогом.  На самом деле, такого «содействия» не получал ни один другой банк.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 57

Вместо этого АРРФР инициировало широкую кампанию запугивания, скоординированную с несколькими государственными учреждениями и частными лицами, и направленную на то, чтобы помешать Банку вести обычную коммерческую деятельность и, в свою очередь, заставить Jusan Group передать средства и контроль над активами Правительству Казахстана и причастным с ним.

2. *Агентство по Финансовому Мониторингу Республики Казахстан Начало Предварительное Расследование в Отношении First Heartland Bank и Изъяло Документы.*

71.    В феврале 2022 года АФМ возбудило уголовное дело в отношении бывших должностных лиц АТФ Банка якобы в связи с выдачей необслуживаемых кредитов в период с 2013 по 2016 г.

72.    Но предмет расследования также оказался ложным предлогом.   АФМ в процессе рассмотрения уголовного дела изъяло у Банка документацию, масштаб которой выходил далеко за рамки расследования предыдущих кредитов.   Например, АФМ изъяло документы, связанные с приобретением АТФ Банка в 2020 году, информацию о дивидендах Банка после 2020 года и операциях по счетам должностных лиц банка, которые совершенно не связаны с предыдущими кредитами АТФ Банка.

3. *Принадлежащие Правительству Организации Предпринимают Меры Неблагоприятного Воздействия Против First Heartland Bank.*

73.    В период с января по март 2022 года ряд организаций, принадлежащих Правительству, вывели все средства из Банка по директиве от Правительства Казахстана.   Это привело к значительному оттоку капитала из Банка.   Ряд принадлежащих Правительству организаций включает, но не ограничивается: Фонд развития предпринимательства «Даму»; Казахтелеком и Кселл, крупнейшая телекоммуникационная компания и основной оператор сотовой связи в Казахстане; и Самрук-Казына, суверенный фонд благосостояния Казахстана, владеющий долями в

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

национальной железнодорожной и почтовой службе, а также в государственных газовых и нефтяных компаниях.

74.     Более того, за этот период, все правительственные учреждения, в частности Министерство цифрового развития и Налоговый комитет, прекратили всякое сотрудничество, имеющее отношение к совместной разработке Банком и Правительством продуктов «govtech».

*4. Агентство Республики Казахстан по Противодействию Коррупции Возбуждает Фиктивное Уголовное Дело и Предпринимает Попытки Вымогательства.*

75.     В начале июня 2022 года Антикоррупционная служба начала намеренное уголовное расследование в отношении Банка в связи с его коммерческой покупкой Цеснабанка в 2019 году и последующими доходами.

76.     По имеющейся информации и убеждениям, толчком к этому расследованию послужило письмо бывшего владельца Цеснабанка, ответчика Адильбека Джаксыбекова, в котором он неправомерно использовал свои личные связи с руководством Антикоррупционной службы для принуждения к расследованию и с конечной целью вымогательства миллионов долларов у Банка.

77.     Желание ответчика Джаксыбекова проводить уголовное расследование обусловлено обвинениями в том, что коммерческая покупка Банком Цеснабанка была какой-то незаконной, несмотря на тот факт, что и он, и Правительство Казахстана участвовали в покупке и/или руководили ею, и что покупка была вызвана близким крахом Цеснабанка который тогда был в его собственности.

78.     Антикоррупционная служба, в рамках расследования предприняла крайне незаконные и произвольные меры принуждения, включая чрезмерные допросы сотрудников Банка, необоснованные обыски ключевого персонала и помещений Банка, а также ограничения передвижения для должностных лиц и сотрудников Jusan Group.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

По имеющейся информации и убеждениям, такие крайние меры принуждения были предприняты Антикоррупционной службой по просьбе г-на Джаксыбекова.

79.    Кроме того, Антикоррупционная служба поручила АРРФР заблокировать все транзакции, включая выплату дивидендов Jusan Group.  7 октября 2022 года в АРРФР поступила корреспонденция от Антикоррупционной службы о том, чтобы «принять эффективные и комплексные меры по приостановке всех расходных (дебетовых) операций по выплате дивидендов Банком, FHS JSC, Jysan Technologies, Jysan Holding и [NGF] их акционерам и владельцам, а также любые другие платежные операции в рамках указанной группы компаний» и «приостановить действия по экспроприации акций Банка и FHS» на период рассмотрения уголовного дела.  8 октября 2022 г. First Heartland Bank получил корреспонденцию от АРРФР за подписью Ответчика Кизатова, в которой тот подробно изложил инструкции для АРРФР от Антикоррупционной службы от 7 октября 2022 г.

80.    Г-н Шигео Катсу, представляя Банк, присутствовал на встрече с Президентом Казахстана Касым-Жомартом Токаевым в июле 2022 года, в попытке положить конец необоснованному расследованию.  Г-н Катсу — Председатель Совета Директоров Банка и FHS.  В ходе встречи Президент Токаев заявил, что ему известно о том, что Ответчик Джаксыбеков подал жалобу насчет приобретения Цеснабанка, и предложил г-ну Катсу заключить мировое соглашение с Ответчиком Джаксыбековым.

81.    После этой встречи Ответчик Джаксыбеков пытался шантажировать г-на Катсу и Банк, намекая, что если Банк ему заплатит, то Антикоррупционная служба закроет расследование.  Ответчик Джаксыбеков рекламировал свои личные связи с должностными лицами Антикоррупционной службы и требовал выплаты 60 миллионов тенге (приблизительно 130 миллионов долларов США) за неуказанный «ущерб».

82.    Г-н Катсу отверг все попытки вымогательства у него и у Банка, отметив, что такой платеж без каких-либо доказательств или обоснования нарушит

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

22

многочисленные законы о борьбе с коррупцией и что Jusan Group должна соблюдать все законы, в том числе законы Казахстана, Великобритании и Соединенных Штатов.

*5. Правительство Казахстана Пытается Принудительно Вернуть Государственную Помощь и Взять под Контроль FHS.*

83.    Растущие регулятивные притеснения со стороны Правительства Казахстана в первом квартале 2022 года вынудили г-на Катсу посетить серию дополнительных встреч с должностными лицами Правительства Казахстана, чтобы добиться прекращения незаконной кампании со стороны Правительства.

84.    В ходе этих встреч должностные лица Правительства Казахстана, в том числе представители АРРФР и премьер-министр Казахстана Алихан Смаилов, заявили, что Банку запрещено выплачивать дивиденды до тех пор, пока Банк не возвратит государственную помощь, оказанную Цеснабанку и АТФ Банку.

85.    Упоминаний о таких ограничениях не имелось ни в одном применимом законе или договоре, и об этом, конечно же, известно Правительству.   Такие ограничения никогда не обсуждались ранее, в том числе при выплате дивидендов Банком в декабре 2021 года.

86.    Кроме того, Правительство Казахстана разрешило другим финансовым учреждениям объявлять дивиденды без каких-либо проблем, несмотря на предварительную государственную помощь.   Например, Halyk Bank, Kaspi Bank и Сбербанку Казахстана было разрешено выплачивать дивиденды, несмотря на получение ими значительной государственной поддержки в течение нескольких лет без предварительного полного погашения кредитов.

87.    Тем не менее, АРРФР продолжает заявлять, что будет блокировать любые выплаты дивидендов, и угрожает посадить в тюрьму любого сотрудника Jusan Group, который будет проводить выплату дивидендов.

88.    Кроме того, г-н Сулейменов встретился с официальными лицами Jusan Group в сентябре 2022 года и потребовал, чтобы право собственности на Jusan Group

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

23

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

было отобрано у компаний США и Великобритании и передано Казахстану.  Во время одной из таких встреч г-н Сулейменов заявил, что участвует в качестве представителя и по указанию президента Токаева, и пригрозил Jusan Group дополнительными действиями Правительства в связи с отсутствием граждан Казахстана в Советах директоров NGF и Jysan Holding.  На этой встрече г-н Сулейменов также потребовал, чтобы контроль над FHS (и соответственно над Банком) был передан неуказанным казахстанским гражданам.  Он не предоставил никакого юридического обоснования своих требований, да и не мог.

6. *Правительство Казахстана Принимает Меры в Отношении Сотрудников Jusan Group.*

89.     По имеющейся информации и убеждениям, в контексте переговоров между Правительством Казахстана и Jusan Group в первом квартале 2022 года, Правительство оказало давление на аудиторов Jusan Group, чтобы они придержали аудиторские отчеты до возврата всех акционных и опционных соглашений от сотрудников Jusan Group. Правительство также пригрозило возбудить уголовное дело по невозвращенным опционам.

90.     Продолжающиеся переговоры и угроза уголовного преследования привели к принудительной сдаче вышеуказанных активов, которыми владели сотрудники Jusan Group.

91.     Вынужденный возврат опционов привел к значительным личным потерям персонала Jusan Group в размере десятков миллионов долларов, что усугубило личные убытки, связанные с указаниями Банку заморозить счета определенных сотрудников Банка и их родственников от АРРФР.

92.     Например, один член руководства Jusan Group, который на данный момент является постоянным резидентом США, был вынужден вернуть свой опцион на 4,62 % акций JTL, балансовая стоимость которых превышает 73 миллиона долларов США по состоянию на май 2022 года.  Правительство также угрожало тому же члену заочным

судом и тюремным заключением, если сотрудник предпримет какие-либо действия, противодействующие правительству Казахстана в усилиях по конфискации имущества Jusan Group и ее сотрудников.

93.     Г-н Сулейменов, в частности, интересовался возвратом акций и опционов в ходе последующих переговоров в сентябре 2022 года, подтверждая тем самым, что вымогательство поддерживается Правительством.

*7.   АРРФР Незаконно Вмешивается в Выплату Дивидендов FHS.*

94.     6 октября 2022 года FHS объявила дивиденды и потребовала, чтобы Банк включил объявление дивидендов во внеочередное общее собрание.  Это заявление и запрос юридически обязывали Банк в соответствии с его письменной политикой и руководящими документами выплачивать дивиденды FHS.  Значительная часть дивидендов, причитающихся FHS, является конечной собственностью Jysan Holding и, в свою очередь, будет причитаться Jysan Holding в соответствии с внутригрупповыми положениями и соглашениями.

95.     7 октября 2022 года АРРФР заблокировало осуществление FHS и Банком этой и других выплат дивидендов на общую сумму около 387 миллионов долларов США, а также осуществление других платежных операций Банка его прямым и косвенным материнским компаниям.

96.     Ответчики Кизатов и Омарбеков, представители АРРФР, звонили представителям Банка в октябре 2022 года по поводу данных заблокированных платежей.  Во время разговора с Главным специалистом Банка по комплаенсу г-жой Ардак Мукашевой Ответчик Омарбеков повторил утверждения, сделанные на предыдущих встречах между представителями Банка и Правительства, заявив, что средства Банка принадлежат Правительству Казахстана, пригрозив, что правоохранительные органы готовятся к задержанию и допросу сотрудников Банка и связанных с Банком организаций.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

97.     Ответчик Омарбеков снова позвонил в Банк 8 октября 2022 года, утверждая, что АРРФР получило письмо от неназванного правоохранительного органа, предписывающее АРРФР заблокировать все выплаты дивидендов от Банка.

*8. АФМ Незаконно Вмешивается в Выплату Дивидендов FHS.*

98.     13 октября 2022 г. АФМ направило в Банк письмо, в котором неверно утверждалось, что Банк получил 1,5 трлн тенге от правительства Казахстана на льготных условиях и каким-то образом не выполнил свои обязательства по этому «долгу». В письме АФМ утверждало, что приостанавливает способность Банка выплачивать дивиденды акционерам и требует, чтобы Банк предоставлял уведомления АФМ прежде, чем будет проводить дальнейшие выплаты дивидендов.

*9. Предложенные Правительством «Оправдания» Непостоянны, Противоречивы и Безосновательны.*

99.     На протяжении всей этой кампании Правительство приводило различные «оправдания» своих действий, ни одно из которых не оправдывает незаконные действия Правительства против Jusan Group.

100.    Когда АРРФР усилило надзор за First Heartland Bank, «оправданием» было обеспечение соблюдения банком недавно обновленных правил по борьбе с отмыванием денег.

101.    Когда АФМ возбудило уголовное дело против бывших должностных лиц АТФ Банка, «оправданием» было расследование выдачи проблемных кредитов в период с 2013 по 2016 г.

102.    В конце концов, Правительство определилось с единым оправданием: уголовное расследование Антикоррупционной службой и блокирование АРРФР и АФМ выплат дивидендов каким-то образом «обоснованы» коммерческой покупкой Цеснабанка и АТФ Банка First Heartland Bank. Разумеется, это «оправдание» столь же беспочвенно, как и все его предшественники, поскольку ключевые участники кампании по травле Банка были одновременно архитекторами Рамочных соглашений.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Действительно, Банк ранее выплачивал дивиденды без возражений со стороны Правительства Казахстана, в том числе совсем недавно, в декабре 2021 года.

103.    По имеющейся информации и убеждениям, намерение Ответчиков состояло в том, чтобы воспрепятствовать выводу дивидендных средств за пределы Казахстана — и, следовательно, за пределы контроля Правительства — в пользу Истцов, поскольку Ответчики знают, что дивидендные средства предназначены для блага и причитаются Истцам JTL, Jysan Holding и, в конечном счете, NGF.

**E.    Правительство Принимает Ответные Меры Против Истцов После Провала Переговоров.**

*10. Истцы уведомляют Ответчиков о Намерении Защищать Свои Права, и Стороны Ведут Безуспешные Переговоры.*

104.    В последней отчаянной попытке разрешить спор без вмешательства суда Истцы уведомили Ответчиков о своем намерении подать иск в Неваде.  Весь ноябрь стороны, включая адвокатов сторон, проводили серию неофициальных переговоров. Эти переговоры не увенчались успехом и были частью тактики проволочек, которые Ответчики проводили, чтобы подготовить коррумпированных законодателей и агентств к нападению на Истцов.

105.    С тех пор кампания преследования Ответчиков только усилилась, что было явной местью за то, что Истцы сообщили Ответчикам о своем намерении подать данный иск.

*11. Ответчики Принимают Ответные Меры Против Истцов, Вводя Законодательство, Направленное Против Jusan Group.*

106.    Через день после переизбрания Президента Токаева, 22 ноября 2022 года, Мажилис, нижняя палата Парламента Казахстана, одобрил законопроект с внесением изменений в Закон «О банках и банковской деятельности в Республике Казахстан». Предлагаемые поправки были направлены на Истцов и должны были, *в частности*, (1) изменить определения «банковского холдинга» и «крупного участника банка» таким

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

образом, чтобы некоммерческие организации, такие как NGF, не смогли прямо или косвенно владеть банками; (2) ввести ограничения для банков, получивших государственную помощь, таких как First Heartland Bank, чтобы не допустить распределения ими дивидендов, в том числе путем разрешения АРРФР блокировать данные дивиденды; и (3) требовать, чтобы все крупные прямые и косвенные акционеры и контролирующие организации банков подали заявки и получили одобрение от АРРФР в течение 30 дней с даты публикации поправок.

107. Верхняя палата парламента Казахстана, Сенат, впоследствии утвердила поправки, позволяющие АРРФР блокировать дивиденды от банков, получивших государственную помощь, и требующие одобрения АРРФР для крупных прямых и косвенных акционеров и контролирующих организаций банков, в то же время отклонив предложенную поправку, запрещающую некоммерческим организациям владеть банками, за отсутствием оснований.

108. Эти поправки, вступившие в силу 1 января 2023 года, позволят Правительству заблокировать дивиденды, на которые Истцы имеют право, и даже запретить Истцам владеть долями в Банке. В соответствии с поправками JTL, Jysan Holding и NGF должны будут получить и представить в АРРФР кредитные рейтинги, аудированную финансовую отчетность, а также соответствующие нотариальные заверения и апостили из несколько юрисдикций в течение 30 дней, что просто невозможно. Кроме того, если эти организации останутся основными акционерами Банка без одобрения АРРФР, АРРФР может потребовать, чтобы они уменьшили свою косвенную долю владения до уровня ниже 25 % и приостановили все операции между ними и Банком; установили доверительное управление акциями Банка на срок до трех месяцев; и в конечном итоге обеспечили отчуждение акций Банка, продав их на рынке ценных бумаг. **Нельзя представить более явного случая незаконного захвата активов, находящихся под контролем граждан Невады**.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

109.     По крайней мере, один член Мажилиса публично заявил, что эти поправки явно нацелены на акционеров First Heartland Bank и блокируют рассматриваемые здесь дивиденды.

110.     Учитывая отсрочку до следующего дня после переизбрания Президента Токаева, Правительство четко обозначило цели и намерения своей кампании — остановить вывод средств в виде дивидендов за пределы Казахстана, принудить группу Jusan Group к передаче средств и контроля над активами Правительству Казахстана и его аффилированным лицам, а также принять ответные меры против Jusan Group за попытку защиты своих прав в американском суде.

*12. Ответчики Принимают Ответные Меры Против Истцов, Подав Против Них*
    *Иск в Казахстане.*

111.     2 декабря 2022 года Генеральная прокуратура Казахстана возбудила иск против многочисленных участников Jusan Group, включая Истцов, и сотрудников Jusan Group, среди которых г-н Катсу и сотрудник, которому ранее угрожали лишением свободы.   Генеральный прокурор подчиняется непосредственно Президенту и представляет интересы Правительства Казахстана в суде.

112.     Иск был направлен на то, чтобы добиться через суд именно того, что Ответчики пытались добиться через их кампанию преследования — ослабить Jusan Group и ограничить ее доступ к собственному капиталу.

113.     В частности, иск был направлен на признание недействительным соглашения между двумя членами Jusan Group — JTL и Pioneer Capital Invest LLP (далее — «Pioneer»). Аннулирование этого соглашения аннулировало бы долю собственности NGF в JTL и, следовательно, лишило бы NGF доступа к дивидендам и распределениям от бизнеса и операций JTL и ее холдингов, включая FHS и Банк. В иске также содержалось требование о возврате активов и денежных средств на миллионы долларов (USD) от JTL компании Pioneer, акции JTL в Банке включительно.  Активы и средства, о которых идет речь, были должным образом переведены в JTL по

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

соглашению, которое Правительство пыталось аннулировать. Пытаясь перевести активы и средства из JTL Истца в казахстанскую компанию Pioneer, правительство вмешивается в активы Jusan Group и пытается перевести их в Казахстан, где правительство сможет осуществлять больший контроль.  И последнее, иск требовал, чтобы все названные сотрудники Jusan Group сдали свои доли в Банке.

114.    Казахстанский суд быстро отклонил иск Генерального прокурора на основании того, что требования не имеют доказательств. Это решительное отклонение необоснованного иска Генерального прокурора еще раз свидетельствует о вопиющем злоупотреблении Правительством возможностями государственного аппарата для преследования Jusan Group.

*13. Государственные чиновники Казахстана угрожают «войной» сотрудникам Jusan Group.*

115.    20 декабря 2022 года премьер-министр Казахстана Алихан Смаилов направил сообщение тому же сотруднику Jusan Group, резиденту США, которому ранее угрожало тюремное заключение, с требованием вернуть Jusan Group в Казахстан и пригрозив «войной», если требования Правительства не будут выполнены.

*14. Ответчики переделывают свой ранее отклоненный иск и повторно подают его в Казахстане.*

116.    10 февраля 2023 года Генеральная прокуратура Казахстана подала еще один иск против членов Jusan Group, оспаривая сделку 2020 года между JTL и Pioneer и добиваясь ареста определенного имущества группы Jusan Group. Хотя в этом иске приводятся несколько иные факты и иные основания иска, его цель та же, что и у иска, поданного и быстро отклоненного в декабре 2022 года, — пригрозить Jusan Group передачей контроля над ней Правительству.

117.    Однако Правительство идет еще дальше в февральском иске и стремится конфисковать множество активов не только ответчиков по иску, но и Jusan Group в

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

целом. Генпрокуратура добивается ареста долей Jusan Group более чем в десятке юридических лиц.

118.   В очередной раз Генеральный прокурор потребовал, чтобы JTL вернула Pioneer миллионы долларов США в виде активов и денежных средств, которые были должным образом переведены в JTL. И снова результатом, если иск будет успешным, будет перемещение законно контролируемых активов Jusan Group в Казахстан, где Правительство сможет осуществлять больший контроль.

**F.   Незаконная   Кампания   Правительства   Совпадает   с   Исторической Коррупционной Практикой**

119.   Действия   Ответчиков   согласуются   с   исторической   коррупционной практикой в Казахстане, а также сообщениями о заметном росте коррупции в Казахстане в последние годы.

120.   Например, в 2013 году арбитражная комиссия присудила молдавской компании возмещение убытков в размере 497 685 101 долларов США (плюс 50 % расходов на юридические услуги) за нарушение Правительством Казахстана Договора к   Энергетической   хартии — международного   соглашения,   устанавливающего трансграничное сотрудничество в энергетической промышленности.  В этом деле использовалась тактика, поразительно похожая на ту, что применяется против Истцов. Там суд установил, что Казахстан нарушил право компании на справедливое и равное обращение  в  соответствии с  Договором.   В  частности, компания  утверждала, что Казахстан  участвовал  в  кампании  преследования,  кульминацией  которой  стало расторжение контрактов на проведение поисково-разведывательных работ для добычи нефти   и   газа   и   конфискация   корпоративных   активов,   расположенных   в Казахстане.  Сообщается, что кампания включала в себя тактику финансовой полиции Казахстана и семи квазигосударственных организаций и включала необоснованное замораживание активов компании, круглосуточное наблюдение и проверки со стороны должностных   лиц   государственных   органов,   которые   препятствовали   ведению

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

сотрудниками обычных деловых операций, необоснованное изъятие документов, незаконный арест и осуждение менеджера в стране, а также отмена ранее одобренных правительством разрешений и отказов.

121.    Совсем недавно в СМИ отмечалось, что в 2022 году число случаев коррупции в Казахстане резко возросло, на целых 30 процентов.  Индекс восприятия коррупции Transparency International — наиболее широко используемый глобальный рейтинг коррупции в мире — присвоил Казахстану худшие показатели по коррупции в государственном секторе в Восточной Европе и Центральной Азии, регионе со вторыми самыми низкими показателями в мире.  Постоянная «серьезная проблема» коррупции, которая существует в Казахстане всесторонне описана в недавнем отчете, опубликованном Группой государств против коррупции, — антикоррупционным органом Совета Европы.  Экспертные оценки показывают, что прогресс Казахстана в антикоррупционных мерах в лучшем случае разрознен.

122.    Сенаторы США в Комитете Сената по международным отношениям в октябре 2022 года призвали к «международному расследованию санкционированного государством насилия и пересмотру вопроса о предоставлении помощи США в области безопасности после общенациональных протестов в Казахстане» в начале этого года и жестокой реакции Казахстанских сил безопасности по отношению к гражданским протестующим.    В рамках расследования Сенаторы призвали Государственный департамент США пересмотреть свои отношения с Казахстаном, чтобы «уделить приоритетное внимание защите основных свобод и укреплению верховенства права».

**G.   Незаконная Кампания Правительства, а именно Блокирование Выплаты Дивидендов, Наносит Конкретный Ущерб Деятельности Jusan Group.**

123.    Неудивительно и, предположительно в соответствии с планами Правительства, кампания Правительства, включая, прежде всего, блокирование примерно 387 миллионов долларов США в виде дивидендов, наносит значительный, непосредственный и конкретный ущерб деятельности Истцов.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 70

124.   Истцы не могут получить дивидендное финансирование от их дочерних компаний, связанных с Банком, — основного источника финансирования, а также не могут выполнить обязательство по предоставлению дивидендного финансирования их материнским организациям.   В свою очередь, NGF не может переводить или использовать собственные средства на собственных банковских счетах или получать законно выплаченные дивиденды для выполнения своей единственной миссии: финансирования Назарбаев Университета и Nazarbayev Intellectual Schools.  В конечном счете, замораживая средства Jusan Group, Правительство лишает Назарбаев Университет и Nazarbayev Intellectual Schools необходимых ресурсов, чем наносит ущерб студентам, исследователям и преподавателям Назарбаев Университета и Nazarbayev Intellectual Schools.

125.   Кроме того, в августе 2022 года Истец JTL заявил о своем намерении выкупить акции JTL на сумму 20 миллионов долларов США у инвестора.   Из-за заблокированных выплат дивидендов JTL не может осуществить выкуп.

### ПЕРВОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА (ЭКСПРОПРИАЦИЯ В НАРУШЕНИЕ МЕЖДУНАРОДНОГО ПРАВА) (против Ответчика Республики Казахстан и Ответчиков правительственных учреждений)

126.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

127.   Как материнские корпорации и акционеры First Heartland Securities и First Heartland Bank, Истцы имеют прямые имущественные интересы в своих правах на получение объявленных дивидендов от дочерних компаний.

128.   Своим поведением, заявленным выше, в том числе воспрепятствованием дочерним компаниям Истцов в выплате законно объявленных дивидендов их иностранным акционерам и прямой направленностью своего поведения на достижение такого результата, Ответчик Республика Казахстан и его учреждения экспроприировали и захватили имущество Истцов в нарушение международного права.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

129.   Ответчик Правительство Казахстана и его учреждения также нарушили существующее международное право, экспроприировав и конфисковав аналогичные имущественные права, принадлежащие First Heartland Securities и First Heartland Bank, действуя с дискриминационной целью причинить вред иностранным акционерам вышеуказанных корпораций.

## ВТОРОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
### (18 U.S.C. § 1964(с)) (против Индивидуальных Ответчиков)

130.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

131.   Индивидуальные Ответчики фактически действуют как совместное предприятие, участвующее в торговле между штатами, их деятельность влияет на торговлю между штатами, а также они управляли и участвовали в управлении дополнительными предприятиями, среди них Правительство ответчика и правительственные учреждения.

132.   Индивидуальные Ответчики согласовали между собой, осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета, осуществляя незаконные преднамеренные вымогательства у Истцов, конечной целью которых было получение личной выгоды.

133.   Индивидуальные Ответчики согласовали между собой, осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета, осуществляя незаконные преднамеренные вымогательства у Jusan Group.

134.   Индивидуальные Ответчики прямо и косвенно осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета и ведя деятельность, описанную выше, в нарушение 18 U.S.C. § 1962(с).

135.   Прямым и непосредственным результатом деятельности Индивидуальных Ответчиков по вымогательству и в нарушение 18 U.S.C. § 1962(с) стало то, что бизнесу и имуществу Истцов был нанесен ущерб.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ex. Page No. 72

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

### ТРЕТЬЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
**(Нев. Рев. Стат. § 207.470) (против всех Индивидуальных Ответчиков)**

136.     Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

137.     Индивидуальные Ответчики совершили как минимум два различных преступления, связанных с рэкетом, в соответствии с определением в Nev. Rev. Stat. § 207.360, представляющий собой рэкет в соответствии с Nev. Rev. Stat. § 207.390.

138.     Ответчики принимали прямое и косвенное участие в деятельности предприятия, действия которого представляют собой рэкет, в нарушение Нев. Рев. Стат. § 207.400.

139.     Бизнесу и имуществу Истцов был причинен вред в связи с нарушениями Ответчиков.

### ЧЕТВЕРТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
**(НАМЕРЕННОЕ ВМЕШАТЕЛЬСТВО В ДОГОВОРНЫЕ ОТНОШЕНИЯ)**
**(против всех Ответчиков)**

140.     Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

141.     Между First Heartland Bank и First Heartland Securities, First Heartland Securities и JTL, JTL и Jysan Holding, Jysan Holding и NGF существуют и действуют межфирменные соглашения.  Каждое из межфирменных соглашений дает право материнской компании на выплату дивидендов от ее дочерней компании.  Jysan Holding и JTL являются сторонами этих соглашений, или сторонними бенефициарами в случае соглашений, стороной которых Jysan Holding и/или JTL не являются.

142.     Каждый из Ответчиков знает о вышеупомянутых соглашениях и совершил преднамеренные действия, направленные на нарушение данных отношений.  Действия Ответчиков привели к фактическому нарушению каждого соглашения, результатами данных нарушений стало причинение Jysan Holding и JTL убытков.

Ex. Page No. 73

**ПЯТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
(НАМЕРЕННОЕ ВМЕШАТЕЛЬСТВО
ДЛЯ ИЗВЛЕЧЕНИЯ ЭКОНОМИЧЕСКОЙ ВЫГОДЫ) (против всех Ответчиков)**

143.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

144.   После получения заблокированных дивидендов от Банка, FHS планировала выплатить все или часть заблокированных дивидендов компании JTL, затем JTL планировала выплатить все заблокированные дивиденды или их часть компании Jysan Holding, которая должна была выплатить все или часть заблокированных дивидендов своей материнской компании NGF, за вычетом разумных операционных расходов. Каждый из Ответчиков знает о конечной цели использования заблокированных дивидендов и совершил преднамеренные действия, направленные на то, чтобы сорвать выплату дивидендов Истцам и выплату дивидендов в пользу NGF.  Действия ответчиков привели к фактическому нарушению процессов осуществления дивидендов и причинили Jysan Holding и JTL убытки, вытекающие в результате данного нарушения.

145.   Поведение Ответчиков было неоправданным и необоснованным.  Нет таких соглашений или законов, которые бы предусматривали права вмешательства или воспрепятствования выплате дивидендов в связи с выплатой Государством финансовой помощи Цеснабанку и АТФ Банку. В результате действий Ответчиков Истцы и их аффилированные лица не получили средства, необходимые для выполнения своих основных функций и задач, включая финансирование NGF, Nazarbayev Intellectual Schools и Назарбаев Университета.

**ШЕСТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
(ГРАЖДАНСКИЙ ЗАГОВОР) (против всех Ответчиков)**

146.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

147.   Ответчики действовали в сговоре, чтобы достичь их незаконной цели, с намерениями причинить вред Jusan Group, Истцам включительно.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

148.    Jusan Group, Истцы включительно, понесли убытки в результате действий Ответчиков по достижению целей сговора.

149.    Ответчики несут солидарную ответственность за ущерб, понесенный Истцами в результате каждого действия, предпринятого каждым Ответчиком в рамках сговора Ответчиков.

## СЕДЬМОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА (ГРАЖДАНСКАЯ ПОМОЩЬ И ПОДСТРЕКАТЕЛЬСТВО) (против всех Ответчиков)

150.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

151.    Каждый Ответчик существенно помогал и поощрял поведение других Ответчиков в нарушении обязанностей перед Истцами, включая деликтные обязанности и установленные законом обязанности, как указано выше.

152.    Нарушения со стороны Ответчиков нанесли ущерб Jusan Group, Истцам включительно.

153.    Каждый Ответчик несет ответственность в соответствии с теорией гражданского пособничества и подстрекательства за ущерб, причиненный нарушениями, которым они существенно содействовали и поощряли.

## ХОДАТАЙСТВО О ПРЕДОСТАВЛЕНИИ СУДЕБНОЙ ЗАЩИТЫ

154.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь, и почтительно просят Суд:

a)    Заявить, что поведение Ответчиков нанесло незаконный ущерб Истцам, и не подлежит каким-либо законным привилегиям или оправданиям;

b)    Присудить Истцам компенсацию и штрафные санкции в размере, который будет определен на слушании, включая тройную сумму возмещения убытков и гонорары адвокатов в соответствии с 18 U.S.C. § 1964(c);

c)    Присудить Истцам издержки и расходы, включая гонорары адвокатов; а также

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

d)    Присудить Истцам дополнительное средство правовой защиты, оправданное обстоятельствами.

## ИСКОВОЕ ЗАЯВЛЕНИЕ О РАССМОТРЕНИИ ДЕЛА СУДОМ ПРИСЯЖНЫХ

Истцы требуют рассмотрения дела судом присяжных по всем спорным вопросам.

ОТ 16 февраля 2023 г.

HOLLAND & HART LLP

/подпись/ *J. Stephen Peek*
J. Stephen Peek/ Дж. Стивен Пик
Erica C. Medley/ Эрика С. Медли
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya/ Тарик Мундия
(*pro hac vice будет предоставлено позднее*)
Jeffrey B. Korn/ Джеффри Б. Корн
(*pro hac vice будет предоставлено позднее*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb/ Майкл Дж. Готлиб
(*pro hac vice будет предоставлено позднее*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006

*Адвокаты Истцов*
*Jysan Holding, LLC; и*
*Jusan Technologies Ltd.*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

38

# ТИТУЛЬНЫЙ ЛИСТ ГРАЖДАНСКОГО ДЕЛА

Титульный лист гражданского дела JS 44 и информация, содержащаяся в нем, не заменяет и не дополняет регистрацию и вручение состязательных бумаг или других документов согласно требованиям закона, за исключением случаев, предусмотренных местными правилами суда. Эта форма, одобренная Конференцией судей Соединенных Штатов в сентябре 1974 года, должна использоваться секретарем суда с целью возбуждения делопроизводства по гражданским делам. *(СМ. ИНСТРУКЦИИ НА СЛЕДУЮЩЕЙ СТРАНИЦЕ ЭТОЙ ФОРМЫ.)*

## I. (a) ИСТЦЫ

Jysan Holding, LLC; Jusan Technologies LTD

**(b)** Округ проживания первого указанного истца _____
*(КРОМЕ ДЕЛ ИСТЦА ИЗ США)*

**(c)** Адвокаты *(название фирмы, адрес и номер телефона)*

(см. приложение)

## ОТВЕТЧИКИ

Республика Казахстан и др. (см. приложение)

Округ проживания первого указанного ответчика   **Республика Казахстан**
*(ТОЛЬКО В ДЕЛАХ ИСТЦА ИЗ США)*
ПРИМЕЧАНИЕ:   В ДЕЛАХ ОБ ОТЧУЖДЕНИИ ЗЕМЛИ ИСПОЛЬЗУЙТЕ АДРЕС СПОРНОГО ЗЕМЕЛЬНОГО УЧАСТКА.

Адвокаты *(если известны)*

## II. ОСНОВА ЮРИСДИКЦИИ *(Поставьте «Х» только в одной ячейке)*

- [ ] 1 Истец правительство США
- [ ] 2 Ответчик правительство США
- [x] 3 Федеральный вопрос *(Правительство США не является стороной)*
- [ ] 4 Другое гражданство *(Укажите гражданство сторон в пункте III)*

## III. ГРАЖДАНСТВО ОСНОВНЫХ СТОРОН *(Поставьте «Х» в одной ячейке для истца и в одной ячейке для ответчика)*
*(Только для дел с другим гражданством)*

| | ИСТ | ОТВ | | ИСТ | ОТВ |
|---|---|---|---|---|---|
| Гражданин этой страны | [ ] 1 | [ ] 1 | Зарегистрирован или юридический адрес в этой стране | [ ] 4 | [ ] 4 |
| Гражданин другой страны | [ ] 2 | [ ] 2 | Зарегистрирован или юридический адрес в другой стране | [ ] 5 | [ ] 5 |
| Гражданин или подданный иностранного государства | [ ] 3 | [ ] 3 | Иностранное государство | [ ] 6 | [ ] 6 |

## IV. ХАРАКТЕР ИСКА *(Поставьте «Х» только в одной ячейке)*

Нажмите здесь, чтобы: Описание характера кода иска.

### ПО ДОГОВОРУ
- [ ] 110 Страхование
- [ ] 120 Морское право
- [ ] 130 Закон Миллера
- [ ] 140 Оборотный документ Взыскание
- [ ] 150 переплаты и исполнение судебного решения Закон о
- [ ] 151 Medicare
- [ ] 152 Взыскание просроченных студенческих ссуд (за искл. ветеранов)
- [ ] 153 Взыскание переплаты ветеранских пособий
- [ ] 160 Иски акционеров
- [ ] 190 Другие договоры
- [ ] 195 Договорная ответственность за продукт Франшиза
- [ ] 196

### НЕДВИЖИМОСТЬ
- [ ] 210 Отчуждение земли
- [ ] 220 Конфискация
- [ ] 230 Нарушение аренды и выселение
- [ ] 240 Земельное правонарушение
- [ ] 245 Нарушение ответственности за качество Вся прочая недвижимость
- [ ] 290

### ПРАВОНАРУШЕНИЕ

**ТРАВМА**
- [ ] 310 Самолеты
- [ ] 315 Ответственность за качество самолета
- [ ] 320 Нападки, клевета и оскорбления
- [ ] 330 Федеральная ответственность
- [ ] 340 Морское право
- [ ] 345 Морское право Ответственность за качество продукции для моря
- [ ] 350 Автомобили
- [ ] 355 Ответственность за качество автомобилей
- [ ] 362 Другие травмы Травма – врачебная ошибка

**ТРАВМА**
- [ ] 365 Травма – Ответственность за качество
- [ ] 367 Здравоохранение/фармацевтика Травма
- [ ] 368 Ответственность за качество Асбест Травма Ответственность за качество

**ЛИЧНАЯ СОБСТВЕННОСТЬ**
- [ ] 370 Другое мошенничество
- [ ] 371 Справедливое кредитование
- [ ] 380 Другой ущерб личному имуществу
- [ ] 385 Ущерб имуществу Ответственность за качество

### ГРАЖДАНСКИЕ ПРАВА
- [ ] 440 Другие гражданские права
- [ ] 441 Голосование
- [ ] 442 Трудоустройство
- [ ] 443 Жилье/проживание
- [ ] 445 Амер. с инвалидностью – Занятость
- [ ] 446 Амер. с инвалидностью – другое
- [ ] 448 Обучение

### ХОДАТАЙСТВА ЗАКЛЮЧЕННЫХ

**Доставка обвиняемого в суд:**
- [ ] 463 Задержание иностранца
- [ ] 510 Ходатайства об отмене приговора
- [ ] 530 Общие
- [ ] 535 Смертный приговор

**Другое:**
- [ ] 540 Приказ и пр.
- [ ] 550 Гражданские права
- [ ] 555 Условия содержания под стражей
- [ ] 560 Задержанный по гражд. делу – Условия содержания под стражей

### КОНФИСКАЦИЯ/ШТРАФ
- [ ] 625 Арест имущества в связи с наркотиками, 21 USC 881
- [ ] 690 Другое

### ТРУД
- [ ] 710 Закон о справедливых трудовых стандартах
- [ ] 720 Трудовые/управленческие отношения
- [ ] 740 Закон о ж.д. транспорте
- [ ] 751 Закон об отпуске и больничном
- [ ] 790 Другие трудовые споры
- [ ] 791 Закон о пенсионном обеспечении

### ИММИГРАЦИЯ
- [ ] 462 Заявка на натурализацию
- [ ] 465 Другие иммиграционные иски

### БАНКРОТСТВО
- [ ] 422 Апелляция, 28 USC 158
- [ ] 423 Отзыв 28 USC 157

### ИМУЩЕСТВЕННЫЕ ПРАВА
- [ ] 820 Авторские права
- [ ] 830 Патент
- [ ] 835 Патент – Сокращенная заявка на новый препарат
- [ ] 840 Товарный знак
- [ ] 880 Закон о защите коммерческой тайны 2016

### СОЦИАЛЬНОЕ ОБЕСПЕЧЕНИЕ
- [ ] 861 HIA (1395ff)
- [ ] 862 Антракоз (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Глава XVI
- [ ] 865 RSI (405(g))

### ФЕДЕРАЛЬНЫЕ НАЛОГОВЫЕ ИСКИ
- [ ] 870 Налоги (истец или ответчик из США)
- [ ] 871 IRS – третья сторона 26 USC 7609

### ДРУГИЕ ЗАКОНЫ
- [ ] 375 Закон о неправомерных претензиях
- [ ] 376 Иск «qui tam» (31 USC 3729 (a))
- [ ] 400 Повторное рассмотрение
- [ ] 410 Антимонопольный закон
- [ ] 430 Банки и банковское дело
- [ ] 450 Депортация
- [ ] 460 Рэкет и коррупция
- [ ] 470 Потребительский кредит (15 USC 1681 или 1692)
- [ ] 480 Закон о защите прав потребителей телефонов
- [x] 485 Кабельное/спутниковое телевидение
- [ ] 850 Ценные бумаги/товары/биржа
- [ ] 890 Другие иски на законных основаниях
- [ ] 891 Закон о сельском хозяйстве
- [ ] 893 Экологические вопросы
- [ ] 895 Закон о свободе информации
- [ ] 896 Арбитраж
- [ ] 899 Административно-процессуальный акт/Пересмотр или обжалование решения агентства
- [ ] 950 Конституционность государственных законов

## V. ВОЗНИКНОВЕНИЕ *(Поставьте «Х» только в одной ячейке)*

- [x] 1 Первичное дело
- [ ] 2 Изъято из суда штата
- [ ] 3 Изъято из апелляционного суда
- [ ] 4 Восстановленные или вновь открытые
- [ ] 5 Переданные из другого округа *(укажите)*
- [ ] 6 Многоокружные процессы – передача
- [ ] 8 Многоокружные процессы – прямая подача

## VI. ОСНОВАНИЕ ИСКА

Укажите Гражданский закон США, по которому вы подаете иск (не цитируйте юрисдикционные законы, кроме случаев иного гражданства):
18 U.S.C. § 1964(c)

Краткое описание основания иска:
Нарушение Закона об организованной преступности, связанной с рэкетом и коррупцией, и связанные с этим нарушения государственного и международного права, основанные на экспроприации активов.

## VII. ЗАПРОС ПО ЖАЛОБЕ.

- [ ] ОТМЕТЬТЕ, ЕСЛИ ЭТО ГРУППОВОЙ ИСК СОГЛАСНО ПРАВИЛУ 23 F.R.Cv.P.

ТРЕБОВАНИЕ $

ОТМЕТЬТЕ «ДА», только если в жалобе требуется:
ТРЕБОВАНИЕ ПРИСЯЖНЫХ:   [x] Да   [ ] Нет

## VIII. СВЯЗАННЫЕ ДЕЛА, ПРИ НАЛИЧИИ

*(См. инструкции):*
СУДЬЯ _____ НОМЕР ДЕЛА _____

| ДАТА | ПОДПИСЬ АДВОКАТА |
|---|---|
| 16.02.2023 | /подпись/ Дж. Стивен Пик |

### ДЛЯ СЛУЖЕБНОГО ПОЛЬЗОВАНИЯ

| КВИТАНЦИЯ # | СУММА | ЗАЯВИТЕЛЬ IFP | СУДЬЯ | МАГ. СУДЬЯ |
|---|---|---|---|---|
| | | | | |

# ИНСТРУКЦИЯ ДЛЯ АДВОКАТОВ, ЗАПОЛНЯЮЩИХ ТИТУЛЬНЫЙ ЛИСТ ГРАЖДАНСКОГО ДЕЛА, ФОРМА JS 44.

### Полномочия по заполнению титульного листа гражданских дел

Титульный лист гражданского дела JS 44 и информация, содержащаяся в нем, не заменяет и не дополняет регистрацию и вручение состязательных бумаг или других документов согласно требованиям закона, за исключением случаев, предусмотренных местными правилами суда. Эта форма, одобренная Конференцией судей Соединенных Штатов в сентябре 1974 года, должна использоваться секретарем суда с целью возбуждения делопроизводства по гражданским делам. Следовательно, титульный лист гражданского дела представляется Секретарю суда для каждого гражданского иска. Адвокат, подающий иск, должен заполнить форму следующим образом:

**I.(a)** **Истцы-ответчики.** Укажите имена (фамилию, имя, отчество) истца и ответчика. Если истцом или ответчиком является государственное учреждение, используйте только полное название или стандартные сокращения. Если истец или ответчик является должностным лицом государственного учреждения, укажите сначала это учреждение, а затем должностное лицо, с указанием имени и должности.

**(b)** **Округ проживания.** Для каждого поданного гражданского дела, за исключением дел истца из США, укажите название округа, в котором проживает первый истец из списка на момент подачи дела. В делах истца из США укажите название округа, в котором проживает первый ответчик из списка на момент подачи заявления. (ПРИМЕЧАНИЕ. В делах об отчуждении земли округ проживания «ответчика» является местом нахождения рассматриваемого земельного участка.)

**(c)** **Адвокаты.** Укажите название фирмы, адрес, номер телефона и доверенное лицо. Если адвокатов несколько, перечислите их в приложении, указав в этом разделе «(см. приложение)».

**II.** **Юрисдикция.** Основа юрисдикции изложена в правиле 8(a) Федерального гражданского процессуального кодекса США (F.R.Cv.P.) согласно которому следует указывать юрисдикцию в состязательных бумагах. Поставьте отметку «Х» в одном из полей. Если имеется более одного основания юрисдикции, приоритет отдается в порядке, указанном ниже.
Истец из США. (1) Юрисдикция на основании разд. 28 Свода законов (U.S.C.), ст. 1345 и 1348. Сюда включены иски государственных органов и чиновников США. Ответчик из США. (2) Если истец предъявляет иск Соединенным Штатам, их чиновникам или государственным органам, поставьте отметку «Х» в этом поле.
Федеральный вопрос. (3) Это относится к искам в соответствии с разд. 28 U.S.C., ст. 1331, когда юрисдикция возникает в соответствии с Конституцией Соединенных Штатов, поправкой к Конституции, актом Конгресса или международным договором Соединенных Штатов. В тех случаях, когда стороной являются США, код истца или ответчика из США имеет приоритет, и необходимо отметить графу 1 или 2. Разные граждане. (4) Это относится к искам по разд. 28 USC ст. 1332, сторонами которых являются граждане разных стран. Если отметка стоит в поле 4, следует проверить гражданство разных сторон. (См. Раздел III ниже. **ПРИМЕЧАНИЕ. Иски по федеральным вопросам имеют приоритет перед делами с разными гражданствами.**

**III.** **Резиденция (гражданство) основных сторон.** Этот раздел JS 44 необходимо заполнить, если выше были указаны разные гражданства. Отметьте этот раздел для каждой основной стороны.

**IV.** **Характер иска.** Поставьте отметку «Х» в соответствующем поле. Если с делом связано несколько кодов исков, выберите наиболее подходящий код иска. Нажмите здесь, чтобы видеть подробное описание иска: Описание характера кода иска.

**V.** **Возникновение.** Поставьте отметку «Х» в одном из семи полей.
Первичное дело. (1) Дела, возбужденные окружными судами США.
Изъято из суда штата. (2) Разбирательство, возбужденное в государственных судах, может быть передано в окружные суды в соответствии с разделом 28 USC, ст. 1441. Изъято из апелляционного суда. (3) Поставьте отметку здесь для дел, переданных в окружной суд для дальнейшего рассмотрения. В качестве даты подачи используйте дату возврата на рассмотрение.
Восстановленные или вновь открытые. (4) Поставьте отметку в этом поле для дел, возобновленных или вновь открытых в окружном суде. В качестве даты подачи используйте дату повторного открытия. Переданные из другого округа. (5) Для дел, переданных в соответствии со ст. 1404(а) Раздела 28 U.S.C. Не используйте эту отметку для передачи внутри округа или передачи в рамках многоокружных процессов. Многоокружные процессы – передача. (6) Поставьте отметку здесь, если дело, относящееся к нескольким округам, передается в округ в соответствии с разд. 28 U.S.C. ст. 1407.
Многоокружные процессы – прямая подача. (8) Поставьте отметку здесь, если дело, относящееся к нескольким округам, подается в том же округе, что и основное дело по многоокружному процессу. **ОБРАТИТЕ ВНИМАНИЕ, ЧТО КОД ВОЗНИНКОВЕНИЯ 7 ОТСУТСТВУЕТ.** Код возникновения 7 использовался для исторических записей и больше не актуален из-за изменений в законодательстве.

**VI.** **Основание иска.** Укажите гражданский закон, непосредственно связанный с основанием для иска, и дайте краткое описание основания. **Не цитируйте юрисдикционные законы, если только речь не идет о гражданстве другой страны.** Пример: Гражданский закон США: разд. 47 USC 553 Краткое описание: Несанкционированный прием кабельного телевидения.

**VII.** **Запрос по жалобе.** Групповой иск. Поставьте отметку «Х» в этом поле, если вы подаете групповой иск в соответствии с Правилом 23, F.R.Cv.P. «Требование». В этом поле введите фактическую сумму претензии в долларах или укажите другое требование, например, предварительный судебный запрет. Требование присяжных. Отметьте это поле, чтобы указать, требуются ли присяжные.

**VIII.** **Связанные дела.** Этот раздел JS 44 используется для ссылки на связанные незавершенные дела, если таковые имеются. Если есть связанные незавершенные дела, укажите номера дел и соответствующие имена судей для таких дел.

**Дата и подпись адвоката.** Поставьте дату и подпишите титульный лист гражданского дела.

**Приложение к титульному листу гражданского дела**

Раздел I(а) Ответчики:
      Республика Казахстан;
      Агентство Республики Казахстан по регулированию и развитию финансового рынка;
      Агентство Республики Казахстан по противодействию коррупцией;
      Агентство Республики Казахстан по финансовому мониторингу;
      Комитет национальной безопасности Республики Казахстан;
      Агентство Республики Казахстан по регулированию и развитию финансового рынка, председатель, Абылкасымова Мадина;
      Агентство Республики Казахстан по регулированию и развитию финансового рынка, заместитель председателя, Кизатов Олжас;
      Агентство Республики Казахстан по регулированию и развитию финансового рынка, представитель, Омарбеков Арман;
      Джаксыбеков Адильбек.

Раздел I(c) Адвокаты истцов
      Стивен Пик (J. Stephen Peek)
      Эрика С. Медли (Erica C. Medley)
      Holland & Hart LLP
      9555 Hillwood Drive, 2nd Floor
      Las Vegas, NV 89,134 (Лас-Вегас, США)
      (702) 669-4600

      Тарик Мундия (Tariq Mundiya)
      Джеффри Б. Корн (Jeffrey B. Korn)
      Willkie Farr & Gallagher LLP 787 Seventh Avenue
      New York, NY 10019 (Нью-Йорк, США)
      (212) 728-8000

      Майкл Дж. Готтлиб (Michael J. Gottlieb)
      Willkie Farr & Gallagher
      1875 K Street, NW
      Washington, DC 20006 (Вашингтон, США)
      (202) 303-1000

AO 440 (Ред. 06/12) Судебная повестка по гражданскому делу

# ОКРУЖНОЙ СУД США

Округа Невада

| | |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | ) |
| | ) |
| | ) |
| _____ | ) |
| *Истец(-цы)* | ) |
| против | ) Гражданское дело No. 2:23-cv-00247-JAD-VCF |
| Республика Казахстан и др. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Ответчик(-и)* | ) |

## СУДЕБНАЯ ПОВЕСТКА ПО ГРАЖДАНСКОМУ ДЕЛУ

Кому: *(Имя и адрес ответчика)*    Мадина Абылкасымова, председатель
Агентство Республики Казахстан по регулированию и развитию
финансового рынка
21, Коктем-3
Алматы, 050040
Республика Казахстан

    Против вас выдвинут судебный иск.

    В течение 21 дня после вручения вам этой повестки (не считая дня, когда вы ее получили) — или 60 дней, если вы являетесь организацией в Соединенных Штатах, либо должностным лицом или сотрудником Соединенных Штатов, указанным в Федеральных правилах гражданского судопроизводства П. 12 (a) (2) или (3) — вы должны вручить истцу ответ на прилагаемый иск или ходатайство в соответствии с правилом 12 Федеральных правил гражданского судопроизводства. Ответ или ходатайство должны быть вручены истцу или его адвокату, чье имя и адрес указаны ниже:

| | | |
|---|---|---|
| Стивен Пик (Stephen Peek) | Тарик Мундия (Tariq Mundiya) | Майкл Дж. Готтлиб (Michael J. Gottlieb) |
| Эрика С. Медли (Erica C. Medley) | Джеффри Б. Корн (Jeffrey B. Korn) | Willkie Farr & Gallagher LLP |
| Holland & Hart LLP | Willkie Farr & Gallagher LLP | 1875 K Street, NW |
| 9555 Hillwood Dr., 2nd Fl. | 787 Seventh Ave. | Washington, DC 20006 |
| Las Vegas, NV 89134 | New York, NY 10019 | |

    Если вы не ответите, против вас будет вынесено решение по умолчанию о возмещении ущерба, требуемого в исковом заявлении. Вы также должны подать свой ответ или ходатайство в суд.

| | |
|---|---|
| ДЕБРА К. КЕМПИ | 22 февраля 2023 г. |
| **Секретарь** | **ДАТА** |
| [подпись] | |

**(составлено) ЗАМЕСТИТЕЛЬ СЕКРЕТАРЯ**

[**Печать**: ОКРУЖНОЙ СУД США ОКРУГА НЕВАДА]

Гражданское дело No. 2:23-cv-00247-JAD-VCF

## РАСПИСКА О ПОЛУЧЕНИИ

*(Этот документ не нужно подавать в суд, если только этого не требует П.4(L) Фед. Прав. Судопроизводства США)*

Эта повестка *(кому - имя и должность)* _____

была получена мною *(дата)* _____.

☐ Я лично вручил(-а) повестку этому лицу в *(место)* _____

_____ *(дата)* _____ ;или

☐ Я оставил(-а) повестку по месту прописки или месту жительства лица у *(имя)* _____

_____ , человека соответствующего возраста и вменяемости, проживающего(-ей) там,

*(дата)* _____ и отправил(-а) копию на последний известный адрес лица; или

☐ Я вручил(-а) повестку *(кому - имя лица)* _____ , которому

по закону назначено вручение процессуальных документов от имени *(название организации)* _____

_____ *(дата)* _____ ; или

☐ Я не вручил(-а) повестку, потому что _____ ; или

☐ Другое *(уточнить):*

Моя оплата составляет $ _____ за транспортные расходы и $ _____ за услуги, что в сумме

составляет $ _____ 0.00_____ .

Я заявляю под страхом наказания за лжесвидетельство, что эта информация соответствует действительности.

Дата: _____        _____

*Подпись судебного исполнителя*

_____

*Печатное имя и должность*

_____

*Адрес судебного исполнителя*

Дополнительная информация о попытке вручения и т.д.

# EXHIBIT B

Complaint, Summons, and Russian
Translations for Defendant Olzhas Kizatov

# EXHIBIT B

1  J. Stephen Peek
   (Nevada Bar No. 1758)
2  Erica C. Medley
   (Nevada Bar No. 13959)
3  HOLLAND & HART LLP
   9555 Hillwood Drive, 2nd Floor
4  Las Vegas, NV 89134
   Tel: 702.669.4600
5  Fax: 702.669.4650
   speek@hollandhart.com
6

7  Tariq Mundiya (*pro hac vice* forthcoming)
   Jeffrey B. Korn (*pro hac vice* forthcoming)
8  WILLKIE FARR & GALLAGHER LLP
   787 Seventh Avenue
9  New York, New York 10019
   (212) 728-8000
10 tmundiya@willkie.com
   jkorn@willkie.com
11

12 Michael J. Gottlieb (*pro hac vice* forthcoming)
   WILLKIE FARR & GALLAGHER LLP
13 1875 K Street, NW
   Washington, DC 20006
14 (202) 303-1000
   mgottlieb@willkie.com
15

16 *Attorneys for Plaintiffs*
   *Jysan Holding, LLC; and*
17 *Jusan Technologies Ltd.*

18                 **UNITED STATES DISTRICT COURT**

19                     **DISTRICT OF NEVADA**

20 JYSAN HOLDING, LLC, a Nevada Limited         **Case No.:**
   Liability Company; JUSAN
21 TECHNOLOGIES LTD, an England and            **COMPLAINT**
   Wales Limited Company;
22                                             **JURY DEMAND**
                        Plaintiff,
23 v.

24 REPUBLIC OF KAZAKHSTAN, a foreign
   sovereign state; THE AGENCY FOR
25 REGULATION AND DEVELOPMENT
   OF THE FINANCIAL MARKET OF THE
26 REPUBLIC OF KAZAKHSTAN, a
   Kazakhstan Government agency; THE
27 ANTI-CORRUPTION AGENCY OF THE
   REPUBLIC OF KAZAKHSTAN, a
28 Kazakhstan Government anti-corruption

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

                            1

agency ; THE FINANCIAL MONITORING AGENCY OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government agency; THE COMMITTEE FOR NATIONAL SECURITY OF KAZAKHSTAN, a Kazakhstan Government intelligence agency; MADINA ABYLKASSYMOVA, an individual; OLZHAS KIZATOV, an individual; ARMAN OMARBEKOV, an individual; and ADILBEK DZHAKSYBEKOV, an individual,

Defendants.

## INTRODUCTION

1.      Since early 2022, the Government of the Republic of Kazakhstan ("Government" or "Government of Kazakhstan") has perpetrated an illegal campaign against Nevada corporations—Plaintiff Jysan Holding, LLC ("Jysan Holding") and the New Generation Foundation, Inc. ("NGF"), and their direct and indirect subsidiaries (together, the "Jusan Group")—in an effort to steal more than USD $1.5 billion of Plaintiffs' assets.  This corrupt and lawless campaign demonstrates the brazen thuggery of a nation—a satellite of the former Soviet Union—that has weaponized the Government's vast powers and senior-most officials to reach far outside Kazakhstan to steal from, intimidate, and otherwise harm persons and entities in the United States.  Defendants are engaged in precisely the type of racketeering and expropriation that federal laws are designed to prohibit. Plaintiffs bring this action to remedy the Defendants' unlawful confiscatory conduct.

2.      Although the Government of Kazakhstan has offered numerous, contradictory, and pretextual justifications for its conduct against the Jusan Group, the Government's true aim is to seize control of the Jusan Group's Kazakhstan-based assets for its own commercial benefit while delivering massive commercial benefits to the Government's favored private individuals.  The Government has evinced its intent to pursue this goal by any means necessary, including threats, intimidation, criminal and civil investigations and litigations, and blocking USD $387 million in dividends slated for distribution by the Jusan Group's privately owned bank, First Heartland Jusan Bank ("First Heartland Bank" or the "Bank") and the

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Bank's direct parent, First Heartland Securities JSC ("FHS")—funds destined for Plaintiff Jusan Technologies Ltd. ("JTL"), Plaintiff Jysan Holding, and ultimately, NGF. The Defendants' scheme to use the organs of Kazakhstan's Government to harm Nevada entities has been made abundantly clear. After Plaintiffs informed Defendants of their intention to enforce their rights in the instant action, Defendants took two plainly retaliatory acts—first, in November 2022, Defendants introduced legislation specifically targeting Plaintiffs and, second, on December 2, 2022, Kazakhstan's Prosecutor General filed a trumped-up lawsuit against Plaintiffs and other members and employees of the Jusan Group in the courts of Kazakhstan. The legislation targeted at the Jusan Group—detailed below—directed the unlawful seizure of the assets under the control of a Nevada entity. Most recently, on February 10, 2023, the Kazakhstani Prosecutor General filed a frivolous lawsuit, predicated on spurious allegations, for the sole purpose of confiscating assets under JTL's control. Even worse, Kazakhstan has leveled threats of violence and imprisonment against United States residents who have material economic interests in the Jusan Group if Kazakhstan's commercial demands are not met. These acts are in line with the Government of Kazakhstan's history of rampant corruption, which according to public reporting has worsened since 2022. In sum, the Government of Kazakhstan has resorted to the same unlawful tools—confiscation, expropriation, threats, and intimidation—favored by the world's most repressive dictators and authoritarian regimes.

3. The conduct by the Government and several individuals is obstructing Plaintiffs—including a Nevada LLC which was formed precisely to avoid the type of illegal asset seizure being perpetrated now—from fulfilling their commitment to ensuring educational freedom and excellence to the NGF grantees by providing U.S.-style higher education and free-market reforms in the Republic of Kazakhstan. Indeed, prior to the illegal conduct described herein, through Plaintiffs' efforts, NGF and the Jusan Group as a whole have provided millions of dollars in grants to Nazarbayev University—a modern, English-language research university located in Astana (formerly Nur-Sultan), the Republic of Kazakhstan's capital—as well as Nazarbayev Intellectual Schools and their organizations.

4. Absent judicial relief, Defendants' unlawful scheme will continue to deprive Plaintiffs of a primary source of funding from their subsidiaries connected to the Bank and will accordingly leave them unable to fulfill their obligation to provide dividend funding to their parent organizations, including NGF. In turn, NGF is unable to transfer its own funds or receive lawfully issued dividends, to serve its sole mission of funding Nazarbayev University and Nazarbayev Intellectual Schools. Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming their students, researchers, and educators by obstructing an education that emphasizes the values of excellence, academic rigor, evidence-based research, scientific temper, intellectual liberty, innovation, and academic freedom.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically 18 U.S.C. § 1964(c).

6. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, are foreign states as defined in 28 U.S.C. § 1603(a) and are not entitled to immunity under 28 U.S.C. §§ 1605–07 or any applicable international agreement. Defendant Republic of Kazakhstan, as well as the Defendant agencies and instrumentalities listed below, are not immune from the jurisdiction of this Court under 28 U.S.C. § 1605(a)(2) because this action is based upon acts outside the territory of the United States in connection with a commercial activity of Defendants elsewhere and those acts have caused a direct effect in the United States.

7. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the other claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4

8. This Court has personal jurisdiction over Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, under 28 U.S.C. § 1330(b).

9. This Court has personal jurisdiction over all Defendants under Nev. Rev. Stat. § 14.065. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965, and Rules 4(k)(1)(C) and 4(k)(2) of the Federal Rules of Civil Procedure.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because a substantial part of the events giving rise to the claim occurred in this District. In the alternative, venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## PARTIES

11. Plaintiff Jysan Holding is a limited liability company incorporated under the laws of the State of Nevada. Jysan Holding's sole member is NGF, a registered 501(c)(4) organization based and incorporated in Nevada. Jysan Holding has a 96.96% direct ownership interest in JTL, which serves as the holding company for Jysan Holding's indirect subsidiaries and is an indirect majority owner of other companies located in Kazakhstan. Jysan Holding manages businesses and other investments of NGF, for the ultimate benefit of students of the grantee educational institutions in the Republic of Kazakhstan.

12. Plaintiff JTL is a limited company organized under the laws of England and Wales. JTL's direct parent is Jysan Holding (the Nevada entity identified above). JTL is a direct and indirect majority owner of other companies in Kazakhstan, including FHS, in which JTL holds a direct 99.48% ownership interest.

13. Defendant Republic of Kazakhstan is a foreign sovereign state within the meaning of 28 U.S.C. § 1603(a). Defendant Republic of Kazakhstan maintains an Embassy within the United States at 1401 16th St. NW, Washington, DC 20036.

14. Defendant Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan ("ARDFM") is a Government agency tasked with supervising the financial market and financial organizations within Kazakhstan.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

5

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

15.     Defendant Anti-Corruption Agency of the Republic of Kazakhstan ("AARK") is a Government anti-corruption agency.  AARK is responsible for formulating and implementing the anti-corruption policy of the Government of Kazakhstan, coordinating the anti-corruption enforcement actions, and detecting, restraining, revealing, and investigating corruption offenses.  AARK reports directly to the President of Kazakhstan.

16.     Defendant Financial Monitoring Agency of the Republic of Kazakhstan ("FMA") is a Government agency responsible for providing guidance in countering money laundering and the financing of terrorism, as well as for the prevention, detection, suppression, disclosure, and investigation of economic and financial offenses referred to it by the legislature of the Republic of Kazakhstan.  FMA reports directly to the President of Kazakhstan.

17.     Defendant Committee for National Security of Kazakhstan ("KNB") is a Government intelligence agency (together with ARDFM, AARK, and FMA, the "Governmental Agency Defendants").

18.     Defendant Madina Abylkassymova is the Chairperson of ARDFM.  She is a resident and citizen of Kazakhstan.

19.     Defendant Olzhas Kizatov is the Deputy Chairperson of ARDFM.  He is a resident and citizen of Kazakhstan.

20.     Defendant Arman Omarbekov is a representative of ARDFM.  He is a resident and citizen of Kazakhstan.

21.     Defendant Adilbek Dzhaksybekov (together with Defendants Abylkassymova, Kizatov, and Omarbekov, the "Individual Defendants") is the former owner of Tsesnabank, a bank the Jusan Group purchased in February 2019.  He is a resident and citizen of Kazakhstan.

## FACTS

**A.  Members of the Jusan Group Assist the Government of Kazakhstan by Purchasing Failing Kazakhstani Banks.**

22.     In 2018, Kazakhstan's banking sector, which had not fully recovered from the 2007-2009 financial crisis and subsequent devaluations of the Kazakhstani tenge in 2008 and 2015, became acutely vulnerable following a sharp drop in global energy prices that had

6

significantly devalued the tenge once again. In response, the Government of Kazakhstan sought various commercial solutions in an attempt to avoid a collapse of the country's entire banking system.

23. At the time, Tsesnabank was Central Asia's second-largest bank in terms of assets and was owned by Defendant Dzhaksybekov. Defendant Dzhaksybekov misused his authority at Tsesnabank to financially advantage himself, his family, and his friends, essentially treating Tsesnabank as a private equity and investment firm for his personal benefit and engaging in other questionable or malicious business conduct.

24. By 2018, Tsesnabank was on the brink of failure, with nearly 90% of its assets non-performing.

25. Despite having received capital injections as part of the Government of Kazakhstan's banking sector bailout in 2017, Tsesnabank continued to face severe liquidity issues. In early September 2018, it received a short-term loan of several hundred million dollars from the National Bank of the Republic of Kazakhstan. In a last-ditch attempt to preserve its business, Tsesnabank sold a significant portion of its agricultural loan portfolio to the state. Nonetheless, by mid-September, S&P had downgraded Tsesnabank's liquidity rating from "adequate" to "less than adequate."

26. The Government of Kazakhstan determined that if Tsesnabank were to fail, it would likely take with it the entire banking sector in Kazakhstan. The Government of Kazakhstan was therefore adamant about brokering a commercial solution to keep Tsesnabank afloat. In an attempt to do so, the Government of Kazakhstan initiated a series of attempted bailouts for Tsesnabank between 2018 and 2019.

27. The Government described those measures as "enhanc[ing] the robustness of Tsesnabank by cardinally improving its credit portfolio." Contemporaneous reporting recognized that this was another bailout targeted at correcting Tsesnabank's weak and deteriorating financial situation.

28. Even with this financial support, by January 2019, significant losses in Tsesnabank's credit portfolio continued to threaten Tsesnabank's viability. Tsesnabank

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1   needed an additional injection of capital to survive.  The Government of Kazakhstan searched

2   urgently for another bank to purchase Tsesnabank, so that the purchasing bank could provide

3   Tsesnabank with new capital to prevent collapse, in addition to providing a change of

4   management to strengthen Tsesnabank's operations.

5          29.    The Government of Kazakhstan identified First Heartland Bank in Kazakhstan,

6   owned by the Jusan Group, as a potential solution.  Under the Jusan Group's stewardship, First

7   Heartland Bank had significantly grown its cash reserves and maintained a sterling reputation

8   for proper stewardship.

9          30.    The Government of Kazakhstan approached the Jusan Group about a potential

10  acquisition of Tsesnabank.  The Jusan Group sought to answer the Government's plea and step

11  in to assist the banking sector.  But the Jusan Group was clear that it could not acquire

12  Tsesnabank if it had a negative balance sheet, and due to Tsesnabank's mismanaged loan

13  portfolio under Defendant Dzhaksybekov, Tsesnabank's balance sheet was deeply in the red.

14         31.    Eager to find a commercial solution, the Government of Kazakhstan led the

15  negotiations of a number of contracts (culminating together in the "Tsesnabank Framework

16  Agreements"), pursuant to which the Government would provide Tsesnabank with additional

17  bailout funds, including through the purchase of distressed assets, and the Jusan Group would

18  then purchase Tsesnabank.

19         32.    In January and February 2019, the Tsesnabank Framework Agreements were

20  executed.  The parties to the Tsesnabank Framework Agreements included the Bank's parent

21  company, First Heartland Securities JSC ("FHS"), Defendant Dzhaksybekov, Tsesnabank, and

22  the Government of the Republic of Kazakhstan represented by the Ministry of Finance of the

23  Republic of Kazakhstan and the National Bank of the Republic of Kazakhstan.   The

24  Tsesnabank Framework Agreements were also expressly supported and negotiated by the

25  current Prime Minister of Kazakhstan, Alikhan Smailov, and the President of Kazakhstan's

26  First Deputy Chief of Staff, Timur Suleimenov.

27         33.    The framework agreement executed on January 17, 2019 ("January 17

28  Tsesnabank Framework Agreement") provided for the injection of Government funds into

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

8

Tsesnabank Bank, which ultimately took the form of bonds with long-term maturities. Then, pursuant to Article 8 of the January 17 Tsesnabank Framework Agreement, FHS purchased Tsesnabank.

34. The Government of Kazakhstan not only fully consented to the deal, but was leading the charge in its execution.

35. Importantly, at no time did the Government of Kazakhstan make paying back the bailout funds before 2023 a condition of its support for the acquisition of Tsesnabank, nor did the Government of Kazakhstan otherwise restrict the Bank's payment of dividends. In fact, until recently, the Bank has issued dividends without objection from the Government of Kazakhstan, including issuing dividends in December 2021.

36. Not long after brokering the acquisition of Tsesnabank, the Government again approached the Jusan Group about acquiring another failing bank, ATF Bank.

37. As with Tsesnabank, the Government was the primary negotiator of the deal in which the Jusan Group acquired ATF Bank (effectuated through the ATF Bank Framework Agreements). And as with Tsesnabank, ATF Bank had significant losses in its credit portfolio, which the Government agreed to bail out in connection with the acquisition.

38. Importantly, and as discussed above, the Government did not condition its bailout of ATF Bank on any obligation to repay the bailout funds before 2023 and it did not otherwise restrict the Bank's payment of dividends.

39. Thus, with the acquisition of ATF Bank, the Jusan Group answered the Government of Kazakhstan's plea for a commercial solution to the banking crisis, invested significant capital into the country's banking sector, and saved it from total failure for the second time in two years. As recently as January 2023, Prime Minister Smailov affirmed that the Jusan Group's acquisitions of Tsesnabank and ATF Bank were necessary to stabilize the institutions' financial situations and to ensure the safety of Kazakhstani citizens' and businesses' deposits.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

9

**B.  Jusan Group Established Nevada Entities to Protect and Grow Its Holdings Amidst the Kazakhstani Banking Crisis.**

40.     At the same time the Jusan Group was assisting the Government in bailing out failing Kazakhstani banks, the Jusan Group leadership was considering how best to continue to protect and grow its own assets.  Up until 2019, the Jusan Group was owned by the Nazarbayev Fund ("NF")—a Kazakhstani corporation established to fund Nazarbayev University and Nazarbayev Intellectual Schools—as well as supporting organizations of Nazarbayev University and Nazarbayev Intellectual Schools.

41.     Established in 2010, Nazarbayev University is Kazakhstan's flagship academic institution with aspirations to become a global-level research university.  Its vision is to "give Kazakhstan and the world the scientists, academics, managers, and entrepreneurs needed to prosper and develop," and it was founded on principles of autonomy and academic freedom. Nazarbayev University has made itself an integral part of the academic research ecosystem, and is associated with more than 5,600 international publications.  Nazarbayev University provides Western-style, English-language based education.

42.     Founded in 2008, the Nazarbayev Intellectual Schools were envisioned as a modern and innovative educational platform for the development and implementation of modern models of educational programs from preschool through high school.  Nazarbayev Intellectual Schools graduates have proven to be successful in gaining admission to top universities, including Nazarbayev University and other top undergraduate programs in Europe and East Asia.

43.     After nearly a decade of having Nazarbayev University and Nazarbayev Intellectual Schools successfully supported by the Kazakhstan-based endowment fund, the Jusan Group leadership became concerned that the endowment's growth was inherently limited and at risk within Kazakhstan.

44.     The Jusan Group leadership decided to establish an endowment fund in Nevada, a state known for strong legal protections and corporate governance standards, strong

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

10

philanthropic traditions, and ample examples of successful university endowments and non-profit organizations.

45. More specifically, the Jusan Group chose to incorporate in Nevada because it is one of the leading jurisdictions in the United States for corporate governance standards. The Jusan Group also considered the fact that many major for-profit and non-profit organizations operate as Nevada corporations.

46. In 2019, NGF was established as a non-stock Nevada non-profit corporation for the sole benefit of Nazarbayev University and Nazarbayev Intellectual Schools. NF then transferred all of its ownership interest in the Jusan Group to NGF. NGF's sole mission is to secure funding for the activities of Nazarbayev University and Nazarbayev Intellectual Schools and their organizations, and it serves as their endowment. Jysan Holding was established to manage NGF's assets.

47. In 2020, JTL, a limited company incorporated under the laws of England and Wales, was established and later placed under Jysan Holding through a capital contribution. JTL was incorporated for the purpose of creating a common corporate holding structure for the Jusan Group's financial and technology arms. JTL is a holding company invested in various sectors, including banking, brokerage, insurance, asset management, e-commerce, telecommunications, logistics, and retail. Although JTL is expanding its portfolio through strategic mergers and acquisitions, its indirect ownership in the Bank makes up 90% of its total assets.

48. JTL has a 99.48% ownership interest in FHS, which in turn has an approximately 80% ownership interest in First Heartland Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

11

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

49.     Thus, by its indirect ownership of JTL, NGF receives passive income in the form of dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.



50.     Under intercompany policies and agreements, dividend payments will be distributed from the Bank to FHS, and, in turn, to JTL, Jysan Holding, and NGF, less the funds necessary to support the reasonable operational expenses.  Each entity has a legal right to declare and to receive dividends from its direct subsidiary.

51.     NGF first began to provide funding to Nazarbayev University and Nazarbayev Intellectual Schools in 2021.  As noted, in two years alone, NGF and the Jusan Group have provided millions of dollars to Nazarbayev University, Nazarbayev Intellectual Schools, and supporting organizations.  These grants have supported efforts to provide education that emphasizes the values of intellectual liberty, innovation, and academic freedom.  NGF expects funding to increase substantially in the coming years, particularly to address a significant

decrease in financial support from the Government of Kazakhstan in light of severe fiscal challenges to Kazakhstan's national budget.

52.     NGF is funded entirely by profit distributions from Jysan Holding, which receives its revenue solely in the form of dividend payments from the Jusan Group entities through JTL.

**C. The Jusan Group's Financial Success Provokes the Government and Dzhaksybekov to Force a Takeover of First Heartland Bank.**

53.     After its acquisitions of Tsesnabank and ATF Bank—which are now part of First Heartland Bank—First Heartland Bank achieved rapid revenue growth.

54.     This success and increased profitability was attributable to a disciplined and strategic approach to handling the impaired loans that still made up a substantial share of the Tsesnabank's and ATF Bank's portfolio after their acquisition by First Heartland Bank.  As part of this effort, First Heartland Bank implemented a new business strategy geared toward increasing repayment of poorly performing loans.  This marked a sharp departure from the corrupt banking practices engaged in by Tsesnabank's former owner.

55.     In addition, the Bank implemented transparent corporate governance and decision-making, clear mechanisms for judicial and out-of-court debt collection, systematic elimination of corruption in the process of debt collections, and categorical suppression of loan restructurings between collectors and debtors.  By removing borrowers' incentives to negotiate for informal payment arrangements, the Bank incentivized borrowers to pay off their debt rather than risk losing collateral.  These and other measures had a significant positive effect on the Bank's revenue and bottom line.

56.     The Bank has also taken a forward-looking approach to its business model.  As one example, in the past few years, the Bank has focused on digital technologies, establishing an e-commerce platform and moving toward an integrated model for financial services.  As a result of these efforts and improvements in profitability, asset quality, solvency, and risk management, Moody's Investors Service upgraded its outlook on the Bank's ratings from stable to positive on December 14, 2022.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

13

57. Thanks in part to the success of these strategies, the Bank has been able to pay dividends.

58. Today, First Heartland Bank is the third-largest banking conglomerate in Kazakhstan and maintains strong relationships with foreign financial institutions.

59. The Bank's ability to pay dividends to its shareholders has, in turn, enabled NGF to provide significant funding to Nazarbayev University and Nazarbayev Intellectual Schools. NGF and the Jusan Group funded these entities, and supporting organizations, with millions of dollars in support to provide education emphasizing excellence, academic rigor, evidence-based research, scientific temper, innovation, and academic freedom.

**D. Defendants Harass and Extort the Jusan Group in an Effort to Steal the Group's Assets.**

60. Beginning in 2022, Defendants, including the government and government-agency Defendants, began to operate as an enterprise associated-in-fact and to participate in and operate other enterprises through a pattern of racketeering activity. Defendants' goal was to wrongfully obtain the assets of the Jusan Group for the benefit of the Individual Defendants. Each of the Individual Defendants are associated by virtue of operating under the color of authority of the Government of Kazakhstan, either directly through employment by the Government, or in the case of Defendant Dzhaksybekov, through close ties to the Government. Defendants' association-in-fact enterprise was in existence at least since January 2022 and is ongoing in a manner that permits its associates to engage in a pattern of racketeering.

61. This pattern of racketeering includes attempts to extort the Jusan Group constituting a violation of the Hobbs Act, 18 U.S.C. § 1951, which provides in relevant part: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both," 18 U.S.C. § 1951(a). As used in that section, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "Commerce"

14

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

includes "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

    1.   *The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan Begins Harassing First Heartland Bank.*

62.    Beginning in January 2022 and continuing through the date of this filing, the Government of Kazakhstan, including various governmental and quasi-governmental agencies, has ordered at least 11 unjustified and unlawful investigations, requests, or inspections of Jysan Holding's indirect subsidiary, First Heartland Bank. These unlawful acts began as a purported effort to assist the Bank with compliance, but they quickly revealed themselves to be transparent—and at times breathtakingly illegal—attempts to force unlawful payments to the Government of Kazakhstan and private individuals.

63.    More specifically, starting on or about January 11, 2022, representatives for the ARDFM assigned five agents to surveil the Bank full-time. This surveillance represents an unwarranted intrusion far beyond ARDFM's historical monitoring of the Bank and ARDFM's standard monitoring of other banks.

64.    In connection with this surveillance, ARDFM representatives flooded the Bank with broad and harassing requests for information regarding all aspects of the Bank's activities. These requests were made with unreasonably short deadlines, forcing Bank staff to prioritize ARDFM's request over regular business operations.

65.    In addition to around-the-clock surveillance, ARDFM imposed arbitrary restricted-transaction thresholds on all transactions of parties related to the Bank. These restrictions, which continue to the date of this filing, are so extreme that all transactions involving the Jusan Group must be approved by ARDFM and the FMA before being executed.

66.    ARDFM has, in turn, unjustifiably denied approval for small and large transactions. For example, under the auspices of these transaction thresholds, ARDFM has blocked certain Bank staff from using their bank card to pay for daily expenses and has blocked

15

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

the transfer of USD $4 million from NGF's account at the Bank to NGF's U.S.-based bank account. This payment remains blocked and is ultimately needed to fund Nazarbayev University's and Nazarbayev Intellectual Schools' operating expenses. NGF has since been unable to transfer any funds from its account at the Bank. This includes small transfers to its own accounts for operations, as well as payments to vendors who have provided services to NGF in furtherance of its core mission. For example, NGF's payments for legal services, web design, translation services, and accounting and tax services have all been blocked. Remarkably, NGF was not provided any formal explanation as to why its transfers have been blocked.

67. ARDFM went even further and instructed the Bank to freeze the accounts of certain Bank personnel and their relatives indefinitely and without justification.

68. ARDFM has been unwilling to leave a record of their actions. When ARDFM approves a transaction, it insists on doing so orally. When ARDFM denies a transaction, it does not provide, either in writing or orally, any explanation for why the transaction was denied.

69. These efforts have hindered the economic activities of the Bank and have caused the loss of many established clients. The Bank's loss of clients and business has had a significant impact on Plaintiffs, which depend on dividend payments from the Bank to fund their operations and their obligations to NGF.

70. ARDFM has stated that the purpose of this surveillance was to ensure the Bank's compliance with the newly updated anti-money laundering regulations. But it is clear that this was pretextual. In reality, no other bank received such "assistance." ARDFM was instead initiating a broad campaign of intimidation, coordinated with several Government agencies and individuals and designed to prevent the Bank from engaging in regular business and, in turn, to pressure the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates.

16

2. *Financial Monitoring Agency of the Republic of Kazakhstan Launches Pretextual Investigation into First Heartland Bank and Seizes Documents.*

71.     In February 2022, the FMA launched a criminal investigation against former ATF Bank officials purportedly regarding the issuance of non-performing loans between 2013 and 2016.

72.     But the focus of the investigation has also proven to be pretextual.  During the pendency of the criminal case, FMA seized documents from the Bank well beyond the scope of an investigation into historical loans.  As examples, the FMA seized documents related to the purchase of ATF Bank in 2020, the Bank's dividend information after 2020 and account transactions of Bank officials entirely unrelated to ATF Bank's historical loans.

3. *Government-Owned Organizations Take Adverse Actions Against First Heartland Bank.*

73.     Between January and March 2022, a number of Government-owned organizations withdrew all funds from the Bank on the instruction of the Government of Kazakhstan.  This resulted in an outflow of significant capital from the Bank.  These Government-owned organizations include, but are not limited to: Damu, Kazakhstan's Entrepreneurship Development Fund; Kazakhtelecom and Kcell, the largest telecommunications company and main cellular communication operator in Kazakhstan; and Samruk-Kazyna, a Kazakhstani sovereign wealth fund with ownership interests in national rail and postal service as well as state-run gas and oil.

74.     Moreover, during this time, all Government agencies, in particular the Ministry of Digital Development and the Tax Committee, ceased all cooperation relating to the Bank's collaborative effort with the Government to develop "govtech" products.

4. *Anti-Corruption Agency of the Republic of Kazakhstan Launches a Sham Criminal Action and Makes Extortion Attempts.*

75.      Beginning in June 2022, AARK launched a purported criminal investigation into the Bank regarding its 2019 commercial purchase of Tsesnabank and subsequent earnings.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

17

76.     On information and belief, the impetus of this investigation was a letter from the former owner of Tsesnabank, Defendant Adilbek Dzhaksybekov, in which he improperly leveraged his personal connections to AARK leadership to force the investigation and with the ultimate goal of extorting millions of dollars from the Bank.

77.     Defendant Dzhaksybekov's push for criminal investigations centers around accusations that the Bank's commercial purchase of Tsesnabank was somehow illegal, notwithstanding the fact that both he and the Government of Kazakhstan participated in and/or led the purchase, and that the purchase was necessitated by the near collapse of Tsesnabank under his prior ownership.

78.     In connection with its investigation, AARK has undertaken extreme illegal and arbitrary enforcement measures, including excessive interrogations of Bank employees, unwarranted searches of key personnel and premises of the Bank, as well as travel restrictions for Jusan Group officers and employees.   On information and belief, these extreme enforcement measures were undertaken by AARK at the request of Mr. Dzhaksybekov.

79.     In addition, AARK directed ARDFM to block all transactions, including the payment of dividends of the Jusan Group.   On October 7, 2022, ARDFM received correspondence from AARK to "take effective and comprehensive measures to suspend all expense (debit) transactions on payment of dividends by the Bank, FHS JSC, Jysan Technologies, Jysan Holding and [NGF] to their shareholders and owners, as well as any other payment transactions under the specified group of companies" and to "suspend expropriation actions of the shares of the Bank and FHS" during the pendency of the criminal investigation. On October 8, 2022, First Heartland Bank received correspondence from ARDFM signed by Defendant Kizatov, in which he detailed AARK's October 7, 2022 instruction to ARDFM.

80.     On behalf of the Bank, Mr. Shigeo Katsu attended a meeting in July 2022 with the President of Kazakhstan, Kassym-Jomart Tokayev, seeking to end the unfounded investigation.  Mr. Katsu is the Chairman of the Board of Directors for both the Bank and FHS. During the meeting, President Tokayev stated he was aware that Defendant Dzhaksybekov had

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 100

raised complaints about the purchase of Tsesnabank, and suggested that Mr. Katsu should settle with Defendant Dzhaksybekov.

81.     Following this meeting, Defendant Dzhaksybekov attempted to extort Mr. Katsu and the Bank, suggesting that AARK would close its investigation if the Bank paid him. Defendant Dzhaksybekov touted his personal connection to AARK officials, and demanded a payment of 60 million tenge (approximately USD $130 million) for unspecified "damages."

82.     Mr. Katsu refused all attempts to extort him and the Bank, noting that such payment without any evidence or justification would violate various anti-corruption laws and that the Jusan Group has to obey all laws, including those of Kazakhstan, the United Kingdom, and the United States.

5.  *Government of Kazakhstan Attempts to Force Repayment of Government Assistance and to Take Control of FHS.*

83.     The mounting regulatory harassment from the Government of Kazakhstan in the first quarter of 2022 forced Mr. Katsu to attend a series of additional meetings with Government of Kazakhstan officials to seek an end to the Government's illegal campaign.

84.     During those meetings, Government of Kazakhstan officials, including representatives of ARDFM and the Prime Minister of Kazakhstan, Alikhan Smailov, claimed that the Bank was forbidden from paying dividends until the Bank repaid the Government assistance provided to Tsesnabank and ATF Bank.

85.     No such limitation existed under any applicable law or contract, which of course, the Government knows.  Nor had this restriction ever been raised before, including when the Bank issued dividends in December 2021.

86.     Further, the Government of Kazakhstan has allowed other financial institutions to declare dividends without any issues, notwithstanding prior government assistance.  As examples, Halyk Bank, Kaspi Bank and Sberbank Kazakhstan were allowed to pay dividends despite receiving significant state support over multiple years without first fully repaying the loans.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

19

87.     Nonetheless, ARDFM continues to state that it will block any dividend payments and has threatened to imprison any Jusan Group employee who facilitates any dividend payment.

88.     In addition, Mr. Suleimenov met with Jusan Group officials in September 2022, to demand that ownership of the Jusan Group be taken from U.S. and U.K. entities and be given to Kazakhstan.  During one such meeting, Mr. Suleimenov stated that he was participating as a representative of, and at the direction of,  President Tokayev, and threatened the Jusan Group with additional Government actions over the lack of Kazakhstani citizens on the Boards of NGF and Jysan Holding.  In that meeting, Mr. Suleimenov also demanded that control of FHS (and by extension, of the Bank) be given to unspecified Kazakhstani citizens. He did not provide any legal justification for the demand, nor could he.

      *6.     Government of Kazakhstan Takes Action against Jusan Group Employees.*

89.     Upon information and belief, in the context of the Government of Kazakhstan's negotiations with the Jusan Group in the first quarter 2022, the Government put pressure on the Jusan Group's auditors to withhold audit reports until the return of all shares and option agreements from Jusan Group employees.  The Government also threatened to initiate a criminal case relating to options that were not returned.

90.     The ongoing negotiations and the threat of criminal action caused the involuntary surrender of these assets held by the Jusan Group employees.

91.     The involuntary return of options caused Jusan Group personnel significant personal losses in the amount of tens of millions of dollars—compounding the personal losses implicated by ARDFM's instruction to the Bank to freeze accounts of certain Bank personnel and their relatives.

92.     For example, one member of the Jusan Group management—now a permanent resident of the United States—was forced to return his option of 4.62% shares of JTL, a book value of over USD $73 million as of May 2022.  The Government has also threatened that same member with trial in absentia and imprisonment should that employee take any actions

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

to counter the Government of Kazakhstan in its efforts to seize the property of the Jusan Group and its employees.

93.     Mr. Suleimenov in particular inquired as to the return of shares and options during subsequent negotiations in September 2022, corroborating the Government-backed nature of the extortion.

*7.     ARDFM Illegally Interferes with FHS's Dividend Payments.*

94.     On October 6, 2022, FHS declared dividends and requested that the Bank add the declaration of dividends to its extraordinary general meeting.  That declaration and request legally obligated the Bank, under its written policies and governing documents, to make a dividend distribution to FHS.  Significant portions of the dividends owed to FHS are the ultimate property of Jysan Holding, and will, in turn, be owed to Jysan Holding under intercompany policies and agreements.

95.     On October 7, 2022, ARDFM blocked FHS and the Bank from making this and other dividend payments in the approximate total amount of USD $387 million, as well as from making other payment transactions of the Bank to its direct and indirect parent companies.

96.     ARDFM representatives Defendants Kizatov and Omarbekov called Bank representatives in October 2022 regarding these blocked payments.  During a call with the Bank's Chief Compliance Officer, Ms. Ardak Mukasheva, Defendant Omarbekov echoed the assertions made in prior meetings between representatives of the Bank and the Government, claiming that the Bank's funds belong to the Government of Kazakhstan and threatening that law enforcement was preparing to arrest and interrogate employees of the Bank and employees of its affiliates.

97.     Defendant Omarbekov called the Bank again on October 8, 2022, claiming that ARDFM had obtained a letter from an unnamed law enforcement agency directing ARDFM to block all dividend payments from the Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

21

*8. FMA Illegally Interferes with FHS's Dividend Payments.*

98.     On October 13, 2022, the FMA sent a letter to the Bank incorrectly asserting that the Bank had received 1.5 trillion tenge from the Government of Kazakhstan on preferential terms and somehow was in default on this "debt." In the letter, the FMA asserted that it was suspending the Bank's ability to pay dividends to its shareholders and requiring that the Bank notify FMA before further dividend payments are carried out.

*9. The Government's Proffered "Justifications" are Shifting, Contradictory, and Baseless.*

99.     Throughout the pendency of its campaign, the Government has provided various "justifications" for its actions—none of which justify the Government's illegal actions against the Jusan Group.

100.     When ARDFM increased surveillance of First Heartland Bank, the "justification" was to ensure the Bank's compliance with the newly updated anti-money laundering regulations.

101.     When FMA launched a criminal investigation against former ATF Bank officials, the "justification" was to investigate the issuance of non-performing loans between 2013 and 2016.

102.     In the end, the Government has settled on a single justification: that AARK's criminal investigation, and ARDFM and FMA's blocking of dividend payments, are somehow "justified" by First Heartland Bank's commercial purchase of Tsesnabank and ATF Bank. Of course, this "justification" is just as baseless as all of its predecessors, as the key members of the campaign to harass the Bank were also the architects of the Framework Agreements. Indeed, the Bank has previously issued dividends without objection from the Government of Kazakhstan, including as recently as December 2021.

103.     On information and belief, the Defendants' intent has been to stop the dividend funds from traveling outside of Kazakhstan—and thus outside of the Government's control— for the benefit of Plaintiffs, because Defendants know the dividend funds are for the benefit of, and owed to, Plaintiffs JTL and Jysan Holding, and ultimately NGF.

22

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**E. The Government Retaliates Against the Plaintiffs After Negotiation Fails.**

*10. Plaintiffs Notify Defendants of Their Intention to Enforce Their Rights and the Parties Engage in Unsuccessful Negotiations.*

104.   In a last-ditch effort to resolve the dispute without court intervention, Plaintiffs notified Defendants of their intention to bring suit in Nevada.  Throughout November, the parties, including counsel for the parties, engaged in a series of informal negotiations.  Those negotiations were unsuccessful and part of a delay tactic while Defendants lined up corrupt legislators and agencies to ready an assault on Plaintiffs.

105.   Since then, Defendants' campaign of harassment has only intensified in what is plainly retaliation for Plaintiffs' informing Defendants of their intention to file this lawsuit.

*11. Defendants Retaliate Against Plaintiffs by Introducing Legislation Targeting the Jusan Group.*

106.   On November 22, 2022, one day after President Tokayev's re-election, the lower house of Kazakhstan's Parliament, the Majilis, approved a draft law with amendments to the Law "On Banks and Banking Activities in the Republic of Kazakhstan."  The proposed amendments were directed at Plaintiffs and sought to, *inter alia*, (1) change the definitions of "bank holding" and "major participant in a bank" such that non-profit organizations, like NGF, could not directly or indirectly own banks; (2) place restrictions on banks that have received Government assistance, like First Heartland Bank, to prevent them from distributing dividends, including by allowing ARDFM to block such dividends; and (3) require all major direct and indirect shareholders and controlling entities of banks to apply for and obtain approval from ARDFM within 30 days of the date of publication of the amendments.

107.   The upper house of Kazakhstan's Parliament, the Senate, subsequently approved the amendments allowing ARDFM to block dividends from banks that have received Government assistance and requiring ARDFM approval for major direct and indirect shareholders and controlling entities of banks, while it rejected the proposed amendment barring non-profit organizations from owning banks, for lack of justification.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

23

108.    These amendments, which entered into force on January 1, 2023, will allow the Government to block the dividends to which Plaintiffs are entitled and even to prohibit Plaintiffs' ownership interests in the Bank.  Under the amendments, JTL, Jysan Holding, and NGF would each need to obtain and submit to ARDFM credit ratings, audited financial statements, and relevant notarizations and apostilles from multiple jurisdictions within 30 days, which is simply not feasible.  Further, if these entities remain major shareholders in the Bank without ARDFM approval, ARDFM may demand that they reduce their indirect ownership share to below 25% and suspend all transactions between them and the Bank; establish trust management of the Bank's shares for up to three months; and ultimately alienate the Bank's shares by selling them on a securities market.  **There could not be a clearer case of unlawful seizure of assets under the control of Nevada citizens**.

109.    At least one member of the Majilis publicly stated that these amendments are explicitly designed to target the shareholders of First Heartland Bank and block the dividends at issue here.

110.    After delaying until one day following President Tokayev's re-election, the Government has now made the objectives and intent of its campaign clear—to stop the dividend funds from traveling outside Kazakhstan, to coerce the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates, and to retaliate against the Jusan Group for seeking to enforce its rights in an American court.

*12. Defendants Retaliate Against Plaintiffs by Filing a Suit Against Them in Kazakhstan.*

111.    On December 2, 2022, Kazakhstan's Prosecutor General filed suit against numerous members of the Jusan Group, including Plaintiffs, and employees of the Jusan Group, including Mr. Katsu and the employee previously threatened with imprisonment.  The Prosecutor General reports directly to the President and represents the interests of the Government of Kazakhstan in court.

112.    The suit sought to do through the court exactly what Defendants have attempted to do through their campaign of harassment—to weaken the Jusan Group and limit its access to its own capital.

24

113. Specifically, the lawsuit sought to invalidate an agreement between two members of the Jusan Group—JTL and Pioneer Capital Invest LLP ("Pioneer"). The invalidation of this agreement would have eliminated NGF's ownership interests in JTL and therefore eliminated NGF's access to dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank. The lawsuit also sought the return of millions of dollars (USD) in assets and cash from JTL to Pioneer, including JTL's shares in the Bank. The assets and funds at issue were properly transferred to JTL via the agreement the Government sought to invalidate. By seeking the movement of assets and funds from Plaintiff JTL to Kazakhstan-based Pioneer, the Government is interfering with Jusan Group's assets and seeking to move them into Kazakhstan where the Government will be able to exert greater control. Finally, the lawsuit sought that all the named Jusan Group employees surrender their shares in the Bank.

114. A Kazakhstani court quickly dismissed the Prosecutor General's suit based on its determination that the claims lacked evidence. This emphatic dismissal of the Prosecutor General's baseless suit further demonstrates the Government's blatant misuse of the state apparatus to target the Jusan Group.

*13. Kazakhstani Government Officials Threaten "War" Against Jusan Group Employees.*

115. On December 20, 2022, Kazakhstani Prime Minister Alikhan Smailov sent a message to the same Jusan Group employee – a United States resident – who was previously threatened with imprisonment, demanding the Jusan Group's return to Kazakhstan and threatening "war" if the Government's demands are not met.

*14. Defendants Repackage Their Previously Dismissed Complaint and Refile Suit in Kazakhstan.*

116. On February 10, 2023, the Kazakhstani Prosecutor General filed another suit against members of the Jusan group challenging the 2020 transaction between JTL and Pioneer and seeking to seize certain Jusan Group property. While this suit alleges slightly different facts and claims different causes of action, its aim is the same as the suit filed, and swiftly

25

1 dismissed, in December 2022—to threaten the Jusan Group into handing over its control to the

2 Government.

3     117. But the Government goes even a step further in the February suit and seeks to

4 seize myriad assets of not just the defendants to the action, but of the Jusan Group at large.

5 The Prosecutor General seeks to seize Jusan Group shares in over a dozen entities.

6     118. Once again the Prosecutor General sought to have JTL return to Pioneer millions

7 of dollars (USD) in assets and cash which were properly transferred to JTL. And once again

8 the result, if the suit were successful, would be the movement of the Jusan Group's lawfully

9 controlled assets into Kazakhstan where the Government will be able to exert greater control.

10 **F. The Government's Illegal Campaign Is Consistent with Historical Corruption.**

11     119. Defendants' actions are consistent with historical corrupt practices in

12 Kazakhstan, as well as reports of a marked increase in corruption in Kazakhstan in recent

13 years.

14     120. As one example, in 2013, an arbitration panel awarded a Moldovan company

15 USD $497,685,101 in damages (plus 50% of the cost of legal representation) for the

16 Government of Kazakhstan's breach of the Energy Charter Treaty, an international agreement

17 establishing cross-border cooperation in the energy industry. That matter involved strikingly

18 similar tactics to those employed against the Plaintiffs. There, the tribunal found that

19 Kazakhstan breached the company's right to fair and equitable treatment under the

20 Treaty. Specifically, the company alleged that Kazakhstan engaged in a campaign of

21 harassment, culminating in the cancellation of its oil and gas exploration contracts and the

22 seizure of its assets located in Kazakhstan. That campaign reportedly included tactics by

23 Kazakhstan's financial police and seven quasi-state entities and involved the baseless freezing

24 of the company's assets, around-the-clock surveillance and inspection by government agency

25 officials which prevented employees from conducting regular business affairs, the

26 unwarranted seizure of documents, the unlawful arrest and conviction of an in-country

27 manager, and the reversal of prior government approvals and waivers.

28

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

26

121.     More recently, media reports have noted that corruption cases in Kazakhstan have increased dramatically in 2022, including by as much as 30 percent. Transparency International's Corruption Perceptions Index, the most widely used global corruption ranking in the world, measures Kazakhstan as a bottom performer in public sector corruption within Eastern Europe and Central Asia, itself the second lowest performing region worldwide. A recent report published by the Group of States Against Corruption, the Council of Europe's anti-corruption body, has comprehensively identified the ongoing "serious problem" of corruption that exists in Kazakhstan. Expert assessments reveal that Kazakhstan's progress toward anti-corruption measures is scattered at best.

122.     In October 2022, U.S. Senators on the Senate Foreign Relations Committee called for an "international investigation into state-sanctioned violence and review of U.S. security assistance following nationwide protests earlier this year" in Kazakhstan, including Kazakh security forces' violent response toward civilian protestors. As part of that investigation, the Senators have called on the U.S. Department of State to review its relationship with Kazakhstan in order to "prioritize protecting fundamental freedoms and strengthening the rule of law."

**G.     The Government's Illegal Campaign, Particularly Blocking Dividend Payments, Is Causing a Concrete Harm to the Jusan Group's Operations.**

123.     Unsurprisingly, and presumably as the Government intended, the Government's campaign, including most notably the blocking of approximately USD $387 million in dividends, is causing significant, immediate, and concrete harm to Plaintiffs' operations.

124.     Plaintiffs are unable to receive dividend funding from their subsidiaries connected to the Bank—a primary source of funding—nor are they able to fulfill their obligation to provide dividend funding to their parent organizations. In turn, NGF is unable to transfer or use its own funds in its own bank accounts or receive lawfully issued dividends, to serve its sole mission: to fund Nazarbayev University and Nazarbayev Intellectual Schools. Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 109

Nazarbayev University's and Nazarbayev Intellectual Schools' students, researchers, and educators.

125.    In addition, in August 2022, Plaintiff JTL represented its intention to buy back USD $20 million in JTL shares from an investor.  Because of the blocked dividend payments, JTL is unable to proceed with this buyback.

### FIRST CAUSE OF ACTION
### (EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW)
**(against Defendant Republic of Kazakhstan and Governmental Agency Defendants)**

126.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

127.    As parent corporations and shareholders of First Heartland Securities and First Heartland Bank, Plaintiffs have direct property interests in their rights to receive declared dividends from those subsidiaries.

128.    Through their conduct alleged above, including obstructing Plaintiffs' subsidiaries from paying lawfully declared dividends to their foreign shareholders and directly aiming their conduct at that result, Defendant Republic of Kazakhstan and its agencies have expropriated and taken Plaintiffs' property in violation of international law.

129.    Defendant Government of Kazakhstan and its agencies have also violated customary international law by expropriating and taking similar property interests belonging to First Heartland Securities and First Heartland Bank with the discriminatory purpose to harm their foreign shareholders.

### SECOND CAUSE OF ACTION
### (18 U.S.C. § 1964(c)) (against the Individual Defendants)

130.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

131.    The Individual Defendants are associated-in-fact as an enterprise engaged in and whose activities affect interstate commerce, and have operated and participated in the conduct of additional enterprises, including the Defendant Government and its agencies.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 110

132.    The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting Plaintiffs, ultimately for their own personal benefit.

133.    The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting the Jusan Group.

134.    The Individual Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

135.    As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

### THIRD CAUSE OF ACTION
### (Nev. Rev. Stat. § 207.470) (against all Individual Defendants)

136.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

137.    Individual Defendants have committed at least two distinct crimes related to racketeering as defined in Nev. Rev. Stat. § 207.360, constituting racketeering activity pursuant to Nev. Rev. Stat. § 207.390.

138.    Defendants have participated directly and indirectly in the conduct of the affairs of an enterprise whose activities constitute racketeering activity, in violation of Nev. Rev. Stat. § 207.400.

139.    Plaintiffs have been injured in their business and property by reason of Defendants' violations.

### FOURTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)
### (against all Defendants)

140.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

29

141.    Valid intercompany agreements exist between First Heartland Bank and First Heartland Securities, First Heartland Securities and JTL, JTL and Jysan Holding, and Jysan Holding and NGF.  Each of those intercompany agreements entitles the parent company in the corporate relationship to dividend payments from its subsidiary.  Jysan Holding and JTL are parties to those agreements or, with respect to the agreements to which Jysan Holding and/or JTL are not a party, third-party beneficiaries.

142.    Defendants each have knowledge of the aforementioned agreements, and have committed intentional acts intended and designed to disrupt each relationship.  Defendants' acts have caused actual disruption of each agreement, and caused Jysan Holding and JTL damages resulting from that disruption.

### FIFTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE
### WITH PROSPECTIVE ECONOMIC ADVANTAGE) (against all Defendants)

143.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

144.    Upon receipt of the blocked dividend from the Bank, FHS planned to dividend all or portions of the blocked dividend to JTL, and JTL then planned to dividend all or portions of the blocked dividend to Jysan Holding, which was to dividend all or portions to its parent, NGF, minus reasonable operational expenses.  Defendants each have knowledge of the ultimate purpose of the blocked dividend, and have committed intentional acts intended and designed to disrupt the dividends to Plaintiffs and the dividend to NGF.  Defendants' acts have caused actual disruption to those prospective dividends, and caused Jysan Holding and JTL damages resulting from that disruption.

145.    Defendants' conduct was unwarranted and without justification.  No agreement or law provides for a right of interference or dividend obstruction relating to the Government's bailout payments to Tsesnabank and ATF Bank. As a direct result of Defendants' conduct, Plaintiffs and their affiliates did not receive funds necessary to perform their basic functions and missions, including their funding of NGF, Nazarbayev Intellectual Schools, and Nazarbayev University.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 112

**SIXTH CAUSE OF ACTION**
**(CIVIL CONSPIRACY) (against all Defendants)**

146.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

147.    Defendants have acted in concert with the intent to accomplish an unlawful objective for the purpose of harming the Jusan Group, including Plaintiffs.

148.    As a result of Defendants' acts in furtherance of that conspiracy, the Jusan Group, including Plaintiffs, has suffered damages.

149.    Defendants are jointly and severally liable for the damages that Plaintiffs have suffered as a result of each act taken by each Defendant in furtherance of Defendants' conspiracy.

**SEVENTH CAUSE OF ACTION**
**(CIVIL AIDING AND ABETTING) (against all Defendants)**

150.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

151.    Each Defendant has substantially assisted and encouraged other Defendants' conduct in breaching duties owed to Plaintiffs, including tort duties and statutory duties as set forth above.

152.    Defendants' breaches have caused harm to the Jusan Group, including Plaintiffs.

153.    Defendants are each liable under a civil aiding and abetting theory for damages caused by the breaches that they have substantially assisted and encouraged.

**PRAYER FOR RELIEF**

154.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein and respectfully request that the Court:

a)  Declare that Defendants' conduct has unlawfully injured Plaintiffs, and is not subject to any lawful privilege or justification;

b)  Award Plaintiffs compensatory and punitive damages in an amount to be determined at trial, including trebled damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

c)  Award Plaintiffs their costs and expenses, including attorneys' fees; and

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

31

d)  Award Plaintiffs such further relief as may be just under the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED this 16th day of February 2023

HOLLAND & HART LLP

 /s/ J. Stephen Peek
J. Stephen Peek
Erica C. Medley
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya
(*pro hac vice* forthcoming)
Jeffrey B. Korn
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 114

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | Republic of Kazakhstan et al. (see attached) |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _Republic of Kazakhstan_
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

(see attached)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [x] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1964(c)

Brief description of cause:
Violation of Racketeer Influenced Corrupt Organizations Act and related violations of state and international law based on expropriation of assets.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/16/2023 | /s/ J. Stephen Peek |

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## Civil Cover Sheet Attachment

Section I(a) Defendants:

       Republic of Kazakhstan;

       The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan;

       The Anti-Corruption Agency of the Republic of Kazakhstan;

       The Financial Monitoring Agency of the Republic of Kazakhstan;

       The Committee for National Security of the Republic of Kazakhstan;

       The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Chairperson, Abylkassymova, Madina;

       The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Deputy Chairperson, Kizatov, Olzhas;

       The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Representative, Omarbekov, Arman;

       Dzhaksybekov, Adilbek.

Section I(c) Plaintiffs' Attorneys:

       J. Stephen Peek
       Erica C. Medley
       Holland & Hart LLP
       9555 Hillwood Drive, 2nd Floor
       Las Vegas, NV 89134
       (702) 669-4600

       Tariq Mundiya
       Jeffrey B. Korn
       Willkie Farr & Gallagher LLP
       787 Seventh Avenue
       New York, NY 10019
       (212) 728-8000

       Michael J. Gottlieb
       Willkie Farr & Gallagher
       1875 K Street, NW
       Washington, DC 20006
       (202) 303-1000

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Republic of Kazakhstan et al. | ) ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No. 2:23-cv-00247-JAD-VCF

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Olzhas Kizatov, Deputy Chairperson
The Agency for Regulation and Development of the Financial Market of the Republic of
Kazakhstan
21, Koktem-3
Almaty, 050040
Republic of Kazakhstan

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| Stephen Peek | Tariq Mundiya | Michael J. Gottlieb |
|---|---|---|
| Erica C. Medley | Jeffrey B. Korn | Willkie Farr & Gallagher LLP |
| Holland & Hart LLP | Willkie Farr & Gallagher LLP | 1875 K Street, NW |
| 9555 Hillwood Dr., 2nd Fl. | 787 Seventh Ave. | Washington, DC 20006 |
| Las Vegas, NV 89134 | New York, NY 10019 | |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DEBRA K. KEMPI

CLERK

*(signature)*

(By) DEPUTY CLERK

February 22, 2023

DATE

Civil Action No. 2:23-cv-00247-JAD-VCF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#10063; I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

&#10063; I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

&#10063; I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

&#10063; I returned the summons unexecuted because _____ ; or

&#10063; Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

1   Дж. Стивен Пик/ J. Stephen Peek
    (Лицензия № 1758 Невады)
2   Эрика С. Медли/ Erica C. Medley
    (Лицензия № 13959 Невады)
3   HOLLAND & HART LLP
    9555 Hillwood Drive, 2nd Floor
4   Las Vegas, NV 89134
    Тел: 702.669.4600
5   Факс: 702.669.4650
    speek@hollandhart.com
6

7   Тарик Мундия/ Tariq Mundiya (*pro hac vice* будет предоставлено позднее)
    Джеффри Б. Корн/ Jeffrey B. Korn (*pro hac vice* будет предоставлено позднее)
8   WILLKIE FARR & GALLAGHER LLP
    787 Seventh Avenue
9   New York, New York 10019
    (212) 728-8000
10  tmundiya@willkie.com
    jkorn@willkie.com
11

12  Майкл Дж. Готлиб/ Michael J. Gottlieb (*pro hac vice* будет предоставлено позднее)
    WILLKIE FARR & GALLAGHER LLP
13  1875 K Street, NW
    Washington, DC 20006
14  (202) 303-1000
    mgottlieb@willkie.com
15

16  *Адвокаты Истцов
    Jysan Holding, LLC; и
    Jusan Technologies Ltd.,*

17

**ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД США**

18

**ОКРУГ НЕВАДА**

19

| JYSAN HOLDING, LLC, компания с ограниченной ответственностью, зарегистрированная в штате Невада; JUSAN TECHNOLOGIES LTD, компания с ограниченной ответственностью, зарегистрированная в Англии и Уэльсе; | Дело №.: |
|---|---|
| | **ИСКОВОЕ ЗАЯВЛЕНИЕ О РАССМОТРЕНИИ ДЕЛА СУДОМ ПРИСЯЖНЫХ** |

20

21

22

23

Истец,

24   против

25   Иностранное суверенное государство РЕСПУБЛИКА КАЗАХСТАН;
26   Правительственное учреждение Казахстана АГЕНТСТВО
27   РЕСПУБЛИКИ КАЗАХСТАН ПО РЕГУЛИРОВАНИЮ И РАЗВИТИЮ
28   ФИНАНСОВОГО РЫНКА;

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Правительственная антикоррупционная служба Казахстана АГЕНТСТВО РЕСПУБЛИКИ КАЗАХСТАН ПО ПРОТИВОДЕЙСТВИЮ КОРРУПЦИИ; Правительственное учреждение Казахстана АГЕНТСТВО РЕСПУБЛИКИ КАЗАХСТАН ПО ФИНАНСОВОМУ МОНИТОРИНГУ; Правительственное разведывательное агентство Казахстана КОМИТЕТ НАЦИОНАЛЬНОЙ БЕЗОПАСНОСТИ РЕСПУБЛИКИ КАЗАХСТАН; физическое лицо МАДИНА АБЫЛКАСЫМОВА; физическое лицо ОЛЖАС КИЗАТОВ; физическое лицо АРМАН ОМАРБЕКОВ; и физическое лицо АДИЛЬБЕК ДЖАКСЫБЕКОВ,

Ответчики.

**ВВЕДЕНИЕ**

1.      С начала 2022 года Правительство Республики Казахстан («Правительство» или «Правительство Казахстана») проводит незаконную кампанию в отношении корпораций штата Невада: Истца Jysan Holding, LLC («Jysan Holding, LLC») и New Generation Foundation, Inc. («NGF»), а также их прямых и косвенных дочерних компаний (вместе именуемых «Jusan Group») в целях хищения активов Истца на сумму более 1,5 млрд долларов США.      Указанная коррупционная и незаконная кампания демонстрирует наглый бандитизм нации — бывшего государства-сателлита Советского Союза, — которая использовала широкие полномочия правительства и высокопоставленных чиновников, чтобы, выходя далеко за пределы Казахстана, красть, запугивать и иным образом причинять вред физическим лицам и организациям в Соединенных Штатах.      Ответчики занимаются тем самым рэкетом и экспроприацией, которые запрещены федеральными законами. Истцы подают настоящий иск, чтобы устранить незаконное конфискационное поведение Ответчиков.

2.      Несмотря на то, что Правительство Казахстана представило многочисленные, противоречивые и предлоговые оправдания их действий против

Ex. Page No. 121

группы Jusan Group, истинная цель Правительства состоит в том, чтобы захватить контроль над активами Jusan Group в Казахстане в целях собственной коммерческой выгоды, обеспечивая огромную коммерческую выгоду частным лицам, наделенным Правительством привилегиями. Правительство продемонстрировало свое намерение добиваться данной цели любыми возможными средствами, среди которых: угрозы, запугивание, уголовные и гражданские расследования и судебные процессы, а также блокировка 387 миллионов долларов США дивидендов, предназначенных для распределения частным банком в составе Jusan Group, First Heartland Jusan Bank («First Heartland Bank» или «Банк») и непосредственной материнской компании Банка, AO First Heartland Securities («FHS») — средства, предназначенные для истца Jusan Technologies Ltd. («JTL»), истца Jysan Holding и, в конечном счете, NGF.  Схема Ответчиков по использованию органов Правительства Казахстана для нанесения вреда организациям из Невады стала предельно ясной. После того, как Истцы проинформировали Ответчиков о намерении защищать свои права в немедленно направленном иске, Ответчики предприняли два очевидных акта возмездия: во-первых, в ноябре 2022 г. Ответчики внесли изменения в законодательство, специально направленные против Истцов; а во-вторых, 2 декабря 2022 г. Генеральная Прокуратура Казахстана подала в суды Казахстана сфабрикованный иск против Истцов и иных членов и сотрудников Jusan Group.  Законодательные меры, направленные против Jusan Group, подробно описанные ниже, предусматривали незаконный захват активов, находящихся под контролем юридического лица из Невады. Совсем недавно, 10 февраля 2023 года, Генеральная прокуратура Казахстана подала недобросовестно составленный иск, основанный на ложных обвинениях, с единственной целью конфискации активов, находящихся под контролем JTL. Более того, Казахстан угрожал насилием и тюремным заключением резидентам США, имеющим материальные экономические интересы в Jusan Group, если коммерческие требования Казахстана не будут выполнены. Эти действия соответствуют ситуации с повсеместной коррупцией в Правительстве

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

3

Казахстана, которая, согласно публичным отчетам, ухудшилась с 2022 года. Таким образом, Правительство Казахстана прибегает к тем же незаконным инструментам — конфискации, экспроприации, угрозам и запугиванию, — которым отдают предпочтение самые репрессивные диктаторы и авторитарные режимы мира.

3.     Действия Правительства и некоторых отдельных лиц препятствуют Истцам (включая КОО штата Невада, которая была создана именно для того, чтобы избежать такого незаконного изъятия активов, которое совершается в настоящее время) в исполнении обязательств по предоставлению свободного образования и передового опыта получателям грантов NGF, через предоставление высшего образования в американском стиле и проведения рыночных реформ в Республике Казахстан. Действительно, в период, предшествующий противоправной деятельности, указанной в настоящем документе, NGF и Jusan Group усилиями Истцов в целом предоставили Назарбаев Университету (современному англоязычному исследовательскому университету, расположенному в столице Республики Казахстан Астане (ранее Нур-Султан)), а также Назарбаев Интеллектуальные Школы и их организациям, гранты на миллионы долларов.

4.     В отсутствие судебной защиты незаконная схема Ответчиков будет продолжать лишать Истцов основного источника финансирования от их дочерних компаний, связанных с Банком, и, соответственно, они не смогут выполнять свои обязательства по предоставлению дивидендного финансирования для их головных организаций, среди которых NGF.  В свою очередь, NGF не в состоянии переводить собственные средства или получать законно выпущенные дивиденды для выполнения своей единственной миссии — финансирования Назарбаев Университета и Назарбаев Интеллектуальные Школы.  В конечном счете, замораживая средства Jusan Group, Правительство лишает Назарбаев Университет и Назарбаев Интеллектуальные Школы необходимых ресурсов, следовательно, наносит ущерб их студентам, исследователям и преподавателям, препятствуя предоставлению образования, которое ставит акцент на

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

необходимость высоких стандартов обучения, академической строгости, исследований, основанных на фактах, научного характера, интеллектуальной свободы, инноваций и академической свободы.

## ЮРИСДИКЦИЯ И МЕСТО РАССМОТРЕНИЯ

5.      Данный Суд обладает предметной юрисдикцией относительно данного иска в соответствии с 28 U.S.C. § 1331, поскольку данный иск возникает в соответствии с законодательством Соединенных Штатов, а именно 18 U.S.C. § 1964(c).

6.      Данный Суд также обладает предметной юрисдикцией относительно данного иска в соответствии с § 1330(a) 28 U.S.C., поскольку Ответчик Республика Казахстан и ее нижеперечисленные учреждения и органы являются иностранными государствами по определению в § 1603(a) 28 U.S.C, и не имеют права на иммунитет в соответствии с 28 U.S.C. §§ 1605–07 или любым применимым международным соглашением.  Ответчик Республика Казахстан, а также перечисленные ниже агентства и органы Ответчика не защищены иммунитетом от юрисдикции данного Суда в соответствии с 28 U.S.C. § 1605(a)(2), поскольку данный иск основан на действиях за пределами территории Соединенных Штатов, связанных с коммерческой деятельностью Ответчиков за пределами США, и данные действия оказали непосредственное воздействие в Соединенных Штатах.

7.      Данный Суд обладает дополнительной юрисдикцией в отношении требований Истцов относительно законодательств штата в соответствии с 28 U.S.C. § 1367(a), поскольку эти требования настолько связаны с другими требованиями иска, что они являются частью того же дела или разногласия в соответствии со Статьей III Конституции Соединенных Штатов.

8.      Данный Суд обладает персональной юрисдикцией в отношении Ответчика Республики Казахстан и ее учреждений и органов, перечисленных ниже, в соответствии с 28 U.S.C. § 1330(b).

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 124

9.      Данный Суд обладает персональной юрисдикцией в отношении всех Ответчиков согласно Nev. Rev. Stat. § 14.065.  Данный Суд также обладает персональной юрисдикцией в отношении всех Ответчиков в соответствии с 18 U.S.C. § 1965 и правилами 4(k)(1)(C) и 4(k)(2) Федеральных правил гражданского судопроизводства.

10.      Место рассмотрения в данном округе является надлежащим в соответствии с 28 U.S.C. § 1391 (f) (1), поскольку значительная часть событий, послуживших основанием для иска, произошла в данном округе.  В качестве альтернативы, место рассмотрения в данном округе является надлежащим в соответствии с 28 U.S.C. § 1391(b)(3), поскольку Ответчики подлежат персональной юрисдикции в данном округе в отношении данного иска.

## СТОРОНЫ

11.      Истец Jysan Holding — компания с ограниченной ответственностью, зарегистрированная в соответствии с законодательством штата Невада.  Единственным членом Jysan Holding является NGF — организация со статусом 501 (c) (4), базирующаяся и зарегистрированная в Неваде.  Jysan Holding имеет 96,96 % прямого участия в JTL, которая выступает в качестве холдинговой компании для непрямых дочерних компаний Jysan Holding и является косвенным мажоритарным владельцем иных компаний, расположенных в Казахстане.  Jysan Holding управляет бизнесом и иной инвестиционной деятельностью NGF в интересах студентов учебных заведений-грантополучателей в Республике Казахстан.

12.      Истец JTL — компания с ограниченной ответственностью, учрежденная в соответствии с законодательством Англии и Уэльса.  Прямой материнской компанией JTL является Jysan Holding (указанная выше организация из Невады).  JTL является прямым и косвенным мажоритарным владельцем прочих компаний в Казахстане, среди которых FHS, в которой JTL владеет прямой долей участия в размере 99,48 %.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 125

13.     Ответчик Республика Казахстан — иностранное суверенное государство в значении 28 U.S.C. § 1603(a).  Ответчик Республика Казахстан имеет посольство в Соединенных Штатах по адресу 1401 16th St NW, Washington, DC 20036.

14.     Ответчик Агентство Республики Казахстан по регулированию и развитию финансового рынка («АРРФР») — правительственное учреждение, которому поручено осуществлять надзор за финансовым рынком и финансовыми организациями в Казахстане.

15.     Ответчик Агентство Республики Казахстан по противодействию коррупции («Антикоррупционная служба») — правительственное антикоррупционное учреждение.  Антикоррупционная служба отвечает за разработку и реализацию антикоррупционной политики Правительства Казахстана, координацию правоприменительных мероприятий по борьбе с коррупцией, а также выявление, пресечение, раскрытие и расследование коррупционных правонарушений. Антикоррупционная служба подчиняется непосредственно Президенту Казахстана.

16.     Ответчик Агентство Республики Казахстан по финансовому мониторингу («АФМ») — государственный орган, ответственный за предоставление рекомендаций по противодействию отмыванию денег и финансированию терроризма, а также за предотвращение, обнаружение, пресечение, раскрытие и расследование экономических и финансовые правонарушений, направленных им законодательными органами Республики Казахстан.  АФМ подчиняется непосредственно Президенту Казахстана.

17.     Ответчик Комитет национальной безопасности Республики Казахстан («КНБ») — правительственное разведывательное учреждение (совместно с АРРФР, Антикоррупционной службой и АФМ «Ответчики правительственных учреждений»).

18.     Ответчик Мадина Абылкасымова — председатель АРРФР.  Она проживает в Казахстане, гражданка Казахстана.

19.     Ответчик Олжас Кизатов — заместитель председателя АРРФР.  Он проживает в Казахстане, гражданин Казахстана.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 126

20.     Ответчик Арман Омарбеков — представитель АРРФР.  Он проживает в Казахстане, гражданин Казахстана.

21.     Ответчик Адильбек Джаксыбеков (вместе с ответчиками Абылкасымовой, Кизатовым и Омарбековым, «Индивидуальные ответчики») — бывший владелец Цеснабанка  банка, который Jusan Group приобрела в феврале 2019 года.  Он проживает в Казахстане, гражданин Казахстана.

## ФАКТЫ

**A.  Члены Jusan Group Помогают Правительству Казахстана, Покупая Обанкротившиеся Казахстанские Банки.**

22.     В 2018 году банковский сектор Казахстана, не полностью оправившийся от финансового кризиса 2007–2009 годов и последующих девальваций казахстанского тенге в 2008 и 2015 годах, попал в острую уязвимую ситуацию после резкого падения мировых цен на энергоносители, что снова привело к значительной девальвации тенге. В ответ правительство Казахстана искало различные коммерческие решения, в стремлении избежать краха всей банковской системы страны.

23.     Цеснабанк в то время был вторым самым большим банком по размеру активов в Центральной Азии и принадлежал ответчику Джаксыбекову.  Ответчик Джаксыбеков злоупотреблял своими полномочиями в Цеснабанке для получения финансовой выгоды в собственных целях, а также для своей семьи и друзей, фактически используя Цеснабанк как частную инвестиционную компанию для достижения своих личных интересов и участия в прочих сомнительных или злонамеренных деловых операциях.

24.     К 2018 году Цеснабанк был на грани краха: почти 90 % активов банка были необслуживаемыми.

25.     Серьезные проблемы с ликвидностью у Цеснабанка не прекращались, несмотря на получение капитальных вливаний в рамках государственной помощи банковскому сектору Казахстана в 2017 году.  В начале сентября 2018 года банк получил

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 127

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

краткосрочный займ в размере нескольких сотен миллионов долларов от Национального Банка Республики Казахстан. В последней отчаянной попытке остаться в бизнесе, Цеснабанк продал государству значительную часть портфеля сельскохозяйственных кредитов. Однако, к середине сентября S&P понизило рейтинг ликвидности Цеснабанка с «адекватного» на «менее чем адекватный».

26.  Правительство Казахстана определило, что в случае краха Цеснабанка он, скорее всего, потопит с собой весь банковский сектор Казахстана. Таким образом, правительство Казахстана непреклонно искало какое-нибудь коммерческое решение, которое бы позволило удержать Цеснабанк на плаву. Пытаясь достичь поставленной цели, правительство Казахстана инициировало серию попыток спасения Цеснабанка в период с 2018 по 2019 год.

27.  Правительство охарактеризовало данные меры как «повышение устойчивости Цеснабанка за счет кардинального улучшения его кредитного портфеля». В современных отчетах признавалось, что это была очередная помощь для спасения, направленная на исправление шаткого и ухудшающегося финансового положения Цеснабанка.

28.  Однако даже при такой финансовой поддержке, к январю 2019 года значительные потери в кредитном портфеле Цеснабанка продолжали угрожать жизнеспособности Цеснабанка. Чтобы выжить, Цеснабанку нужны были дополнительные вливания капитала. Правительство Казахстана срочно искало другой банк, который купил бы Цеснабанк и предоставил новый капитал, чтобы предотвратить крах Цеснабанка, а также обеспечить смену руководства для усиления операционной деятельности Цеснабанка.

29.  Правительство Казахстана обнаружило, что First Heartland Bank в Казахстане, принадлежащий Jusan Group, — потенциальное решение. First Heartland Bank значительно нарастил наличные резервы и сохранил безупречную репутацию благодаря надлежащему управлению под руководством Jusan Group.

Ex. Page No. 128

30.     Правительство Казахстана обратилось к Jusan Group насчет потенциального приобретения Цеснабанка.   Jusan Group постарались удовлетворить просьбу правительства и принять участие в оказании помощи банковскому сектору.   Но для Jusan Group было очевидно, что они не смогут приобрести Цеснабанк, если у Цеснабанка отрицательный баланс, а из-за неэффективного управления кредитным портфелем Цеснабанка под руководством ответчика Джаксыбекова у Цеснабанка был очень отрицательный баланс.

31.     В попытке найти коммерческое решение, Правительство Казахстана провело переговоры по ряду контрактов (кульминацией которых стали «Рамочные соглашения по Цеснабанку»), в соответствии с которыми Правительство предоставит Цеснабанку дополнительные средства на выживание, в которые входит покупка проблемных активов, после чего Jusan Group приобретет Цеснабанк.

32.     Рамочные соглашения по Цеснабанку были заключены в январе и феврале 2019 года.   Сторонами Рамочных соглашений по Цеснабанку были AO First Heartland Securities («FHS»), материнская компания Банка, ответчик Джаксыбеков, Цеснабанк и Правительство Республики Казахстан в лице Министерства финансов Республики Казахстан и Национального Банка Республики Казахстан.   Рамочные соглашения по Цеснабанку явно поддерживались и были согласованы с нынешним премьер-министром Казахстана Алиханом Смаиловым и первым заместителем руководителя аппарата Президента Казахстана Тимуром Сулейменовым.

33.     Рамочное соглашение, подписанное 17 января 2019 года («Рамочное соглашение по Цеснабанку от 17 января»), предусматривало вливание государственных средств в Банк Цеснабанк, которые в конечном итоге приняли форму облигаций с длительным сроком погашения.   Затем, FHS приобрела Цеснабанк, в соответствии со статьей 8 «Рамочного соглашения по Цеснабанку от 17 января».

34.     Правительство Казахстана не только дало полное согласие на сделку, но и возглавило ее исполнение.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

35.     Важно отметить, что возвращение суммы спасательного капитала к 2023 году не являлось условием Правительства Казахстана для поддержки в вопросе приобретения Цеснабанка, также Правительство Казахстана не ограничивало выплату дивидендов Банком каким-либо иным образом.  Фактически до недавнего момента, в декабре 2021 года включительно, Банк выплачивал дивиденды без возражений со стороны Правительства Казахстана.

36.     Вскоре после сделки по продаже Цеснабанка, Правительство снова обратилось к Jusan Group, с предложением приобрести еще один обанкротившийся банк, АТФ Банк.

37.     Как и в случае с Цеснабанком, Правительство было основной стороной переговоров по сделке, в рамках которой Jusan Group приобрела АТФ Банк (осуществлялось посредством Рамочных соглашений по АТФ Банку).  Как и в случае с Цеснабанком, у АТФ Банка имелись значительные убытки по кредитному портфелю, который Правительство согласилось спасти, в связи с приобретением.

38.     Важно отметить, что, как указано выше, Правительство не обусловило оказание помощи АТФ Банку какими-либо обязательствами по возврату средств до 2023 года и никаким иным образом не ограничивало выплату Банком дивидендов.

39.     Таким образом, приобретая АТФ Банк, Jusan Group удовлетворила просьбу Правительства Казахстана о коммерческом решении банковского кризиса, вложила значительный капитал в банковский сектор страны и во второй раз за два года спасла сектор от полного краха. Еще в январе 2023 года премьер-министр Смаилов подтвердил, что приобретение Jusan Group Цеснабанка и АТФ Банка было необходимо, чтобы стабилизировать финансовое положение учреждений и обеспечить безопасность вкладов казахстанских граждан и юридических лиц.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 130

**B.   Jusan Group Создала Предприятия в Неваде для Защиты и Увеличения Своих Активов на Фоне Банковского Кризиса в Казахстане.**

40.     В то время, когда Jusan Group помогала Правительству в спасении обанкротившихся казахстанских банков, руководство Jusan Group искало наилучшие варианты, как и далее защищать и приумножать собственные активы.  До 2019 года Jusan Group принадлежала фонду Nazarbayev Fund («NF») — казахстанской корпорации, созданной для финансирования Назарбаев Университета и Nazarbayev Intellectual Schools, а также организаций, поддерживающих Назарбаев Университет и Nazarbayev Intellectual Schools.

41.     Назарбаев Университет, основанный в 2010 году, является флагманским учебным заведением Казахстана, с амбициями стать исследовательским университетом мирового уровня.  Цель университета — «предоставить Казахстану и миру ученых, академиков, менеджеров и предпринимателей, необходимых для процветания и развития», университет был основан на принципах автономии и академической свободы.   Назарбаев Университет стал неотъемлемой частью академической исследовательской экосистемы с более 5600 международных публикаций.  Назарбаев Университет оказывает образовательные услуги западного образца на английском языке.

42.     Nazarbayev Intellectual Schools были основаны в 2008 году и созданы как современная и инновационная образовательная платформа для разработки и внедрения современных моделей образовательных программ от дошкольного до старшего школьного возраста.  Выпускники Nazarbayev Intellectual Schools успешно поступают в ведущие университеты, среди которых Назарбаев Университет и другие ведущие программы бакалавриата в Европе и Восточной Азии.

43.     После почти десяти лет поддержки Назарбаев Университета и Nazarbayev Intellectual Schools от благотворительного фонда в Казахстане, руководство Jusan Group

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

стало все более беспокоиться о том, что рост благотворительного фонда в Казахстане по сути ограничен и находится под угрозой.

44.  Руководство Jusan Group приняло решение создать благотворительный фонд в Неваде — штате, известном строгой правовой защитой и стандартами корпоративного управления, сильными традициями благотворительности и многочисленными успешными университетскими благотворительными фондами и некоммерческими организациями.

45.  В частности, Jusan Group решила зарегистрировать компанию в Неваде, потому что это одна из ведущих юрисдикций в США по стандартам корпоративного управления.  Jusan Group также учла тот факт, что многие крупные коммерческие и некоммерческие организации ведут свою операционную деятельность как корпорации штата Невада.

46.  NGF была создана в 2019 году в Неваде как неакционерная некоммерческая корпорация, с целью ведения деятельности исключительно в интересах Назарбаев Университета и Nazarbayev Intellectual Schools.  NF затем передала NGF всю свою долю в Jusan Group.  Единственной миссией NGF является обеспечение финансирования деятельности Назарбаев Университета и Nazarbayev Intellectual Schools, а также их организаций, это благотворительный фонд для них.  Jysan Holding был создан для управления активами NGF.

47.  Компания с ограниченной ответственностью JTL была зарегистрирована в 2020 году в соответствии с законодательством Англии и Уэльса и позднее передана Jysan Holding за счет взноса капитала.  JTL была зарегистрирована с целью создания общей корпоративной холдинговой структуры для финансового и технологического подразделений Jusan Group.  JTL — холдинговая компания, инвестирующая в различные сферы, среди которых банковское дело, брокерские услуги, страхование, управление активами, электронная коммерция, телекоммуникации, логистика и розничная торговля.  JTL расширяет свой портфель за счет стратегических слияний и

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

поглощений, тем не менее, косвенное участие JTL в Банке составляет 90 % его общих активов.

48.     JTL владеет 99,48 % долей в FHS, которая, в свою очередь, владеет примерно 80 % долей в First Heartland Bank.

49.     Таким образом, NGF получает пассивный доход через косвенное владение JTL, в виде дивидендов и распределений от бизнеса и деятельности JTL и ее холдингов, включая FHS и Банк.



50.     В соответствии с внутригрупповыми положениями и соглашениями, выплаты дивидендов будут распределяться от Банка к FHS и, в свою очередь, к JTL, Jysan Holding и NGF, за вычетом средств, необходимых для покрытия адекватных операционных расходов.   Каждое предприятие имеет законное право объявлять и получать дивиденды от своей прямой дочерней компании.

51.     NGF впервые начал предоставлять финансирование Назарбаев Университету и Nazarbayev Intellectual Schools в 2021 году.  Как отмечается, только за

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 133

два года NGF и Jusan Group предоставили Назарбаев Университету, Nazarbayev Intellectual Schools и поддерживающим их организациям миллионы долларов. Вышеуказанные гранты шли на поддержку усилий по предоставлению образования, в котором особое внимание уделяется ценностям интеллектуальной свободы, инноваций и академической свободы.  NGF ожидает, что финансирование значительно увеличится в ближайшие годы, в частности, в рамках решения проблемы существенного сокращения финансовой поддержки со стороны Правительства Казахстана в контексте серьезных финансовых проблем национального бюджета Казахстана.

52.    NGF полностью финансируется за счет распределения прибыли от Jysan Holding, которая получает свой доход исключительно в виде выплат дивидендов от компаний Jusan Group через JTL.

**C.  Финансовый    Успех    Jusan    Group    Провоцирует    Правительство    и Джаксыбекова Принудительно Захватить First Heartland Bank.**

53.    После приобретения Цеснабанка и АТФ Банка — которые теперь являются частью First Heartland Bank — First Heartland Bank добился быстрого увеличения выручки.

54.    Такой    успех    и    повышение    прибыльности    были    связаны    с дисциплинированным    и    стратегическим    подходом    к    работе    с    обесцененными кредитами, которые по-прежнему составляли значительную долю портфеля Цеснабанка и АТФ Банка после того, как их приобрел First Heartland Bank.  В рамках вышеуказанных усилий First Heartland Bank реализовал новую бизнес-стратегию, направленную на увеличение    выплат    по    неэффективным    кредитам.    Что    резко    отличалось    от коррупционной банковской практики бывшего владельца Цеснабанка.

55.    Кроме того, Банк внедрил прозрачное корпоративное управление и принятие решений, четкие механизмы судебного и внесудебного взыскания долгов, системное устранение коррупции в процессе взыскания долгов, категорическое пресечение реструктуризации кредитов между коллекторами и должниками.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 134

Ликвидировав у заемщиков стимулы к ведению переговоров по неформальным платежным схемам, Банк стимулировал заемщиков погасить свой долг, а не рисковать потерей залога.  Эти и другие меры оказали значительное положительное влияние на размер выручки и чистой прибыли Банка.

56.     Банк также придерживается бизнес-модели с дальновидным подходом. Например, за последние несколько лет Банк сосредоточился на цифровых технологиях, создав платформу электронной коммерции и двигаясь в сторону интегрированной модели финансовых услуг. В результате этих усилий и улучшения показателей прибыльности, качества активов, платежеспособности и управления рисками 14 декабря 2022 года агентство Moody's Investors Service повысило прогноз по рейтингам Банка со стабильного на позитивный.

57.     Отчасти благодаря успеху вышеуказанных стратегий Банк смог выплачивать дивиденды.

58.     Сегодня First Heartland Bank является третьим по величине банковским конгломератом в Казахстане и поддерживает прочные отношения с иностранными финансовыми институтами.

59.     Способность Банка выплачивать дивиденды акционерам, в свою очередь, позволила NGF предоставлять значительное финансирование Назарбаев Университету и Nazarbayev Intellectual Schools.   NGF и Jusan Group финансировали данные учреждения и поддерживающие их организации, выделяя миллионы долларов на поддержку образования, которое ставит акцент на превосходство, академическую строгость, научно-обоснованные исследования, научный характер, инновации и академическую свободу.

**D.  Ответчики Преследовали и Вымогали Деньги у Jusan Group в Попытке Украсть Активы Группы.**

60.     Начиная с 2022 года Ответчики, среди которых Ответчики правительственных учреждений и Правительства, стали действовать как фактически

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 135

совместное предприятие, а также участвовать в деятельности и управлении иными предприятиями путем рэкета. Цель Ответчиков состояла в том, чтобы неправомерно заполучить активы Jusan Group в интересах Индивидуальных Ответчиков. Каждый из Индивидуальных Ответчиков связан в силу того, что действует в контексте полномочий Правительства Казахстана, либо напрямую через работу на Правительство, либо, в случае Ответчика Джаксыбекова, через тесные связи с Правительством. Сообщная деятельность Ответчиков фактически имела место как минимум с января 2022 года и продолжается таким образом, что сообщникам позволено периодически заниматься рэкетом.

61. Рэкет включает в себя попытки вымогательства у Jusan Group, представляющие собой нарушение Закона Хоббса, 18 U.S.C. § 1951, которым предусматривается в соответствующей части: «Тот, кто любым образом, или в любой степени, препятствует, задерживает, или влияет на коммерческую деятельность или передвижение в рамках коммерческой деятельности любого товара или сырья, путем грабежа или вымогательства, или предпринимает подобные попытки, или вступает в сговор для совершения таких действий. . . подлежит наложению штрафа в соответствии с данным разделом или лишению свободы на срок до двадцати лет, или и тому и другому», 18 U.S.C. § 1951(a). В соответствии с данным разделом, термин «вымогательство» означает получение собственности от другого лица с его согласия, полученного путем неправомерного применения фактической или угрожаемой силы, насилия или запугивания или под прикрытием официального права». 18 U.S.C. § 1951(b)(2). «Коммерческая деятельность» включает в себя «всякую коммерческую деятельность между любой точкой Штата, Территории, Владения или Округа Колумбии и любой точкой за их пределами; всякую коммерческую деятельность между точками внутри одного Штата через любую точку за пределами данного Штата; и всякую прочую коммерческую деятельность, в отношении которой Соединенные Штаты имеют юрисдикцию». 18 U.S.C. § 1951(b)(3).

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1.   *Агентство Республики Казахстан по Регулированию и Развитию Финансового*
     *Рынка Начинает Преследование First Heartland Bank.*

62.     Начиная с января 2022 года и на момент подачи настоящего иска, Правительство Казахстана, различные правительственные и квазиправительственные учреждения включительно, распорядилось провести не менее 11 необоснованных и незаконных расследований, запросов или проверок по отношению к First Heartland Bank, косвенной дочерней компании Jysan Holding.  Данные незаконные действия начались как завуалированные попытки помочь Банку в соблюдении нормативных требований, но вскоре стало понятно, что это очевидные — а иногда и явно незаконные — попытки принудить к незаконным платежам в пользу Правительства Казахстана и частных лиц.

63.     В частности, начиная примерно с 11 января 2022 года представители АРРФР назначили пять агентов для постоянного наблюдения за Банком. Вышеуказанное наблюдение представляет собой необоснованное вторжение, выходящее далеко за рамки ранее проводимого мониторинга Банка и стандартного мониторинга других банков, которые АРРФР обычно проводит.

64.     В контексте данного наблюдения представители АРРФР завалили Банк обширными и назойливыми запросами информации по всем аспектам деятельности Банка.  Запросы были с неоправданно сжатыми сроками исполнения, что вынудило сотрудников Банка заниматься запросом АРРФР, вместо обычных деловых операций.

65.     В дополнение к круглосуточному наблюдению, АРРФР установило ограничительные пороговые показатели для всех транзакций, проводимых сторонами, имеющими отношение к Банку.  Ограничения, которые действуют на дату подачи данного иска, настолько драконовские, что для проведения любой транзакции с участием Jusan Group требуются предварительные одобрения от АРРФР и АФМ.

66.     АРРФР, в свою очередь, необоснованно отказывает в одобрении мелких и крупных сделок.   Например, в соответствии с установленными пороговыми показателями для транзакций, АРРФР заблокировало банковские карты некоторых

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 137

сотрудников Банка, которые использовались для оплаты ежедневных расходов, а также заблокировало перевод в размере 4 миллионов долларов США со счета NGF в Банке на счет NGF в банке, находящемся в США.   Вышеуказанный платеж остается заблокированным, он в конечном итоге необходим для финансирования операционных расходов Назарбаев Университета и Назарбаев Интеллектуальные Школы.  NGF с тех пор не может перевести никакие средства со своего счета в Банке.   Сюда входят небольшие переводы на оплату собственной операционной деятельности, а также платежи поставщикам, которые предоставляли услуги NGF для достижения целей основной миссии организации.   Например, платежи NGF за юридические услуги, веб-дизайн, переводческие услуги, бухгалтерские и налоговые услуги были заблокированы. Примечательно, что NGF не было предоставлено никаких официальных объяснений, почему его переводы были заблокированы.

67.   АРРФР пошло еще дальше и поручило Банку заморозить счета некоторых сотрудников Банка и их родственников на неопределенный срок и без каких-либо обоснований.

68.   АРРФР не желает документировать свои действия в письменном виде. Когда Агентство Республики Казахстан по регулированию и развитию финансового рынка одобряет транзакцию, оно настаивает на том, чтобы одобрение было сделано в устной форме.   Когда АРРФР отказывает в транзакции, оно не предоставляет ни письменно, ни устно никаких объяснений того, почему транзакция была отклонена.

69.   Данные действия привели к снижению экономической деятельности Банка и к потере многих постоянных клиентов.   Потеря Банком клиентов и бизнеса значительно повлияла на Истцов, чье финансирование деятельности и выполнение обязательств перед NGF зависят от выплат им дивидендов Банком.

70.   АРРФР заявило, что целью наблюдения было обеспечение соблюдения Банком недавно обновленных правил по борьбе с отмыванием денег.  Но ясно, что это было предлогом.  На самом деле, такого «содействия» не получал ни один другой банк.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 138

Вместо этого АРРФР инициировало широкую кампанию запугивания, скоординированную с несколькими государственными учреждениями и частными лицами, и направленную на то, чтобы помешать Банку вести обычную коммерческую деятельность и, в свою очередь, заставить Jusan Group передать средства и контроль над активами Правительству Казахстана и причастным с ним.

*2. Агентство по Финансовому Мониторингу Республики Казахстан Начало Предварительное Расследование в Отношении First Heartland Bank и Изъяло Документы.*

71.     В феврале 2022 года АФМ возбудило уголовное дело в отношении бывших должностных лиц АТФ Банка якобы в связи с выдачей необслуживаемых кредитов в период с 2013 по 2016 г.

72.     Но предмет расследования также оказался ложным предлогом.  АФМ в процессе рассмотрения уголовного дела изъяло у Банка документацию, масштаб которой выходил далеко за рамки расследования предыдущих кредитов.  Например, АФМ изъяло документы, связанные с приобретением АТФ Банка в 2020 году, информацию о дивидендах Банка после 2020 года и операциях по счетам должностных лиц банка, которые совершенно не связаны с предыдущими кредитами АТФ Банка.

*3. Принадлежащие Правительству Организации Предпринимают Меры Неблагоприятного Воздействия Против First Heartland Bank.*

73.     В период с января по март 2022 года ряд организаций, принадлежащих Правительству, вывели все средства из Банка по директиве от Правительства Казахстана.   Это привело к значительному оттоку капитала из Банка.   Ряд принадлежащих Правительству организаций включает, но не ограничивается: Фонд развития предпринимательства «Даму»; Казахтелеком и Кселл, крупнейшая телекоммуникационная компания и основной оператор сотовой связи в Казахстане; и Самрук-Казына, суверенный фонд благосостояния Казахстана, владеющий долями в

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

национальной железнодорожной и почтовой службе, а также в государственных газовых и нефтяных компаниях.

74.    Более того, за этот период, все правительственные учреждения, в частности Министерство цифрового развития и Налоговый комитет, прекратили всякое сотрудничество, имеющее отношение к совместной разработке Банком и Правительством продуктов «govtech».

*4.  Агентство   Республики   Казахстан   по   Противодействию   Коррупции  Возбуждает   Фиктивное   Уголовное   Дело   и   Предпринимает   Попытки  Вымогательства.*

75.    В начале июня 2022 года Антикоррупционная служба начала намеренное уголовное расследование в отношении Банка в связи с его коммерческой покупкой Цеснабанка в 2019 году и последующими доходами.

76.    По имеющейся информации и убеждениям, толчком к этому расследованию послужило письмо бывшего владельца Цеснабанка, ответчика Адильбека Джаксыбекова, в котором он неправомерно использовал свои личные связи с руководством Антикоррупционной службы для принуждения к расследованию и с конечной целью вымогательства миллионов долларов у Банка.

77.    Желание ответчика Джаксыбекова проводить уголовное расследование обусловлено обвинениями в том, что коммерческая покупка Банком Цеснабанка была какой-то незаконной, несмотря на тот факт, что и он, и Правительство Казахстана участвовали в покупке и/или руководили ею, и что покупка была вызвана близким крахом Цеснабанка который тогда был в его собственности.

78.    Антикоррупционная служба, в рамках расследования предприняла крайне незаконные и произвольные меры принуждения, включая чрезмерные допросы сотрудников Банка, необоснованные обыски ключевого персонала и помещений Банка, а также ограничения передвижения для должностных лиц и сотрудников Jusan Group.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

По имеющейся информации и убеждениям, такие крайние меры принуждения были предприняты Антикоррупционной службой по просьбе г-на Джаксыбекова.

79.   Кроме того, Антикоррупционная служба поручила АРРФР заблокировать все транзакции, включая выплату дивидендов Jusan Group.  7 октября 2022 года в АРРФР поступила корреспонденция от Антикоррупционной службы о том, чтобы «принять эффективные и комплексные меры по приостановке всех расходных (дебетовых) операций по выплате дивидендов Банком, FHS JSC, Jysan Technologies, Jysan Holding и [NGF] их акционерам и владельцам, а также любые другие платежные операции в рамках указанной группы компаний» и «приостановить действия по экспроприации акций Банка и FHS» на период рассмотрения уголовного дела.  8 октября 2022 г. First Heartland Bank получил корреспонденцию от АРРФР за подписью Ответчика Кизатова, в которой тот подробно изложил инструкции для АРРФР от Антикоррупционной службы от 7 октября 2022 г.

80.   Г-н Шигео Катсу, представляя Банк, присутствовал на встрече с Президентом Казахстана Касым-Жомартом Токаевым в июле 2022 года, в попытке положить конец необоснованному расследованию.  Г-н Катсу — Председатель Совета Директоров Банка и FHS.  В ходе встречи Президент Токаев заявил, что ему известно о том, что Ответчик Джаксыбеков подал жалобу насчет приобретения Цеснабанка, и предложил г-ну Катсу заключить мировое соглашение с Ответчиком Джаксыбековым.

81.   После этой встречи Ответчик Джаксыбеков пытался шантажировать г-на Катсу и Банк, намекая, что если Банк ему заплатит, то Антикоррупционная служба закроет расследование.  Ответчик Джаксыбеков рекламировал свои личные связи с должностными лицами Антикоррупционной службы и требовал выплаты 60 миллионов тенге (приблизительно 130 миллионов долларов США) за неуказанный «ущерб».

82.   Г-н Катсу отверг все попытки вымогательства у него и у Банка, отметив, что такой платеж без каких-либо доказательств или обоснования нарушит

многочисленные законы о борьбе с коррупцией и что Jusan Group должна соблюдать все законы, в том числе законы Казахстана, Великобритании и Соединенных Штатов.

*5. Правительство Казахстана Пытается Принудительно Вернуть Государственную Помощь и Взять под Контроль FHS.*

83.     Растущие регулятивные притеснения со стороны Правительства Казахстана в первом квартале 2022 года вынудили г-на Катсу посетить серию дополнительных встреч с должностными лицами Правительства Казахстана, чтобы добиться прекращения незаконной кампании со стороны Правительства.

84.     В ходе этих встреч должностные лица Правительства Казахстана, в том числе представители АРРФР и премьер-министр Казахстана Алихан Смаилов, заявили, что Банку запрещено выплачивать дивиденды до тех пор, пока Банк не возвратит государственную помощь, оказанную Цеснабанку и АТФ Банку.

85.     Упоминаний о таких ограничениях не имелось ни в одном применимом законе или договоре, и об этом, конечно же, известно Правительству.   Такие ограничения никогда не обсуждались ранее, в том числе при выплате дивидендов Банком в декабре 2021 года.

86.     Кроме того, Правительство Казахстана разрешило другим финансовым учреждениям объявлять дивиденды без каких-либо проблем, несмотря на предварительную государственную помощь.   Например, Halyk Bank, Kaspi Bank и Сбербанку Казахстана было разрешено выплачивать дивиденды, несмотря на получение ими значительной государственной поддержки в течение нескольких лет без предварительного полного погашения кредитов.

87.     Тем не менее, АРРФР продолжает заявлять, что будет блокировать любые выплаты дивидендов, и угрожает посадить в тюрьму любого сотрудника Jusan Group, который будет проводить выплату дивидендов.

88.     Кроме того, г-н Сулейменов встретился с официальными лицами Jusan Group в сентябре 2022 года и потребовал, чтобы право собственности на Jusan Group

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 142

было отобрано у компаний США и Великобритании и передано Казахстану.  Во время одной из таких встреч г-н Сулейменов заявил, что участвует в качестве представителя и по указанию президента Токаева, и пригрозил Jusan Group дополнительными действиями Правительства в связи с отсутствием граждан Казахстана в Советах директоров NGF и Jysan Holding.  На этой встрече г-н Сулейменов также потребовал, чтобы контроль над FHS (и соответственно над Банком) был передан неуказанным казахстанским гражданам.  Он не предоставил никакого юридического обоснования своих требований, да и не мог.

6.  *Правительство Казахстана Принимает Меры в Отношении Сотрудников Jusan Group.*

89.    По имеющейся информации и убеждениям, в контексте переговоров между Правительством Казахстана и Jusan Group в первом квартале 2022 года, Правительство оказало давление на аудиторов Jusan Group, чтобы они придержали аудиторские отчеты до возврата всех акционных и опционных соглашений от сотрудников Jusan Group.  Правительство также пригрозило возбудить уголовное дело по невозвращенным опционам.

90.    Продолжающиеся переговоры и угроза уголовного преследования привели к принудительной сдаче вышеуказанных активов, которыми владели сотрудники Jusan Group.

91.    Вынужденный возврат опционов привел к значительным личным потерям персонала Jusan Group в размере десятков миллионов долларов, что усугубило личные убытки, связанные с указаниями Банку заморозить счета определенных сотрудников Банка и их родственников от АРРФР.

92.    Например, один член руководства Jusan Group, который на данный момент является постоянным резидентом США, был вынужден вернуть свой опцион на 4,62 % акций JTL, балансовая стоимость которых превышает 73 миллиона долларов США по состоянию на май 2022 года.  Правительство также угрожало тому же члену заочным

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

24

судом и тюремным заключением, если сотрудник предпримет какие-либо действия, противодействующие правительству Казахстана в усилиях по конфискации имущества Jusan Group и ее сотрудников.

93.     Г-н Сулейменов, в частности, интересовался возвратом акций и опционов в ходе последующих переговоров в сентябре 2022 года, подтверждая тем самым, что вымогательство поддерживается Правительством.

*7.   АРРФР Незаконно Вмешивается в Выплату Дивидендов FHS.*

94.     6 октября 2022 года FHS объявила дивиденды и потребовала, чтобы Банк включил объявление дивидендов во внеочередное общее собрание.  Это заявление и запрос юридически обязывали Банк в соответствии с его письменной политикой и руководящими документами выплачивать дивиденды FHS.  Значительная часть дивидендов, причитающихся FHS, является конечной собственностью Jysan Holding и, в свою очередь, будет причитаться Jysan Holding в соответствии с внутригрупповыми положениями и соглашениями.

95.     7 октября 2022 года АРРФР заблокировало осуществление FHS и Банком этой и других выплат дивидендов на общую сумму около 387 миллионов долларов США, а также осуществление других платежных операций Банка его прямым и косвенным материнским компаниям.

96.     Ответчики Кизатов и Омарбеков, представители АРРФР, звонили представителям Банка в октябре 2022 года по поводу данных заблокированных платежей.  Во время разговора с Главным специалистом Банка по комплаенсу г-жой Ардак Мукашевой Ответчик Омарбеков повторил утверждения, сделанные на предыдущих встречах между представителями Банка и Правительства, заявив, что средства Банка принадлежат Правительству Казахстана, пригрозив, что правоохранительные органы готовятся к задержанию и допросу сотрудников Банка и связанных с Банком организаций.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

97.    Ответчик Омарбеков снова позвонил в Банк 8 октября 2022 года, утверждая, что АРРФР получило письмо от неназванного правоохранительного органа, предписывающее АРРФР заблокировать все выплаты дивидендов от Банка.

*8. АФМ Незаконно Вмешивается в Выплату Дивидендов FHS.*

98.    13 октября 2022 г. АФМ направило в Банк письмо, в котором неверно утверждалось, что Банк получил 1,5 трлн тенге от правительства Казахстана на льготных условиях и каким-то образом не выполнил свои обязательства по этому «долгу». В письме АФМ утверждало, что приостанавливает способность Банка выплачивать дивиденды акционерам и требует, чтобы Банк предоставлял уведомления АФМ прежде, чем будет проводить дальнейшие выплаты дивидендов.

*9. Предложенные Правительством «Оправдания» Непостоянны, Противоречивы и Безосновательны.*

99.    На протяжении всей этой кампании Правительство приводило различные «оправдания» своих действий, ни одно из которых не оправдывает незаконные действия Правительства против Jusan Group.

100.    Когда АРРФР усилило надзор за First Heartland Bank, «оправданием» было обеспечение соблюдения банком недавно обновленных правил по борьбе с отмыванием денег.

101.    Когда АФМ возбудило уголовное дело против бывших должностных лиц АТФ Банка, «оправданием» было расследование выдачи проблемных кредитов в период с 2013 по 2016 г.

102.    В конце концов, Правительство определилось с единым оправданием: уголовное расследование Антикоррупционной службой и блокирование АРРФР и АФМ выплат дивидендов каким-то образом «обоснованы» коммерческой покупкой Цеснабанка и АТФ Банка First Heartland Bank. Разумеется, это «оправдание» столь же беспочвенно, как и все его предшественники, поскольку ключевые участники кампании по травле Банка были одновременно архитекторами Рамочных соглашений.

Действительно, Банк ранее выплачивал дивиденды без возражений со стороны Правительства Казахстана, в том числе совсем недавно, в декабре 2021 года.

103. По имеющейся информации и убеждениям, намерение Ответчиков состояло в том, чтобы воспрепятствовать выводу дивидендных средств за пределы Казахстана — и, следовательно, за пределы контроля Правительства — в пользу Истцов, поскольку Ответчики знают, что дивидендные средства предназначены для блага и причитаются Истцам JTL, Jysan Holding и, в конечном счете, NGF.

**E. Правительство Принимает Ответные Меры Против Истцов После Провала Переговоров.**

*10. Истцы уведомляют Ответчиков о Намерении Защищать Свои Права, и Стороны Ведут Безуспешные Переговоры.*

104. В последней отчаянной попытке разрешить спор без вмешательства суда Истцы уведомили Ответчиков о своем намерении подать иск в Неваде. Весь ноябрь стороны, включая адвокатов сторон, проводили серию неофициальных переговоров. Эти переговоры не увенчались успехом и были частью тактики проволочек, которые Ответчики проводили, чтобы подготовить коррумпированных законодателей и агентств к нападению на Истцов.

105. С тех пор кампания преследования Ответчиков только усилилась, что было явной местью за то, что Истцы сообщили Ответчикам о своем намерении подать данный иск.

*11. Ответчики Принимают Ответные Меры Против Истцов, Вводя Законодательство, Направленное Против Jusan Group.*

106. Через день после переизбрания Президента Токаева, 22 ноября 2022 года, Мажилис, нижняя палата Парламента Казахстана, одобрил законопроект с внесением изменений в Закон «О банках и банковской деятельности в Республике Казахстан». Предлагаемые поправки были направлены на Истцов и должны были, *в частности*, (1) изменить определения «банковского холдинга» и «крупного участника банка» таким

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

образом, чтобы некоммерческие организации, такие как NGF, не смогли прямо или косвенно владеть банками; (2) ввести ограничения для банков, получивших государственную помощь, таких как First Heartland Bank, чтобы не допустить распределения ими дивидендов, в том числе путем разрешения АРРФР блокировать данные дивиденды; и (3) требовать, чтобы все крупные прямые и косвенные акционеры и контролирующие организации банков подали заявки и получили одобрение от АРРФР в течение 30 дней с даты публикации поправок.

107.    Верхняя палата парламента Казахстана, Сенат, впоследствии утвердила поправки, позволяющие АРРФР блокировать дивиденды от банков, получивших государственную помощь, и требующие одобрения АРРФР для крупных прямых и косвенных акционеров и контролирующих организаций банков, в то же время отклонив предложенную поправку, запрещающую некоммерческим организациям владеть банками, за отсутствием оснований.

108.    Эти поправки, вступившие в силу 1 января 2023 года, позволят Правительству заблокировать дивиденды, на которые Истцы имеют право, и даже запретить Истцам владеть долями в Банке. В соответствии с поправками JTL, Jysan Holding и NGF должны будут получить и представить в АРРФР кредитные рейтинги, аудированную финансовую отчетность, а также соответствующие нотариальные заверения и апостили из несколько юрисдикций в течение 30 дней, что просто невозможно. Кроме того, если эти организации останутся основными акционерами Банка без одобрения АРРФР, АРРФР может потребовать, чтобы они уменьшили свою косвенную долю владения до уровня ниже 25 % и приостановили все операции между ними и Банком; установили доверительное управление акциями Банка на срок до трех месяцев; и в конечном итоге обеспечили отчуждение акций Банка, продав их на рынке ценных бумаг. **Нельзя представить более явного случая незаконного захвата активов, находящихся под контролем граждан Невады**.

Ex. Page No. 147

109.    По крайней мере, один член Мажилиса публично заявил, что эти поправки явно нацелены на акционеров First Heartland Bank и блокируют рассматриваемые здесь дивиденды.

110.    Учитывая отсрочку до следующего дня после переизбрания Президента Токаева, Правительство четко обозначило цели и намерения своей кампании — остановить вывод средств в виде дивидендов за пределы Казахстана, принудить группу Jusan Group к передаче средств и контроля над активами Правительству Казахстана и его аффилированным лицам, а также принять ответные меры против Jusan Group за попытку защиты своих прав в американском суде.

*12. Ответчики Принимают Ответные Меры Против Истцов, Подав Против Них*
  *Иск в Казахстане.*

111.    2 декабря 2022 года Генеральная прокуратура Казахстана возбудила иск против многочисленных участников Jusan Group, включая Истцов, и сотрудников Jusan Group, среди которых г-н Катсу и сотрудник, которому ранее угрожали лишением свободы.   Генеральный прокурор подчиняется непосредственно Президенту и представляет интересы Правительства Казахстана в суде.

112.    Иск был направлен на то, чтобы добиться через суд именно того, что Ответчики пытались добиться через их кампанию преследования — ослабить Jusan Group и ограничить ее доступ к собственному капиталу.

113.    В частности, иск был направлен на признание недействительным соглашения между двумя членами Jusan Group — JTL и Pioneer Capital Invest LLP (далее — «Pioneer»). Аннулирование этого соглашения аннулировало бы долю собственности NGF в JTL и, следовательно, лишило бы NGF доступа к дивидендам и распределениям от бизнеса и операций JTL и ее холдингов, включая FHS и Банк. В иске также содержалось требование о возврате активов и денежных средств на миллионы долларов (USD) от JTL компании Pioneer, акции JTL в Банке включительно.  Активы и средства, о которых идет речь, были должным образом переведены в JTL по

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

соглашению, которое Правительство пыталось аннулировать. Пытаясь перевести активы и средства из JTL Истца в казахстанскую компанию Pioneer, правительство вмешивается в активы Jusan Group и пытается перевести их в Казахстан, где правительство сможет осуществлять больший контроль.  И последнее, иск требовал, чтобы все названные сотрудники Jusan Group сдали свои доли в Банке.

114.    Казахстанский суд быстро отклонил иск Генерального прокурора на основании того, что требования не имеют доказательств. Это решительное отклонение необоснованного иска Генерального прокурора еще раз свидетельствует о вопиющем злоупотреблении Правительством возможностями государственного аппарата для преследования Jusan Group.

*13. Государственные чиновники Казахстана угрожают «войной» сотрудникам Jusan Group.*

115.    20 декабря 2022 года премьер-министр Казахстана Алихан Смаилов направил сообщение тому же сотруднику Jusan Group, резиденту США, которому ранее угрожало тюремное заключение, с требованием вернуть Jusan Group в Казахстан и пригрозив «войной», если требования Правительства не будут выполнены.

*14. Ответчики переделывают свой ранее отклоненный иск и повторно подают его в Казахстане.*

116.    10 февраля 2023 года Генеральная прокуратура Казахстана подала еще один иск против членов Jusan Group, оспаривая сделку 2020 года между JTL и Pioneer и добиваясь ареста определенного имущества группы Jusan Group. Хотя в этом иске приводятся несколько иные факты и иные основания иска, его цель та же, что и у иска, поданного и быстро отклоненного в декабре 2022 года, — пригрозить Jusan Group передачей контроля над ней Правительству.

117.    Однако Правительство идет еще дальше в февральском иске и стремится конфисковать множество активов не только ответчиков по иску, но и Jusan Group в

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

целом. Генпрокуратура добивается ареста долей Jusan Group более чем в десятке юридических лиц.

118.   В очередной раз Генеральный прокурор потребовал, чтобы JTL вернула Pioneer миллионы долларов США в виде активов и денежных средств, которые были должным образом переведены в JTL. И снова результатом, если иск будет успешным, будет перемещение законно контролируемых активов Jusan Group в Казахстан, где Правительство сможет осуществлять больший контроль.

**F.   Незаконная   Кампания   Правительства   Совпадает   с   Исторической Коррупционной Практикой**

119.   Действия   Ответчиков   согласуются   с   исторической   коррупционной практикой в Казахстане, а также сообщениями о заметном росте коррупции в Казахстане в последние годы.

120.   Например, в 2013 году арбитражная комиссия присудила молдавской компании возмещение убытков в размере 497 685 101 долларов США (плюс 50 % расходов на юридические услуги) за нарушение Правительством Казахстана Договора к   Энергетической   хартии — международного   соглашения,   устанавливающего трансграничное сотрудничество в энергетической промышленности.  В этом деле использовалась тактика, поразительно похожая на ту, что применяется против Истцов. Там суд установил, что Казахстан нарушил право компании на справедливое и равное обращение в соответствии с Договором.  В частности, компания утверждала, что Казахстан участвовал в кампании преследования, кульминацией которой стало расторжение контрактов на проведение поисково-разведывательных работ для добычи нефти   и   газа   и   конфискация   корпоративных   активов,   расположенных   в Казахстане.  Сообщается, что кампания включала в себя тактику финансовой полиции Казахстана и семи квазигосударственных организаций и включала необоснованное замораживание активов компании, круглосуточное наблюдение и проверки со стороны должностных   лиц   государственных   органов,   которые   препятствовали   ведению

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

31

сотрудниками обычных деловых операций, необоснованное изъятие документов, незаконный арест и осуждение менеджера в стране, а также отмена ранее одобренных правительством разрешений и отказов.

121.    Совсем недавно в СМИ отмечалось, что в 2022 году число случаев коррупции в Казахстане резко возросло, на целых 30 процентов.  Индекс восприятия коррупции Transparency International — наиболее широко используемый глобальный рейтинг коррупции в мире — присвоил Казахстану худшие показатели по коррупции в государственном секторе в Восточной Европе и Центральной Азии, регионе со вторыми самыми низкими показателями в мире.  Постоянная «серьезная проблема» коррупции, которая существует в Казахстане всесторонне описана в недавнем отчете, опубликованном Группой государств против коррупции, — антикоррупционным органом Совета Европы.  Экспертные оценки показывают, что прогресс Казахстана в антикоррупционных мерах в лучшем случае разрознен.

122.    Сенаторы США в Комитете Сената по международным отношениям в октябре 2022 года призвали к «международному расследованию санкционированного государством насилия и пересмотру вопроса о предоставлении помощи США в области безопасности после общенациональных протестов в Казахстане» в начале этого года и жестокой реакции Казахстанских сил безопасности по отношению к гражданским протестующим.    В рамках расследования Сенаторы призвали Государственный департамент США пересмотреть свои отношения с Казахстаном, чтобы «уделить приоритетное внимание защите основных свобод и укреплению верховенства права».

**G.   Незаконная Кампания Правительства, а именно Блокирование Выплаты Дивидендов, Наносит Конкретный Ущерб Деятельности Jusan Group.**

123.    Неудивительно и, предположительно в соответствии с планами Правительства, кампания Правительства, включая, прежде всего, блокирование примерно 387 миллионов долларов США в виде дивидендов, наносит значительный, непосредственный и конкретный ущерб деятельности Истцов.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 151

124.   Истцы не могут получить дивидендное финансирование от их дочерних компаний, связанных с Банком, — основного источника финансирования, а также не могут выполнить обязательство по предоставлению дивидендного финансирования их материнским организациям.   В свою очередь, NGF не может переводить или использовать собственные средства на собственных банковских счетах или получать законно выплаченные дивиденды для выполнения своей единственной миссии: финансирования Назарбаев Университета и Nazarbayev Intellectual Schools.  В конечном счете, замораживая средства Jusan Group, Правительство лишает Назарбаев Университет и Nazarbayev Intellectual Schools необходимых ресурсов, чем наносит ущерб студентам, исследователям и преподавателям Назарбаев Университета и Nazarbayev Intellectual Schools.

125.   Кроме того, в августе 2022 года Истец JTL заявил о своем намерении выкупить акции JTL на сумму 20 миллионов долларов США у инвестора.   Из-за заблокированных выплат дивидендов JTL не может осуществить выкуп.

### ПЕРВОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА (ЭКСПРОПРИАЦИЯ В НАРУШЕНИЕ МЕЖДУНАРОДНОГО ПРАВА) (против Ответчика Республики Казахстан и Ответчиков правительственных учреждений)

126.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

127.   Как материнские корпорации и акционеры First Heartland Securities и First Heartland Bank, Истцы имеют прямые имущественные интересы в своих правах на получение объявленных дивидендов от дочерних компаний.

128.   Своим поведением, заявленным выше, в том числе воспрепятствованием дочерним компаниям Истцов в выплате законно объявленных дивидендов их иностранным акционерам и прямой направленностью своего поведения на достижение такого результата, Ответчик Республика Казахстан и его учреждения экспроприировали и захватили имущество Истцов в нарушение международного права.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

129.    Ответчик Правительство Казахстана и его учреждения также нарушили существующее международное право, экспроприировав и конфисковав аналогичные имущественные права, принадлежащие First Heartland Securities и First Heartland Bank, действуя с дискриминационной целью причинить вред иностранным акционерам вышеуказанных корпораций.

## ВТОРОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
### (18 U.S.C. § 1964(c)) (против Индивидуальных Ответчиков)

130.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

131.    Индивидуальные Ответчики фактически действуют как совместное предприятие, участвующее в торговле между штатами, их деятельность влияет на торговлю между штатами, а также они управляли и участвовали в управлении дополнительными предприятиями, среди них Правительство ответчика и правительственные учреждения.

132.    Индивидуальные Ответчики согласовали между собой, осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета, осуществляя незаконные преднамеренные вымогательства у Истцов, конечной целью которых было получение личной выгоды.

133.    Индивидуальные Ответчики согласовали между собой, осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета, осуществляя незаконные преднамеренные вымогательства у Jusan Group.

134.    Индивидуальные Ответчики прямо и косвенно осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета и ведя деятельность, описанную выше, в нарушение 18 U.S.C. § 1962(c).

135.    Прямым и непосредственным результатом деятельности Индивидуальных Ответчиков по вымогательству и в нарушение 18 U.S.C. § 1962(c) стало то, что бизнесу и имуществу Истцов был нанесен ущерб.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

### ТРЕТЬЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
**(Нев. Рев. Стат. § 207.470) (против всех Индивидуальных Ответчиков)**

136.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

137.    Индивидуальные Ответчики совершили как минимум два различных преступления, связанных с рэкетом, в соответствии с определением в Nev. Rev. Stat. § 207.360, представляющий собой рэкет в соответствии с Nev. Rev. Stat. § 207.390.

138.    Ответчики принимали прямое и косвенное участие в деятельности предприятия, действия которого представляют собой рэкет, в нарушение Нев. Рев. Стат. § 207.400.

139.    Бизнесу и имуществу Истцов был причинен вред в связи с нарушениями Ответчиков.

### ЧЕТВЕРТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
**(НАМЕРЕННОЕ ВМЕШАТЕЛЬСТВО В ДОГОВОРНЫЕ ОТНОШЕНИЯ)**
**(против всех Ответчиков)**

140.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

141.    Между First Heartland Bank и First Heartland Securities, First Heartland Securities и JTL, JTL и Jysan Holding, Jysan Holding и NGF существуют и действуют межфирменные соглашения.   Каждое из межфирменных соглашений дает право материнской компании на выплату дивидендов от ее дочерней компании.  Jysan Holding и JTL являются сторонами этих соглашений, или сторонними бенефициарами в случае соглашений, стороной которых Jysan Holding и/или JTL не являются.

142.    Каждый из Ответчиков знает о вышеупомянутых соглашениях и совершил преднамеренные действия, направленные на нарушение данных отношений.  Действия Ответчиков привели к фактическому нарушению каждого соглашения, результатами данных нарушений стало причинение Jysan Holding и JTL убытков.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 154

**ПЯТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА**
**(НАМЕРЕННОЕ ВМЕШАТЕЛЬСТВО**
**ДЛЯ ИЗВЛЕЧЕНИЯ ЭКОНОМИЧЕСКОЙ ВЫГОДЫ) (против всех Ответчиков)**

143.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

144.   После получения заблокированных дивидендов от Банка, FHS планировала выплатить все или часть заблокированных дивидендов компании JTL, затем JTL планировала выплатить все заблокированные дивиденды или их часть компании Jysan Holding, которая должна была выплатить все или часть заблокированных дивидендов своей материнской компании NGF, за вычетом разумных операционных расходов. Каждый из Ответчиков знает о конечной цели использования заблокированных дивидендов и совершил преднамеренные действия, направленные на то, чтобы сорвать выплату дивидендов Истцам и выплату дивидендов в пользу NGF.  Действия ответчиков привели к фактическому нарушению процессов осуществления дивидендов и причинили Jysan Holding и JTL убытки, вытекающие в результате данного нарушения.

145.   Поведение Ответчиков было неоправданным и необоснованным.  Нет таких соглашений или законов, которые бы предусматривали права вмешательства или воспрепятствования выплате дивидендов в связи с выплатой Государством финансовой помощи Цеснабанку и АТФ Банку. В результате действий Ответчиков Истцы и их аффилированные лица не получили средства, необходимые для выполнения своих основных функций и задач, включая финансирование NGF, Nazarbayev Intellectual Schools и Назарбаев Университета.

**ШЕСТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА**
**(ГРАЖДАНСКИЙ ЗАГОВОР) (против всех Ответчиков)**

146.   Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

147.   Ответчики действовали в сговоре, чтобы достичь их незаконной цели, с намерениями причинить вред Jusan Group, Истцам включительно.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

148.    Jusan Group, Истцы включительно, понесли убытки в результате действий Ответчиков по достижению целей сговора.

149.    Ответчики несут солидарную ответственность за ущерб, понесенный Истцами в результате каждого действия, предпринятого каждым Ответчиком в рамках сговора Ответчиков.

### СЕДЬМОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА (ГРАЖДАНСКАЯ ПОМОЩЬ И ПОДСТРЕКАТЕЛЬСТВО) (против всех Ответчиков)

150.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

151.    Каждый Ответчик существенно помогал и поощрял поведение других Ответчиков в нарушении обязанностей перед Истцами, включая деликтные обязанности и установленные законом обязанности, как указано выше.

152.    Нарушения со стороны Ответчиков нанесли ущерб Jusan Group, Истцам включительно.

153.    Каждый Ответчик несет ответственность в соответствии с теорией гражданского пособничества и подстрекательства за ущерб, причиненный нарушениями, которым они существенно содействовали и поощряли.

### ХОДАТАЙСТВО О ПРЕДОСТАВЛЕНИИ СУДЕБНОЙ ЗАЩИТЫ

154.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь, и почтительно просят Суд:

a)    Заявить, что поведение Ответчиков нанесло незаконный ущерб Истцам, и не подлежит каким-либо законным привилегиям или оправданиям;

b)    Присудить Истцам компенсацию и штрафные санкции в размере, который будет определен на слушании, включая тройную сумму возмещения убытков и гонорары адвокатов в соответствии с 18 U.S.C. § 1964(c);

c)    Присудить Истцам издержки и расходы, включая гонорары адвокатов; а также

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

d)    Присудить Истцам дополнительное средство правовой защиты, оправданное обстоятельствами.

### ИСКОВОЕ ЗАЯВЛЕНИЕ О РАССМОТРЕНИИ ДЕЛА СУДОМ ПРИСЯЖНЫХ

Истцы требуют рассмотрения дела судом присяжных по всем спорным вопросам.

ОТ 16 февраля 2023 г.

**HOLLAND & HART LLP**

/подпись/ *J. Stephen Peek*
J. Stephen Peek/ Дж. Стивен Пик
Erica C. Medley/ Эрика С. Медли
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134


Tariq Mundiya/ Тарик Мундия
(*pro hac vice будет предоставлено позднее*)
Jeffrey B. Korn/ Джеффри Б. Корн
(*pro hac vice будет предоставлено позднее*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb/ Майкл Дж. Готлиб
(*pro hac vice будет предоставлено позднее*)
**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, NW
Washington, DC 20006

*Адвокаты Истцов
Jysan Holding, LLC; и
Jusan Technologies Ltd.*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 157

Дело 2:23-cv-00247 Документ 1-1 Подано 16.02.23 Стр. 1 из 3

# ТИТУЛЬНЫЙ ЛИСТ ГРАЖДАНСКОГО ДЕЛА

Титульный лист гражданского дела JS 44 и информация, содержащаяся в нем, не заменяет и не дополняет регистрацию и вручение состязательных бумаг или других документов согласно требованиям закона, за исключением случаев, предусмотренных местными правилами суда. Эта форма, одобренная Конференцией судей Соединенных Штатов в сентябре 1974 года, должна использоваться секретарем суда с целью возбуждения делопроизводства по гражданским делам. *(СМ. ИНСТРУКЦИИ НА СЛЕДУЮЩЕЙ СТРАНИЦЕ ЭТОЙ ФОРМЫ.)*

## I. (a) ИСТЦЫ

Jysan Holding, LLC; Jusan Technologies LTD

**(b)** Округ проживания первого указанного истца _____
*(КРОМЕ ДЕЛ ИСТЦА ИЗ США)*

**(c)** Адвокаты *(название фирмы, адрес и номер телефона)*

(см. приложение)

## ОТВЕТЧИКИ

Республика Казахстан и др. (см. приложение)

Округ проживания первого указанного ответчика  **Республика Казахстан**
*(ТОЛЬКО В ДЕЛАХ ИСТЦА ИЗ США)*

ПРИМЕЧАНИЕ:   В ДЕЛАХ ОБ ОТЧУЖДЕНИИ ЗЕМЛИ ИСПОЛЬЗУЙТЕ АДРЕС СПОРНОГО ЗЕМЕЛЬНОГО УЧАСТКА.

Адвокаты *(если известны)*

## II. ОСНОВА ЮРИСДИКЦИИ *(Поставьте «Х» только в одной ячейке)*

- ☐ 1 Истец правительство США
- ☐ 2 Ответчик правительство США
- ☒ 3 Федеральный вопрос *(Правительство США не является стороной)*
- ☐ 4 Другое гражданство *(Укажите гражданство сторон в пункте III)*

## III. ГРАЖДАНСТВО ОСНОВНЫХ СТОРОН *(Поставьте «Х» в одной ячейке для истца и в одной ячейке для ответчика)*
*(Только для дел с другим гражданством)*

| | ИСТ | ОТВ | | ИСТ | ОТВ |
|---|---|---|---|---|---|
| Гражданин этой страны | ☐ 1 | ☐ 1 | Зарегистрирован или юридический адрес в этой стране | ☐ 4 | ☐ 4 |
| Гражданин другой страны | ☐ 2 | ☐ 2 | Зарегистрирован и юридический адрес в другой стране | ☐ 5 | ☐ 5 |
| Гражданин или подданный иностранного государства | ☐ 3 | ☐ 3 | Иностранное государство | ☐ 6 | ☐ 6 |

## IV. ХАРАКТЕР ИСКА *(Поставьте «Х» только в одной ячейке)*

Нажмите здесь, чтобы: Описание характера кода иска.

### ПО ДОГОВОРУ
- ☐ 110 Страхование
- ☐ 120 Морское право
- ☐ 130 Закон Миллера
- ☐ 140 Оборотный документ Взыскание
- ☐ 150 переплаты и исполнение судебного решения Закон о
- ☐ 151 Medicare
- ☐ 152 Взыскание просроченных студенческих ссуд (за искл. ветеранов)
- ☐ 153 Взыскание переплаты ветеранских пособий
- ☐ 160 Иски акционеров
- ☐ 190 Другие договоры
- ☐ 195 Договорная ответственность за продукт Франшиза
- ☐ 196

### НЕДВИЖИМОСТЬ
- ☐ 210 Отчуждение земли
- ☐ 220 Конфискация
- ☐ 230 Нарушение аренды и выселение
- ☐ 240 Земельное правонарушение
- ☐ 245 Деликтная ответственности за качество Вся прочая недвижимость
- ☐ 290

### ПРАВОНАРУШЕНИЕ

#### ТРАВМА
- ☐ 310 Самолеты
- ☐ 315 Ответственность за качество самолета
- ☐ 320 Нападки, клевета и оскорбления
- ☐ 330 Федеральная ответственность работодателей
- ☐ 340 Морское право
- ☐ 345 Морское право Ответственность за качество продукции для моря
- ☐ 350 Автомобили
- ☐ 355 Ответственность за качество автомобилей
- ☐ 360 Другие травмы
- ☐ 362 Травма – врачебная ошибка

#### ТРАВМА
- ☐ 365 Травма – Ответственность за качество
- ☐ 367 Здравоохранение/фармацевтика Травма
- ☐ 368 Ответственность за качество Асбест Травма Ответственность за качество

#### ЛИЧНАЯ СОБСТВЕННОСТЬ
- ☐ 370 Другое мошенничество
- ☐ 371 Справедливое кредитование
- ☐ 380 Другой ущерб личному имуществу
- ☐ 385 Ущерб имуществу Ответственность за качество

### ГРАЖДАНСКИЕ ПРАВА
- ☐ 440 Другие гражданские права
- ☐ 441 Голосование
- ☐ 442 Трудоустройство
- ☐ 443 Жилье/проживание
- ☐ 445 Амер. с инвалидностью – Занятость
- ☐ 446 Амер. с инвалидностью – другое
- ☐ 448 Обучение

### ХОДАТАЙСТВА ЗАКЛЮЧЕННЫХ
**Доставка обвиняемого в суд:**
- ☐ 463 Задержание иностранца
- ☐ 510 Ходатайства об отмене приговора
- ☐ 530 Общие
- ☐ 535 Смертный приговор

**Другое:**
- ☐ 540 Приказ и пр.
- ☐ 550 Гражданские права
- ☐ 555 Гражданские права
- ☐ 560 Задержанный по гражд. делу – Условия содержания под стражей

### КОНФИСКАЦИЯ/ШТРАФ
- ☐ 625 Арест имущества в связи с наркотиками, 21 USC 881
- ☐ 690 Другое

### ТРУД
- ☐ 710 Закон о справедливых трудовых стандартах
- ☐ 720 Трудовые/управленческие отношения
- ☐ 740 Закон о ж.д. транспорте
- ☐ 751 Закон об отпуске и больничном
- ☐ 790 Другие трудовые споры
- ☐ 791 Закон о пенсионном обеспечении

### ИММИГРАЦИЯ
- ☐ 462 Заявка на натурализацию
- ☐ 465 Другие иммиграционные иски

### БАНКРОТСТВО
- ☐ 422 Апелляция, 28 USC 158
- ☐ 423 Отзыв 28 USC 157

### ИМУЩЕСТВЕННЫЕ ПРАВА
- ☐ 820 Авторские права
- ☐ 830 Патент
- ☐ 835 Патент – Сокращенная заявка на новый препарат
- ☐ 840 Товарный знак
- ☐ 880 Закон о защите коммерческой тайны 2016

### СОЦИАЛЬНОЕ ОБЕСПЕЧЕНИЕ
- ☐ 861 HIA (1395ff)
- ☐ 862 Антракоз (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Глава XVI
- ☐ 865 RSI (405(g))

### ФЕДЕРАЛЬНЫЕ НАЛОГОВЫЕ ИСКИ
- ☐ 870 Налоги (истец или ответчик из США)
- ☐ 871 IRS – третья сторона 26 USC 7609

### ДРУГИЕ ЗАКОНЫ
- ☐ 375 Закон о неправомерных претензиях
- ☐ 376 Иск «qui tam» (31 USC 3729 (a))
- ☐ 400 Повторное рассмотрение
- ☐ 410 Антимонопольный закон
- ☐ 430 Банки и банковское дело
- ☐ 450 Депортация
- ☐ 460 Рэкет и коррупция Потребительский кредит
- ☐ 470
- ☐ 480 Закон о защите прав потребителей Телефонная
- ☒ 485 потребителей телефонов Кабельное/спутниковое
- ☐ 490 телевидение
- ☐ 850 Ценные бумаги/товары/биржа
- ☐ 890 Другие иски на законных основаниях
- ☐ 891 Закон о сельском хозяйстве
- ☐ 893 Экологические вопросы
- ☐ 895 Закон о свободе информации
- ☐ 896 Арбитраж
- ☐ 899 Административный акт/Пересмотр или обжалование решения агентства
- ☐ 950 Конституционность государственных законов

## V. ВОЗНИКНОВЕНИЕ *(Поставьте «Х» только в одной ячейке)*

- ☒ 1 Первичное дело
- ☐ 2 Изъято из суда штата
- ☐ 3 Изъято из апелляционного суда
- ☐ 4 Восстановленные или вновь открытые
- ☐ 5 Переданные из другого округа *(укажите)*
- ☐ 6 Многоокружные процессы – передача
- ☐ 8 Многоокружные процессы – прямая подача

## VI. ОСНОВАНИЕ ИСКА

Укажите Гражданский закон США, по которому вы подаете иск (не цитируйте юрисдикционные законы, кроме случаев иного гражданства):
18 U.S.C. § 1964(c)

Краткое описание основания иска:
Нарушение Закона об организованной преступности, связанное с рэкетом и коррупцией, и связанные с этим нарушения государственного и международного права, основанные на экспроприации активов.

## VII. ЗАПРОС ПО ЖАЛОБЕ.

☐ ОТМЕТЬТЕ, ЕСЛИ ЭТО ГРУППОВОЙ ИСК СОГЛАСНО ПРАВИЛУ 23 F.R.Cv.P.

ТРЕБОВАНИЕ $

ОТМЕТЬТЕ «ДА», только если в жалобе требуется:
ТРЕБОВАНИЕ ПРИСЯЖНЫХ: ☒ Да   ☐ Нет

## VIII. СВЯЗАННЫЕ ДЕЛА, ПРИ НАЛИЧИИ *(См. инструкции):*

СУДЬЯ _____ НОМЕР ДЕЛА _____

| ДАТА | ПОДПИСЬ АДВОКАТА |
|---|---|
| 16.02.2023 | /подпись/ Дж. Стивен Пик |

## ДЛЯ СЛУЖЕБНОГО ПОЛЬЗОВАНИЯ

КВИТАНЦИЯ # _____ СУММА _____ ЗАЯВИТЕЛЬ IFP _____ СУДЬЯ _____ МАГ. СУДЬЯ _____

Ex. Page No. 158

# ИНСТРУКЦИЯ ДЛЯ АДВОКАТОВ, ЗАПОЛНЯЮЩИХ ТИТУЛЬНЫЙ ЛИСТ ГРАЖДАНСКОГО ДЕЛА, ФОРМА JS 44.

### Полномочия по заполнению титульного листа гражданских дел

Титульный лист гражданского дела JS 44 и информация, содержащаяся в нем, не заменяет и не дополняет регистрацию и вручение состязательных бумаг или других документов согласно требованиям закона, за исключением случаев, предусмотренных местными правилами суда. Эта форма, одобренная Конференцией судей Соединенных Штатов в сентябре 1974 года, должна использоваться секретарем суда с целью возбуждения делопроизводства по гражданским делам. Следовательно, титульный лист гражданского дела представляется Секретарю суда для каждого гражданского иска. Адвокат, подающий иск, должен заполнить форму следующим образом:

**I.(a)**    **Истцы-ответчики.** Укажите имена (фамилию, имя, отчество) истца и ответчика. Если истцом или ответчиком является государственное учреждение, используйте только полное название или стандартные сокращения. Если истец или ответчик является должностным лицом государственного учреждения, укажите сначала это учреждение, а затем должностное лицо, с указанием имени и должности.

**(b)**    **Округ проживания.** Для каждого поданного гражданского дела, за исключением дел истца из США, укажите название округа, в котором проживает первый истец из списка на момент подачи дела. В делах истца из США укажите название округа, в котором проживает первый ответчик из списка на момент подачи заявления. (ПРИМЕЧАНИЕ. В делах об отчуждении земли округ проживания «ответчика» является местом нахождения рассматриваемого земельного участка.)

**(c)**    **Адвокаты.** Укажите название фирмы, адрес, номер телефона и доверенное лицо. Если адвокатов несколько, перечислите их в приложении, указав в этом разделе «(см. приложение)».

**II.**    **Юрисдикция.** Основа юрисдикции изложена в правиле 8(a) Федерального гражданского процессуального кодекса США (F.R.Cv.P.) согласно которому следует указывать юрисдикцию в состязательных бумагах. Поставьте отметку «Х» в одном из полей. Если имеется более одного основания юрисдикции, приоритет отдается в порядке, указанном ниже.
Истец из США. (1) Юрисдикция на основании разд. 28 Свода законов США (U.S.C.), ст. 1345 и 1348. Сюда включены иски государственных органов и чиновников США. Ответчик из США. (2) Если истец предъявляет иск Соединенным Штатам, их чиновникам или государственным органам, поставьте отметку «Х» в этом поле.
Федеральный вопрос. (3) Это относится к искам в соответствии с разд. 28 U.S.C., ст. 1331, когда юрисдикция возникает в соответствии с Конституцией Соединенных Штатов, поправкой к Конституции, актом Конгресса или международным договором Соединенных Штатов. В тех случаях, когда стороной являются США, код истца или ответчика из США имеет приоритет, и необходимо отметить графу 1 или 2. Разные гражданства. (4) Это относится к искам по разд. 28 USC ст. 1332, сторонами которых являются граждане разных стран. Если отметка стоит в поле 4, следует проверить гражданство разных сторон. (См. Раздел III ниже. **ПРИМЕЧАНИЕ. Иски по федеральным вопросам имеют приоритет перед делами с разными гражданствами.**

**III.**    **Резиденция (гражданство) основных сторон.** Этот раздел JS 44 необходимо заполнить, если выше были указаны разные гражданства. Отметьте этот раздел для каждой основной стороны.

**IV.**    **Характер иска.** Поставьте отметку «Х» в соответствующем поле. Если с делом связано несколько кодов исков, выберите наиболее подходящий код иска. Нажмите здесь, чтобы видеть подробное описание иска: Описание характера кода иска.

**V.**    **Возникновение.** Поставьте отметку «Х» в одном из семи полей.
Первичное дело. (1) Дела, возбужденные окружными судами США.
Изъято из суда штата. (2) Разбирательство, возбужденное в государственных судах, может быть передано в окружные суды в соответствии с разделом 28 USC, ст. 1441. Изъято из апелляционного суда. (3) Поставьте отметку здесь для дел, переданных в окружной суд для дальнейшего рассмотрения. В качестве даты подачи используйте дату возврата на рассмотрение.
Восстановленные или вновь открытые. (4) Поставьте отметку в этом поле для дел, возобновленных или вновь открытых в окружном суде. В качестве даты подачи используйте дату повторного открытия. Переданные из другого округа. (5) Для дел, переданных в соответствии со ст. 1404(a) Раздела 28 U.S.C. Не используйте эту отметку для передачи внутри округа или передачи в рамках многоокружных процессов. Многоокружные процессы – передача. (6) Поставьте отметку здесь, если дело, относящееся к нескольким округам, передается в округ в соответствии с разд. 28 U.S.C. ст. 1407.
Многоокружные процессы – прямая подача. (8) Поставьте отметку здесь, если дело, относящееся к нескольким округам, подается в том же округе, что и основное по многоокружному процессу. **ОБРАТИТЕ ВНИМАНИЕ, ЧТО КОД ВОЗНИКНОВЕНИЯ 7 ОТСУТСТВУЕТ.** Код возникновения 7 использовался для исторических записей и больше не актуален из-за изменений в законодательстве.

**VI.**    **Основание иска.** Укажите гражданский закон, непосредственно связанный с основанием для иска, и дайте краткое описание основания. **Не цитируйте юрисдикционные законы, если только речь не идет о гражданстве другой страны.** Пример: Гражданский закон США: разд. 47 USC 553 Краткое описание: Несанкционированный прием кабельного телевидения.

**VII.**    **Запрос по жалобе.** Групповой иск. Поставьте отметку «Х» в этом поле, если вы подаете групповой иск в соответствии с Правилом 23, F.R.Cv.P. «Требование». В этом поле введите фактическую сумму претензии в долларах или укажите другое требование, например, предварительный судебный запрет. Требование присяжных. Отметьте это поле, чтобы указать, требуются ли присяжные.

**VIII.**    **Связанные дела.** Этот раздел JS 44 используется для ссылки на связанные незавершенные дела, если таковые имеются. Если есть связанные незавершенные дела, укажите номера дел и соответствующие имена судей для таких дел.

**Дата и подпись адвоката.** Поставьте дату и подпишите титульный лист гражданского дела.

**Приложение к титульному листу гражданского дела**

<u>Раздел I(a) Ответчики</u>:

       Республика Казахстан;

       Агентство Республики Казахстан по регулированию и развитию финансового рынка;

       Агентство Республики Казахстан по противодействию коррупцией;

       Агентство Республики Казахстан по финансовому мониторингу;

       Комитет национальной безопасности Республики Казахстан;

       Агентство Республики Казахстан по регулированию и развитию финансового рынка, председатель, Абылкасымова Мадина;

       Агентство Республики Казахстан по регулированию и развитию финансового рынка, заместитель председателя, Кизатов Олжас;

       Агентство Республики Казахстан по регулированию и развитию финансового рынка, представитель, Омарбеков Арман;

       Джаксыбеков Адильбек.

<u>Раздел I(c) Адвокаты истцов</u>

       Стивен Пик (J. Stephen Peek)

       Эрика С. Медли (Erica C. Medley)

       Holland & Hart LLP

       9555 Hillwood Drive, 2nd Floor

       Las Vegas, NV 89,134 (Лас-Вегас, США)

       (702) 669-4600

       Тарик Мундия (Tariq Mundiya)

       Джеффри Б. Корн (Jeffrey B. Korn)

       Willkie Farr & Gallagher LLP 787 Seventh Avenue

       New York, NY 10019 (Нью-Йорк, США)

       (212) 728-8000

       Майкл Дж. Готтлиб (Michael J. Gottlieb)

       Willkie Farr & Gallagher

       1875 K Street, NW

       Washington, DC 20006 (Вашингтон, США)

       (202) 303-1000

AO 440 (Ред. 06/12) Судебная повестка по гражданскому делу

# ОКРУЖНОЙ СУД США

## Округа Невада

Jysan Holding, LLC; Jusan Technologies LTD )
)
)
_____ )
*Истец(-цы)* )
против )    Гражданское дело No. 2:23-cv-00247-JAD-VCF
)
Республика Казахстан и др. )
)
)
_____ )
*Ответчик(-и)* )

## СУДЕБНАЯ ПОВЕСТКА ПО ГРАЖДАНСКОМУ ДЕЛУ

Кому: *(Имя и адрес ответчика)*    Олжас Кизатов, заместитель председателя
Агентство Республики Казахстан по регулированию и развитию
финансового рынка
21, Коктем-3
Алматы, 050040
Республика Казахстан

Против вас выдвинут судебный иск.

В течение 21 дня после вручения вам этой повестки (не считая дня, когда вы ее получили) — или 60 дней, если вы являетесь организацией в Соединенных Штатах, либо должностным лицом или сотрудником Соединенных Штатов, указанным в Федеральных правилах гражданского судопроизводства П. 12 (а) (2) или (3) — вы должны вручить истцу ответ на прилагаемый иск или ходатайство в соответствии с правилом 12 Федеральных правил гражданского судопроизводства. Ответ или ходатайство должны быть вручены истцу или его адвокату, чья имя и адрес указаны ниже:

| | | |
|---|---|---|
| Стивен Пик (Stephen Peek) | Тарик Мундия (Tariq Mundiya) | Майкл Дж. Готтлиб (Michael J. Gottlieb) |
| Эрика С. Медли (Erica C. Medley) | Джеффри Б. Корн (Jeffrey B. Korn) | Willkie Farr & Gallagher LLP |
| Holland & Hart LLP | Willkie Farr & Gallagher LLP | 1875 K Street, NW |
| 9555 Hillwood Dr., 2nd Fl. | 787 Seventh Ave. | Washington, DC 20006 |
| Las Vegas, NV 89134 | New York, NY 10019 | |

Если вы не ответите, против вас будет вынесено решение по умолчанию о возмещении ущерба, требуемого в исковом заявлении. Вы также должны подать свой ответ или ходатайство в суд.

ДЕБРА К. КЕМПИ                                          22 февраля 2023 г.

**Секретарь**                                          **ДАТА**

[подпись]

**(составлено) ЗАМЕСТИТЕЛЬ СЕКРЕТАРЯ**

[**Печать**: ОКРУЖНОЙ СУД США ОКРУГА НЕВАДА]

AO 440 (Ред. 06/12) Судебная повестка по гражданскому делу (стр.2)

Гражданское дело No.  2:23-cv-00247-JAD-VCF

## РАСПИСКА О ПОЛУЧЕНИИ
*(Этот документ не нужно подавать в суд, если только этого не требует П.4(L) Фед. Прав. Судопроизводства США)*

Эта повестка *(кому - имя и должность)*  _____

была получена мною *(дата)*  _____.

☐ Я лично вручил(-а) повестку этому лицу в *(место)*  _____

_____  *(дата)*  _____ ;или

☐ Я оставил(-а) повестку по месту прописки или месту жительства лица у *(имя)*  _____

_____ , человека соответствующего возраста и вменяемости, проживающего(-ей) там,

*(дата)*  _____  и отправил(-а) копию на последний известный адрес лица; или

☐ Я вручил(-а) повестку *(кому - имя лица)*  _____ , которому

по закону назначено вручение процессуальных документов от имени *(название организации)*  _____

_____  *(дата)*  _____ ; или

☐ Я не вручил(-а) повестку, потому что _____ ; или

☐ Другое *(уточнить):*

Моя оплата составляет $  _____  за транспортные расходы и $  _____  за услуги, что в сумме

составляет $  _____ 0.00  .

Я заявляю под страхом наказания за лжесвидетельство, что эта информация соответствует действительности.

Дата:  _____

_____
*Подпись судебного исполнителя*

_____
*Печатное имя и должность*

_____
*Адрес судебного исполнителя*

Дополнительная информация о попытке вручения и т.д.

# EXHIBIT C

Complaint, Summons, and Russian
Translations for Defendant Arman Omarbekov

# EXHIBIT C

J. Stephen Peek
(Nevada Bar No. 1758)
Erica C. Medley
(Nevada Bar No. 13959)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Tel: 702.669.4600
Fax: 702.669.4650
speek@hollandhart.com

Tariq Mundiya (*pro hac vice* forthcoming)
Jeffrey B. Korn (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tmundiya@willkie.com
jkorn@willkie.com

Michael J. Gottlieb (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
mgottlieb@willkie.com

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JYSAN HOLDING, LLC, a Nevada Limited Liability Company; JUSAN TECHNOLOGIES LTD, an England and Wales Limited Company; <br><br> Plaintiff, <br><br> v. <br><br> REPUBLIC OF KAZAKHSTAN, a foreign sovereign state; THE AGENCY FOR REGULATION AND DEVELOPMENT OF THE FINANCIAL MARKET OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government agency; THE ANTI-CORRUPTION AGENCY OF THE REPUBLIC OF KAZAKHSTAN, a Kazakhstan Government anti-corruption | **Case No.:** <br><br> **COMPLAINT** <br><br> **JURY DEMAND** |

1

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1  agency ; THE FINANCIAL MONITORING
   AGENCY OF THE REPUBLIC OF
2  KAZAKHSTAN, a Kazakhstan Government
   agency; THE COMMITTEE FOR
3  NATIONAL SECURITY OF
   KAZAKHSTAN, a Kazakhstan Government
4  intelligence agency; MADINA
   ABYLKASSYMOVA, an individual;
5  OLZHAS KIZATOV, an individual;
   ARMAN OMARBEKOV, an individual;
6  and ADILBEK DZHAKSYBEKOV, an
   individual,
7
8              Defendants.

9                      **INTRODUCTION**

10      1.      Since early 2022, the Government of the Republic of Kazakhstan ("Government"

11  or "Government of Kazakhstan") has perpetrated an illegal campaign against Nevada

12  corporations—Plaintiff Jysan Holding, LLC ("Jysan Holding") and the New Generation

13  Foundation, Inc. ("NGF"), and their direct and indirect subsidiaries (together, the "Jusan

14  Group")—in an effort to steal more than USD $1.5 billion of Plaintiffs' assets.  This corrupt

15  and lawless campaign demonstrates the brazen thuggery of a nation—a satellite of the former

16  Soviet Union—that has weaponized the Government's vast powers and senior-most officials

17  to reach far outside Kazakhstan to steal from, intimidate, and otherwise harm persons and

18  entities in the United States.  Defendants are engaged in precisely the type of racketeering and

19  expropriation that federal laws are designed to prohibit. Plaintiffs bring this action to remedy

20  the Defendants' unlawful confiscatory conduct.

21      2.      Although the Government of Kazakhstan has offered numerous, contradictory,

22  and pretextual justifications for its conduct against the Jusan Group, the Government's true

23  aim is to seize control of the Jusan Group's Kazakhstan-based assets for its own commercial

24  benefit while delivering massive commercial benefits to the Government's favored private

25  individuals.  The Government has evinced its intent to pursue this goal by any means

26  necessary, including threats, intimidation, criminal and civil investigations and litigations, and

27  blocking USD $387 million in dividends slated for distribution by the Jusan Group's privately

28  owned bank, First Heartland Jusan Bank ("First Heartland Bank" or the "Bank") and the

                                      2

Bank's direct parent, First Heartland Securities JSC ("FHS")—funds destined for Plaintiff Jusan Technologies Ltd. ("JTL"), Plaintiff Jysan Holding, and ultimately, NGF. The Defendants' scheme to use the organs of Kazakhstan's Government to harm Nevada entities has been made abundantly clear. After Plaintiffs informed Defendants of their intention to enforce their rights in the instant action, Defendants took two plainly retaliatory acts—first, in November 2022, Defendants introduced legislation specifically targeting Plaintiffs and, second, on December 2, 2022, Kazakhstan's Prosecutor General filed a trumped-up lawsuit against Plaintiffs and other members and employees of the Jusan Group in the courts of Kazakhstan. The legislation targeted at the Jusan Group—detailed below—directed the unlawful seizure of the assets under the control of a Nevada entity. Most recently, on February 10, 2023, the Kazakhstani Prosecutor General filed a frivolous lawsuit, predicated on spurious allegations, for the sole purpose of confiscating assets under JTL's control. Even worse, Kazakhstan has leveled threats of violence and imprisonment against United States residents who have material economic interests in the Jusan Group if Kazakhstan's commercial demands are not met. These acts are in line with the Government of Kazakhstan's history of rampant corruption, which according to public reporting has worsened since 2022. In sum, the Government of Kazakhstan has resorted to the same unlawful tools—confiscation, expropriation, threats, and intimidation—favored by the world's most repressive dictators and authoritarian regimes.

3. The conduct by the Government and several individuals is obstructing Plaintiffs—including a Nevada LLC which was formed precisely to avoid the type of illegal asset seizure being perpetrated now—from fulfilling their commitment to ensuring educational freedom and excellence to the NGF grantees by providing U.S.-style higher education and free-market reforms in the Republic of Kazakhstan. Indeed, prior to the illegal conduct described herein, through Plaintiffs' efforts, NGF and the Jusan Group as a whole have provided millions of dollars in grants to Nazarbayev University—a modern, English-language research university located in Astana (formerly Nur-Sultan), the Republic of Kazakhstan's capital—as well as Nazarbayev Intellectual Schools and their organizations.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 166

4. Absent judicial relief, Defendants' unlawful scheme will continue to deprive Plaintiffs of a primary source of funding from their subsidiaries connected to the Bank and will accordingly leave them unable to fulfill their obligation to provide dividend funding to their parent organizations, including NGF. In turn, NGF is unable to transfer its own funds or receive lawfully issued dividends, to serve its sole mission of funding Nazarbayev University and Nazarbayev Intellectual Schools. Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming their students, researchers, and educators by obstructing an education that emphasizes the values of excellence, academic rigor, evidence-based research, scientific temper, intellectual liberty, innovation, and academic freedom.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically 18 U.S.C. § 1964(c).

6. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, are foreign states as defined in 28 U.S.C. § 1603(a) and are not entitled to immunity under 28 U.S.C. §§ 1605–07 or any applicable international agreement. Defendant Republic of Kazakhstan, as well as the Defendant agencies and instrumentalities listed below, are not immune from the jurisdiction of this Court under 28 U.S.C. § 1605(a)(2) because this action is based upon acts outside the territory of the United States in connection with a commercial activity of Defendants elsewhere and those acts have caused a direct effect in the United States.

7. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the other claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

8. This Court has personal jurisdiction over Defendant Republic of Kazakhstan and its agencies and instrumentalities, listed below, under 28 U.S.C. § 1330(b).

9. This Court has personal jurisdiction over all Defendants under Nev. Rev. Stat. § 14.065. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965, and Rules 4(k)(1)(C) and 4(k)(2) of the Federal Rules of Civil Procedure.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because a substantial part of the events giving rise to the claim occurred in this District. In the alternative, venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## PARTIES

11. Plaintiff Jysan Holding is a limited liability company incorporated under the laws of the State of Nevada. Jysan Holding's sole member is NGF, a registered 501(c)(4) organization based and incorporated in Nevada. Jysan Holding has a 96.96% direct ownership interest in JTL, which serves as the holding company for Jysan Holding's indirect subsidiaries and is an indirect majority owner of other companies located in Kazakhstan. Jysan Holding manages businesses and other investments of NGF, for the ultimate benefit of students of the grantee educational institutions in the Republic of Kazakhstan.

12. Plaintiff JTL is a limited company organized under the laws of England and Wales. JTL's direct parent is Jysan Holding (the Nevada entity identified above). JTL is a direct and indirect majority owner of other companies in Kazakhstan, including FHS, in which JTL holds a direct 99.48% ownership interest.

13. Defendant Republic of Kazakhstan is a foreign sovereign state within the meaning of 28 U.S.C. § 1603(a). Defendant Republic of Kazakhstan maintains an Embassy within the United States at 1401 16th St. NW, Washington, DC 20036.

14. Defendant Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan ("ARDFM") is a Government agency tasked with supervising the financial market and financial organizations within Kazakhstan.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

5

15. Defendant Anti-Corruption Agency of the Republic of Kazakhstan ("AARK") is a Government anti-corruption agency. AARK is responsible for formulating and implementing the anti-corruption policy of the Government of Kazakhstan, coordinating the anti-corruption enforcement actions, and detecting, restraining, revealing, and investigating corruption offenses. AARK reports directly to the President of Kazakhstan.

16. Defendant Financial Monitoring Agency of the Republic of Kazakhstan ("FMA") is a Government agency responsible for providing guidance in countering money laundering and the financing of terrorism, as well as for the prevention, detection, suppression, disclosure, and investigation of economic and financial offenses referred to it by the legislature of the Republic of Kazakhstan. FMA reports directly to the President of Kazakhstan.

17. Defendant Committee for National Security of Kazakhstan ("KNB") is a Government intelligence agency (together with ARDFM, AARK, and FMA, the "Governmental Agency Defendants").

18. Defendant Madina Abylkassymova is the Chairperson of ARDFM. She is a resident and citizen of Kazakhstan.

19. Defendant Olzhas Kizatov is the Deputy Chairperson of ARDFM. He is a resident and citizen of Kazakhstan.

20. Defendant Arman Omarbekov is a representative of ARDFM. He is a resident and citizen of Kazakhstan.

21. Defendant Adilbek Dzhaksybekov (together with Defendants Abylkassymova, Kizatov, and Omarbekov, the "Individual Defendants") is the former owner of Tsesnabank, a bank the Jusan Group purchased in February 2019. He is a resident and citizen of Kazakhstan.

## FACTS

**A. Members of the Jusan Group Assist the Government of Kazakhstan by Purchasing Failing Kazakhstani Banks.**

22. In 2018, Kazakhstan's banking sector, which had not fully recovered from the 2007-2009 financial crisis and subsequent devaluations of the Kazakhstani tenge in 2008 and 2015, became acutely vulnerable following a sharp drop in global energy prices that had

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

6

significantly devalued the tenge once again. In response, the Government of Kazakhstan sought various commercial solutions in an attempt to avoid a collapse of the country's entire banking system.

23. At the time, Tsesnabank was Central Asia's second-largest bank in terms of assets and was owned by Defendant Dzhaksybekov. Defendant Dzhaksybekov misused his authority at Tsesnabank to financially advantage himself, his family, and his friends, essentially treating Tsesnabank as a private equity and investment firm for his personal benefit and engaging in other questionable or malicious business conduct.

24. By 2018, Tsesnabank was on the brink of failure, with nearly 90% of its assets non-performing.

25. Despite having received capital injections as part of the Government of Kazakhstan's banking sector bailout in 2017, Tsesnabank continued to face severe liquidity issues. In early September 2018, it received a short-term loan of several hundred million dollars from the National Bank of the Republic of Kazakhstan. In a last-ditch attempt to preserve its business, Tsesnabank sold a significant portion of its agricultural loan portfolio to the state. Nonetheless, by mid-September, S&P had downgraded Tsesnabank's liquidity rating from "adequate" to "less than adequate."

26. The Government of Kazakhstan determined that if Tsesnabank were to fail, it would likely take with it the entire banking sector in Kazakhstan. The Government of Kazakhstan was therefore adamant about brokering a commercial solution to keep Tsesnabank afloat. In an attempt to do so, the Government of Kazakhstan initiated a series of attempted bailouts for Tsesnabank between 2018 and 2019.

27. The Government described those measures as "enhanc[ing] the robustness of Tsesnabank by cardinally improving its credit portfolio." Contemporaneous reporting recognized that this was another bailout targeted at correcting Tsesnabank's weak and deteriorating financial situation.

28. Even with this financial support, by January 2019, significant losses in Tsesnabank's credit portfolio continued to threaten Tsesnabank's viability. Tsesnabank

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

7

needed an additional injection of capital to survive. The Government of Kazakhstan searched urgently for another bank to purchase Tsesnabank, so that the purchasing bank could provide Tsesnabank with new capital to prevent collapse, in addition to providing a change of management to strengthen Tsesnabank's operations.

29. The Government of Kazakhstan identified First Heartland Bank in Kazakhstan, owned by the Jusan Group, as a potential solution. Under the Jusan Group's stewardship, First Heartland Bank had significantly grown its cash reserves and maintained a sterling reputation for proper stewardship.

30. The Government of Kazakhstan approached the Jusan Group about a potential acquisition of Tsesnabank. The Jusan Group sought to answer the Government's plea and step in to assist the banking sector. But the Jusan Group was clear that it could not acquire Tsesnabank if it had a negative balance sheet, and due to Tsesnabank's mismanaged loan portfolio under Defendant Dzhaksybekov, Tsesnabank's balance sheet was deeply in the red.

31. Eager to find a commercial solution, the Government of Kazakhstan led the negotiations of a number of contracts (culminating together in the "Tsesnabank Framework Agreements"), pursuant to which the Government would provide Tsesnabank with additional bailout funds, including through the purchase of distressed assets, and the Jusan Group would then purchase Tsesnabank.

32. In January and February 2019, the Tsesnabank Framework Agreements were executed. The parties to the Tsesnabank Framework Agreements included the Bank's parent company, First Heartland Securities JSC ("FHS"), Defendant Dzhaksybekov, Tsesnabank, and the Government of the Republic of Kazakhstan represented by the Ministry of Finance of the Republic of Kazakhstan and the National Bank of the Republic of Kazakhstan. The Tsesnabank Framework Agreements were also expressly supported and negotiated by the current Prime Minister of Kazakhstan, Alikhan Smailov, and the President of Kazakhstan's First Deputy Chief of Staff, Timur Suleimenov.

33. The framework agreement executed on January 17, 2019 ("January 17 Tsesnabank Framework Agreement") provided for the injection of Government funds into

8

1  Tsesnabank Bank, which ultimately took the form of bonds with long-term maturities. Then,

2  pursuant to Article 8 of the January 17 Tsesnabank Framework Agreement, FHS purchased

3  Tsesnabank.

4      34.    The Government of Kazakhstan not only fully consented to the deal, but was

5  leading the charge in its execution.

6      35.    Importantly, at no time did the Government of Kazakhstan make paying back the

7  bailout funds before 2023 a condition of its support for the acquisition of Tsesnabank, nor did

8  the Government of Kazakhstan otherwise restrict the Bank's payment of dividends. In fact,

9  until recently, the Bank has issued dividends without objection from the Government of

10  Kazakhstan, including issuing dividends in December 2021.

11      36.    Not long after brokering the acquisition of Tsesnabank, the Government again

12  approached the Jusan Group about acquiring another failing bank, ATF Bank.

13      37.    As with Tsesnabank, the Government was the primary negotiator of the deal in

14  which the Jusan Group acquired ATF Bank (effectuated through the ATF Bank Framework

15  Agreements). And as with Tsesnabank, ATF Bank had significant losses in its credit portfolio,

16  which the Government agreed to bail out in connection with the acquisition.

17      38.    Importantly, and as discussed above, the Government did not condition its bailout

18  of ATF Bank on any obligation to repay the bailout funds before 2023 and it did not otherwise

19  restrict the Bank's payment of dividends.

20      39.    Thus, with the acquisition of ATF Bank, the Jusan Group answered the

21  Government of Kazakhstan's plea for a commercial solution to the banking crisis, invested

22  significant capital into the country's banking sector, and saved it from total failure for the

23  second time in two years. As recently as January 2023, Prime Minister Smailov affirmed that

24  the Jusan Group's acquisitions of Tsesnabank and ATF Bank were necessary to stabilize the

25  institutions' financial situations and to ensure the safety of Kazakhstani citizens' and

26  businesses' deposits.

27

28

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**B. Jusan Group Established Nevada Entities to Protect and Grow Its Holdings Amidst the Kazakhstani Banking Crisis.**

40.     At the same time the Jusan Group was assisting the Government in bailing out failing Kazakhstani banks, the Jusan Group leadership was considering how best to continue to protect and grow its own assets.  Up until 2019, the Jusan Group was owned by the Nazarbayev Fund ("NF")—a Kazakhstani corporation established to fund Nazarbayev University and Nazarbayev Intellectual Schools—as well as supporting organizations of Nazarbayev University and Nazarbayev Intellectual Schools.

41.     Established in 2010, Nazarbayev University is Kazakhstan's flagship academic institution with aspirations to become a global-level research university.  Its vision is to "give Kazakhstan and the world the scientists, academics, managers, and entrepreneurs needed to prosper and develop," and it was founded on principles of autonomy and academic freedom.  Nazarbayev University has made itself an integral part of the academic research ecosystem, and is associated with more than 5,600 international publications.  Nazarbayev University provides Western-style, English-language based education.

42.     Founded in 2008, the Nazarbayev Intellectual Schools were envisioned as a modern and innovative educational platform for the development and implementation of modern models of educational programs from preschool through high school.  Nazarbayev Intellectual Schools graduates have proven to be successful in gaining admission to top universities, including Nazarbayev University and other top undergraduate programs in Europe and East Asia.

43.     After nearly a decade of having Nazarbayev University and Nazarbayev Intellectual Schools successfully supported by the Kazakhstan-based endowment fund, the Jusan Group leadership became concerned that the endowment's growth was inherently limited and at risk within Kazakhstan.

44.     The Jusan Group leadership decided to establish an endowment fund in Nevada, a state known for strong legal protections and corporate governance standards, strong

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1   philanthropic traditions, and ample examples of successful university endowments and non-
2   profit organizations.

3       45.     More specifically, the Jusan Group chose to incorporate in Nevada because it is
4   one of the leading jurisdictions in the United States for corporate governance standards.  The
5   Jusan Group also considered the fact that many major for-profit and non-profit organizations
6   operate as Nevada corporations.

7       46.     In 2019, NGF was established as a non-stock Nevada non-profit corporation for
8   the sole benefit of Nazarbayev University and Nazarbayev Intellectual Schools.  NF then
9   transferred all of its ownership interest in the Jusan Group to NGF.  NGF's sole mission is to
10  secure funding for the activities of Nazarbayev University and Nazarbayev Intellectual Schools
11  and their organizations, and it serves as their endowment.  Jysan Holding was established to
12  manage NGF's assets.

13      47.     In 2020, JTL, a limited company incorporated under the laws of England and
14  Wales, was established and later placed under Jysan Holding through a capital contribution.
15  JTL was incorporated for the purpose of creating a common corporate holding structure for
16  the Jusan Group's financial and technology arms.  JTL is a holding company invested in
17  various sectors, including banking, brokerage, insurance, asset management, e-commerce,
18  telecommunications, logistics, and retail.  Although JTL is expanding its portfolio through
19  strategic mergers and acquisitions, its indirect ownership in the Bank makes up 90% of its total
20  assets.

21      48.     JTL has a 99.48% ownership interest in FHS, which in turn has an approximately
22  80% ownership interest in First Heartland Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 174

49. Thus, by its indirect ownership of JTL, NGF receives passive income in the form of dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.



50. Under intercompany policies and agreements, dividend payments will be distributed from the Bank to FHS, and, in turn, to JTL, Jysan Holding, and NGF, less the funds necessary to support the reasonable operational expenses. Each entity has a legal right to declare and to receive dividends from its direct subsidiary.

51. NGF first began to provide funding to Nazarbayev University and Nazarbayev Intellectual Schools in 2021. As noted, in two years alone, NGF and the Jusan Group have provided millions of dollars to Nazarbayev University, Nazarbayev Intellectual Schools, and supporting organizations. These grants have supported efforts to provide education that emphasizes the values of intellectual liberty, innovation, and academic freedom. NGF expects funding to increase substantially in the coming years, particularly to address a significant

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

12

decrease in financial support from the Government of Kazakhstan in light of severe fiscal challenges to Kazakhstan's national budget.

52.     NGF is funded entirely by profit distributions from Jysan Holding, which receives its revenue solely in the form of dividend payments from the Jusan Group entities through JTL.

## C. The Jusan Group's Financial Success Provokes the Government and Dzhaksybekov to Force a Takeover of First Heartland Bank.

53.     After its acquisitions of Tsesnabank and ATF Bank—which are now part of First Heartland Bank—First Heartland Bank achieved rapid revenue growth.

54.     This success and increased profitability was attributable to a disciplined and strategic approach to handling the impaired loans that still made up a substantial share of the Tsesnabank's and ATF Bank's portfolio after their acquisition by First Heartland Bank.  As part of this effort, First Heartland Bank implemented a new business strategy geared toward increasing repayment of poorly performing loans.  This marked a sharp departure from the corrupt banking practices engaged in by Tsesnabank's former owner.

55.     In addition, the Bank implemented transparent corporate governance and decision-making, clear mechanisms for judicial and out-of-court debt collection, systematic elimination of corruption in the process of debt collections, and categorical suppression of loan restructurings between collectors and debtors.  By removing borrowers' incentives to negotiate for informal payment arrangements, the Bank incentivized borrowers to pay off their debt rather than risk losing collateral.  These and other measures had a significant positive effect on the Bank's revenue and bottom line.

56.     The Bank has also taken a forward-looking approach to its business model.  As one example, in the past few years, the Bank has focused on digital technologies, establishing an e-commerce platform and moving toward an integrated model for financial services.  As a result of these efforts and improvements in profitability, asset quality, solvency, and risk management, Moody's Investors Service upgraded its outlook on the Bank's ratings from stable to positive on December 14, 2022.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

57. Thanks in part to the success of these strategies, the Bank has been able to pay dividends.

58. Today, First Heartland Bank is the third-largest banking conglomerate in Kazakhstan and maintains strong relationships with foreign financial institutions.

59. The Bank's ability to pay dividends to its shareholders has, in turn, enabled NGF to provide significant funding to Nazarbayev University and Nazarbayev Intellectual Schools. NGF and the Jusan Group funded these entities, and supporting organizations, with millions of dollars in support to provide education emphasizing excellence, academic rigor, evidence-based research, scientific temper, innovation, and academic freedom.

**D. Defendants Harass and Extort the Jusan Group in an Effort to Steal the Group's Assets.**

60. Beginning in 2022, Defendants, including the government and government-agency Defendants, began to operate as an enterprise associated-in-fact and to participate in and operate other enterprises through a pattern of racketeering activity. Defendants' goal was to wrongfully obtain the assets of the Jusan Group for the benefit of the Individual Defendants. Each of the Individual Defendants are associated by virtue of operating under the color of authority of the Government of Kazakhstan, either directly through employment by the Government, or in the case of Defendant Dzhaksybekov, through close ties to the Government. Defendants' association-in-fact enterprise was in existence at least since January 2022 and is ongoing in a manner that permits its associates to engage in a pattern of racketeering.

61. This pattern of racketeering includes attempts to extort the Jusan Group constituting a violation of the Hobbs Act, 18 U.S.C. § 1951, which provides in relevant part: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both," 18 U.S.C. § 1951(a). As used in that section, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "Commerce"

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

14

includes "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

1. *The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan Begins Harassing First Heartland Bank.*

62. Beginning in January 2022 and continuing through the date of this filing, the Government of Kazakhstan, including various governmental and quasi-governmental agencies, has ordered at least 11 unjustified and unlawful investigations, requests, or inspections of Jysan Holding's indirect subsidiary, First Heartland Bank. These unlawful acts began as a purported effort to assist the Bank with compliance, but they quickly revealed themselves to be transparent—and at times breathtakingly illegal—attempts to force unlawful payments to the Government of Kazakhstan and private individuals.

63. More specifically, starting on or about January 11, 2022, representatives for the ARDFM assigned five agents to surveil the Bank full-time. This surveillance represents an unwarranted intrusion far beyond ARDFM's historical monitoring of the Bank and ARDFM's standard monitoring of other banks.

64. In connection with this surveillance, ARDFM representatives flooded the Bank with broad and harassing requests for information regarding all aspects of the Bank's activities. These requests were made with unreasonably short deadlines, forcing Bank staff to prioritize ARDFM's request over regular business operations.

65. In addition to around-the-clock surveillance, ARDFM imposed arbitrary restricted-transaction thresholds on all transactions of parties related to the Bank. These restrictions, which continue to the date of this filing, are so extreme that all transactions involving the Jusan Group must be approved by ARDFM and the FMA before being executed.

66. ARDFM has, in turn, unjustifiably denied approval for small and large transactions. For example, under the auspices of these transaction thresholds, ARDFM has blocked certain Bank staff from using their bank card to pay for daily expenses and has blocked

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

15

the transfer of USD $4 million from NGF's account at the Bank to NGF's U.S.-based bank account. This payment remains blocked and is ultimately needed to fund Nazarbayev University's and Nazarbayev Intellectual Schools' operating expenses. NGF has since been unable to transfer any funds from its account at the Bank. This includes small transfers to its own accounts for operations, as well as payments to vendors who have provided services to NGF in furtherance of its core mission. For example, NGF's payments for legal services, web design, translation services, and accounting and tax services have all been blocked. Remarkably, NGF was not provided any formal explanation as to why its transfers have been blocked.

67.     ARDFM went even further and instructed the Bank to freeze the accounts of certain Bank personnel and their relatives indefinitely and without justification.

68.     ARDFM has been unwilling to leave a record of their actions. When ARDFM approves a transaction, it insists on doing so orally. When ARDFM denies a transaction, it does not provide, either in writing or orally, any explanation for why the transaction was denied.

69.     These efforts have hindered the economic activities of the Bank and have caused the loss of many established clients. The Bank's loss of clients and business has had a significant impact on Plaintiffs, which depend on dividend payments from the Bank to fund their operations and their obligations to NGF.

70.     ARDFM has stated that the purpose of this surveillance was to ensure the Bank's compliance with the newly updated anti-money laundering regulations. But it is clear that this was pretextual. In reality, no other bank received such "assistance." ARDFM was instead initiating a broad campaign of intimidation, coordinated with several Government agencies and individuals and designed to prevent the Bank from engaging in regular business and, in turn, to pressure the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates.

16

*2. Financial Monitoring Agency of the Republic of Kazakhstan Launches Pretextual Investigation into First Heartland Bank and Seizes Documents.*

71.     In February 2022, the FMA launched a criminal investigation against former ATF Bank officials purportedly regarding the issuance of non-performing loans between 2013 and 2016.

72.     But the focus of the investigation has also proven to be pretextual.  During the pendency of the criminal case, FMA seized documents from the Bank well beyond the scope of an investigation into historical loans.  As examples, the FMA seized documents related to the purchase of ATF Bank in 2020, the Bank's dividend information after 2020 and account transactions of Bank officials entirely unrelated to ATF Bank's historical loans.

*3. Government-Owned Organizations Take Adverse Actions Against First Heartland Bank.*

73.     Between January and March 2022, a number of Government-owned organizations withdrew all funds from the Bank on the instruction of the Government of Kazakhstan.  This resulted in an outflow of significant capital from the Bank.  These Government-owned organizations include, but are not limited to: Damu, Kazakhstan's Entrepreneurship Development Fund; Kazakhtelecom and Kcell, the largest telecommunications company and main cellular communication operator in Kazakhstan; and Samruk-Kazyna, a Kazakhstani sovereign wealth fund with ownership interests in national rail and postal service as well as state-run gas and oil.

74.     Moreover, during this time, all Government agencies, in particular the Ministry of Digital Development and the Tax Committee, ceased all cooperation relating to the Bank's collaborative effort with the Government to develop "govtech" products.

*4. Anti-Corruption Agency of the Republic of Kazakhstan Launches a Sham Criminal Action and Makes Extortion Attempts.*

75.     Beginning in June 2022, AARK launched a purported criminal investigation into the Bank regarding its 2019 commercial purchase of Tsesnabank and subsequent earnings.

17

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

76.     On information and belief, the impetus of this investigation was a letter from the former owner of Tsesnabank, Defendant Adilbek Dzhaksybekov, in which he improperly leveraged his personal connections to AARK leadership to force the investigation and with the ultimate goal of extorting millions of dollars from the Bank.

77.     Defendant Dzhaksybekov's push for criminal investigations centers around accusations that the Bank's commercial purchase of Tsesnabank was somehow illegal, notwithstanding the fact that both he and the Government of Kazakhstan participated in and/or led the purchase, and that the purchase was necessitated by the near collapse of Tsesnabank under his prior ownership.

78.     In connection with its investigation, AARK has undertaken extreme illegal and arbitrary enforcement measures, including excessive interrogations of Bank employees, unwarranted searches of key personnel and premises of the Bank, as well as travel restrictions for Jusan Group officers and employees.     On information and belief, these extreme enforcement measures were undertaken by AARK at the request of Mr. Dzhaksybekov.

79.     In addition, AARK directed ARDFM to block all transactions, including the payment of dividends of the Jusan Group.     On October 7, 2022, ARDFM received correspondence from AARK to "take effective and comprehensive measures to suspend all expense (debit) transactions on payment of dividends by the Bank, FHS JSC, Jysan Technologies, Jysan Holding and [NGF] to their shareholders and owners, as well as any other payment transactions under the specified group of companies" and to "suspend expropriation actions of the shares of the Bank and FHS" during the pendency of the criminal investigation. On October 8, 2022, First Heartland Bank received correspondence from ARDFM signed by Defendant Kizatov, in which he detailed AARK's October 7, 2022 instruction to ARDFM.

80.     On behalf of the Bank, Mr. Shigeo Katsu attended a meeting in July 2022 with the President of Kazakhstan, Kassym-Jomart Tokayev, seeking to end the unfounded investigation.  Mr. Katsu is the Chairman of the Board of Directors for both the Bank and FHS. During the meeting, President Tokayev stated he was aware that Defendant Dzhaksybekov had

Ex. Page No. 181

raised complaints about the purchase of Tsesnabank, and suggested that Mr. Katsu should settle with Defendant Dzhaksybekov.

81.     Following this meeting, Defendant Dzhaksybekov attempted to extort Mr. Katsu and the Bank, suggesting that AARK would close its investigation if the Bank paid him. Defendant Dzhaksybekov touted his personal connection to AARK officials, and demanded a payment of 60 million tenge (approximately USD $130 million) for unspecified "damages."

82.     Mr. Katsu refused all attempts to extort him and the Bank, noting that such payment without any evidence or justification would violate various anti-corruption laws and that the Jusan Group has to obey all laws, including those of Kazakhstan, the United Kingdom, and the United States.

   *5.   Government of Kazakhstan Attempts to Force Repayment of Government Assistance and to Take Control of FHS.*

83.     The mounting regulatory harassment from the Government of Kazakhstan in the first quarter of 2022 forced Mr. Katsu to attend a series of additional meetings with Government of Kazakhstan officials to seek an end to the Government's illegal campaign.

84.     During those meetings, Government of Kazakhstan officials, including representatives of ARDFM and the Prime Minister of Kazakhstan, Alikhan Smailov, claimed that the Bank was forbidden from paying dividends until the Bank repaid the Government assistance provided to Tsesnabank and ATF Bank.

85.     No such limitation existed under any applicable law or contract, which of course, the Government knows.  Nor had this restriction ever been raised before, including when the Bank issued dividends in December 2021.

86.     Further, the Government of Kazakhstan has allowed other financial institutions to declare dividends without any issues, notwithstanding prior government assistance.  As examples, Halyk Bank, Kaspi Bank and Sberbank Kazakhstan were allowed to pay dividends despite receiving significant state support over multiple years without first fully repaying the loans.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

19

87.     Nonetheless, ARDFM continues to state that it will block any dividend payments and has threatened to imprison any Jusan Group employee who facilitates any dividend payment.

88.     In addition, Mr. Suleimenov met with Jusan Group officials in September 2022, to demand that ownership of the Jusan Group be taken from U.S. and U.K. entities and be given to Kazakhstan.   During one such meeting, Mr. Suleimenov stated that he was participating as a representative of, and at the direction of,  President Tokayev, and threatened the Jusan Group with additional Government actions over the lack of Kazakhstani citizens on the Boards of NGF and Jysan Holding.  In that meeting, Mr. Suleimenov also demanded that control of FHS (and by extension, of the Bank) be given to unspecified Kazakhstani citizens. He did not provide any legal justification for the demand, nor could he.

*6.     Government of Kazakhstan Takes Action against Jusan Group Employees.*

89.     Upon information and belief, in the context of the Government of Kazakhstan's negotiations with the Jusan Group in the first quarter 2022, the Government put pressure on the Jusan Group's auditors to withhold audit reports until the return of all shares and option agreements from Jusan Group employees.  The Government also threatened to initiate a criminal case relating to options that were not returned.

90.     The ongoing negotiations and the threat of criminal action caused the involuntary surrender of these assets held by the Jusan Group employees.

91.     The involuntary return of options caused Jusan Group personnel significant personal losses in the amount of tens of millions of dollars—compounding the personal losses implicated by ARDFM's instruction to the Bank to freeze accounts of certain Bank personnel and their relatives.

92.     For example, one member of the Jusan Group management—now a permanent resident of the United States—was forced to return his option of 4.62% shares of JTL, a book value of over USD $73 million as of May 2022.  The Government has also threatened that same member with trial in absentia and imprisonment should that employee take any actions

to counter the Government of Kazakhstan in its efforts to seize the property of the Jusan Group and its employees.

93.    Mr. Suleimenov in particular inquired as to the return of shares and options during subsequent negotiations in September 2022, corroborating the Government-backed nature of the extortion.

*7.    ARDFM Illegally Interferes with FHS's Dividend Payments.*

94.    On October 6, 2022, FHS declared dividends and requested that the Bank add the declaration of dividends to its extraordinary general meeting.  That declaration and request legally obligated the Bank, under its written policies and governing documents, to make a dividend distribution to FHS.  Significant portions of the dividends owed to FHS are the ultimate property of Jysan Holding, and will, in turn, be owed to Jysan Holding under intercompany policies and agreements.

95.    On October 7, 2022, ARDFM blocked FHS and the Bank from making this and other dividend payments in the approximate total amount of USD $387 million, as well as from making other payment transactions of the Bank to its direct and indirect parent companies.

96.    ARDFM representatives Defendants Kizatov and Omarbekov called Bank representatives in October 2022 regarding these blocked payments.  During a call with the Bank's Chief Compliance Officer, Ms. Ardak Mukasheva, Defendant Omarbekov echoed the assertions made in prior meetings between representatives of the Bank and the Government, claiming that the Bank's funds belong to the Government of Kazakhstan and threatening that law enforcement was preparing to arrest and interrogate employees of the Bank and employees of its affiliates.

97.    Defendant Omarbekov called the Bank again on October 8, 2022, claiming that ARDFM had obtained a letter from an unnamed law enforcement agency directing ARDFM to block all dividend payments from the Bank.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

21

1   *8.  FMA Illegally Interferes with FHS's Dividend Payments.*

2       98.     On October 13, 2022, the FMA sent a letter to the Bank incorrectly asserting that

3   the Bank had received 1.5 trillion tenge from the Government of Kazakhstan on preferential

4   terms and somehow was in default on this "debt."  In the letter, the FMA asserted that it was

5   suspending the Bank's ability to pay dividends to its shareholders and requiring that the Bank

6   notify FMA before further dividend payments are carried out.

7       *9.  The Government's Proffered "Justifications" are Shifting, Contradictory, and*

8           *Baseless.*

9       99.     Throughout the pendency of its campaign, the Government has provided various

10  "justifications" for its actions—none of which justify the Government's illegal actions against

11  the Jusan Group.

12      100.    When ARDFM increased surveillance of First Heartland Bank, the "justification"

13  was to ensure the Bank's compliance with the newly updated anti-money laundering

14  regulations.

15      101.    When FMA launched a criminal investigation against former ATF Bank officials,

16  the "justification" was to investigate the issuance of non-performing loans between 2013 and

17  2016.

18      102.    In the end, the Government has settled on a single justification: that AARK's

19  criminal investigation, and ARDFM and FMA's blocking of dividend payments, are somehow

20  "justified" by First Heartland Bank's commercial purchase of Tsesnabank and ATF Bank.  Of

21  course, this "justification" is just as baseless as all of its predecessors, as the key members of

22  the campaign to harass the Bank were also the architects of the Framework Agreements.

23  Indeed, the Bank has previously issued dividends without objection from the Government of

24  Kazakhstan, including as recently as December 2021.

25      103.    On information and belief, the Defendants' intent has been to stop the dividend

26  funds from traveling outside of Kazakhstan—and thus outside of the Government's control—

27  for the benefit of Plaintiffs, because Defendants know the dividend funds are for the benefit

28  of, and owed to, Plaintiffs JTL and Jysan Holding, and ultimately NGF.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**E.  The Government Retaliates Against the Plaintiffs After Negotiation Fails.**

*10. Plaintiffs Notify Defendants of Their Intention to Enforce Their Rights and the Parties Engage in Unsuccessful Negotiations.*

104.    In a last-ditch effort to resolve the dispute without court intervention, Plaintiffs notified Defendants of their intention to bring suit in Nevada.  Throughout November, the parties, including counsel for the parties, engaged in a series of informal negotiations.  Those negotiations were unsuccessful and part of a delay tactic while Defendants lined up corrupt legislators and agencies to ready an assault on Plaintiffs.

105.    Since then, Defendants' campaign of harassment has only intensified in what is plainly retaliation for Plaintiffs' informing Defendants of their intention to file this lawsuit.

*11. Defendants Retaliate Against Plaintiffs by Introducing Legislation Targeting the Jusan Group.*

106.    On November 22, 2022, one day after President Tokayev's re-election, the lower house of Kazakhstan's Parliament, the Majilis, approved a draft law with amendments to the Law "On Banks and Banking Activities in the Republic of Kazakhstan."  The proposed amendments were directed at Plaintiffs and sought to, *inter alia*, (1) change the definitions of "bank holding" and "major participant in a bank" such that non-profit organizations, like NGF, could not directly or indirectly own banks; (2) place restrictions on banks that have received Government assistance, like First Heartland Bank, to prevent them from distributing dividends, including by allowing ARDFM to block such dividends; and (3) require all major direct and indirect shareholders and controlling entities of banks to apply for and obtain approval from ARDFM within 30 days of the date of publication of the amendments.

107.    The upper house of Kazakhstan's Parliament, the Senate, subsequently approved the amendments allowing ARDFM to block dividends from banks that have received Government assistance and requiring ARDFM approval for major direct and indirect shareholders and controlling entities of banks, while it rejected the proposed amendment barring non-profit organizations from owning banks, for lack of justification.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

23

108.    These amendments, which entered into force on January 1, 2023, will allow the Government to block the dividends to which Plaintiffs are entitled and even to prohibit Plaintiffs' ownership interests in the Bank.  Under the amendments, JTL, Jysan Holding, and NGF would each need to obtain and submit to ARDFM credit ratings, audited financial statements, and relevant notarizations and apostilles from multiple jurisdictions within 30 days, which is simply not feasible.  Further, if these entities remain major shareholders in the Bank without ARDFM approval, ARDFM may demand that they reduce their indirect ownership share to below 25% and suspend all transactions between them and the Bank; establish trust management of the Bank's shares for up to three months; and ultimately alienate the Bank's shares by selling them on a securities market.  **There could not be a clearer case of unlawful seizure of assets under the control of Nevada citizens**.

109.    At least one member of the Majilis publicly stated that these amendments are explicitly designed to target the shareholders of First Heartland Bank and block the dividends at issue here.

110.    After delaying until one day following President Tokayev's re-election, the Government has now made the objectives and intent of its campaign clear—to stop the dividend funds from traveling outside Kazakhstan, to coerce the Jusan Group into surrendering funds and control of assets to the Government of Kazakhstan and its affiliates, and to retaliate against the Jusan Group for seeking to enforce its rights in an American court.

*12. Defendants Retaliate Against Plaintiffs by Filing a Suit Against Them in Kazakhstan.*

111.    On December 2, 2022, Kazakhstan's Prosecutor General filed suit against numerous members of the Jusan Group, including Plaintiffs, and employees of the Jusan Group, including Mr. Katsu and the employee previously threatened with imprisonment.  The Prosecutor General reports directly to the President and represents the interests of the Government of Kazakhstan in court.

112.    The suit sought to do through the court exactly what Defendants have attempted to do through their campaign of harassment—to weaken the Jusan Group and limit its access to its own capital.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

113.     Specifically, the lawsuit sought to invalidate an agreement between two members of the Jusan Group—JTL and Pioneer Capital Invest LLP ("Pioneer").   The invalidation of this agreement would have eliminated NGF's ownership interests in JTL and therefore eliminated NGF's access to dividends and distributions from the business and operations of JTL and its holdings, including FHS and the Bank.  The lawsuit also sought the return of millions of dollars (USD) in assets and cash from JTL to Pioneer, including JTL's shares in the Bank.  The assets and funds at issue were properly transferred to JTL via the agreement the Government sought to invalidate.  By seeking the movement of assets and funds from Plaintiff JTL to Kazakhstan-based Pioneer, the Government is interfering with Jusan Group's assets and seeking to move them into Kazakhstan where the Government will be able to exert greater control.  Finally, the lawsuit sought that all the named Jusan Group employees surrender their shares in the Bank.

114.     A Kazakhstani court quickly dismissed the Prosecutor General's suit based on its determination that the claims lacked  evidence.   This emphatic dismissal of the Prosecutor General's baseless suit further demonstrates the Government's blatant misuse of the state apparatus to target the Jusan Group.

*13. Kazakhstani Government Officials Threaten "War" Against Jusan Group Employees.*

115.     On December 20, 2022, Kazakhstani Prime Minister Alikhan Smailov sent a message to the same Jusan Group employee – a United States resident – who was previously threatened with imprisonment, demanding the Jusan Group's return to Kazakhstan and threatening "war" if the Government's demands are not met.

*14. Defendants Repackage Their Previously Dismissed Complaint and Refile Suit in Kazakhstan.*

116.     On February 10, 2023, the Kazakhstani Prosecutor General filed another suit against members of the Jusan group challenging the 2020 transaction between JTL and Pioneer and seeking to seize certain Jusan Group property.  While this suit alleges slightly different facts and claims different causes of action, its aim is the same as the suit filed, and swiftly

25

dismissed, in December 2022—to threaten the Jusan Group into handing over its control to the Government.

117.    But the Government goes even a step further in the February suit and seeks to seize myriad assets of not just the defendants to the action, but of the Jusan Group at large. The Prosecutor General seeks to seize Jusan Group shares in over a dozen entities.

118.    Once again the Prosecutor General sought to have JTL return to Pioneer millions of dollars (USD) in assets and cash which were properly transferred to JTL.  And once again the result, if the suit were successful, would be the movement of the Jusan Group's lawfully controlled assets into Kazakhstan where the Government will be able to exert greater control.

**F.    The Government's Illegal Campaign Is Consistent with Historical Corruption.**

119.    Defendants' actions are consistent with historical corrupt practices in Kazakhstan, as well as reports of a marked increase in corruption in Kazakhstan in recent years.

120.    As one example, in 2013, an arbitration panel awarded a Moldovan company USD $497,685,101 in damages (plus 50% of the cost of legal representation) for the Government of Kazakhstan's breach of the Energy Charter Treaty, an international agreement establishing cross-border cooperation in the energy industry.  That matter involved strikingly similar tactics to those employed against the Plaintiffs.  There, the tribunal found that Kazakhstan breached the company's right to fair and equitable treatment under the Treaty.  Specifically, the company alleged that Kazakhstan engaged in a campaign of harassment, culminating in the cancellation of its oil and gas exploration contracts and the seizure of its assets located in Kazakhstan.  That campaign reportedly included tactics by Kazakhstan's financial police and seven quasi-state entities and involved the baseless freezing of the company's assets, around-the-clock surveillance and inspection by government agency officials which prevented employees from conducting regular business affairs, the unwarranted seizure of documents, the unlawful arrest and conviction of an in-country manager, and the reversal of prior government approvals and waivers.

26

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

121. More recently, media reports have noted that corruption cases in Kazakhstan have increased dramatically in 2022, including by as much as 30 percent. Transparency International's Corruption Perceptions Index, the most widely used global corruption ranking in the world, measures Kazakhstan as a bottom performer in public sector corruption within Eastern Europe and Central Asia, itself the second lowest performing region worldwide. A recent report published by the Group of States Against Corruption, the Council of Europe's anti-corruption body, has comprehensively identified the ongoing "serious problem" of corruption that exists in Kazakhstan. Expert assessments reveal that Kazakhstan's progress toward anti-corruption measures is scattered at best.

122. In October 2022, U.S. Senators on the Senate Foreign Relations Committee called for an "international investigation into state-sanctioned violence and review of U.S. security assistance following nationwide protests earlier this year" in Kazakhstan, including Kazakh security forces' violent response toward civilian protestors. As part of that investigation, the Senators have called on the U.S. Department of State to review its relationship with Kazakhstan in order to "prioritize protecting fundamental freedoms and strengthening the rule of law."

**G. The Government's Illegal Campaign, Particularly Blocking Dividend Payments, Is Causing a Concrete Harm to the Jusan Group's Operations.**

123. Unsurprisingly, and presumably as the Government intended, the Government's campaign, including most notably the blocking of approximately USD $387 million in dividends, is causing significant, immediate, and concrete harm to Plaintiffs' operations.

124. Plaintiffs are unable to receive dividend funding from their subsidiaries connected to the Bank—a primary source of funding—nor are they able to fulfill their obligation to provide dividend funding to their parent organizations. In turn, NGF is unable to transfer or use its own funds in its own bank accounts or receive lawfully issued dividends, to serve its sole mission: to fund Nazarbayev University and Nazarbayev Intellectual Schools. Ultimately, by freezing the Jusan Group's funds, the Government is depriving Nazarbayev University and Nazarbayev Intellectual Schools of necessary resources, and thereby harming

27

Nazarbayev University's and Nazarbayev Intellectual Schools' students, researchers, and educators.

125.    In addition, in August 2022, Plaintiff JTL represented its intention to buy back USD $20 million in JTL shares from an investor.  Because of the blocked dividend payments, JTL is unable to proceed with this buyback.

### FIRST CAUSE OF ACTION
### (EXPROPRIATION IN VIOLATION OF INTERNATIONAL LAW)
### (against Defendant Republic of Kazakhstan and Governmental Agency Defendants)

126.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

127.    As parent corporations and shareholders of First Heartland Securities and First Heartland Bank, Plaintiffs have direct property interests in their rights to receive declared dividends from those subsidiaries.

128.    Through their conduct alleged above, including obstructing Plaintiffs' subsidiaries from paying lawfully declared dividends to their foreign shareholders and directly aiming their conduct at that result, Defendant Republic of Kazakhstan and its agencies have expropriated and taken Plaintiffs' property in violation of international law.

129.    Defendant Government of Kazakhstan and its agencies have also violated customary international law by expropriating and taking similar property interests belonging to First Heartland Securities and First Heartland Bank with the discriminatory purpose to harm their foreign shareholders.

### SECOND CAUSE OF ACTION
### (18 U.S.C. § 1964(c)) (against the Individual Defendants)

130.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

131.    The Individual Defendants are associated-in-fact as an enterprise engaged in and whose activities affect interstate commerce, and have operated and participated in the conduct of additional enterprises, including the Defendant Government and its agencies.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 191

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

132.    The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting Plaintiffs, ultimately for their own personal benefit.

133.    The Individual Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting the Jusan Group.

134.    The Individual Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

135.    As a direct and proximate result of the Individual Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

### THIRD CAUSE OF ACTION
### (Nev. Rev. Stat. § 207.470) (against all Individual Defendants)

136.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

137.    Individual Defendants have committed at least two distinct crimes related to racketeering as defined in Nev. Rev. Stat. § 207.360, constituting racketeering activity pursuant to Nev. Rev. Stat. § 207.390.

138.    Defendants have participated directly and indirectly in the conduct of the affairs of an enterprise whose activities constitute racketeering activity, in violation of Nev. Rev. Stat. § 207.400.

139.    Plaintiffs have been injured in their business and property by reason of Defendants' violations.

### FOURTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)
### (against all Defendants)

140.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

29

141.     Valid intercompany agreements exist between First Heartland Bank and First Heartland Securities, First Heartland Securities and JTL, JTL and Jysan Holding, and Jysan Holding and NGF.  Each of those intercompany agreements entitles the parent company in the corporate relationship to dividend payments from its subsidiary.  Jysan Holding and JTL are parties to those agreements or, with respect to the agreements to which Jysan Holding and/or JTL are not a party, third-party beneficiaries.

142.     Defendants each have knowledge of the aforementioned agreements, and have committed intentional acts intended and designed to disrupt each relationship.  Defendants' acts have caused actual disruption of each agreement, and caused Jysan Holding and JTL damages resulting from that disruption.

### FIFTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE
### WITH PROSPECTIVE ECONOMIC ADVANTAGE) (against all Defendants)

143.     Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

144.     Upon receipt of the blocked dividend from the Bank, FHS planned to dividend all or portions of the blocked dividend to JTL, and JTL then planned to dividend all or portions of the blocked dividend to Jysan Holding, which was to dividend all or portions to its parent, NGF, minus reasonable operational expenses.  Defendants each have knowledge of the ultimate purpose of the blocked dividend, and have committed intentional acts intended and designed to disrupt the dividends to Plaintiffs and the dividend to NGF.  Defendants' acts have caused actual disruption to those prospective dividends, and caused Jysan Holding and JTL damages resulting from that disruption.

145.     Defendants' conduct was unwarranted and without justification.  No agreement or law provides for a right of interference or dividend obstruction relating to the Government's bailout payments to Tsesnabank and ATF Bank. As a direct result of Defendants' conduct, Plaintiffs and their affiliates did not receive funds necessary to perform their basic functions and missions, including their funding of NGF, Nazarbayev Intellectual Schools, and Nazarbayev University.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**SIXTH CAUSE OF ACTION**
**(CIVIL CONSPIRACY) (against all Defendants)**

146.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

147.    Defendants have acted in concert with the intent to accomplish an unlawful objective for the purpose of harming the Jusan Group, including Plaintiffs.

148.    As a result of Defendants' acts in furtherance of that conspiracy, the Jusan Group, including Plaintiffs, has suffered damages.

149.    Defendants are jointly and severally liable for the damages that Plaintiffs have suffered as a result of each act taken by each Defendant in furtherance of Defendants' conspiracy.

**SEVENTH CAUSE OF ACTION**
**(CIVIL AIDING AND ABETTING) (against all Defendants)**

150.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein.

151.    Each Defendant has substantially assisted and encouraged other Defendants' conduct in breaching duties owed to Plaintiffs, including tort duties and statutory duties as set forth above.

152.    Defendants' breaches have caused harm to the Jusan Group, including Plaintiffs.

153.    Defendants are each liable under a civil aiding and abetting theory for damages caused by the breaches that they have substantially assisted and encouraged.

**PRAYER FOR RELIEF**

154.    Plaintiffs incorporate and re-allege the foregoing as if alleged herein and respectfully request that the Court:

   a)   Declare that Defendants' conduct has unlawfully injured Plaintiffs, and is not subject to any lawful privilege or justification;

   b)   Award Plaintiffs compensatory and punitive damages in an amount to be determined at trial, including trebled damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

   c)   Award Plaintiffs their costs and expenses, including attorneys' fees; and

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

31

d) Award Plaintiffs such further relief as may be just under the circumstances.

### JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED this 16th day of February 2023

HOLLAND & HART LLP

/s/ *J. Stephen Peek*

J. Stephen Peek
Erica C. Medley
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya
(*pro hac vice* forthcoming)
Jeffrey B. Korn
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb
(*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006

*Attorneys for Plaintiffs*
*Jysan Holding, LLC; and*
*Jusan Technologies Ltd.*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

32

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | Republic of Kazakhstan et al. (see attached) |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Republic of Kazakhstan
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

(see attached)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [x] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1964(c)

Brief description of cause:
Violation of Racketeer Influenced Corrupt Organizations Act and related violations of state and international law based on expropriation of assets.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/16/2023 | /s/ J. Stephen Peek |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## Civil Cover Sheet Attachment

Section I(a) Defendants:

Republic of Kazakhstan;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan;
The Anti-Corruption Agency of the Republic of Kazakhstan;
The Financial Monitoring Agency of the Republic of Kazakhstan;
The Committee for National Security of the Republic of Kazakhstan;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Chairperson, Abylkassymova, Madina;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Deputy Chairperson, Kizatov, Olzhas;
The Agency for Regulation and Development of the Financial Market of the Republic of Kazakhstan, Representative, Omarbekov, Arman;
Dzhaksybekov, Adilbek.

Section I(c) Plaintiffs' Attorneys:

J. Stephen Peek
Erica C. Medley
Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
(702) 669-4600

Tariq Mundiya
Jeffrey B. Korn
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Michael J. Gottlieb
Willkie Farr & Gallagher
1875 K Street, NW
Washington, DC 20006
(202) 303-1000

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) |
| Republic of Kazakhstan et al. | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No. 2:23-cv-00247-JAD-VCF

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Arman Omarbekov
The Agency for Regulation and Development of the Financial Market of the Republic of
Kazakhstan
21, Koktem-3
Almaty, 050040
Republic of Kazakhstan

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| Stephen Peek | Tariq Mundiya | Michael J. Gottlieb |
|---|---|---|
| Erica C. Medley | Jeffrey B. Korn | Willkie Farr & Gallagher LLP |
| Holland & Hart LLP | Willkie Farr & Gallagher LLP | 1875 K Street, NW |
| 9555 Hillwood Dr., 2nd Fl. | 787 Seventh Ave. | Washington, DC 20006 |
| Las Vegas, NV 89134 | New York, NY 10019 | |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DEBRA K. KEMPI

CLERK

*(By) DEPUTY CLERK*

DATE    February 22, 2023

Civil Action No.  2:23-cv-00247-JAD-VCF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

1   Дж. Стивен Пик/ J. Stephen Peek
    (Лицензия № 1758 Невады)
2   Эрика С. Медли/ Erica C. Medley
    (Лицензия № 13959 Невады)
3   HOLLAND & HART LLP
    9555 Hillwood Drive, 2nd Floor
4   Las Vegas, NV 89134
    Тел: 702.669.4600
5   Факс: 702.669.4650
    speek@hollandhart.com
6

7   Тарик Мундия/ Tariq Mundiya (*pro hac vice* будет предоставлено позднее)
    Джеффри Б. Корн/ Jeffrey B. Korn (*pro hac vice* будет предоставлено позднее)
8   WILLKIE FARR & GALLAGHER LLP
    787 Seventh Avenue
9   New York, New York 10019
    (212) 728-8000
10  tmundiya@willkie.com
    jkorn@willkie.com
11

12  Майкл Дж. Готлиб/ Michael J. Gottlieb (*pro hac vice* будет предоставлено позднее)
    WILLKIE FARR & GALLAGHER LLP
13  1875 K Street, NW
    Washington, DC 20006
14  (202) 303-1000
    mgottlieb@willkie.com
15

16  *Адвокаты Истцов*
    *Jysan Holding, LLC; u*
    *Jusan Technologies Ltd.,*

17         **ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД США**

18               **ОКРУГ НЕВАДА**

19

| | |
|---|---|
| 20  JYSAN HOLDING, LLC, компания с ограниченной ответственностью, зарегистрированная в штате Невада; | **Дело №.:** |
| 21  JUSAN TECHNOLOGIES LTD, компания с ограниченной ответственностью, зарегистрированная в Англии и Уэльсе; | **ИСКОВОЕ ЗАЯВЛЕНИЕ О РАССМОТРЕНИИ ДЕЛА СУДОМ ПРИСЯЖНЫХ** |
| 22 | |
| 23 | |
| 24                Истец, | |
| против | |
| 25  Иностранное суверенное государство | |
| 26  РЕСПУБЛИКА КАЗАХСТАН; Правительственное учреждение | |
| 27  Казахстана АГЕНТСТВО РЕСПУБЛИКИ КАЗАХСТАН ПО | |
| 28  РЕГУЛИРОВАНИЮ И РАЗВИТИЮ ФИНАНСОВОГО РЫНКА; | |

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1   Правительственная антикоррупционная
служба Казахстана АГЕНТСТВО
2   РЕСПУБЛИКИ КАЗАХСТАН ПО
ПРОТИВОДЕЙСТВИЮ КОРРУПЦИИ;
3   Правительственное учреждение
Казахстана АГЕНТСТВО
4   РЕСПУБЛИКИ КАЗАХСТАН ПО
ФИНАНСОВОМУ МОНИТОРИНГУ;
5   Правительственное разведывательное
агентство Казахстана КОМИТЕТ
6   НАЦИОНАЛЬНОЙ БЕЗОПАСНОСТИ
РЕСПУБЛИКИ КАЗАХСТАН;
7   физическое лицо МАДИНА
АБЫЛКАСЫМОВА; физическое лицо
8   ОЛЖАС КИЗАТОВ; физическое лицо
АРМАН ОМАРБЕКОВ; и физическое
9   лицо АДИЛЬБЕК ДЖАКСЫБЕКОВ,

10                                Ответчики.

11

12                              **ВВЕДЕНИЕ**

13        1.      С начала 2022 года Правительство Республики Казахстан («Правительство»

14   или «Правительство Казахстана») проводит незаконную кампанию в отношении

15   корпораций штата Невада: Истца Jysan Holding, LLC («Jysan Holding, LLC») и New

16   Generation Foundation, Inc. («NGF»), а также их прямых и косвенных дочерних компаний

17   (вместе именуемых «Jusan Group») в целях хищения активов Истца на сумму более

18   1,5 млрд долларов США.    Указанная коррупционная и незаконная кампания

19   демонстрирует наглый бандитизм нации — бывшего государства-сателлита Советского

20   Союза, — которая использовала широкие полномочия правительства и

21   высокопоставленных чиновников, чтобы, выходя далеко за пределы Казахстана, красть,

22   запугивать и иным образом причинять вред физическим лицам и организациям в

23   Соединенных Штатах.  Ответчики занимаются тем самым рэкетом и экспроприацией,

24   которые запрещены федеральными законами. Истцы подают настоящий иск, чтобы

25   устранить незаконное конфискационное поведение Ответчиков.

26        2.      Несмотря на то, что Правительство Казахстана представило

27   многочисленные, противоречивые и предлоговые оправдания их действий против

28

                                    2

группы Jusan Group, истинная цель Правительства состоит в том, чтобы захватить контроль над активами Jusan Group в Казахстане в целях собственной коммерческой выгоды, обеспечивая огромную коммерческую выгоду частным лицам, наделенным Правительством привилегиями. Правительство продемонстрировало свое намерение добиваться данной цели любыми возможными средствами, среди которых: угрозы, запугивание, уголовные и гражданские расследования и судебные процессы, а также блокировка 387 миллионов долларов США дивидендов, предназначенных для распределения частным банком в составе Jusan Group, First Heartland Jusan Bank («First Heartland Bank» или «Банк») и непосредственной материнской компании Банка, АО First Heartland Securities («FHS») — средства, предназначенные для истца Jusan Technologies Ltd. («JTL»), истца Jysan Holding и, в конечном счете, NGF.  Схема Ответчиков по использованию органов Правительства Казахстана для нанесения вреда организациям из Невады стала предельно ясной. После того, как Истцы проинформировали Ответчиков о намерении защищать свои права в немедленно направленном иске, Ответчики предприняли два очевидных акта возмездия: во-первых, в ноябре 2022 г. Ответчики внесли изменения в законодательство, специально направленные против Истцов; а во-вторых, 2 декабря 2022 г. Генеральная Прокуратура Казахстана подала в суды Казахстана сфабрикованный иск против Истцов и иных членов и сотрудников Jusan Group.  Законодательные меры, направленные против Jusan Group, подробно описанные ниже, предусматривали незаконный захват активов, находящихся под контролем юридического лица из Невады. Совсем недавно, 10 февраля 2023 года, Генеральная прокуратура Казахстана подала недобросовестно составленный иск, основанный на ложных обвинениях, с единственной целью конфискации активов, находящихся под контролем JTL. Более того, Казахстан угрожал насилием и тюремным заключением резидентам США, имеющим материальные экономические интересы в Jusan Group, если коммерческие требования Казахстана не будут выполнены. Эти действия соответствуют ситуации с повсеместной коррупцией в Правительстве

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 203

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Казахстана, которая, согласно публичным отчетам, ухудшилась с 2022 года. Таким образом, Правительство Казахстана прибегает к тем же незаконным инструментам — конфискации, экспроприации, угрозам и запугиванию, — которым отдают предпочтение самые репрессивные диктаторы и авторитарные режимы мира.

3.     Действия Правительства и некоторых отдельных лиц препятствуют Истцам (включая КОО штата Невада, которая была создана именно для того, чтобы избежать такого незаконного изъятия активов, которое совершается в настоящее время) в исполнении обязательств по предоставлению свободного образования и передового опыта получателям грантов NGF, через предоставление высшего образования в американском стиле и проведения рыночных реформ в Республике Казахстан. Действительно, в период, предшествующий противоправной деятельности, указанной в настоящем документе, NGF и Jusan Group усилиями Истцов в целом предоставили Назарбаев Университету (современному англоязычному исследовательскому университету, расположенному в столице Республики Казахстан Астане (ранее Нур-Султан)), а также Назарбаев Интеллектуальные Школы и их организациям, гранты на миллионы долларов.

4.     В отсутствие судебной защиты незаконная схема Ответчиков будет продолжать лишать Истцов основного источника финансирования от их дочерних компаний, связанных с Банком, и, соответственно, они не смогут выполнять свои обязательства по предоставлению дивидендного финансирования для их головных организаций, среди которых NGF.  В свою очередь, NGF не в состоянии переводить собственные средства или получать законно выпущенные дивиденды для выполнения своей единственной миссии — финансирования Назарбаев Университета и Назарбаев Интеллектуальные Школы.  В конечном счете, замораживая средства Jusan Group, Правительство лишает Назарбаев Университет и Назарбаев Интеллектуальные Школы необходимых ресурсов, следовательно, наносит ущерб их студентам, исследователям и преподавателям, препятствуя предоставлению образования, которое ставит акцент на

Ex. Page No. 204

необходимость высоких стандартов обучения, академической строгости, исследований, основанных на фактах, научного характера, интеллектуальной свободы, инноваций и академической свободы.

## ЮРИСДИКЦИЯ И МЕСТО РАССМОТРЕНИЯ

5.      Данный Суд обладает предметной юрисдикцией относительно данного иска в соответствии с 28 U.S.C. § 1331, поскольку данный иск возникает в соответствии с законодательством Соединенных Штатов, а именно 18 U.S.C. § 1964(c).

6.      Данный Суд также обладает предметной юрисдикцией относительно данного иска в соответствии с § 1330(a) 28 U.S.C., поскольку Ответчик Республика Казахстан и ее нижеперечисленные учреждения и органы являются иностранными государствами по определению в § 1603(a) 28 U.S.C, и не имеют права на иммунитет в соответствии с 28 U.S.C. §§ 1605–07 или любым применимым международным соглашением.  Ответчик Республика Казахстан, а также перечисленные ниже агентства и органы Ответчика не защищены иммунитетом от юрисдикции данного Суда в соответствии с 28 U.S.C. § 1605(a)(2), поскольку данный иск основан на действиях за пределами территории Соединенных Штатов, связанных с коммерческой деятельностью Ответчиков за пределами США, и данные действия оказали непосредственное воздействие в Соединенных Штатах.

7.      Данный Суд обладает дополнительной юрисдикцией в отношении требований Истцов относительно законодательств штата в соответствии с 28 U.S.C. § 1367(a), поскольку эти требования настолько связаны с другими требованиями иска, что они являются частью того же дела или разногласия в соответствии со Статьей III Конституции Соединенных Штатов.

8.      Данный Суд обладает персональной юрисдикцией в отношении Ответчика Республики Казахстан и ее учреждений и органов, перечисленных ниже, в соответствии с 28 U.S.C. § 1330(b).

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 205

9.      Данный Суд обладает персональной юрисдикцией в отношении всех Ответчиков согласно Nev. Rev. Stat. § 14.065.  Данный Суд также обладает персональной юрисдикцией в отношении всех Ответчиков в соответствии с 18 U.S.C. § 1965 и правилами 4(k)(1)(C) и 4(k)(2) Федеральных правил гражданского судопроизводства.

10.      Место рассмотрения в данном округе является надлежащим в соответствии с 28 U.S.C. § 1391 (f) (1), поскольку значительная часть событий, послуживших основанием для иска, произошла в данном округе.  В качестве альтернативы, место рассмотрения в данном округе является надлежащим в соответствии с 28 U.S.C. § 1391(b)(3), поскольку Ответчики подлежат персональной юрисдикции в данном округе в отношении данного иска.

## СТОРОНЫ

11.      Истец Jysan Holding — компания с ограниченной ответственностью, зарегистрированная в соответствии с законодательством штата Невада.  Единственным членом Jysan Holding является NGF — организация со статусом 501 (c) (4), базирующаяся и зарегистрированная в Неваде.  Jysan Holding имеет 96,96 % прямого участия в JTL, которая выступает в качестве холдинговой компании для непрямых дочерних компаний Jysan Holding и является косвенным мажоритарным владельцем иных компаний, расположенных в Казахстане.  Jysan Holding управляет бизнесом и иной инвестиционной деятельностью NGF в интересах студентов учебных заведений-грантополучателей в Республике Казахстан.

12.      Истец JTL — компания с ограниченной ответственностью, учрежденная в соответствии с законодательством Англии и Уэльса.  Прямой материнской компанией JTL является Jysan Holding (указанная выше организация из Невады).  JTL является прямым и косвенным мажоритарным владельцем прочих компаний в Казахстане, среди которых FHS, в которой JTL владеет прямой долей участия в размере 99,48 %.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 206

13.     Ответчик Республика Казахстан — иностранное суверенное государство в значении 28 U.S.C. § 1603(a).  Ответчик Республика Казахстан имеет посольство в Соединенных Штатах по адресу 1401 16th St NW, Washington, DC 20036.

14.     Ответчик Агентство Республики Казахстан по регулированию и развитию финансового рынка («АРРФР») — правительственное учреждение, которому поручено осуществлять надзор за финансовым рынком и финансовыми организациями в Казахстане.

15.     Ответчик Агентство Республики Казахстан по противодействию коррупции («Антикоррупционная служба») — правительственное антикоррупционное учреждение.  Антикоррупционная служба отвечает за разработку и реализацию антикоррупционной политики Правительства Казахстана, координацию правоприменительных мероприятий по борьбе с коррупцией, а также выявление, пресечение, раскрытие и расследование коррупционных правонарушений. Антикоррупционная служба подчиняется непосредственно Президенту Казахстана.

16.     Ответчик Агентство Республики Казахстан по финансовому мониторингу («АФМ») — государственный орган, ответственный за предоставление рекомендаций по противодействию отмыванию денег и финансированию терроризма, а также за предотвращение, обнаружение, пресечение, раскрытие и расследование экономических и финансовые правонарушений, направленных им законодательными органами Республики Казахстан.  АФМ подчиняется непосредственно Президенту Казахстана.

17.     Ответчик Комитет национальной безопасности Республики Казахстан («КНБ») — правительственное разведывательное учреждение (совместно с АРРФР, Антикоррупционной службой и АФМ «Ответчики правительственных учреждений»).

18.     Ответчик Мадина Абылкасымова — председатель АРРФР.  Она проживает в Казахстане, гражданка Казахстана.

19.     Ответчик Олжас Кизатов — заместитель председателя АРРФР.  Он проживает в Казахстане, гражданин Казахстана.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

7

20.     Ответчик Арман Омарбеков — представитель АРРФР.  Он проживает в Казахстане, гражданин Казахстана.

21.     Ответчик Адильбек Джаксыбеков (вместе с ответчиками Абылкасымовой, Кизатовым и Омарбековым, «Индивидуальные ответчики») — бывший владелец Цеснабанка  банка, который Jusan Group приобрела в феврале 2019 года.  Он проживает в Казахстане, гражданин Казахстана.

### ФАКТЫ

**A.  Члены  Jusan  Group  Помогают  Правительству  Казахстана,  Покупая Обанкротившиеся Казахстанские Банки.**

22.     В 2018 году банковский сектор Казахстана, не полностью оправившийся от финансового кризиса 2007–2009 годов и последующих девальваций казахстанского тенге в 2008 и 2015 годах, попал в острую уязвимую ситуацию после резкого падения мировых цен на энергоносители, что снова привело к значительной девальвации тенге. В  ответ  правительство  Казахстана  искало  различные  коммерческие  решения,  в стремлении избежать краха всей банковской системы страны.

23.     Цеснабанк в то время был вторым самым большим банком по размеру активов  в  Центральной  Азии  и  принадлежал  ответчику  Джаксыбекову.   Ответчик Джаксыбеков  злоупотреблял  своими  полномочиями  в  Цеснабанке  для  получения финансовой выгоды в собственных целях, а также для своей семьи и друзей, фактически используя Цеснабанк как частную инвестиционную компанию для достижения своих личных  интересов  и  участия  в  прочих  сомнительных  или  злонамеренных  деловых операциях.

24.     К 2018 году Цеснабанк был на грани краха: почти 90 % активов банка были необслуживаемыми.

25.     Серьезные  проблемы  с  ликвидностью  у  Цеснабанка  не  прекращались, несмотря  на  получение  капитальных  вливаний  в  рамках  государственной  помощи банковскому сектору Казахстана в 2017 году.  В начале сентября 2018 года банк получил

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 208

краткосрочный займ в размере нескольких сотен миллионов долларов от Национального Банка Республики Казахстан. В последней отчаянной попытке остаться в бизнесе, Цеснабанк продал государству значительную часть портфеля сельскохозяйственных кредитов. Однако, к середине сентября S&P понизило рейтинг ликвидности Цеснабанка с «адекватного» на «менее чем адекватный».

26.    Правительство Казахстана определило, что в случае краха Цеснабанка он, скорее всего, потопит с собой весь банковский сектор Казахстана. Таким образом, правительство Казахстана непреклонно искало какое-нибудь коммерческое решение, которое бы позволило удержать Цеснабанк на плаву. Пытаясь достичь поставленной цели, правительство Казахстана инициировало серию попыток спасения Цеснабанка в период с 2018 по 2019 год.

27.    Правительство охарактеризовало данные меры как «повышение устойчивости Цеснабанка за счет кардинального улучшения его кредитного портфеля». В современных отчетах признавалось, что это была очередная помощь для спасения, направленная на исправление шаткого и ухудшающегося финансового положения Цеснабанка.

28.    Однако даже при такой финансовой поддержке, к январю 2019 года значительные потери в кредитном портфеле Цеснабанка продолжали угрожать жизнеспособности Цеснабанка. Чтобы выжить, Цеснабанку нужны были дополнительные вливания капитала. Правительство Казахстана срочно искало другой банк, который купил бы Цеснабанк и предоставил новый капитал, чтобы предотвратить крах Цеснабанка, а также обеспечить смену руководства для усиления операционной деятельности Цеснабанка.

29.    Правительство Казахстана обнаружило, что First Heartland Bank в Казахстане, принадлежащий Jusan Group, — потенциальное решение. First Heartland Bank значительно нарастил наличные резервы и сохранил безупречную репутацию благодаря надлежащему управлению под руководством Jusan Group.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 209

30. Правительство Казахстана обратилось к Jusan Group насчет потенциального приобретения Цеснабанка. Jusan Group постарались удовлетворить просьбу правительства и принять участие в оказании помощи банковскому сектору. Но для Jusan Group было очевидно, что они не смогут приобрести Цеснабанк, если у Цеснабанка отрицательный баланс, а из-за неэффективного управления кредитным портфелем Цеснабанка под руководством ответчика Джаксыбекова у Цеснабанка был очень отрицательный баланс.

31. В попытке найти коммерческое решение, Правительство Казахстана провело переговоры по ряду контрактов (кульминацией которых стали «Рамочные соглашения по Цеснабанку»), в соответствии с которыми Правительство предоставит Цеснабанку дополнительные средства на выживание, в которые входит покупка проблемных активов, после чего Jusan Group приобретет Цеснабанк.

32. Рамочные соглашения по Цеснабанку были заключены в январе и феврале 2019 года. Сторонами Рамочных соглашений по Цеснабанку были АО First Heartland Securities («FHS»), материнская компания Банка, ответчик Джаксыбеков, Цеснабанк и Правительство Республики Казахстан в лице Министерства финансов Республики Казахстан и Национального Банка Республики Казахстан. Рамочные соглашения по Цеснабанку явно поддерживались и были согласованы с нынешним премьер-министром Казахстана Алиханом Смаиловым и первым заместителем руководителя аппарата Президента Казахстана Тимуром Сулейменовым.

33. Рамочное соглашение, подписанное 17 января 2019 года («Рамочное соглашение по Цеснабанку от 17 января»), предусматривало вливание государственных средств в Банк Цеснабанк, которые в конечном итоге приняли форму облигаций с длительным сроком погашения. Затем, FHS приобрела Цеснабанк, в соответствии со статьей 8 «Рамочного соглашения по Цеснабанку от 17 января».

34. Правительство Казахстана не только дало полное согласие на сделку, но и возглавило ее исполнение.

Ex. Page No. 210

35.     Важно отметить, что возвращение суммы спасательного капитала к 2023 году не являлось условием Правительства Казахстана для поддержки в вопросе приобретения Цеснабанка, также Правительство Казахстана не ограничивало выплату дивидендов Банком каким-либо иным образом.  Фактически до недавнего момента, в декабре 2021 года включительно, Банк выплачивал дивиденды без возражений со стороны Правительства Казахстана.

36.     Вскоре после сделки по продаже Цеснабанка, Правительство снова обратилось к Jusan Group, с предложением приобрести еще один обанкротившийся банк, АТФ Банк.

37.     Как и в случае с Цеснабанком, Правительство было основной стороной переговоров по сделке, в рамках которой Jusan Group приобрела АТФ Банк (осуществлялось посредством Рамочных соглашений по АТФ Банку).  Как и в случае с Цеснабанком, у АТФ Банка имелись значительные убытки по кредитному портфелю, который Правительство согласилось спасти, в связи с приобретением.

38.     Важно отметить, что, как указано выше, Правительство не обусловило оказание помощи АТФ Банку какими-либо обязательствами по возврату средств до 2023 года и никаким иным образом не ограничивало выплату Банком дивидендов.

39.     Таким образом, приобретая АТФ Банк, Jusan Group удовлетворила просьбу Правительства Казахстана о коммерческом решении банковского кризиса, вложила значительный капитал в банковский сектор страны и во второй раз за два года спасла сектор от полного краха. Еще в январе 2023 года премьер-министр Смаилов подтвердил, что приобретение Jusan Group Цеснабанка и АТФ Банка было необходимо, чтобы стабилизировать финансовое положение учреждений и обеспечить безопасность вкладов казахстанских граждан и юридических лиц.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 211

**B. Jusan Group Создала Предприятия в Неваде для Защиты и Увеличения Своих Активов на Фоне Банковского Кризиса в Казахстане.**

40.     В то время, когда Jusan Group помогала Правительству в спасении обанкротившихся казахстанских банков, руководство Jusan Group искало наилучшие варианты, как и далее защищать и приумножать собственные активы.  До 2019 года Jusan Group принадлежала фонду Nazarbayev Fund («NF») — казахстанской корпорации, созданной для финансирования Назарбаев Университета и Nazarbayev Intellectual Schools, а также организаций, поддерживающих Назарбаев Университет и Nazarbayev Intellectual Schools.

41.     Назарбаев Университет, основанный в 2010 году, является флагманским учебным заведением Казахстана, с амбициями стать исследовательским университетом мирового уровня.  Цель университета — «предоставить Казахстану и миру ученых, академиков, менеджеров и предпринимателей, необходимых для процветания и развития», университет был основан на принципах автономии и академической свободы.   Назарбаев Университет стал неотъемлемой частью академической исследовательской экосистемы с более 5600 международных публикаций.  Назарбаев Университет оказывает образовательные услуги западного образца на английском языке.

42.     Nazarbayev Intellectual Schools были основаны в 2008 году и созданы как современная и инновационная образовательная платформа для разработки и внедрения современных моделей образовательных программ от дошкольного до старшего школьного возраста.  Выпускники Nazarbayev Intellectual Schools успешно поступают в ведущие университеты, среди которых Назарбаев Университет и другие ведущие программы бакалавриата в Европе и Восточной Азии.

43.     После почти десяти лет поддержки Назарбаев Университета и Nazarbayev Intellectual Schools от благотворительного фонда в Казахстане, руководство Jusan Group

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

стало все более беспокоиться о том, что рост благотворительного фонда в Казахстане по сути ограничен и находится под угрозой.

44.    Руководство Jusan Group приняло решение создать благотворительный фонд в Неваде — штате, известном строгой правовой защитой и стандартами корпоративного управления, сильными традициями благотворительности и многочисленными успешными университетскими благотворительными фондами и некоммерческими организациями.

45.    В частности, Jusan Group решила зарегистрировать компанию в Неваде, потому что это одна из ведущих юрисдикций в США по стандартам корпоративного управления.  Jusan Group также учла тот факт, что многие крупные коммерческие и некоммерческие организации ведут свою операционную деятельность как корпорации штата Невада.

46.    NGF была создана в 2019 году в Неваде как неакционерная некоммерческая корпорация, с целью ведения деятельности исключительно в интересах Назарбаев Университета и Nazarbayev Intellectual Schools.  NF затем передала NGF всю свою долю в Jusan Group.   Единственной миссией NGF является обеспечение финансирования деятельности Назарбаев Университета и Nazarbayev Intellectual Schools, а также их организаций, это благотворительный фонд для них.  Jysan Holding был создан для управления активами NGF.

47.    Компания с ограниченной ответственностью JTL была зарегистрирована в 2020 году в соответствии с законодательством Англии и Уэльса и позднее передана Jysan Holding за счет взноса капитала.  JTL была зарегистрирована с целью создания общей корпоративной холдинговой структуры для финансового и технологического подразделений Jusan Group.    JTL — холдинговая компания, инвестирующая в различные сферы, среди которых банковское дело, брокерские услуги, страхование, управление активами, электронная коммерция, телекоммуникации, логистика и розничная торговля.  JTL расширяет свой портфель за счет стратегических слияний и

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

поглощений, тем не менее, косвенное участие JTL в Банке составляет 90 % его общих активов.

48.    JTL владеет 99,48 % долей в FHS, которая, в свою очередь, владеет примерно 80 % долей в First Heartland Bank.

49.    Таким образом, NGF получает пассивный доход через косвенное владение JTL, в виде дивидендов и распределений от бизнеса и деятельности JTL и ее холдингов, включая FHS и Банк.



50.    В соответствии с внутригрупповыми положениями и соглашениями, выплаты дивидендов будут распределяться от Банка к FHS и, в свою очередь, к JTL, Jysan Holding и NGF, за вычетом средств, необходимых для покрытия адекватных операционных расходов.   Каждое предприятие имеет законное право объявлять и получать дивиденды от своей прямой дочерней компании.

51.    NGF впервые начал предоставлять финансирование Назарбаев Университету и Nazarbayev Intellectual Schools в 2021 году.  Как отмечается, только за

Ex. Page No. 214

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

два года NGF и Jusan Group предоставили Назарбаев Университету, Nazarbayev Intellectual Schools и поддерживающим их организациям миллионы долларов. Вышеуказанные гранты шли на поддержку усилий по предоставлению образования, в котором особое внимание уделяется ценностям интеллектуальной свободы, инноваций и академической свободы.  NGF ожидает, что финансирование значительно увеличится в ближайшие годы, в частности, в рамках решения проблемы существенного сокращения финансовой поддержки со стороны Правительства Казахстана в контексте серьезных финансовых проблем национального бюджета Казахстана.

52.    NGF полностью финансируется за счет распределения прибыли от Jysan Holding, которая получает свой доход исключительно в виде выплат дивидендов от компаний Jusan Group через JTL.

**C.  Финансовый  Успех  Jusan  Group  Провоцирует  Правительство  и Джаксыбекова Принудительно Захватить First Heartland Bank.**

53.    После приобретения Цеснабанка и АТФ Банка — которые теперь являются частью First Heartland Bank — First Heartland Bank добился быстрого увеличения выручки.

54.    Такой    успех    и    повышение    прибыльности    были    связаны    с дисциплинированным  и  стратегическим  подходом  к  работе  с  обесцененными кредитами, которые по-прежнему составляли значительную долю портфеля Цеснабанка и АТФ Банка после того, как их приобрел First Heartland Bank.  В рамках вышеуказанных усилий First Heartland Bank реализовал новую бизнес-стратегию, направленную на увеличение  выплат  по  неэффективным  кредитам.    Что  резко  отличалось  от коррупционной банковской практики бывшего владельца Цеснабанка.

55.    Кроме того, Банк внедрил прозрачное корпоративное управление и принятие решений, четкие механизмы судебного и внесудебного взыскания долгов, системное устранение коррупции в процессе взыскания долгов, категорическое пресечение реструктуризации кредитов между коллекторами и должниками.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 215

Ликвидировав у заемщиков стимулы к ведению переговоров по неформальным платежным схемам, Банк стимулировал заемщиков погасить свой долг, а не рисковать потерей залога.  Эти и другие меры оказали значительное положительное влияние на размер выручки и чистой прибыли Банка.

56.    Банк также придерживается бизнес-модели с дальновидным подходом. Например, за последние несколько лет Банк сосредоточился на цифровых технологиях, создав платформу электронной коммерции и двигаясь в сторону интегрированной модели финансовых услуг. В результате этих усилий и улучшения показателей прибыльности, качества активов, платежеспособности и управления рисками 14 декабря 2022 года агентство Moody's Investors Service повысило прогноз по рейтингам Банка со стабильного на позитивный.

57.    Отчасти благодаря успеху вышеуказанных стратегий Банк смог выплачивать дивиденды.

58.    Сегодня First Heartland Bank является третьим по величине банковским конгломератом в Казахстане и поддерживает прочные отношения с иностранными финансовыми институтами.

59.    Способность Банка выплачивать дивиденды акционерам, в свою очередь, позволила NGF предоставлять значительное финансирование Назарбаев Университету и Nazarbayev Intellectual Schools.   NGF и Jusan Group финансировали данные учреждения и поддерживающие их организации, выделяя миллионы долларов на поддержку образования, которое ставит акцент на превосходство, академическую строгость, научно-обоснованные исследования, научный характер, инновации и академическую свободу.

**D.  Ответчики Преследовали и Вымогали Деньги у Jusan Group в Попытке Украсть Активы Группы.**

60.    Начиная с 2022 года Ответчики, среди которых Ответчики правительственных учреждений и Правительства, стали действовать как фактически

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 216

совместное предприятие, а также участвовать в деятельности и управлении иными предприятиями путем рэкета.  Цель Ответчиков состояла в том, чтобы неправомерно заполучить активы Jusan Group в интересах Индивидуальных Ответчиков.  Каждый из Индивидуальных Ответчиков связан в силу того, что действует в контексте полномочий Правительства Казахстана, либо напрямую через работу на Правительство, либо, в случае Ответчика Джаксыбекова, через тесные связи с Правительством.  Сообщная деятельность Ответчиков фактически имела место как минимум с января 2022 года и продолжается таким образом, что сообщникам позволено периодически заниматься рэкетом.

61.     Рэкет включает в себя попытки вымогательства у Jusan Group, представляющие собой нарушение Закона Хоббса, 18 U.S.C. § 1951, которым предусматривается в соответствующей части: «Тот, кто любым образом, или в любой степени, препятствует, задерживает, или влияет на коммерческую деятельность или передвижение в рамках коммерческой деятельности любого товара или сырья, путем грабежа или вымогательства, или предпринимает подобные попытки, или вступает в сговор для совершения таких действий. . . подлежит наложению штрафа в соответствии с данным разделом или лишению свободы на срок до двадцати лет, или и тому и другому», 18 U.S.C. § 1951(a).  В соответствии с данным разделом, термин «вымогательство» означает получение собственности от другого лица с его согласия, полученного путем неправомерного применения фактической или угрожаемой силы, насилия или запугивания или под прикрытием официального права». 18 U.S.C. § 1951(b)(2).  «Коммерческая деятельность» включает в себя «всякую коммерческую деятельность между любой точкой Штата, Территории, Владения или Округа Колумбии и любой точкой за их пределами; всякую коммерческую деятельность между точками внутри одного Штата через любую точку за пределами данного Штата; и всякую прочую коммерческую деятельность, в отношении которой Соединенные Штаты имеют юрисдикцию». 18 U.S.C. § 1951(b)(3).

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1. *Агентство Республики Казахстан по Регулированию и Развитию Финансового Рынка Начинает Преследование First Heartland Bank.*

62.     Начиная с января 2022 года и на момент подачи настоящего иска, Правительство Казахстана, различные правительственные и квазиправительственные учреждения включительно, распорядилось провести не менее 11 необоснованных и незаконных расследований, запросов или проверок по отношению к First Heartland Bank, косвенной дочерней компании Jysan Holding.  Данные незаконные действия начались как завуалированные попытки помочь Банку в соблюдении нормативных требований, но вскоре стало понятно, что это очевидные — а иногда и явно незаконные — попытки принудить к незаконным платежам в пользу Правительства Казахстана и частных лиц.

63.     В частности, начиная примерно с 11 января 2022 года представители АРРФР назначили пять агентов для постоянного наблюдения за Банком. Вышеуказанное наблюдение представляет собой необоснованное вторжение, выходящее далеко за рамки ранее проводимого мониторинга Банка и стандартного мониторинга других банков, которые АРРФР обычно проводит.

64.     В контексте данного наблюдения представители АРРФР завалили Банк обширными и назойливыми запросами информации по всем аспектам деятельности Банка.  Запросы были с неоправданно сжатыми сроками исполнения, что вынудило сотрудников Банка заниматься запросом АРРФР, вместо обычных деловых операций.

65.     В дополнение к круглосуточному наблюдению, АРРФР установило ограничительные пороговые показатели для всех транзакций, проводимых сторонами, имеющими отношение к Банку.  Ограничения, которые действуют на дату подачи данного иска, настолько драконовские, что для проведения любой транзакции с участием Jusan Group требуются предварительные одобрения от АРРФР и АФМ.

66.     АРРФР, в свою очередь, необоснованно отказывает в одобрении мелких и крупных сделок.   Например, в соответствии с установленными пороговыми показателями для транзакций, АРРФР заблокировало банковские карты некоторых

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

сотрудников Банка, которые использовались для оплаты ежедневных расходов, а также заблокировало перевод в размере 4 миллионов долларов США со счета NGF в Банке на счет NGF в банке, находящемся в США.   Вышеуказанный платеж остается заблокированным, он в конечном итоге необходим для финансирования операционных расходов Назарбаев Университета и Назарбаев Интеллектуальные Школы.  NGF с тех пор не может перевести никакие средства со своего счета в Банке.   Сюда входят небольшие переводы на оплату собственной операционной деятельности, а также платежи поставщикам, которые предоставляли услуги NGF для достижения целей основной миссии организации.   Например, платежи NGF за юридические услуги, веб-дизайн, переводческие услуги, бухгалтерские и налоговые услуги были заблокированы. Примечательно, что NGF не было предоставлено никаких официальных объяснений, почему его переводы были заблокированы.

67.     АРРФР пошло еще дальше и поручило Банку заморозить счета некоторых сотрудников Банка и их родственников на неопределенный срок и без каких-либо обоснований.

68.     АРРФР не желает документировать свои действия в письменном виде. Когда Агентство Республики Казахстан по регулированию и развитию финансового рынка одобряет транзакцию, оно настаивает на том, чтобы одобрение было сделано в устной форме.   Когда АРРФР отказывает в транзакции, оно не предоставляет ни письменно, ни устно никаких объяснений того, почему транзакция была отклонена.

69.     Данные действия привели к снижению экономической деятельности Банка и к потере многих постоянных клиентов.   Потеря Банком клиентов и бизнеса значительно повлияла на Истцов, чье финансирование деятельности и выполнение обязательств перед NGF зависят от выплат им дивидендов Банком.

70.     АРРФР заявило, что целью наблюдения было обеспечение соблюдения Банком недавно обновленных правил по борьбе с отмыванием денег.  Но ясно, что это было предлогом.  На самом деле, такого «содействия» не получал ни один другой банк.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

19

Вместо этого АРРФР инициировало широкую кампанию запугивания, скоординированную с несколькими государственными учреждениями и частными лицами, и направленную на то, чтобы помешать Банку вести обычную коммерческую деятельность и, в свою очередь, заставить Jusan Group передать средства и контроль над активами Правительству Казахстана и причастным с ним.

*2. Агентство по Финансовому Мониторингу Республики Казахстан Начало Предварительное Расследование в Отношении First Heartland Bank и Изъяло Документы.*

71.   В феврале 2022 года АФМ возбудило уголовное дело в отношении бывших должностных лиц АТФ Банка якобы в связи с выдачей необслуживаемых кредитов в период с 2013 по 2016 г.

72.   Но предмет расследования также оказался ложным предлогом.   АФМ в процессе рассмотрения уголовного дела изъяло у Банка документацию, масштаб которой выходил далеко за рамки расследования предыдущих кредитов.   Например, АФМ изъяло документы, связанные с приобретением АТФ Банка в 2020 году, информацию о дивидендах Банка после 2020 года и операциях по счетам должностных лиц банка, которые совершенно не связаны с предыдущими кредитами АТФ Банка.

*3. Принадлежащие Правительству Организации Предпринимают Меры Неблагоприятного Воздействия Против First Heartland Bank.*

73.   В период с января по март 2022 года ряд организаций, принадлежащих Правительству, вывели все средства из Банка по директиве от Правительства Казахстана.   Это привело к значительному оттоку капитала из Банка.   Ряд принадлежащих Правительству организаций включает, но не ограничивается: Фонд развития предпринимательства «Даму»;   Казахтелеком и Кселл, крупнейшая телекоммуникационная компания и основной оператор сотовой связи в Казахстане; и Самрук-Казына, суверенный фонд благосостояния Казахстана, владеющий долями в

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

национальной железнодорожной и почтовой службе, а также в государственных газовых и нефтяных компаниях.

74.    Более того, за этот период, все правительственные учреждения, в частности Министерство цифрового развития и Налоговый комитет, прекратили всякое сотрудничество, имеющее отношение к совместной разработке Банком и Правительством продуктов «govtech».

*4. Агентство Республики Казахстан по Противодействию Коррупции Возбуждает Фиктивное Уголовное Дело и Предпринимает Попытки Вымогательства.*

75.    В начале июня 2022 года Антикоррупционная служба начала намеренное уголовное расследование в отношении Банка в связи с его коммерческой покупкой Цеснабанка в 2019 году и последующими доходами.

76.    По имеющейся информации и убеждениям, толчком к этому расследованию послужило письмо бывшего владельца Цеснабанка, ответчика Адильбека Джаксыбекова, в котором он неправомерно использовал свои личные связи с руководством Антикоррупционной службы для принуждения к расследованию и с конечной целью вымогательства миллионов долларов у Банка.

77.    Желание ответчика Джаксыбекова проводить уголовное расследование обусловлено обвинениями в том, что коммерческая покупка Банком Цеснабанка была какой-то незаконной, несмотря на тот факт, что и он, и Правительство Казахстана участвовали в покупке и/или руководили ею, и что покупка была вызвана близким крахом Цеснабанка который тогда был в его собственности.

78.    Антикоррупционная служба, в рамках расследования предприняла крайне незаконные и произвольные меры принуждения, включая чрезмерные допросы сотрудников Банка, необоснованные обыски ключевого персонала и помещений Банка, а также ограничения передвижения для должностных лиц и сотрудников Jusan Group.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 221

По имеющейся информации и убеждениям, такие крайние меры принуждения были предприняты Антикоррупционной службой по просьбе г-на Джаксыбекова.

79.      Кроме того, Антикоррупционная служба поручила АРРФР заблокировать все транзакции, включая выплату дивидендов Jusan Group.  7 октября 2022 года в АРРФР поступила корреспонденция от Антикоррупционной службы о том, чтобы «принять эффективные и комплексные меры по приостановке всех расходных (дебетовых) операций по выплате дивидендов Банком, FHS JSC, Jysan Technologies, Jysan Holding и [NGF] их акционерам и владельцам, а также любые другие платежные операции в рамках указанной группы компаний» и «приостановить действия по экспроприации акций Банка и FHS» на период рассмотрения уголовного дела.  8 октября 2022 г. First Heartland Bank получил корреспонденцию от АРРФР за подписью Ответчика Кизатова, в которой тот подробно изложил инструкции для АРРФР от Антикоррупционной службы от 7 октября 2022 г.

80.      Г-н Шигео Катсу, представляя Банк, присутствовал на встрече с Президентом Казахстана Касым-Жомартом Токаевым в июле 2022 года, в попытке положить конец необоснованному расследованию.  Г-н Катсу — Председатель Совета Директоров Банка и FHS.  В ходе встречи Президент Токаев заявил, что ему известно о том, что Ответчик Джаксыбеков подал жалобу насчет приобретения Цеснабанка, и предложил г-ну Катсу заключить мировое соглашение с Ответчиком Джаксыбековым.

81.      После этой встречи Ответчик Джаксыбеков пытался шантажировать г-на Катсу и Банк, намекая, что если Банк ему заплатит, то Антикоррупционная служба закроет расследование.  Ответчик Джаксыбеков рекламировал свои личные связи с должностными лицами Антикоррупционной службы и требовал выплаты 60 миллионов тенге (приблизительно 130 миллионов долларов США) за неуказанный «ущерб».

82.      Г-н Катсу отверг все попытки вымогательства у него и у Банка, отметив, что такой платеж без каких-либо доказательств или обоснования нарушит

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 222

многочисленные законы о борьбе с коррупцией и что Jusan Group должна соблюдать все законы, в том числе законы Казахстана, Великобритании и Соединенных Штатов.

5. *Правительство Казахстана Пытается Принудительно Вернуть Государственную Помощь и Взять под Контроль FHS.*

83.     Растущие регулятивные притеснения со стороны Правительства Казахстана в первом квартале 2022 года вынудили г-на Катсу посетить серию дополнительных встреч с должностными лицами Правительства Казахстана, чтобы добиться прекращения незаконной кампании со стороны Правительства.

84.     В ходе этих встреч должностные лица Правительства Казахстана, в том числе представители АРРФР и премьер-министр Казахстана Алихан Смаилов, заявили, что Банку запрещено выплачивать дивиденды до тех пор, пока Банк не возвратит государственную помощь, оказанную Цеснабанку и АТФ Банку.

85.     Упоминаний о таких ограничениях не имелось ни в одном применимом законе или договоре, и об этом, конечно же, известно Правительству.  Такие ограничения никогда не обсуждались ранее, в том числе при выплате дивидендов Банком в декабре 2021 года.

86.     Кроме того, Правительство Казахстана разрешило другим финансовым учреждениям объявлять дивиденды без каких-либо проблем, несмотря на предварительную государственную помощь.  Например, Halyk Bank, Kaspi Bank и Сбербанку Казахстана было разрешено выплачивать дивиденды, несмотря на получение ими значительной государственной поддержки в течение нескольких лет без предварительного полного погашения кредитов.

87.     Тем не менее, АРРФР продолжает заявлять, что будет блокировать любые выплаты дивидендов, и угрожает посадить в тюрьму любого сотрудника Jusan Group, который будет проводить выплату дивидендов.

88.     Кроме того, г-н Сулейменов встретился с официальными лицами Jusan Group в сентябре 2022 года и потребовал, чтобы право собственности на Jusan Group

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

было отобрано у компаний США и Великобритании и передано Казахстану. Во время одной из таких встреч г-н Сулейменов заявил, что участвует в качестве представителя и по указанию президента Токаева, и пригрозил Jusan Group дополнительными действиями Правительства в связи с отсутствием граждан Казахстана в Советах директоров NGF и Jysan Holding. На этой встрече г-н Сулейменов также потребовал, чтобы контроль над FHS (и соответственно над Банком) был передан неуказанным казахстанским гражданам. Он не предоставил никакого юридического обоснования своих требований, да и не мог.

6. *Правительство Казахстана Принимает Меры в Отношении Сотрудников Jusan Group.*

89.    По имеющейся информации и убеждениям, в контексте переговоров между Правительством Казахстана и Jusan Group в первом квартале 2022 года, Правительство оказало давление на аудиторов Jusan Group, чтобы они придержали аудиторские отчеты до возврата всех акционных и опционных соглашений от сотрудников Jusan Group. Правительство также пригрозило возбудить уголовное дело по невозвращенным опционам.

90.    Продолжающиеся переговоры и угроза уголовного преследования привели к принудительной сдаче вышеуказанных активов, которыми владели сотрудники Jusan Group.

91.    Вынужденный возврат опционов привел к значительным личным потерям персонала Jusan Group в размере десятков миллионов долларов, что усугубило личные убытки, связанные с указаниями Банку заморозить счета определенных сотрудников Банка и их родственников от АРРФР.

92.    Например, один член руководства Jusan Group, который на данный момент является постоянным резидентом США, был вынужден вернуть свой опцион на 4,62 % акций JTL, балансовая стоимость которых превышает 73 миллиона долларов США по состоянию на май 2022 года. Правительство также угрожало тому же члену заочным

судом и тюремным заключением, если сотрудник предпримет какие-либо действия, противодействующие правительству Казахстана в усилиях по конфискации имущества Jusan Group и ее сотрудников.

93.    Г-н Сулейменов, в частности, интересовался возвратом акций и опционов в ходе последующих переговоров в сентябре 2022 года, подтверждая тем самым, что вымогательство поддерживается Правительством.

*7.    АРРФР Незаконно Вмешивается в Выплату Дивидендов FHS.*

94.    6 октября 2022 года FHS объявила дивиденды и потребовала, чтобы Банк включил объявление дивидендов во внеочередное общее собрание.  Это заявление и запрос юридически обязывали Банк в соответствии с его письменной политикой и руководящими документами выплачивать дивиденды FHS.  Значительная часть дивидендов, причитающихся FHS, является конечной собственностью Jysan Holding и, в свою очередь, будет причитаться Jysan Holding в соответствии с внутригрупповыми положениями и соглашениями.

95.    7 октября 2022 года АРРФР заблокировало осуществление FHS и Банком этой и других выплат дивидендов на общую сумму около 387 миллионов долларов США, а также осуществление других платежных операций Банка его прямым и косвенным материнским компаниям.

96.    Ответчики Кизатов и Омарбеков, представители АРРФР, звонили представителям Банка в октябре 2022 года по поводу данных заблокированных платежей.  Во время разговора с Главным специалистом Банка по комплаенсу г-жой Ардак Мукашевой Ответчик Омарбеков повторил утверждения, сделанные на предыдущих встречах между представителями Банка и Правительства, заявив, что средства Банка принадлежат Правительству Казахстана, пригрозив, что правоохранительные органы готовятся к задержанию и допросу сотрудников Банка и связанных с Банком организаций.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

97.     Ответчик Омарбеков снова позвонил в Банк 8 октября 2022 года, утверждая, что АРРФР получило письмо от неназванного правоохранительного органа, предписывающее АРРФР заблокировать все выплаты дивидендов от Банка.

*8.   АФМ Незаконно Вмешивается в Выплату Дивидендов FHS.*

98.     13 октября 2022 г. АФМ направило в Банк письмо, в котором неверно утверждалось, что Банк получил 1,5 трлн тенге от правительства Казахстана на льготных условиях и каким-то образом не выполнил свои обязательства по этому «долгу». В письме АФМ утверждало, что приостанавливает способность Банка выплачивать дивиденды акционерам и требует, чтобы Банк предоставлял уведомления АФМ прежде, чем будет проводить дальнейшие выплаты дивидендов.

*9.   Предложенные Правительством «Оправдания» Непостоянны, Противоречивы и Безосновательны.*

99.     На протяжении всей этой кампании Правительство приводило различные «оправдания» своих действий, ни одно из которых не оправдывает незаконные действия Правительства против Jusan Group.

100.     Когда АРРФР усилило надзор за First Heartland Bank, «оправданием» было обеспечение соблюдения банком недавно обновленных правил по борьбе с отмыванием денег.

101.     Когда АФМ возбудило уголовное дело против бывших должностных лиц АТФ Банка, «оправданием» было расследование выдачи проблемных кредитов в период с 2013 по 2016 г.

102.     В конце концов, Правительство определилось с единым оправданием: уголовное расследование Антикоррупционной службой и блокирование АРРФР и АФМ выплат дивидендов каким-то образом «обоснованы» коммерческой покупкой Цеснабанка и АТФ Банка First Heartland Bank. Разумеется, это «оправдание» столь же беспочвенно, как и все его предшественники, поскольку ключевые участники кампании по травле Банка были одновременно архитекторами Рамочных соглашений.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Действительно, Банк ранее выплачивал дивиденды без возражений со стороны Правительства Казахстана, в том числе совсем недавно, в декабре 2021 года.

103.    По имеющейся информации и убеждениям, намерение Ответчиков состояло в том, чтобы воспрепятствовать выводу дивидендных средств за пределы Казахстана — и, следовательно, за пределы контроля Правительства — в пользу Истцов, поскольку Ответчики знают, что дивидендные средства предназначены для блага и причитаются Истцам JTL, Jysan Holding и, в конечном счете, NGF.

**E.    Правительство Принимает Ответные Меры Против Истцов После Провала Переговоров.**

*10. Истцы уведомляют Ответчиков о Намерении Защищать Свои Права,и Стороны Ведут Безуспешные Переговоры.*

104.    В последней отчаянной попытке разрешить спор без вмешательства суда Истцы уведомили Ответчиков о своем намерении подать иск в Неваде.  Весь ноябрь стороны, включая адвокатов сторон, проводили серию неофициальных переговоров.  Эти переговоры не увенчались успехом и были частью тактики проволочек, которые Ответчики проводили, чтобы подготовить коррумпированных законодателей и агентств к нападению на Истцов.

105.    С тех пор кампания преследования Ответчиков только усилилась, что было явной местью за то, что Истцы сообщили Ответчикам о своем намерении подать данный иск.

*11. Ответчики Принимают Ответные Меры Против Истцов, Вводя Законодательство, Направленное Против Jusan Group.*

106.    Через день после переизбрания Президента Токаева, 22 ноября 2022 года, Мажилис, нижняя палата Парламента Казахстана, одобрил законопроект с внесением изменений в Закон «О банках и банковской деятельности в Республике Казахстан». Предлагаемые поправки были направлены на Истцов и должны были, *в частности*, (1) изменить определения «банковского холдинга» и «крупного участника банка» таким

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

образом, чтобы некоммерческие организации, такие как NGF, не смогли прямо или косвенно владеть банками; (2) ввести ограничения для банков, получивших государственную помощь, таких как First Heartland Bank, чтобы не допустить распределения ими дивидендов, в том числе путем разрешения АРРФР блокировать данные дивиденды; и (3) требовать, чтобы все крупные прямые и косвенные акционеры и контролирующие организации банков подали заявки и получили одобрение от АРРФР в течение 30 дней с даты публикации поправок.

107.   Верхняя палата парламента Казахстана, Сенат, впоследствии утвердила поправки, позволяющие АРРФР блокировать дивиденды от банков, получивших государственную помощь, и требующие одобрения АРРФР для крупных прямых и косвенных акционеров и контролирующих организаций банков, в то же время отклонив предложенную поправку, запрещающую некоммерческим организациям владеть банками, за отсутствием оснований.

108.   Эти поправки, вступившие в силу 1 января 2023 года, позволят Правительству заблокировать дивиденды, на которые Истцы имеют право, и даже запретить Истцам владеть долями в Банке. В соответствии с поправками JTL, Jysan Holding и NGF должны будут получить и представить в АРРФР кредитные рейтинги, аудированную финансовую отчетность, а также соответствующие нотариальные заверения и апостили из несколько юрисдикций в течение 30 дней, что просто невозможно. Кроме того, если эти организации останутся основными акционерами Банка без одобрения АРРФР, АРРФР может потребовать, чтобы они уменьшили свою косвенную долю владения до уровня ниже 25 % и приостановили все операции между ними и Банком; установили доверительное управление акциями Банка на срок до трех месяцев; и в конечном итоге обеспечили отчуждение акций Банка, продав их на рынке ценных бумаг. **Нельзя представить более явного случая незаконного захвата активов, находящихся под контролем граждан Невады**.

28

109.    По крайней мере, один член Мажилиса публично заявил, что эти поправки явно нацелены на акционеров First Heartland Bank и блокируют рассматриваемые здесь дивиденды.

110.    Учитывая отсрочку до следующего дня после переизбрания Президента Токаева, Правительство четко обозначило цели и намерения своей кампании — остановить вывод средств в виде дивидендов за пределы Казахстана, принудить группу Jusan Group к передаче средств и контроля над активами Правительству Казахстана и его аффилированным лицам, а также принять ответные меры против Jusan Group за попытку защиты своих прав в американском суде.

*12. Ответчики Принимают Ответные Меры Против Истцов, Подав Против Них Иск в Казахстане.*

111.    2 декабря 2022 года Генеральная прокуратура Казахстана возбудила иск против многочисленных участников Jusan Group, включая Истцов, и сотрудников Jusan Group, среди которых г-н Катсу и сотрудник, которому ранее угрожали лишением свободы.  Генеральный прокурор подчиняется непосредственно Президенту и представляет интересы Правительства Казахстана в суде.

112.    Иск был направлен на то, чтобы добиться через суд именно того, что Ответчики пытались добиться через их кампанию преследования — ослабить Jusan Group и ограничить ее доступ к собственному капиталу.

113.    В частности, иск был направлен на признание недействительным соглашения между двумя членами Jusan Group — JTL и Pioneer Capital Invest LLP (далее — «Pioneer»). Аннулирование этого соглашения аннулировало бы долю собственности NGF в JTL и, следовательно, лишило бы NGF доступа к дивидендам и распределениям от бизнеса и операций JTL и ее холдингов, включая FHS и Банк. В иске также содержалось требование о возврате активов и денежных средств на миллионы долларов (USD) от JTL компании Pioneer, акции JTL в Банке включительно.  Активы и средства, о которых идет речь, были должным образом переведены в JTL по

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 229

соглашению, которое Правительство пыталось аннулировать. Пытаясь перевести активы и средства из JTL Истца в казахстанскую компанию Pioneer, правительство вмешивается в активы Jusan Group и пытается перевести их в Казахстан, где правительство сможет осуществлять больший контроль.  И последнее, иск требовал, чтобы все названные сотрудники Jusan Group сдали свои доли в Банке.

114.    Казахстанский суд быстро отклонил иск Генерального прокурора на основании того, что требования не имеют доказательств. Это решительное отклонение необоснованного иска Генерального прокурора еще раз свидетельствует о вопиющем злоупотреблении Правительством возможностями государственного аппарата для преследования Jusan Group.

*13. Государственные чиновники Казахстана угрожают «войной» сотрудникам Jusan Group.*

115.    20 декабря 2022 года премьер-министр Казахстана Алихан Смаилов направил сообщение тому же сотруднику Jusan Group, резиденту США, которому ранее угрожало тюремное заключение, с требованием вернуть Jusan Group в Казахстан и пригрозив «войной», если требования Правительства не будут выполнены.

*14. Ответчики переделывают свой ранее отклоненный иск и повторно подают его в Казахстане.*

116.    10 февраля 2023 года Генеральная прокуратура Казахстана подала еще один иск против членов Jusan Group, оспаривая сделку 2020 года между JTL и Pioneer и добиваясь ареста определенного имущества группы Jusan Group. Хотя в этом иске приводятся несколько иные факты и иные основания иска, его цель та же, что и у иска, поданного и быстро отклоненного в декабре 2022 года, — пригрозить Jusan Group передачей контроля над ней Правительству.

117.    Однако Правительство идет еще дальше в февральском иске и стремится конфисковать множество активов не только ответчиков по иску, но и Jusan Group в

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 230

целом. Генпрокуратура добивается ареста долей Jusan Group более чем в десятке юридических лиц.

118.    В очередной раз Генеральный прокурор потребовал, чтобы JTL вернула Pioneer миллионы долларов США в виде активов и денежных средств, которые были должным образом переведены в JTL. И снова результатом, если иск будет успешным, будет перемещение законно контролируемых активов Jusan Group в Казахстан, где Правительство сможет осуществлять больший контроль.

**F.   Незаконная   Кампания   Правительства   Совпадает   с   Исторической Коррупционной Практикой**

119.    Действия Ответчиков согласуются с исторической коррупционной практикой в Казахстане, а также сообщениями о заметном росте коррупции в Казахстане в последние годы.

120.    Например, в 2013 году арбитражная комиссия присудила молдавской компании возмещение убытков в размере 497 685 101 долларов США (плюс 50 % расходов на юридические услуги) за нарушение Правительством Казахстана Договора к Энергетической хартии — международного соглашения, устанавливающего трансграничное сотрудничество в энергетической промышленности. В этом деле использовалась тактика, поразительно похожая на ту, что применяется против Истцов. Там суд установил, что Казахстан нарушил право компании на справедливое и равное обращение в соответствии с Договором. В частности, компания утверждала, что Казахстан участвовал в кампании преследования, кульминацией которой стало расторжение контрактов на проведение поисково-разведывательных работ для добычи нефти и газа и конфискация корпоративных активов, расположенных в Казахстане. Сообщается, что кампания включала в себя тактику финансовой полиции Казахстана и семи квазигосударственных организаций и включала необоснованное замораживание активов компании, круглосуточное наблюдение и проверки со стороны должностных лиц государственных органов, которые препятствовали ведению

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 231

сотрудниками обычных деловых операций, необоснованное изъятие документов, незаконный арест и осуждение менеджера в стране, а также отмена ранее одобренных правительством разрешений и отказов.

121.    Совсем недавно в СМИ отмечалось, что в 2022 году число случаев коррупции в Казахстане резко возросло, на целых 30 процентов.  Индекс восприятия коррупции Transparency International — наиболее широко используемый глобальный рейтинг коррупции в мире — присвоил Казахстану худшие показатели по коррупции в государственном секторе в Восточной Европе и Центральной Азии, регионе со вторыми самыми низкими показателями в мире.  Постоянная «серьезная проблема» коррупции, которая существует в Казахстане всесторонне описана в недавнем отчете, опубликованном Группой государств против коррупции, — антикоррупционным органом Совета Европы.  Экспертные оценки показывают, что прогресс Казахстана в антикоррупционных мерах в лучшем случае разрознен.

122.    Сенаторы США в Комитете Сената по международным отношениям в октябре 2022 года призвали к «международному расследованию санкционированного государством насилия и пересмотру вопроса о предоставлении помощи США в области безопасности после общенациональных протестов в Казахстане» в начале этого года и жестокой реакции Казахстанских сил безопасности по отношению к гражданским протестующим.   В рамках расследования Сенаторы призвали Государственный департамент США пересмотреть свои отношения с Казахстаном, чтобы «уделить приоритетное внимание защите основных свобод и укреплению верховенства права».

**G.   Незаконная Кампания Правительства, а именно Блокирование Выплаты Дивидендов, Наносит Конкретный Ущерб Деятельности Jusan Group.**

123.    Неудивительно и, предположительно в соответствии с планами Правительства, кампания Правительства, включая, прежде всего, блокирование примерно 387 миллионов долларов США в виде дивидендов, наносит значительный, непосредственный и конкретный ущерб деятельности Истцов.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

124.    Истцы не могут получить дивидендное финансирование от их дочерних компаний, связанных с Банком, — основного источника финансирования, а также не могут выполнить обязательство по предоставлению дивидендного финансирования их материнским организациям.   В свою очередь, NGF не может переводить или использовать собственные средства на собственных банковских счетах или получать законно выплаченные дивиденды для выполнения своей единственной миссии: финансирования Назарбаев Университета и Nazarbayev Intellectual Schools.  В конечном счете, замораживая средства Jusan Group, Правительство лишает Назарбаев Университет и Nazarbayev Intellectual Schools необходимых ресурсов, чем наносит ущерб студентам, исследователям и преподавателям Назарбаев Университета и Nazarbayev Intellectual Schools.

125.    Кроме того, в августе 2022 года Истец JTL заявил о своем намерении выкупить акции JTL на сумму 20 миллионов долларов США у инвестора.   Из-за заблокированных выплат дивидендов JTL не может осуществить выкуп.

### ПЕРВОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА (ЭКСПРОПРИАЦИЯ В НАРУШЕНИЕ МЕЖДУНАРОДНОГО ПРАВА) (против Ответчика Республики Казахстан и Ответчиков правительственных учреждений)

126.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

127.    Как материнские корпорации и акционеры First Heartland Securities и First Heartland Bank, Истцы имеют прямые имущественные интересы в своих правах на получение объявленных дивидендов от дочерних компаний.

128.    Своим поведением, заявленным выше, в том числе воспрепятствованием дочерним компаниям Истцов в выплате законно объявленных дивидендов их иностранным акционерам и прямой направленностью своего поведения на достижение такого результата, Ответчик Республика Казахстан и его учреждения экспроприировали и захватили имущество Истцов в нарушение международного права.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 233

129.    Ответчик Правительство Казахстана и его учреждения также нарушили существующее международное право, экспроприировав и конфисковав аналогичные имущественные права, принадлежащие First Heartland Securities и First Heartland Bank, действуя с дискриминационной целью причинить вред иностранным акционерам вышеуказанных корпораций.

## ВТОРОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
### (18 U.S.C. § 1964(c)) (против Индивидуальных Ответчиков)

130.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

131.    Индивидуальные Ответчики фактически действуют как совместное предприятие, участвующее в торговле между штатами, их деятельность влияет на торговлю между штатами, а также они управляли и участвовали в управлении дополнительными предприятиями, среди них Правительство ответчика и правительственные учреждения.

132.    Индивидуальные Ответчики согласовали между собой, осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета, осуществляя незаконные преднамеренные вымогательства у Истцов, конечной целью которых было получение личной выгоды.

133.    Индивидуальные Ответчики согласовали между собой, осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета, осуществляя незаконные преднамеренные вымогательства у Jusan Group.

134.    Индивидуальные Ответчики прямо и косвенно осуществляли действия и участвовали в деятельности предприятия путем периодического рэкета и ведя деятельность, описанную выше, в нарушение 18 U.S.C. § 1962(c).

135.    Прямым и непосредственным результатом деятельности Индивидуальных Ответчиков по вымогательству и в нарушение 18 U.S.C. § 1962(c) стало то, что бизнесу и имуществу Истцов был нанесен ущерб.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 234

### ТРЕТЬЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
### (Нев. Рев. Стат. § 207.470) (против всех Индивидуальных Ответчиков)

136.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

137.    Индивидуальные Ответчики совершили как минимум два различных преступления, связанных с рэкетом, в соответствии с определением в Nev. Rev. Stat. § 207.360, представляющий собой рэкет в соответствии с Nev. Rev. Stat. § 207.390.

138.    Ответчики принимали прямое и косвенное участие в деятельности предприятия, действия которого представляют собой рэкет, в нарушение Нев. Рев. Стат. § 207.400.

139.    Бизнесу и имуществу Истцов был причинен вред в связи с нарушениями Ответчиков.

### ЧЕТВЕРТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
### (НАМЕРЕННОЕ ВМЕШАТЕЛЬСТВО В ДОГОВОРНЫЕ ОТНОШЕНИЯ)
### (против всех Ответчиков)

140.    Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

141.    Между First Heartland Bank и First Heartland Securities, First Heartland Securities и JTL, JTL и Jysan Holding, Jysan Holding и NGF существуют и действуют межфирменные соглашения.  Каждое из межфирменных соглашений дает право материнской компании на выплату дивидендов от ее дочерней компании.  Jysan Holding и JTL являются сторонами этих соглашений, или сторонними бенефициарами в случае соглашений, стороной которых Jysan Holding и/или JTL не являются.

142.    Каждый из Ответчиков знает о вышеупомянутых соглашениях и совершил преднамеренные действия, направленные на нарушение данных отношений.  Действия Ответчиков привели к фактическому нарушению каждого соглашения, результатами данных нарушений стало причинение Jysan Holding и JTL убытков.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Ex. Page No. 235

**ПЯТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
(НАМЕРЕННОЕ ВМЕШАТЕЛЬСТВО
ДЛЯ ИЗВЛЕЧЕНИЯ ЭКОНОМИЧЕСКОЙ ВЫГОДЫ) (против всех Ответчиков)**

143. Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

144. После получения заблокированных дивидендов от Банка, FHS планировала выплатить все или часть заблокированных дивидендов компании JTL, затем JTL планировала выплатить все заблокированные дивиденды или их часть компании Jysan Holding, которая должна была выплатить все или часть заблокированных дивидендов своей материнской компании NGF, за вычетом разумных операционных расходов. Каждый из Ответчиков знает о конечной цели использования заблокированных дивидендов и совершил преднамеренные действия, направленные на то, чтобы сорвать выплату дивидендов Истцам и выплату дивидендов в пользу NGF. Действия ответчиков привели к фактическому нарушению процессов осуществления дивидендов и причинили Jysan Holding и JTL убытки, вытекающие в результате данного нарушения.

145. Поведение Ответчиков было неоправданным и необоснованным. Нет таких соглашений или законов, которые бы предусматривали права вмешательства или воспрепятствования выплате дивидендов в связи с выплатой Государством финансовой помощи Цеснабанку и АТФ Банку. В результате действий Ответчиков Истцы и их аффилированные лица не получили средства, необходимые для выполнения своих основных функций и задач, включая финансирование NGF, Nazarbayev Intellectual Schools и Назарбаев Университета.

**ШЕСТОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА
(ГРАЖДАНСКИЙ ЗАГОВОР) (против всех Ответчиков)**

146. Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

147. Ответчики действовали в сговоре, чтобы достичь их незаконной цели, с намерениями причинить вред Jusan Group, Истцам включительно.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

148.     Jusan Group, Истцы включительно, понесли убытки в результате действий Ответчиков по достижению целей сговора.

149.     Ответчики несут солидарную ответственность за ущерб, понесенный Истцами в результате каждого действия, предпринятого каждым Ответчиком в рамках сговора Ответчиков.

### СЕДЬМОЕ ОСНОВАНИЕ ДЛЯ УДОВЛЕТВОРЕНИЯ ИСКА (ГРАЖДАНСКАЯ ПОМОЩЬ И ПОДСТРЕКАТЕЛЬСТВО) (против всех Ответчиков)

150.     Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь.

151.     Каждый Ответчик существенно помогал и поощрял поведение других Ответчиков в нарушении обязанностей перед Истцами, включая деликтные обязанности и установленные законом обязанности, как указано выше.

152.     Нарушения со стороны Ответчиков нанесли ущерб Jusan Group, Истцам включительно.

153.     Каждый Ответчик несет ответственность в соответствии с теорией гражданского пособничества и подстрекательства за ущерб, причиненный нарушениями, которым они существенно содействовали и поощряли.

### ХОДАТАЙСТВО О ПРЕДОСТАВЛЕНИИ СУДЕБНОЙ ЗАЩИТЫ

154.     Истцы приводят и повторно утверждают вышеизложенное, как если бы утверждалось здесь, и почтительно просят Суд:

a)     Заявить, что поведение Ответчиков нанесло незаконный ущерб Истцам, и не подлежит каким-либо законным привилегиям или оправданиям;

b)     Присудить Истцам компенсацию и штрафные санкции в размере, который будет определен на слушании, включая тройную сумму возмещения убытков и гонорары адвокатов в соответствии с 18 U.S.C. § 1964(c);

c)     Присудить Истцам издержки и расходы, включая гонорары адвокатов; а также

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

d)   Присудить Истцам дополнительное средство правовой защиты, оправданное обстоятельствами.

**ИСКОВОЕ ЗАЯВЛЕНИЕ О РАССМОТРЕНИИ ДЕЛА СУДОМ ПРИСЯЖНЫХ**

Истцы требуют рассмотрения дела судом присяжных по всем спорным вопросам.

ОТ 16 февраля 2023 г.

HOLLAND & HART LLP

/подпись/ *J. Stephen Peek*
J. Stephen Peek/ Дж. Стивен Пик
Erica C. Medley/ Эрика С. Медли
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

Tariq Mundiya/ Тарик Мундия
(*pro hac vice будет предоставлено позднее*)
Jeffrey B. Korn/ Джеффри Б. Корн
(*pro hac vice будет предоставлено позднее*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

Michael J. Gottlieb/ Майкл Дж. Готлиб
(*pro hac vice будет предоставлено позднее*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006

*Адвокаты Истцов*
*Jysan Holding, LLC; и*
*Jusan Technologies Ltd.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ТИТУЛЬНЫЙ ЛИСТ ГРАЖДАНСКОГО ДЕЛА

Титульный лист гражданского дела JS 44 и информация, содержащаяся в нем, не заменяет и не дополняет регистрацию и вручение состязательных бумаг или других документов согласно требованиям закона, за исключением случаев, предусмотренных местными правилами суда. Эта форма, одобренная Конференцией судей Соединенных Штатов в сентябре 1974 года, должна использоваться секретарем суда с целью возбуждения делопроизводства по гражданским делам. *(СМ. ИНСТРУКЦИИ НА СЛЕДУЮЩЕЙ СТРАНИЦЕ ЭТОЙ ФОРМЫ.)*

## I. (a) ИСТЦЫ

Jysan Holding, LLC; Jusan Technologies LTD

**(b)** Округ проживания первого указанного истца _____
*(КРОМЕ ДЕЛ ИСТЦА ИЗ США)*

**(c)** Адвокаты *(название фирмы, адрес и номер телефона)*

(см. приложение)

## ОТВЕТЧИКИ

Республика Казахстан и др. (см. приложение)

Округ проживания первого указанного ответчика **Республика Казахстан**
*(ТОЛЬКО В ДЕЛАХ ИСТЦА ИЗ США)*

ПРИМЕЧАНИЕ: В ДЕЛАХ ОБ ОТЧУЖДЕНИИ ЗЕМЛИ ИСПОЛЬЗУЙТЕ АДРЕС СПОРНОГО ЗЕМЕЛЬНОГО УЧАСТКА.

Адвокаты *(если известны)*

## II. ОСНОВА ЮРИСДИКЦИИ *(Поставьте «Х» только в одной ячейке)*

- ☐ 1 Истец правительство США
- ☐ 2 Ответчик правительство США
- ☒ 3 Федеральный вопрос *(Правительство США не является стороной)*
- ☐ 4 Другое гражданство *(Укажите гражданство сторон в пункте III)*

## III. ГРАЖДАНСТВО ОСНОВНЫХ СТОРОН *(Поставьте «Х» в одной ячейке для истца и в одной ячейке для ответчика)*
*(Только для дел с другим гражданством)*

| | ИСТ | ОТВ | | ИСТ | ОТВ |
|---|---|---|---|---|---|
| Гражданин этой страны | ☐ 1 | ☐ 1 | Зарегистрирован или юридический адрес в этой стране | ☐ 4 | ☐ 4 |
| Гражданин другой страны | ☐ 2 | ☐ 2 | Зарегистрирован и юридический адрес в другой стране | ☐ 5 | ☐ 5 |
| Гражданин или подданный иностранного государства | ☐ 3 | ☐ 3 | Иностранное государство | ☐ 6 | ☐ 6 |

## IV. ХАРАКТЕР ИСКА *(Поставьте «Х» только в одной ячейке)*

Нажмите здесь, чтобы: Описание характера кода иска.

### ПО ДОГОВОРУ
- ☐ 110 Страхование
- ☐ 120 Морское право
- ☐ 130 Закон Миллера
- ☐ 140 Оборотный документ Взыскание
- ☐ 150 переплаты и исполнение судебного решения Закон о
- ☐ 151 Medicare
- ☐ 152 Взыскание просроченных студенческих ссуд (за искл. ветеранов)
- ☐ 153 Взыскание переплаты ветеранских пособий
- ☐ 160 Иски акционеров
- ☐ 190 Другие договоры
- ☐ 195 Договорная ответственность за продукт Франшиза
- ☐ 196

### НЕДВИЖИМОСТЬ
- ☐ 210 Отчуждение земли
- ☐ 220 Конфискация
- ☐ 230 Нарушение аренды и выселение
- ☐ 240 Земельное правонарушение
- ☐ 245 Ответственности за качество Вся прочая недвижимость
- ☐ 290

### ПРАВОНАРУШЕНИЕ

**ТРАВМА**
- ☐ 310 Самолеты
- ☐ 315 Ответственность за качество самолета
- ☐ 320 Нападки, клевета и оскорбления
- ☐ 330 Федеральная ответственность работодателей
- ☐ 340 Морское право
- ☐ 345 Морское право Ответственность за качество продукции для моря
- ☐ 350 Автомобили
- ☐ 355 Ответственность за качество автомобилей
- ☐ 362 Другие травмы Травма – врачебная ошибка

**ТРАВМА**
- ☐ 365 Травма – Ответственность за качество
- ☐ 367 Здравоохранение/фармацевтика Травма
- ☐ 368 Ответственность за качество Асбест Травма Ответственность за качество

**ЛИЧНАЯ СОБСТВЕННОСТЬ**
- ☐ 370 Другое мошенничество
- ☐ 371 Справедливое кредитование
- ☐ 380 Другой ущерб личному имуществу
- ☐ 385 Ответственность за качество Ущерб имуществу Ответственность за качество

### ГРАЖДАНСКИЕ ПРАВА
- ☐ 440 Другие гражданские права
- ☐ 441 Голосование
- ☐ 442 Трудоустройство
- ☐ 443 Жилье/проживание
- ☐ 445 Амер. с инвалидностью – Занятость
- ☐ 446 Амер. с инвалидностью – другое
- ☐ 448 Обучение

### ХОДАТАЙСТВА ЗАКЛЮЧЕННЫХ

**Доставка обвиняемого в суд:**
- ☐ 463 Задержание иностранца
- ☐ 510 Ходатайство об отмене приговора
- ☐ 530 Общие
- ☐ 535 Смертный приговор

**Другое:**
- ☐ 540 Приказ и пр.
- ☐ 550 Гражданские права
- ☐ 555 Гражданские права
- ☐ 560 Задержанный по гражд. делу – Условия содержания под стражей

### КОНФИСКАЦИЯ/ШТРАФ
- ☐ 625 Арест имущества в связи с наркотиками, 21 USC 881
- ☐ 690 Другое

### ТРУД
- ☐ 710 Закон о справедливых трудовых стандартах
- ☐ 720 Трудовые/управленческие отношения
- ☐ 740 Закон о труде на ж.д. транспорте
- ☐ 751 Закон об отпуске и больничном
- ☐ 790 Прочие трудовые споры
- ☐ 791 Закон о пенсионном обеспечении

### ИММИГРАЦИЯ
- ☐ 462 Заявка на натурализацию
- ☐ 465 Другие иммиграционные иски

### БАНКРОТСТВО
- ☐ 422 Апелляция, 28 USC 158
- ☐ 423 Отзыв 28 USC 157

### ИМУЩЕСТВЕННЫЕ ПРАВА
- ☐ 820 Авторские права
- ☐ 830 Патент
- ☐ 835 Патент – Сокращенная заявка на новый препарат
- ☐ 840 Товарный знак
- ☐ 880 Закон о защите коммерческой тайны 2016

### СОЦИАЛЬНОЕ ОБЕСПЕЧЕНИЕ
- ☐ 861 HIA (1395ff)
- ☐ 862 Антракоз (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Глава XVI
- ☐ 865 RSI (405(g))

### ФЕДЕРАЛЬНЫЕ НАЛОГОВЫЕ ИСКИ
- ☐ 870 Налоги (истец или ответчик из США)
- ☐ 871 IRS – третья сторона 26 USC 7609

### ДРУГИЕ ЗАКОНЫ
- ☐ 375 Закон о неправомерных претензиях
- ☐ 376 Иск «qui tam» (31 USC 3729
- ☐ 400 (a))
- ☐ 410 Повторное рассмотрение
- ☐ 430 Антимонопольный закон
- ☐ 450 Банки и банковское дело
- ☐ 460 Депортация
- ☐ 470 Рэкет и коррупция Потребительский кредит
- ☐ 480 (15 USC 1681 или 1692)
- ☐ 485 Закон о защите прав потребителей телефонов
- ☐ 490 Кабельное/спутниковое телевидение
- ☐ 850 Ценные бумаги/товары/ биржа
- ☐ 890 Другие иски на законных основаниях
- ☐ 891 Закон о сельском хозяйстве
- ☐ 893 Экологические вопросы
- ☐ 895 Закон о свободе информации
- ☐ 896 Арбитраж
- ☐ 899 Административный акт/Пересмотр или обжалование решения агентства
- ☐ 950 Конституционность государственных законов

## V. ВОЗНИКНОВЕНИЕ *(Поставьте «Х» только в одной ячейке)*

- ☒ 1 Первичное дело
- ☐ 2 Изъято из суда штата
- ☐ 3 Изъято из апелляционного суда
- ☐ 4 Восстановленные или вновь открытые
- ☐ 5 Переданные из другого округа *(укажите)*
- ☐ 6 Многоокружные процессы – передача
- ☐ 8 Многоокружные процессы – прямая подача

## VI. ОСНОВАНИЕ ИСКА

Укажите Гражданский закон США, по которому вы подаете иск (не цитируйте юрисдикционные законы, кроме случаев иного гражданства):
18 U.S.C. § 1964(c)

Краткое описание основания иска:
Нарушение Закона об организованной преступности, связанной с рэкетом и коррупцией, и связанные с этим нарушения государственного и международного права, основанные на экспроприации активов.

## VII. ЗАПРОС ПО ЖАЛОБЕ.

☐ ОТМЕТЬТЕ, ЕСЛИ ЭТО ГРУППОВОЙ ИСК СОГЛАСНО ПРАВИЛУ 23 F.R.Cv.P.

ТРЕБОВАНИЕ $

ОТМЕТЬТЕ «ДА», только если в жалобе требуется:

ТРЕБОВАНИЕ ПРИСЯЖНЫХ: ☒ Да   ☐ Нет

## VIII. СВЯЗАННЫЕ ДЕЛА, ПРИ НАЛИЧИИ

*(См. инструкции):*
СУДЬЯ _____   НОМЕР ДЕЛА _____

| ДАТА | ПОДПИСЬ АДВОКАТА |
|---|---|
| 16.02.2023 | /подпись/ Дж. Стивен Пик |

**ДЛЯ СЛУЖЕБНОГО ПОЛЬЗОВАНИЯ**

КВИТАНЦИЯ # _____   СУММА _____   ЗАЯВИТЕЛЬ IFP _____   СУДЬЯ _____   МАГ. СУДЬЯ _____

# ИНСТРУКЦИЯ ДЛЯ АДВОКАТОВ, ЗАПОЛНЯЮЩИХ ТИТУЛЬНЫЙ ЛИСТ ГРАЖДАНСКОГО ДЕЛА, ФОРМА JS 44.

### Полномочия по заполнению титульного листа гражданских дел

Титульный лист гражданского дела JS 44 и информация, содержащаяся в нем, не заменяет и не дополняет регистрацию и вручение состязательных бумаг или других документов согласно требованиям закона, за исключением случаев, предусмотренных местными правилами суда. Эта форма, одобренная Конференцией судей Соединенных Штатов в сентябре 1974 года, должна использоваться секретарем суда с целью возбуждения делопроизводства по гражданским делам. Следовательно, титульный лист гражданского дела представляется Секретарю суда для каждого поданного гражданского иска. Адвокат, подающий иск, должен заполнить форму следующим образом:

**I.(a)    Истцы-ответчики.** Укажите имена (фамилию, имя, отчество) истца и ответчика. Если истцом или ответчиком является государственное учреждение, используйте только полное название или стандартные сокращения. Если истец или ответчик является должностным лицом государственного учреждения, укажите сначала это учреждение, а затем должностное лицо, с указанием имени и должности.

**(b)    Округ проживания.** Для каждого поданного гражданского дела, за исключением дел истца из США, укажите название округа, в котором проживает первый истец из списка на момент подачи дела. В делах истца из США укажите название округа, в котором проживает первый ответчик из списка на момент подачи заявления. (ПРИМЕЧАНИЕ. В делах об отчуждении земли округ проживания «ответчика» является местом нахождения рассматриваемого земельного участка.)

**(c)    Адвокаты.** Укажите название фирмы, адрес, номер телефона и доверенное лицо. Если адвокатов несколько, перечислите их в приложении, указав в этом разделе «(см. приложение)».

**II.    Юрисдикция.** Основа юрисдикции изложена в правиле 8(a) Федерального гражданского процессуального кодекса США (F.R.Cv.P.) согласно которому следует указывать юрисдикцию в состязательных бумагах. Поставьте отметку «Х» в одном из полей. Если имеется более одного основания юрисдикции, приоритет отдается в порядке, указанном ниже.
Истец из США. (1) Юрисдикция на основании разд. 28 Свода законов США (U.S.C.), ст. 1345 и 1348. Сюда включены иски государственных органов и чиновников США. Ответчик из США. (2) Если истец предъявляет иск Соединенным Штатам, их чиновникам или государственным органам, поставьте отметку «Х» в этом поле.
Федеральный вопрос. (3) Это относится к искам в соответствии с разд. 28 U.S.C., ст. 1331, когда юрисдикция возникает в соответствии с Конституцией Соединенных Штатов, поправкой к Конституции, актом Конгресса или международным договором Соединенных Штатов. В тех случаях, когда стороной являются США, код истца или ответчика из США имеет приоритет, и необходимо отметить графу 1 или 2.
Разные гражданства. (4) Это относится к искам по разд. 28 USC ст. 1332, сторонами которых являются граждане разных стран. Если отметка стоит в поле 4, следует проверить гражданство разных сторон. (См. Раздел III ниже. **ПРИМЕЧАНИЕ. Иски по федеральным вопросам имеют приоритет перед делами с разными гражданствами.**

**III.    Резиденция (гражданство) основных сторон.** Этот раздел JS 44 необходимо заполнить, если выше были указаны разные гражданства. Отметьте этот раздел для каждой основной стороны.

**IV.    Характер иска.** Поставьте отметку «Х» в соответствующем поле. Если с делом связано несколько кодов исков, выберите наиболее подходящий код иска. Нажмите здесь, чтобы видеть подробное описание иска: Описание характера кода иска.

**V.    Возникновение.** Поставьте отметку «Х» в одном из семи полей.
Первичное дело. (1) Дела, возбужденные окружными судами США.
Изъято из суда штата. (2) Разбирательство, возбужденное в государственных судах, может быть передано в окружные суды в соответствии с разделом 28 USC, ст. 1441. Изъято из апелляционного суда. (3) Поставьте отметку здесь для дел, переданных в окружной суд для дальнейшего рассмотрения. В качестве даты подачи используйте дату возврата на рассмотрение.
Восстановленные или вновь открытые. (4) Поставьте отметку в этом поле для дел, возобновленных или вновь открытых в окружном суде. В качестве даты подачи используйте дату повторного открытия. Переданные из другого округа. (5) Для дел, переданных в соответствии со ст. 1404(a) Раздела 28 U.S.C. Не используйте эту отметку для передачи внутри округа или передачи в рамках многоокружных процессов. Многоокружные процессы – передача. (6) Поставьте отметку здесь, если дело, относящееся к нескольким округам, передается в округ в соответствии с разд. 28 U.S.C. ст. 1407.
Многоокружные процессы – прямая подача. (8) Поставьте отметку здесь, если дело, относящееся к нескольким округам, подается в том же округе, что и основное дело по многоокружному процессу. **ОБРАТИТЕ ВНИМАНИЕ, ЧТО КОД ВОЗНИКНОВЕНИЯ 7 ОТСУТСТВУЕТ.** Код возникновения 7 использовался для исторических записей и больше не актуален из-за изменений в законодательстве.

**VI.    Основание иска.** Укажите гражданский закон, непосредственно связанный с основанием для иска, и дайте краткое описание основания. **Не цитируйте юрисдикционные законы, если только речь не идет о гражданстве другой страны.** Пример: Гражданский закон США: разд. 47 USC 553 Краткое описание: Несанкционированный прием кабельного телевидения.

**VII.    Запрос по жалобе.** Групповой иск. Поставьте отметку «Х» в этом поле, если вы подаете групповой иск в соответствии с Правилом 23, F.R.Cv.P. «Требование». В этом поле введите фактическую сумму претензии в долларах или укажите другое требование, например, предварительный судебный запрет. Требование присяжных. Отметьте это поле, чтобы указать, требуются ли присяжные.

**VIII.    Связанные дела.** Этот раздел JS 44 используется для ссылки на связанные незавершенные дела, если таковые имеются. Если есть связанные незавершенные дела, укажите номера дел и соответствующие имена судей для таких дел.

**Дата и подпись адвоката.** Поставьте дату и подпишите титульный лист гражданского дела.

**Приложение к титульному листу гражданского дела**

Раздел I(а) Ответчики:
Республика Казахстан;
Агентство Республики Казахстан по регулированию и развитию финансового рынка;
Агентство Республики Казахстан по противодействию коррупцией;
Агентство Республики Казахстан по финансовому мониторингу;
Комитет национальной безопасности Республики Казахстан;
Агентство Республики Казахстан по регулированию и развитию финансового рынка, председатель, Абылкасымова Мадина;
Агентство Республики Казахстан по регулированию и развитию финансового рынка, заместитель председателя, Кизатов Олжас;
Агентство Республики Казахстан по регулированию и развитию финансового рынка, представитель, Омарбеков Арман;
Джаксыбеков Адильбек.

Раздел I(с) Адвокаты истцов
Стивен Пик (J. Stephen Peek)
Эрика С. Медли (Erica C. Medley)
Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89,134 (Лас-Вегас, США)
(702) 669-4600

Тарик Мундия (Tariq Mundiya)
Джеффри Б. Корн (Jeffrey B. Korn)
Willkie Farr & Gallagher LLP 787 Seventh Avenue
New York, NY 10019 (Нью-Йорк, США)
(212) 728-8000

Майкл Дж. Готтлиб (Michael J. Gottlieb)
Willkie Farr & Gallagher
1875 K Street, NW
Washington, DC 20006 (Вашингтон, США)
(202) 303-1000

AO 440 (Ред. 06/12) Судебная повестка по гражданскому делу

# ОКРУЖНОЙ СУД США

Округа Невада

| | |
|---|---|
| Jysan Holding, LLC; Jusan Technologies LTD | ) |
| | ) |
| | ) |
| _____ | ) |
| *Истец(-цы)* | ) |
| против | ) Гражданское дело No. 2:23-cv-00247-JAD-VCF |
| Республика Казахстан и др. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Ответчик(-и)* | ) |

## СУДЕБНАЯ ПОВЕСТКА ПО ГРАЖДАНСКОМУ ДЕЛУ

Кому: *(Имя и адрес ответчика)*    Арман Омарбеков
Агентство Республики Казахстан по регулированию и развитию финансового рынка
21, Коктем-3
Алматы, 050040
Республика Казахстан

    Против вас выдвинут судебный иск.

    В течение 21 дня после вручения вам этой повестки (не считая дня, когда вы ее получили) — или 60 дней, если вы являетесь организацией в Соединенных Штатах, либо должностным лицом или сотрудником Соединенных Штатов, указанным в Федеральных правилах гражданского судопроизводства П. 12 (а) (2) или (3) — вы должны вручить истцу ответ на прилагаемый иск или ходатайство в соответствии с правилом 12 Федеральных правил гражданского судопроизводства. Ответ или ходатайство должны быть вручены истцу или его адвокату, чье имя и адрес указаны ниже:

| | | |
|---|---|---|
| Стивен Пик (Stephen Peek) | Тарик Мундия (Tariq Mundiya) | Майкл Дж. Готтлиб (Michael J. Gottlieb) |
| Эрика С. Медли (Erica C. Medley) | Джеффри Б. Корн (Jeffrey B. Korn) | Willkie Farr & Gallagher LLP |
| Holland & Hart LLP | Willkie Farr & Gallagher LLP | 1875 K Street, NW |
| 9555 Hillwood Dr., 2nd Fl. | 787 Seventh Ave. | Washington, DC 20006 |
| Las Vegas, NV 89134 | New York, NY 10019 | |

    Если вы не ответите, против вас будет вынесено решение по умолчанию о возмещении ущерба, требуемого в исковом заявлении. Вы также должны подать свой ответ или ходатайство в суд.

ДЕБРА К. КЕМПИ

**Секретарь**

    [подпись]

**(составлено) ЗАМЕСТИТЕЛЬ СЕКРЕТАРЯ**

**ДАТА**    22 февраля 2023 г.

[**Печать**: ОКРУЖНОЙ СУД США ОКРУГА НЕВАДА]

Ex. Page No. 242

AO 440 (Ред. 06/12) Судебная повестка по гражданскому делу (стр.2)

Гражданское дело No.  2:23-cv-00247-JAD-VCF

## РАСПИСКА О ПОЛУЧЕНИИ

*(Этот документ не нужно подавать в суд, если только этого не требует П.4(L) Фед. Прав. Судопроизводства США)*

Эта повестка *(кому - имя и должность)*  _____

была получена мною *(дата)*  _____.

☐ Я лично вручил(-а) повестку этому лицу в *(место)*  _____

_____  *(дата)*  _____  ;или

☐ Я оставил(-а) повестку по месту прописки или месту жительства лица у *(имя)*  _____

_____ , человека соответствующего возраста и вменяемости, проживающего(-ей) там,

*(дата)*  _____  и отправил(-а) копию на последний известный адрес лица; или

☐ Я вручил(-а) повестку *(кому - имя лица)*  _____ , которому

по закону назначено вручение процессуальных документов от имени *(название организации)*  _____

_____  *(дата)*  _____ ; или

☐ Я не вручил(-а) повестку, потому что  _____ ; или

☐ Другое *(уточнить):*

Моя оплата составляет $  _____ за транспортные расходы и $  _____ за услуги, что в сумме

составляет $  _____0.00_____ .

Я заявляю под страхом наказания за лжесвидетельство, что эта информация соответствует действительности.

Дата:  _____

_____
*Подпись судебного исполнителя*

_____
*Печатное имя и должность*

_____
*Адрес судебного исполнителя*

Дополнительная информация о попытке вручения и т.д.